# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: <br><br>FKF MADISON PARK GROUP OWNER, LLC <br><br>Involuntary Debtor. | Chapter 7 Case No. 10-11867 (KG) |
| IN RE: <br><br>JMJS 23RD STREET REALTY OWNER, LLC <br><br>Involuntary Debtor. | Chapter 7 Case No. 10-11868 (KG) |
| IN RE: <br><br>MADISON PARK GROUP OWNER, LLC <br><br>Involuntary Debtor. | Chapter 7 Case No. 10-11869 (KG) |
| IN RE: <br><br>SLAZER ENTERPRISES OWNER, LLC <br><br>Involuntary Debtor. | Chapter 7 Case No. 10-11870 (KG) <br><br>**Hearing Date: 6/29/10 at 4:30 p.m.** <br>**Proposed Objection Deadline: 6/28/10 at 4:00 p.m.** |

## MOTION OF iSTAR TARA LLC FOR AN ORDER AUTHORIZING THE EXTENSION OF SECURED, PROTECTIVE ADVANCES ON BEHALF OF DEBTORS UNDER BUILDING LOAN AGREEMENT DURING "GAP PERIOD" AND, TO THE EXTENT NECESSARY, GRANTING RELIEF FROM THE AUTOMATIC STAY

84455015v5

iStar Tara LLC ("iStar"), through its undersigned counsel, submits this motion for an order, pursuant to sections 105(a), 303(f), and 549 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the extension by iStar of protective advances on behalf of FKF Madison Group Owner, LLC ("FKF"), JMJS 23rd Street Realty Owner, LLC ("JMJS"), Madison Park Group Owner, LLC ("Madison Park") and Slazer Enterprises Owner, LLC ("Slazer," and together with FKF, JMJS, and Madison Park, the "Debtors") secured by the Debtors' real and personal property and, to the extent necessary, for an order pursuant to section 362(d) of the Bankruptcy Code, Fed. R. Bankr. P. 4001(a) and Del. Bankr. L.R. 4001-1, for relief from the automatic stay to permit iStar to make such protective advances. In support of its motion, iStar respectfully represents as follows:

## INTRODUCTION

1. Involuntary chapter 7 petitions were filed in this Court against each of the Debtors by alleged creditors other than iStar. The Debtors own, as tenants-in-common, real property consisting of approximately 80% of the condominium units in a 50-story condominium tower located at the south end of Madison Avenue in New York City (the "Building" or the "Mortgaged Property").[1] The construction of the Building is still underway, although a small number of units have been sold and are occupied by residents, and the costs of completing the project have been estimated as at least $60 million. The Debtors have committed numerous defaults under their loan agreements with iStar and, consequently, the Mortgaged Property is presently the subject of a foreclosure proceeding pending in New York state court. The New York court has appointed a receiver (the "Receiver") who is currently in control of the

---

[1] As used herein, the term "Building" shall refer to the entire condominium tower inclusive of residential units that have been sold to third-parties and are no longer owned by the Debtors, whereas the term "Mortgaged Property" shall refer only to those portions of the Building that the Debtors presently own and which remain subject to iStar's mortgages.

84455015v5

Mortgaged Property and the construction activities that have been taking place thereon. The day-to-day operation of the Building is conducted by a Managing Agent (as defined below) engaged by the Debtors. The Managing Agent is responsible for seeing that Building expenses are paid, including, without limitation, Building employee payroll, utilities, insurance and maintenance obligations.

2. The Debtors have had no source of cash with which to maintain the Building or pay the Managing Agent. However, while the Debtors' secured loans have been in default and prior to the petition date, iStar had exercised its rights under the loan documents to make protective advances on behalf of the Debtors in order to fund essential operation and maintenance costs and continuing construction and repairs of the Building. These amounts have been earmarked for, among other things, life-safety issues, such as keeping the electricity, phone, plumbing and other critical support systems operational. By the terms of the loan documents, such protective advances are secured by iStar's liens and mortgages on the Building and certain other property described below (the "Collateral"). As a result of the involuntary petitions filed against the Debtors, however, and until such time that orders for relief are entered or the cases are dismissed, there is uncertainty whether iStar is authorized to continue making such protective advances and whether such advances would be secured by iStar's Collateral.

3. Accordingly, iStar is requesting an order of this Court authorizing it to make certain protective advances during the "gap period" as detailed in the Critical Expenses Budget (as defined below) for the purpose of funding (i) essential operating and maintenance expenses for the Building, including payroll for staff, payment of the Managing Agent, utilities,

84455015v5

insurance, permits and warranty-related costs and (ii) emergency repairs and construction to ensure the safety of the Building and the health and welfare of the residents and the public.[2]

4. iStar is willing to make such protective advances as long as, consistent with the terms of the loan documents, such advances would constitute indebtedness under the loan documents and be secured by the Collateral. iStar submits that the Bankruptcy Code authorizes such secured advances during the gap period through a combination of section 303(f), which permits the debtor to continue business and dispose of its property as if the involuntary case had not been filed, and section 549(b), which safeguards transfers of the debtor's property during the gap period from avoidance to the extent the transferee provides value in return.

5. If the Court concludes that the automatic stay prevents iStar from making such protective advances, then iStar submits that its inability to make such advances constitutes a lack of adequate protection of iStar's interest in the Mortgaged Property and that relief from the stay to make such advances, secured by the Collateral, is warranted under section 362(d)(1) of the Bankruptcy Code in order to permit iStar to preserve the value of its Collateral.

## BACKGROUND

### A. The Debtors and the Mortgaged Property

6. The Debtors, as tenants-in-common, own certain real property in Manhattan, commonly known as the One Madison Park Condominium, located at 23 East 22nd Street, New

---

[2] iStar is only seeking authority to pay the costs and expenses listed on the Critical Expenses Budget (as defined below). The Receiver's professionals have taken pains to include only critical costs and expenses that are necessary to preserve the Building by ensuring the safety and welfare of the Building and its residents and the uninterrupted operation of Building's facilities. Subject to its reservation of rights below, iStar is not seeking authority to pay other costs and expenses associated with the Building, including costs and expenses that are otherwise entitled to status as protective advances under the Loan Documents and the Receiver Orders (each, as defined below).

84455015v5

York, New York (the "Mortgaged Property").[3] Slazer owns a 78% undivided interest in the Mortgaged Property, while FKF owns a 6% undivided interest, JMJS owns a 4% undivided interest, and Madison Park owns a 12% undivided interest.

7. The Mortgaged Property consists of approximately 80% of the condominium units in a luxury residential apartment tower (the "Building") facing 23rd Street that is approximately 50 stories tall, construction of which is still underway. Presently, temporary certificates of occupancy have been issued for the cellar, first floor lobby, mezzanine and residential floors 6-26 and 28-39 of the Building.[4]

8. Each of the Debtors is the subject of an involuntary chapter 7 petition filed with the Court on June 8, 2010 (the "Petition Date"), by certain alleged creditors of the Debtors (not including iStar). The time within which the Debtors must respond to the involuntary petitions has not expired and no order for relief has been entered in any of the Debtors' cases.

**B.    The Loans and Events of Default**

9. On or about November 16, 2007, SFT I Inc. ("SFT"), iStar's predecessor-in-interest, advanced loans to the Debtors in the maximum aggregate principal amount of $238,500,000.00 (the "Loans"), consisting of: (i) a loan in the principal amount of up to $70,943,079.00 (the "Senior Loan"), the proceeds of which were to be used primarily to satisfy existing indebtedness encumbering the Mortgaged Property; (ii) a loan in the principal amount of up to $35,025,505.00 (the "Project Loan"), the proceeds of which were to be used to pay certain

---

[3] The Mortgaged Property is more particularly described in Exhibit A annexed to the Verified Amended Complaint filed by iStar against the Debtors and other defendants named therein on March 4, 2010 (the "Amended Complaint"), in the Supreme Court of the State of New York – County of New York ("New York Supreme Court"), seeking, among other things, to foreclose the Mortgaged Property. A copy of the Amended Complaint is annexed hereto as Exhibit A.

[4] See Affidavit of John F. Kubicko in Support of Plaintiff's Ex Parte Application for Appointment of Receiver in Mortgage Foreclosure Action, sworn to on February 18, 2009 (the "Kubicko Affidavit"), at ¶ 33. A copy of the Kubicko Affidavit, without exhibits, is annexed hereto as Exhibit B.

costs pertaining to the property other than costs of improvement, and (iii) a loan in the principal amount of up to $132,531,416.00 (the "Building Loan"), the proceeds of which were to be used to pay or reimburse the Debtors for costs of improvement incurred in connection with the construction of the One Madison Park Condominium project.

11. The Building Loan was made pursuant to a Building Loan and Security Agreement (the "Building Loan Agreement"), the Senior Loan was made pursuant to a Senior Loan and Security Agreement, and the Project Loan was made pursuant to a Project Loan and Security Agreement, each dated as of November 16, 2007, between SFT and the Debtors (collectively, and, as amended, the "Loan Agreements"). On or about March 1, 2009, SFT assigned the Loan Agreements to iStar. The Loan Agreements were subsequently modified by agreement, dated as of June 24, 2009, among the Debtors and iStar to amend certain provisions and to increase the Project Loan to a principal amount of up $47,159,585.00 and decrease the Building Loan to a principal amount of up $127,633,643.00.

11. As more fully described in the Amended Complaint, all of the Debtors' borrowings under the Loan Agreements are secured by liens upon the Collateral which consists of the Mortgaged Property, assignments of leases and rents, and security interests in all or substantially all of the Debtors' fixtures and personal property, including all accounts, fixtures and personalty, general intangibles, inventory and other collateral constituting a part of the Mortgaged Property. (Amended Complaint ¶¶ 33-49; 90-91.)

12. As of the Petition Date, there remained due and owing to iStar from the Debtors under the Loan Agreements and related notes and Collateral documents (collectively, the "Loan Documents"): (i) outstanding principal in the approximate amount of $208 million, and (ii) interest and fees, not including legal fees, in the approximate amount of $26.25 million.
6

13. The Debtors have committed numerous breaches of their obligations under the Loan Documents, which breaches amount to Events of Default thereunder, including: (a) the failure to pay each monthly installment of interest that was due between October 1, 2009 and June 1, 2010; (b) incurring indebtedness that is not Permitted Indebtedness (as defined in the Loan Documents); (c) transferring a portion of the Mortgaged Property without iStar's consent; and (d) failing to keep the Loans "in balance" and failing to remit to iStar cash in the amount necessary to restore the Loans to "in balance" status notwithstanding due demand therefor.

14. In consequence of such Events of Default, iStar, by notice of acceleration dated February 18, 2010, declared immediately due and payable all of the Debtors' obligations under the Loan Documents. As a result, there is now due and owing to iStar approximately $234 million in outstanding principal, interest, charges and fees.

C. **The Foreclosure Action and Receiver Order**

15. On February 18, 2010, iStar commenced an action to foreclose the mortgages on the Mortgaged Property, and for related relief, in the New York Supreme Court (the "Foreclosure Action"), naming each of the Debtors, as well as numerous other actual and potential claimants with respect to the Mortgaged Property, as defendants. On March 4, 2010, iStar amended its complaint in the Foreclosure Action by filing the Amended Complaint.

16. After commencing the Foreclosure Action, iStar discovered that the Debtors and their principals engaged in gross misconduct, including a scheme whereby numerous purchase agreements for condominium units in the Building were entered into between the Debtors and their affiliates and/or other third parties without iStar's knowledge or approval.[5] The purchase

---

[5] See Affirmation of Matthew D. Parrott in Further Support of Plaintiff's Application for Appointment of Receiver in Mortgage Foreclosure Action, dated April 6, 2010 (the "Parrott Affirmation"), a copy of which, without exhibits, is annexed hereto as Exhibit C.

7

rights under these undisclosed agreements were then apparently assigned as collateral for millions of dollars in loans to the Debtors and their affiliates, the proceeds of which are unaccounted for. (Parrott Affirmation ¶ 3.) Moreover, the Debtors and their affiliates apparently defaulted under these loans and numerous lawsuits have been filed seeking specific performance of the unauthorized purchase agreements, in some instances by multiple parties seeking possession of the very same condominium units.[6]

17. Based on these extreme circumstances, which revealed the Debtors' principals to be entirely untrustworthy, iStar sought immediate appointment of a receiver to take control of the Mortgaged Property in order to prevent waste and dissipation of iStar's Collateral and to permit the completion of construction under responsible management. By order entered May 5, 2010 (the "May Receiver Order" and, together with other orders related to the receivership, the "Receiver Orders"), the New York Supreme Court appointed Jonathan H. Newman as the Receiver with expanded powers to preserve and control the Mortgaged Property.[7]

### D. Protective Advances under Building Loan Agreement and Receiver Order

18. Under the Building Loan Agreement, if the Debtors fail to make any payment or perform any covenant under the Loan Documents or if any Event of Default exists, iStar is authorized to make such payment or expend funds to perform such covenant or to cure any Event of Default. Such "protective advances" constitute secured indebtedness under the Loan Documents. Specifically, section 11.14 of the Building Loan Agreement provides

> Any amounts expended by [iStar] in connection with such action shall constitute additional advances hereunder, the payment of

---

[6] In addition, upon information and belief, there is serious dissention among the Debtors' principals, Ira Shapiro and Marc Jacobs, and the former may be under investigation for fraud by the District Attorney for Rockland County, New York . (Parrott Affirmation ¶ 24.)

[7] A copy of the May Receiver Order is annexed hereto as Exhibit D.

which is additional Indebtedness, secured by the Loan Documents and shall become due and payable upon demand by [iStar], with interest at the Default Rate from the date of disbursement thereof until fully paid.

19. Section 3.7 of the Building Loan Agreement also authorizes iStar, upon the occurrence of an Event of Default, to take any steps necessary to complete construction of the project and "through an advance of Loan proceeds, make payments due for the cost of development, design and Construction directly to any Contractor, any Subcontractor ... or any other party owed by [the Debtors]." Section 3.7 further provides that "[a]ll such action shall be at [the Debtors'] sole cost and expense, such sums being secured by the Building Loan Mortgage and the other Loan Documents." In addition, section 7.1(l) of the Building Mortgage (as defined in the Kubicko Affidavit) expressly authorizes iStar to make repairs, alterations, additions and improvements as it deems necessary or desirable. (Kubicko Affidavit ¶ 36.)

20. As a result of the Events of Default under the Loan Documents and the acceleration of the Loans, the Debtors have had no source of funding to maintain the Mortgaged Property or to continue construction. Consequently, and consistent with iStar's rights to make protective advances under the Building Loan Agreement, the Receiver Orders provide that iStar shall make protective advances to the Receiver in order to (i) "safeguard the Mortgaged Property and ensure staffing at the Mortgaged Property remains at levels adequate to provide all Building residents all necessary services as may be required by the Offering Plan and governing law," (ii) compensate the managing agent of the Mortgaged Property, (iii) compensate construction and architectural consultants, (iv) compensate legal counsel, (v) complete and/or develop the Mortgaged Property and, (vi) compensate the Receiver. (May Receiver Order, at 4-8.)

E. **Funding of Critical Expenses**

1. **Existing Working Budget**

21. In order to fund essential recurring expenses of the Mortgaged Property, iStar and the Receiver agreed that iStar would fund monthly protective advances to the Receiver under the Building Loan Agreement in accordance with a budget (the "Working Budget") prepared by Andrews Building Co., the managing agent (the "Managing Agent") of the Mortgaged Property.[8] The Working Budget provides for the payment of (i) the Managing Agent's fee and certain other limited administrative expenses, (ii) operating expenses, including building and liability insurance, supplies, exterminating, and uniforms, (iii) payroll expenses for Building employees, including doormen and the superintendent, (iv) service and maintenance contracts, and (v) utility expenses, including electricity and telephone. The Working Budget covers the period from June 2010 to May 2011 and provides for the funding of monthly expenses in the approximate average amount of $130,000.

22. Prior to the Petition Date, iStar provided funding to the Receiver for June 2010 expenses under the Working Budget in the amount of $124,610. Certain of these funds were disbursed by the Receiver after the Petition Date or are presently held by the Receiver. Since the Petition Date, iStar has not provided any additional funding to the Receiver or otherwise for the benefit of the Debtors.

2. **Emergency Repair and Construction Expenses**

23. As discussed (supra, at ¶ 7), the Building, while substantially completed and partially occupied, is still under construction. The Debtors have retained Bovis Lend Lease LMB, Inc. ("Bovis") as construction manager for the construction of the Building and, since the

---

[8] A copy of the Working Budget is annexed hereto as Exhibit E.

84455015v5

Loans were accelerated, iStar has been making protective advances under the Building Loan Agreement to the Receiver in order to fund the continued construction of the Building. Bovis, in turn, uses such funds to pay itself and various subcontractors for their work performed at the site.

24. As a result of the filing of involuntary petitions against the Debtors and the automatic stay imposed, iStar has ceased continued funding of construction of the Building. However, Bovis has informed iStar that certain work must proceed in order to prevent a serious threat to the health and safety of the Building's residents as well as the general public. For example, the glass curtain wall for the top of the Building is under construction and must be completed to ensure that all of the glass panels are secured. In fact, iStar is informed that one of the panels on the glass curtain wall broke and the shattered glass fell on an adjacent roof. Bovis has also recommended that an investigation and repair of certain leaks in the Building's roof be performed to prevent any additional problems or damage in the Building.

### 3. Immediate Funding Requirements during Gap Period

25. As set forth in the accompanying affidavit of David J. Spector in support of this motion, Mr. Spector, whose firm serves as the Receiver's project management and construction consultant, prepared the budget annexed thereto as Exhibit A (the "Critical Expenses Budget") as an estimate of the operating and maintenance expenses that must be funded during the remainder of June and July 2010 in order to ensure the safety and welfare of the Building and its residents and the uninterrupted operation of Building's facilities. The Critical Expenses Budget includes (i) the Building's monthly expenses for July 2010 that were to be paid under the Working Budget, (ii) additional expenses to be paid through the Managing Agent, including essential maintenance of the Building's heating, cooling and fire safety systems, (iii) payments to be made

to Bovis in order to fund emergency construction and repairs, and (iv) fees to renew various building permits and temporary occupancy certificates.[9]

## RELIEF REQUESTED

26. By this motion, iStar requests entry of an order pursuant to sections 105(a), 303(f), 549, and, to the extent necessary, 362(d) of the Bankruptcy Code, and Fed. R. Bankr. P. 4001(a) and Del. Bankr. L.R. 4001-1, (i) authorizing iStar to make protective advances under the Building Loan Agreement on behalf of the Debtors in accordance with the Critical Expenses Budget through the Receiver, the Managing Agent or directly to the Debtors' contractors, (ii) authorizing the granting of liens and security interests in the Debtors' property as provided in the Loan Documents to secure all protective advances made by iStar pursuant to such order, (iii) determining that all protective advances under the Critical Expenses Budget made pursuant to such order constitute value given after the commencement of these cases but before the orders for relief in exchange for the granting of liens and security interests in the Debtors' property, as permitted by section 549(b) of the Bankruptcy Code, (iv) determining that all disbursements of funds by the Receiver after the Petition Date in payment of expenses set forth on the Working Budget or the Critical Expenses Budget are or were necessary to preserve the Building, and (v) in the event the Court determines that the automatic stay may prevent iStar from making the protective advances secured by the Collateral, modifying the automatic stay under section 362(d)(1) of the Bankruptcy Code in order to permit such protective advances and to permit liens

---

[9] Certain of the expenses set forth on the Critical Expenses Budget may include some relatively small pre-petition amounts. Such costs relate to services that are critical and would jeopardize the residents and/or the public if lost even temporarily (e.g., elevator service, fire alarm maintenance) Moreover, the costs in paying personnel to try to obtain a pre-petition and post-petition breakdown would likely exceed any temporary savings. In addition, as discussed below, iStar submits that the right to freely continue operation of the Debtors' business during the "gap period" pursuant to section 303(f) of the Bankruptcy Code includes the authority to pay pre-petition debts.

and security interests to attach against the Debtors' property securing the advances made pursuant to such order.

## BASIS FOR RELIEF

27. Before making protective advances during the period between the filing of the involuntary petition in these cases and the entry of orders for relief (or dismissal), commonly known as the "gap period," iStar requires assurance in the form of an order of this Court that its advances are authorized and will be secured by the Debtors' property as provided under the Loan Documents without the risk of avoidance. In addition, iStar requires assurance that the making of protective advances in exchange for liens and security interests cannot be challenged as a violation of the automatic stay. As discussed below, there is ample authority under the Bankruptcy Code to grant the relief requested in this motion.

A. **Authority under Sections 303(f) and 549 of the Bankruptcy Code**

28. Section 303(f) of the Bankruptcy Code, provides that "any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced." 11 U.S.C. § 303(f); see In re Williams Contract Furniture, Inc., 148 B.R. 799, 803 (Bankr. E.D.Va. 1992) (During the gap period, "[t]here are no restrictions on the [debtor's] operation[s] similar to those found in § 363 unless the court issues an order conditioning the operation of the business."); 2 COLLIER ON BANKRUPTCY ¶ 303.24[1] (15th ed. rev. 2010) (hereinafter "Collier") ("Section 303(f) authorizes the debtor to operate the debtor's business during the gap.")

29. Although 303(f) permits the debtor to do business freely during the gap period, under section 549(a)(2)(A) of the Bankruptcy Code, a transfer of property of the estate during the gap period that is authorized *solely* under 303(f) may subsequently be avoided. However,

13

transfers of the debtor's property during the gap period may not be avoided if one of several conditions are satisfied, two of which are applicable here. First, under section 549(a)(2)(B) of the Bankruptcy Code, if the transfer is authorized by the court it may not be avoided. Vogel v. Russell Transfer, Inc., 852 F.2d 797, 800 (4th Cir. 1988); Collier ¶ 303.24[3] ("Transfers authorized by the bankruptcy court, such as the granting of a security interest, would also not be within the avoiding powers of a trustee."). Second, "section 549(b) protects from avoidance transfers made by an alleged debtor during the involuntary gap to the extent that they were made for value given after the commencement of the case in exchange for the transfer." Collier ¶ 303.24[2]; see In re Roxy Roller Rink Joint Venture, 73 B.R. 521, 525 (Bankr. S.D.N.Y. 1987) ("[Section 549(b)] protects persons who receive transfers of property of the estate during the involuntary gap period to the extent that post-petition value is given.")

30. Applying sections 303(f) and 549 of the Bankruptcy Code, several courts have upheld the validity of transfers, including the granting of security interests in the debtor's property, to a debtor's attorney during the gap period. For example, in In re Shah Int'l, Inc., 94 B.R. 136, 136-37 (Bankr. E D Wis. 1988), a gap debtor sought and received approval for securing the wages of its attorneys with a mortgage on its property. See also In re Quincy Air Cargo, Inc., 155 B.R. 193, 197 (Bankr. C.D. Ill. 1993) (approving payment of attorney's fees from retainer granted during gap period).

31. In the Roxy Roller Rink case, the court declined to authorize secured financing to the debtor during the gap period pursuant to section 364 of the Bankruptcy Code – determining that section 364 as well as section 363 applied only after an order for relief is entered – but stated that section 549(b) of the Bankruptcy Code --

> protects persons who receive transfers of property of the estate
> during the involuntary gap period to the extent that post-petition

14

84455015v5

> value is given .... Thus, the grant of a security interest in the lease
> by the Debtor to [lender] in exchange for a loan would not have
> been a voidable transfer even if no court order was obtained.

73 B.R. 521, 525-26 (internal citations omitted). Nonetheless, the court suggested that "additional protection would be afforded by a court order." Id. at 526, n.2 (citing 11 U.S.C. § 549(a)(2)(B)).

32. Under the Roxy Roller Rink view, section 549 provides a clear exception to the automatic stay of section 362 of the Bankruptcy Code. See *J. Mullin, Bridging the Gap: Defining the Debtor's Status During the Involuntary Gap Period*, 61 U. Chi. L. Rev. 1091, 1109 (Summer 1994) (hereinafter "Mullin"). During the gap period a debtor should be able to transfer property, including the grant of a security interest in its property, notwithstanding the limitations of section 362, and a creditor should obtain all of the benefits of being a secured lender. Mullin, at 1097 (arguing that section 549(b) must supersede section 362 because they are both facially valid Bankruptcy Code provisions that cannot be reconciled. Id. at 1097, n.27).

**B.   The Protective Advances Constitute Value Under Section 549(b).**

33. The proposed protective advances requested in this motion fall squarely within the safe harbor of section 549(b) of the Bankruptcy Code. Preliminarily, funds will be advanced by iStar on behalf of the Debtors after the Petition Date in exchange for the transfer of liens and security interests in the Debtors' property equal to the amount of such advances. That transaction, under the plain language of the Bankruptcy Code, satisfies the requirements of section 549(b).

34. Nevertheless, the application of the protective advances under the Critical Expenses Budget will provide value to the estate by funding essential ongoing operating expenses and emergency construction and repairs to ensure the safety of the Building. For example, there can be little question that the estates' property will be jeopardized if payroll for

the staff of the Building is halted and doormen, janitors, the superintendent and others abandon their duties, or if utilities are turned off or insurance coverage lapses.[10] Even more obviously, funding for emergency construction and repairs during the gap period, such as for completion of the glass curtain wall, is required to ensure the safety of the Building and the health and welfare of the residents and the public.

### C. iStar is an Appropriate Party to Request Authority to Make Protective Advances on behalf of the Debtors.

35. Although section 303(f) of the Bankruptcy Code addresses the debtor's authority to "continue to use, acquire or dispose of property,"[11] as the Debtors' secured lender under the Building Loan Agreement, iStar has express contractual authority to make advances on behalf of the Debtors, which are to be treated as secured indebtedness under the Loan Documents. Under the present circumstances, where Events of Default have occurred, the Loans have been accelerated and the Receiver has been appointed, the Debtors should not be permitted to oppose the protective advances.

36. Notably, iStar has been advised that the Receiver, who remains in possession of the Mortgaged Property subject to section 543 of the Bankruptcy Code, supports the relief requested herein. Moreover, the Receiver Orders already provide for iStar to make protective advances, such as those requested herein, for the protection and preservation of the Mortgaged Property.

---

[10] Arguably the utility providers and the insurance carriers would be stayed by virtue of the automatic stay from terminating services or coverage for the Building, but this is not a risk that iStar is, or any other creditor should be, willing to take. Even a temporary loss of power in a 50-story building can create a highly dangerous situation.

[11] Of course, section 303(f) is also written in the passive voice – providing that "any business of the debtor may continue to operate" – and, in that sense, is not limited to the debtor's authority to take action during the gap period.

37.     Finally, while iStar does not anticipate that the Debtors will object to the motion, as a practical matter, given the apparent fraud and the chaotic state of affairs in which the Debtors' principals find themselves (See Parrott Affirmation ¶¶ 24-31), the Debtors cannot reasonably be expected to protect the Mortgaged Property without the protective advances.

### D.     Disbursements by the Receiver after the Petition Date Are Necessary to Preserve the Building.

38.     As discussed above, prior to the Petition Date, iStar made a protective advance to the Receiver in the amount of $124,610 in accordance with the Working Budget. Certain of these funds were not disbursed by the Receiver in payment of Building expenses until after the Petition Date and some portion may still be held by the Receiver but will be used to satisfy Building expenses under either the Working Budget or the Critical Expenses Budget. In addition, the Receiver will make additional disbursements during the gap period in accordance with the Critical Expenses Budget to the extent that iStar makes additional protective advances. All such disbursements that have been made, or will be made, by the Receiver after the Petition Date in payment of Building expenses clearly were or will be necessary to preserve the value and ensure the safety of the Building and, therefore, comply with section 543(a) of the Bankruptcy Code.

### E.     Relief From the Automatic Stay Should be Granted, to the Extent Necessary.

39.     As discussed above, because the safe harbor of section 549(b) applies to the transfer of liens and security interests in exchange for the post-petition protective advances, iStar submits that relief from the automatic stay should not be required. Nonetheless, some courts

17

84455015v5

have taken a more restrictive view. See In re BankVest Capital Corp., 2003 WL 1700978, *6 (D. Mass. 2003); In re E.D. Wilkins Grain Co., 235 B.R. 647, 650-51 (Bankr. E.D. Cal. 1999).[12]

40. To the extent stay relief is required, it should be granted here pursuant to section 362(d)(1) of the Bankruptcy Code, which provides,

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section ... (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

See In re Price, 370 F.3d 362, 373 (3d Cir. 2004) (In bankruptcy, "[a] secured creditor retains the right to 'adequate protection' of its collateral, which means it is entitled to have the value of its collateral maintained at all times, and it can obtain relief from the automatic stay and take back its collateral at any time if that interest is not adequately protected or for other 'cause.'"); In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) aff'd, 91 F.3d 553 (3d Cir. 1996) ("[A] party can be granted relief from the stay if his interest is not adequately protected; if that request for relief from stay is not granted, and the value of the collateral is declining, adequate protection may be required.").

41. "Cause" exists to lift the stay to permit extension of the protective advances. Absent the proposed protective advances under the Critical Expenses Budget, iStar's interest in the Mortgaged Property as well as the health and welfare of the existing residents and the public will suffer. The protective advances are necessary to adequately protect the value of iStar's Collateral. Relief from the automatic stay is clearly appropriate in these cases for the limited purpose of allowing iStar to make the protective advances and for liens and security interests to

---

[12] The "prevailing view," is that supported by the Roxy Roller Rink court, however, in which gap period transfers that fall within the safe harbor of section 549(b) are exempt from the automatic stay. Mullin, 61 U. Chi. L.R., at 1108.

attach to the Debtors' property, as provided under the Loan Documents and the Receiver Orders, to the extent of the protective advances authorized by the Court.

## RESERVATION OF RIGHTS

42. iStar makes this application for the purpose of seeking authority to extend the protective advances to meet the Debtors' critical costs and expenses described herein, and reserves all rights to seek any additional or further relief, including, without limitation, approval for the payment of additional costs and expenses not listed on the Critical Expenses Budget, an order transferring venue of this case, or further relief under sections 105, 303, 362, 363, 364, 543 or 549 of the Bankruptcy Code.[13]

## CONCLUSION

43. For all the foregoing reasons, iStar respectfully requests that the Court enter an order, in the form annexed hereto, (i) pursuant to sections 105(a), 303(f), and 549, authorizing the extension of protective advances under the Building Loan Agreement in accordance with the Critical Expenses Budget, which advances shall be secured by the Debtors' real and personal property, (ii) to the extent necessary, granting relief from that automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code, and (iii) for such other relief as is necessary or appropriate.

---

[13] In addition, Bovis reserves all of its rights under its AIA construction management contract with the Debtors' agent, Slazer Enterprises LLC, dated June 12, 2007 (and all documents incorporated by reference therein) (collectively, the "AIA Agreement"), and requests that all such rights be preserved and unimpaired by the entry of an order approving this motion and any actions taken pursuant thereto.

Dated: June 24, 2010  
      Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Marc J. Phillips*

Jeffrey C. Wisler (Del. Bar No. 2795)  
Marc J. Phillips (Del. Bar No. 4445)  
The Nemours Building  
1007 N. Orange Street  
P.O. Box 2207  
Wilmington, Delaware 19899  
(302) 658-9141

- and -

Jeff J. Friedman (admitted *pro hac vice*)  
Matthew D. Parrott (admitted *pro hac vice*)  
Arthur S. Linker (admitted *pro hac vice*)  
Matthew W. Olsen (admitted *pro hac vice*)  
KATTEN MUCHIN ROSENMAN LLP  
575 Madison Avenue  
New York, New York 10022  
212-940-8800

*Attorneys for iStar Tara LLC*

#788026v1

84455015v5