## EXHIBIT A

**Debtor in Possession Loan Commitment Letter**

**New One Madison Park Member I, LP**
590 Madison Avenue
26th Floor
New York, NY 10022

**Debtor-in-Possession Loan Commitment Letter**

November 18, 2010

FKF Madison Park Group Owner, LLC
JMJS 23rd Street Realty Owner, LLC
Madison Park Group Owner, LLC
Slazer Enterprises Owner, LLC
230 Congers Road
New City, NY 10956
Attn.: Ira Shapiro

Dear Mr. Shapiro:

This letter (the "<u>DIP Loan Commitment Letter</u>") is intended to be a commitment to lend to the Borrowers (as defined herein) on the terms set forth below and subject to satisfaction of the conditions precedent set forth below. This document is delivered to you with the understanding that neither it nor its substance shall be disclosed, without the prior written consent of the DIP Lender (as defined herein), to any third party, other than the Sponsor Creditors[1], and except in connection with the filing of a motion seeking approval of the DIP Advances (as defined herein) in the Bankruptcy Cases (as defined herein) when such cases are converted to voluntary Chapter 11 Cases (as defined below).

| | |
|---|---|
| **Borrowers:** | FKF Madison Park Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC and Slazer Enterprises Owner, LLC, as debtors and debtors in possession (each a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>") in Case Nos. 10-11867 (KG) through 10-11870 (KG) pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") pursuant to involuntary Chapter 7 filings on June 8, 2010 (the "<u>Bankruptcy Cases</u>") and the order(s) for relief and converting the Bankruptcy Cases to cases under Chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") to be entered by the Bankruptcy Court (the "<u>Conversion Order</u>") and thereby creating the estates of the Debtors pursuant to Section 541 of the Bankruptcy Code (the "<u>Estates</u>"). The date upon which the Conversion Order is entered by the Bankruptcy Court shall be referred to as the "<u>Conversion Date</u>." |
| **DIP Lender:** | New One Madison Park Member I, LP, including its assignees and participants, shall be the Lender providing |

---

[1] The Sponsor Creditors are Mad 52, LLC, Stephen Kraus and Mitchell Kraus.

the Loan Advances as contemplated hereby (the "<u>DIP Lender</u>").

**Loan Advances:**

Pursuant to the terms and conditions of this Commitment Letter and the DIP Orders (as defined below), the DIP Lender shall make advances (the "<u>Loan Advances</u>") (as described below) to the Borrowers in an aggregate amount up to approximately one million dollars ($1,000,000), with such Loan Advances to be used only for Approved Expenses (as defined below) in accordance with the Use of Proceeds section hereof.

An amount up to approximately two hundred fifty thousand dollars ($250,000) and approved by the Bankruptcy Court in the interim order (the "<u>Interim DIP Order</u>"), and which amount shall be reasonably acceptable to the DIP Lender, shall be available during the period from the date of entry of the Interim DIP Order by the Bankruptcy Court through the date of entry of the final order by the Bankruptcy Court (the "<u>Final DIP Order</u>", and together with the Interim DIP Order, the "<u>DIP Orders</u>"), and the remainder of Loan Advances shall be available after entry of the Final DIP Order, and the Interim DIP Order and the Final DIP Order shall, in each case, approve the Loan Advances and the other obligations of the Borrowers hereunder and under the DIP Orders to the DIP Lender (collectively, the "<u>DIP Obligations</u>"), and the terms and conditions set forth herein, all in form and substance satisfactory to the DIP Lender in its sole and absolute discretion. Upon entry of the Interim DIP Order, the Debtors shall open a new deposit account, at a bank acceptable to DIP Lender, in which the proceeds of the Loan Advances shall be held and from which disbursements in accordance with the Approved Budget shall be made. The Borrowers will be jointly liable for the full amount of the DIP Obligations and each Borrower waives all rights of indemnification or contribution against the other Borrowers until such time as the DIP Obligations are indefeasibly paid in cash in full.

No Loan Advances shall be made if there is an Event of Default that has occurred and has not been cured or waived.

**Material Adverse Effect:**

Any material adverse effect in the business, assets, operations, results of operations or financial or other condition or prospects of the Property or the Borrowers, or the occurrence of any fact or circumstance which materially and adversely affects the rights, remedies or

benefits of, or conferred by, the transactions contemplated herein or hereby, including, without limitation, strike, lockout, war, terrorism, act of God, fire or other casualty, unusually adverse weather conditions, inability to obtain labor or materials or governmental restriction or other act or thing.

**Maturity Date:**

All DIP Obligations shall be due and payable, and repaid in full, in cash, on the date (the "Maturity Date") that is the first to occur of: (i) four (4) months from the Conversion Date; (ii) the effective date of a plan of reorganization confirmed in one or more of the Chapter 11 Cases; (iii) conversion or dismissal of one or more of the Chapter 11 Cases; (iv) appointment of a trustee in one or more of the Chapter 11 Cases; or (v) the occurrence of an Event of Default under, or as otherwise set forth in, the DIP Orders.

**Use of Proceeds:**

Proceeds from Loan Advances shall be used exclusively for funding the following expenses (collectively, the "Approved Expenses" which are set forth in amount on the budget (the "Approved Budget") annexed hereto as Exhibit A): (x) normal operating expenses consistent with past practices, including (i) insurance (ii) payroll expenses, (iii) operating service and maintenance, and (iv) utility expenses, including electricity, gas and telephone; and (y) fees of the United States Trustee and allowed professional fees of the Borrowers and any official committee of unsecured creditors (the "Committee") appointed in the Chapter 11 Cases in amounts not to exceed that set forth in the Approved Budget and accrued and unpaid prior to the occurrence of an Event of Default (as defined herein), and, in the case of allowed professional fees of the Borrowers, the lesser of $75,000 and the remainder of the amount set forth in the Approved Budget for fees and expenses of the Borrowers' professionals and not expended as of the occurrence of such Event of Default. The Borrowers will be permitted variances of up to 110% for each line item on the Approved Budget, exclusive of restructuring, legal and professional fees, and shall be permitted to carry forward from a prior month to the next succeeding month any unused portion of the aggregated actual amounts attributable to the prior month. None of the proceeds from Loan Advances, the collateral securing the DIP Loan or the Carve-Out may be used by the Borrowers or the Committee to investigate or challenge the validity, perfection, priority, extent or enforceability of the DIP obligations under the Commitment Letter and the DIP Orders (the "DIP Obligations"), the liens securing the DIP Obligations, or the claims of the DIP Lender with respect

to the foregoing.

**Loan Advances/Approved Budget:**

Loan Advances shall occur no more frequently than once every month and shall be in a minimum amount of one hundred thousand dollars ($100,000) unless less than one hundred thousand dollars ($100,000) remains to be funded hereunder, and shall not exceed for each month the amount set forth in the Approved Budget. During the period from the entry of the Interim Order until the Final Order becomes a final order, Loan Advances shall not exceed two hundred fifty thousand dollars ($250,000). The Interim DIP Order and the Final DIP Order approving the DIP Obligations shall include the Approved Budget.

No later than the third (3rd) business day of every week commencing with the week following the week of the approval of the Interim DIP Order, the Borrowers shall deliver: (i) a variance report detailing: (x) the cash expenditures for the prior week and as compared to the Approved Budget for that week; (y) the cumulative cash expenditures for all of the prior weeks since the Conversion Date and a comparison to the Approved Budget for such weeks; and (z) a narrative explanation of the variances between the actual weekly expenditures and the budgeted weekly expenditures; and (ii) an updated weekly cash flow forecast for the then remaining period of the Approved Budget (the "Updated Budget"), consistent with the Approved Budget (collectively, the "Weekly Reports"). The Weekly Reports shall be subject to the review and approval by the DIP Lender, which approval shall not be unreasonably withheld. Subject to the approval of the DIP Lender, which shall not be unreasonably withheld and which shall not require any further Bankruptcy Court approval, the Updated Budget shall be deemed the Approved Budget.

**Collateral and Priority:**

To secure all DIP Obligations of the Borrowers to the DIP Lender, the DIP Lender shall:

1) receive and be entitled to, pursuant to Section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provisions of the Bankruptcy Code (a "Superpriority Claim");

2) receive and have liens, security interests, mortgages,

and encumbrances (the "DIP Liens") as follows:

(i) valid, properly perfected, first priority senior liens on all now existing and hereafter acquired (whether before or after the Petition Date) assets of Borrowers, including, without limitation, all of Borrowers' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, including without limitation, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, development orders, environmental permits or other approvals to develop any real property, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, tax refunds, and all rights, claims, and other causes of action of the Borrowers and the Borrowers' Estates (including any actions asserted by the Borrowers or any subsequently appointed trustee or representative of the Borrowers' Estates under any section of the Bankruptcy Code, and in each case, all proceeds resulting therefrom, excluding, however, avoidance actions ("Avoidance Actions") under sections 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code) (collectively, the "Collateral") pursuant to section 364(d)(1) of the Bankruptcy Code, with such liens securing the DIP Obligations to prime and be deemed senior to all other liens maintained with respect to any of Borrower's now existing or hereafter acquired property; provided, however, if it is determined that the Borrowers have an interest in any commercial tort claims or tax refunds that is property of the Borrowers' Estates, the proceeds of such interests shall be part of the Collateral; and

(ii) perfected, first-priority senior liens, pursuant to Section 364(c)(2) of the Bankruptcy Code, on that portion of the Collateral that is unencumbered property of Borrowers.

In each case, the Collateral shall also include any and all rents, issues, products, offspring and profits generated by any item of Collateral, without the necessity of any further action or any kind or nature the DIP Lender in order to claim or perfect such interests.

The DIP Orders shall provide that the DIP Liens are valid, binding and enforceable without the need for any further documentation or filing, but authorize the DIP Lender to prepare (and order the Borrowers to execute), all pledges, liens, security interests and mortgages as reasonably required by the DIP Lender, which shall be on terms satisfactory to the DIP Lender.

**Interest Rate:**  Interest on the DIP Obligations shall accrue at a variable rate, adjusted monthly, equal to the Prime Rate plus fifty (50) basis points (0.50%), and be paid payable monthly in arrears calculated on the basis of actual days elapsed in a year of three hundred and sixty (360) days. The Prime Rate shall be the prime rate as reported in <u>The Wall Street Journal</u>. The default rate of interest will be two percent (2%) higher than the rate otherwise payable.

**Due Diligence Expenses:**  All out-of-pocket expenses incurred prior to the Closing Date to provide the contemplated financing, including without limitation: reasonable legal fees, expenses, closing costs, title fees, appraisal fees, UCC search and recording fees, costs for credit reports, and collateral auditing examination costs incurred by the DIP Lender in connection with the transactions contemplated herein, are to be paid by Borrowers upon funding of first Loan Advance under the Interim DIP Order; provided, however, such expenses incurred prior to the Closing Date shall not exceed twenty-five thousand dollars ($25,000).

Borrowers acknowledge that the DIP Lender will incur significant costs and expenses in order to conduct due diligence, seek approval for, and engage in documentation of, the transactions contemplated hereby. By acceptance of this proposal, Borrowers acknowledge and agree that twenty-five thousand dollars ($25,000) represents a reasonable payment to the DIP Lender for such initial due diligence, and documentation, and that the DIP Lender's willingness to conduct such due diligence and engage in such documentation provides an actual and material benefit to the Borrowers by ensuring that the Borrowers have funds to operate during the Chapter 11 Cases and thus constitutes a substantial contribution to the Borrowers and their Estates and are actual and necessary costs of the Borrowers' Estates. Accordingly, Borrowers agree that they will not object to, and will support, payment to the DIP Lender of at least twenty-five thousand dollars ($25,000) in consideration for the DIP Lender's undertaking such due diligence and documentation in

connection with its motion for Bankruptcy Court approval of the transactions contemplated hereby that any such payment shall be subject to Bankruptcy Court approval.

**Financial Reporting:** The DIP Orders will require, among other things, that the Borrowers shall:

1) provide the Weekly Reports;

2) provide monthly financial statements, operating reports, and budget and operating plans for each such monthly period (the "Monthly Reports");

3) provide on an as-requested basis all such other reports and information respecting the Borrowers' business, financial condition or prospects as the DIP Lender from time to time reasonably requests; and

4) provide copies of all pleadings, motions, applications, judicial information and other documents filed by or on behalf of the Borrower with the Bankruptcy Court or the U.S. Trustee.

The delivery of the Weekly Reports and the Monthly Reports shall be accompanied by a certification from the Borrowers that such Weekly Reports and Monthly Reports are true and correct in all material respects.

**Termination:** An Event of Default shall exist upon the occurrence of any of the following:

1) the failure to pay the DIP Obligations in cash in full upon the Maturity Date, or when due if prior to the Maturity Date;

2) breach by the Borrowers of any of their representations, warranties or covenants under this Commitment Letter and the DIP Orders, which breach is not cured within ten business days of written notice by the DIP Lender to the Borrowers of such breach;

3) the filing of a plan of reorganization for one or more of the Borrowers that does not provide for the payment in cash in full of the DIP Obligations;

4) entry of an order in the Chapter 11 Cases to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral

under section 506(c) of the Bankruptcy Code; and

5) the commencement of any litigation which, if successful, would have a material adverse impact on Borrowers, their business, or their ability to repay the DIP Obligations or which would challenge in any respect the DIP Obligations or the DIP Liens.

**Remedies:** Upon the occurrence of an Event of Default, the DIP Lender may: (x) immediately (A) deliver a notice of an Event of Default; and (B) terminate or suspend any outstanding Loan Advances; and (y) upon five (5) business days' written notice (within which period the Borrowers may only dispute the DIP Lender's declaration of an Event of Default on the basis of events (2) or (5), immediately above, in the Bankruptcy Court on an expedited basis), the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Bankruptcy Court, with the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lender to do any one or more of the following: (A) charge the default rate of interest on the Loan Advances; and (B) declare the principal of and accrued interest, fees and expenses constituting the DIP Obligations to be due and payable. Upon and after the occurrence of an Event of Default, except as provided in the preceding sentence, the DIP Lender shall be required to file a motion seeking relief from the automatic stay to enforce any of its other rights or remedies. Borrowers shall waive, and the DIP Orders shall effect such waiver of, any rights of the Borrowers under Section 105 of the Bankruptcy Code to stay or otherwise enjoin the exercise of the rights and remedies of the DIP Lender upon the occurrence of an Event of Default.

**Indemnification:** The Borrowers shall indemnify and hold harmless, and provide limitations of liability to, the DIP Lender, and its affiliates, and each of their respective officers, directors, members, employees, agents, advisors, attorneys, and representatives, in connection with the DIP Obligations, subject to customary limitations for gross negligence and willful misconduct, as set forth in detail in the DIP Orders.

**Expenses:** The Borrowers shall pay, without court review and approval, the expenses of the DIP Lender including, without limitation, the reasonable fees and disbursements of counsel and third party appraisers, collateral agents, consultants, advisors and auditors engaged in connection with the DIP Obligations; expenses in connection with

periodic field audits; the periodic and other monitoring of the Collateral; other miscellaneous disbursements in connection with the preparation and negotiation of this Commitment Letter and related agreements and documents and any amendments thereto; and the fees, costs and expenses in taking any action in connection with the DIP Obligations during, or after, the Chapter 11 Cases to monitor, investigate, negotiate, or enforce any right or remedy under this Commitment Letter and the DIP Orders (collectively, the "DIP Lender Expenses"). The DIP Lender Expenses shall be part of the DIP Obligations and shall be deemed Loan Advances when incurred by the DIP Lender and shall accrue interest at the rates specified herein until paid in full. DIP Lender Expenses incurred prior to the Closing Date shall not exceed twenty-five thousand dollars ($25,000).

**Governing Law:** New York, except as governed by the Bankruptcy Code.

**DIP Orders:** The DIP Orders shall be in conformity in all material respects with the forms of Interim DIP Order and Final DIP Order annexed hereto as Exhibits B and C, respectively.

**Closing Date:** The interim closing date (the "Interim Closing Date") shall be the date upon which all Conditions Precedent to such date, as described below, have been satisfied and the final closing date (the "Final Closing Date," and along with the Interim Closing Date, the "Closing Date") shall be the date upon which all Conditions Precedent to such date, as described below, have been satisfied.

**Conditions Precedent:** The following are conditions precedent to the occurrence of the Closing Date (except as otherwise noted) and the extension of any financial accommodation by the DIP Lender:

    1) Completion of a satisfactory pre-loan collateral audit review and site visit by the DIP Lender's collateral analysts prior to the commencement of the interim hearing on approval of the Loan Advances.

    2) The entry by the Bankruptcy Court of the Conversion Order on or before November 23, 2010.

    3) The entry of an order pursuant to section 543 of the Bankruptcy Code requiring the receiver that is currently in possession of the Borrowers' assets to turnover the assets (and all related documents and

information) to the Borrowers.

4) With respect to the Interim Closing Date, entry of the Interim DIP Order (with no stay thereof), and with respect to the Final Closing Date, entry of the Final DIP Order, by the Bankruptcy Court (with no stay thereof) in the forms attached as Exhibits B and C, respectively, after proper and sufficient notice to all parties entitled to notice under the Bankruptcy Code, Bankruptcy Rules, any local rules and orders of the Bankruptcy Court, which, among other provisions: (i) finds that the DIP Lender has acted in good faith in connection with the proposed financing and is entitled to the benefits of Section 364(e) of the Bankruptcy Code such that the validity of any debt incurred under the DIP Orders, or any priority or DIP Lien granted to the DIP Lender hereunder will not be affected by any reversal or modification of the DIP Orders on appeal; (ii) provides that the DIP Liens granted to the DIP Lender under the DIP Orders are deemed perfected without the necessity of the DIP Lender filing for record of any documents, notices or other filings (but Borrowers agree to execute and deliver to the DIP Lender, and to authorize the DIP Lender to file, any such documents); (iii) finds that the financing arrangement evidenced by the DIP Orders is vital to avoid immediate and irreparable harm to Borrowers' Estates and to permit a successful reorganization; (iv) includes a factual finding that the specific standard and required elements of Section 364 have been satisfied; and (v) contains such other terms and conditions as the DIP Lender shall find acceptable in its sole and absolute discretion. The Final DIP Order shall be entered, in form and substance satisfactory to the DIP Lender in its sole and absolute discretion not later than December 10, 2010. The Final DIP Order shall also proscribe any surcharge against the DIP Lender and the Collateral pursuant to Section 506(c) of the Bankruptcy Code, or otherwise, for any expenses incurred between the Conversion Date and the Maturity Date.

5) Borrowers will waive, and the DIP Orders shall effect Borrowers' waiver of, any right to obtain alternative post-petition financing senior to the DIP Obligations pursuant to Section 364 of the Bankruptcy Code or otherwise unless the proceeds of any such financing are to be applied to the indefeasible payment, in full, in cash, of the DIP Obligations.

6) No Material Adverse Effect shall have occurred.

7) Neither the Property nor any part thereof shall have suffered any casualty or be subject to any existing or threatened condemnation or taking by eminent domain proceeding or otherwise.

8) Interim Funding of the Loan Advances shall occur not later than November 24, 2010, and final approval of the DIP Obligations shall occur not later than December 10, 2010, subject in each case to the terms and conditions of the Interim DIP Order and the Final DIP Order.

9) As of the Closing Date, there shall be no litigation commenced or existing which, if successful, would prevent the Debtors' repayment of the DIP Obligations.

10) Delivery of a four month forecast, prepared on a monthly basis, with line item detail to, through, and including March 18, 2011, (the "DIP Budget") reviewed and approved by the DIP Lender and to be attached to the Interim DIP Order and the Final DIP Order entered by the Bankruptcy Court as the Approved Budget.

11) Confirmation of sufficient insurance coverage for all property of Borrowers, general liability insurance and other forms of insurance in amounts with deductibles reasonably satisfactory to the DIP Lender, and providing that the DIP Lender is an additional insured and loss payee.

| | |
|---|---|
| **Adequate Protection Of iStar Tara LLC** | With respect to that certain: |

1) (i) Senior Loan and Security Agreement between Borrowers and SFT I, Inc. as lender ("SFT") dated as of November 16, 2007 (the "Senior Loan"); (ii) Project Loan and Security Agreement between Borrowers and SFT dated as of November 16, 2007 (the "Project Loan"), and (iii) Building Loan and Security Agreement between Borrowers and SFT dated as of November 16, 2007 (the "Building Loan"), as such Senior Loan, Project Loan and Building Loan have been modified by that certain Modification Of Loan Agreements And Other Loan Documents between Borrowers and iStar Tara LLC

(as success in interest to SFT) as lender ("iStar")
dated as of June 24, 2009 (collectively, the "Loan
Agreements");

2) (i) Consolidated, Amended and Restated Promissory
Note (Senior Loan) made by Borrowers in favor of
SFT dated November 16, 2007 (the "Senior Note");
(ii) Consolidated, Amended and Restated Promissory
Note (Project Loan) made by Borrowers in favor of
SFT dated November 16, 2007 (the "Project Note");
(iii) Consolidated, Amended and Restated Promissory
Note (Building Loan) made by Borrowers in favor of
SFT dated November 16, 2007 (the "Building Note");
(iv) the Second Gap Promissory Note (Project Loan)
made by Borrowers in favor of iStar dated June 24,
2009 (the "Gap Note"); and the (v) the Amended and
Restated Promissory Note (Building Loan) made by
Borrowers in favor of iStar dated June 24, 2009 (the
"Amended Building Note") (collectively, the Senior
Note, the Project Note, the Building Note, the Gap
Note and the Amended Building Note, collectively,
the "Notes");

3) (i) Consolidated, Amended and Restated Mortgage
with Security Agreement, Assignment of Leases and
Rents and Fixture Filing (Senior Loan) dated
November 16, 2007; (ii) Consolidated, Amended and
Restated Mortgage with Security Agreement,
Assignment of Leases and Rents and Fixture Filing
(Project Loan) dated November 16, 2007;
(iii) Consolidated, Amended and Restated Mortgage
with Security Agreement, Assignment of Leases and
Rents and Fixture Filing (Building Loan) dated
November 16, 2007; (iv) Second Gap Mortgage With
Security Agreement, Assignment of Leases and Rents
and Fixture Filing (Project Loan) dated June 24,
2009; and (v) Second Consolidated, Amended and
Restated Mortgage with Security Agreement,
Assignment of Leases and Rents and Fixture Filing
(Project Loan) dated June 24, 2009 (collectively, the
"Mortgages"); and

4) those certain UCC Financing Statement filings of
record made by iStar (or its predecessor) with respect
to the Borrowers (collectively, the "UCC Filings");

iStar, shall be afforded adequate protection for its interests
under the Mortgages and UCC Filings (the "Prepetition
Liens") encumbering the assets of the Borrowers (the
"Prepetition Collateral") and securing the obligations

owing under the Loan Agreements and the Notes (collectively, the "iStar Prepetition Obligations"), to the same extent, validity, enforceability, and priority of such Prepetition Liens, in the form of:

    *a.  iStar Replacement Liens.* Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the interests of iStar in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, the Borrowers will grant to the iStar, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "iStar Replacement Liens"). The iStar Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out (as described below); and (iii) to the extent that the Other Liens (as described below) are senior to the Prepetition Liens, the Other Liens and the Other Lienholder Replacement Liens; and will be of the same priority, validity and enforceability as the iStar Prepetition Liens. The iStar Replacement Liens shall be senior to all other liens.

*b.  iStar Adequate Protection Priority Claim.* As further adequate protection of the interests of iStar in the Prepetition Collateral against any diminution in value of such interests in the Property on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, iStar shall have a superpriority administrative expense claim in the Chapter 11 Cases (the "iStar Adequate Protection Priority Claim"). Except as set forth in the Interim DIP Order, the Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Borrowers or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the iStar Adequate Protection Priority Claim shall be junior in priority to the Superpriority Claim of the DIP Lender,

the Carve-Out and the Other Lienholder Adequate Protection Claims to the extent that the Other Liens are senior to the iStar Prepetition Liens.

*c. Reports.* Delivery of a copy of the Weekly Reports and the Monthly Reports concurrent with delivery of the same to the DIP Lender.

**Adequate Protection Of Other Lienholders:**

Other holders of liens on the Collateral ("Other Liens"), shall be afforded adequate protection in the form of:

*a. Other Lienholder Replacement Liens.* Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the interests of holders of Other Liens ("Other Lienholders") against any diminution in value of such interests in the Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value from and the funding of the Loan Advances and (ii) the granting of the DIP Liens, the Borrowers will grant to such Other Lienholders, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "Other Lienholder Replacement Liens"). The Other Lienholder Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out (as described below); and (iii) the iStar Prepetition Liens and the iStar Replacement Liens to the extent that the iStar Prepetition Liens are senior to the Other Liens; and will be of the same prior, validity and enforceability as the Other Liens. The Other Lienholders Replacement Liens shall be senior to all other liens.

*b. Other Lienholder Adequate Protection Claims.* As further adequate protection of the interests of Other Lienholders in the Collateral against any diminution in value of such interests in the Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, Other Lienholders shall have superpriority administrative expense claims in the Chapter 11 Cases (the "Other Lienholder Adequate Protection Priority Claims"). Except as set forth in the Interim DIP Order, the Other Lienholder Adequate Protection Priority Claims shall have priority over all administrative expense claims and unsecured claims against the Borrowers or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code

sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the Other Lienholder Adequate Protection Priority Claims shall be junior in priority to the Superpriority Claim of the DIP Lender, the Carve-Out and the iStar Adequate Protection Priority Claim to the extent the iStar Prepetition Liens are senior to Other Liens.

**Carve Out:**                    The liens and the superpriority claims securing the DIP Loan, the iStar Replacement Liens and the iStar Adequate Protection Priority Claim, and the Other Lienholder Replacement Liens and the Other Lienholder Adequate Protection Priority Claim, shall be subject to a carve-out (the "Carve-Out") which shall mean collectively: (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and all fees required to be paid to the Clerk of the Bankruptcy Court, which are incurred after the first business day after effective delivery of a Carve-Out Trigger Notice (as defined immediately below); (ii) allowed fees, expenses and costs of attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Borrowers (the "Borrowers' Professionals") or any official committee of unsecured creditors (the "Committee Professionals") pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 and owed pursuant to such professionals' respective engagement letters to the extent permitted under the Approved Budget for such respective professionals in each case through such date of the Carve-out Trigger Notice , which are actually incurred and unpaid prior to the business day following delivery by the DIP Lender of a Carve-Out Trigger Notice(the "Carve-out Trigger Date"), whether allowed prior to or after such date; and (iii) in the case of the Borrowers' Professionals, an amount equal to the lesser of $75,000 and the amount of remaining amount of the Approved Budget for the Borrowers' Professionals after payment of their allowed fees and expenses incurred through the Carve-out Trigger Date. In all instances, the payment fees and expenses is subject to the rights of the DIP Lender to object to the allowance of any such fees and expenses. No portion of the Carve-Out may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, objection or other litigation against the DIP Lender.

Except as required by law, or as set forth above, neither this letter nor its contents shall be disclosed publicly or privately except to those individuals who are officers, employees or

advisors who have a need to know as a result of being involved in the transactions contemplated hereby and then only on the condition that such matters may not be further disclosed.

If you are in agreement with the foregoing, please sign the original of this DIP Loan Commitment Letter.

This DIP Loan Commitment Letter will expire if not accepted before the close of business on November 18, 2010.

We appreciate the opportunity to make this proposal and look forward to a mutually beneficial relationship.

[Signature Pages Follow]

Sincerely,

New One Madison Park Member I, LP
a Delaware limited partnership

By:    New One Madison Park GP, LLC
Its:    General Partner

By: _____
Name: Ian Bruce Eichner
Its:    Sole Member

Accepted and agreed to this 18 day of November 2010.

FKF MADISON GROUP OWNER, LLC,
a Delaware limited liability company

By:   Slazer Enterprises LLC
Its:   Manager

     By:   _____
     Name: Ira J. Shapiro
     Its:   Member


FKF MADISON GROUP OWNER, LLC,
a Delaware limited liability company

By:   _____
Name: Ira J. Shapiro
Its:   President and Secretary

Accepted and agreed to this 18 day of November 2010.

JMJS 23RD STREET REALTY OWNER, LLC,
a Delaware limited liability company

By:    Slazer Enterprises LLC
Its:    Manager

    By: _____
    Name: Ira J. Shapiro
    Its:    Member

JMJS 23RD STREET REALTY OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Ira J. Shapiro
Its:    President and Secretary

Accepted and agreed to this 18 day of November 2010.

MADISON PARK GROUP OWNER, LLC,
a Delaware limited liability company

By: Slazer Enterprises LLC
Its: Manager

By: _____
Name: Ira J. Shapiro
Its: Member

MADISON PARK GROUP OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Ira J. Shapiro
Its: President and Secretary

Accepted and agreed to this 18 day of November 2010.

SLAZER ENTERPRISES OWNER, LLC,
a Delaware limited liability company

By:     Slazer Enterprises LLC
Its:     Member

     By: _____
     Name: Ira J. Shapiro
     Its:    Member

SLAZER ENTERPRISES OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Ira J. Shapiro
Its:    President and Secretary

# EXHIBIT A

## Approved Budget

One Madison
D.I.P. Financing
Updated: November 17, 2010

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| | 20-Nov-10 | Dec-10 | Jan-11 | Feb-11 | 19-Mar-11 |
| *PROPERTY OPERATING EXPENSES* | | | | | |
| Utilities | 20,659 | 61,978 | 61,978 | 61,978 | 37,987 |
| Contract Services | 3,407 | 10,220 | 10,220 | 10,220 | 6,264 |
| Repairs & Maintenance | 793 | 2,380 | 2,380 | 2,380 | 1,459 |
| Administration, Payroll & Association Legal | 20,396 | 61,187 | 61,187 | 61,187 | 37,502 |
| Management Fee | 1,588 | 4,764 | 4,764 | 4,764 | 2,920 |
| Insurance | 2,401 | 7,202 | 7,202 | 7,202 | 4,414 |
| Sub-Total Operating Expenses | 49,244 | 147,732 | 147,732 | 147,732 | 90,546 |
| Real Estate Taxes | | - | | - | - |
| Total Property Operating Expenses | 49,244 | 147,732 | 147,732 | 147,732 | 90,546 |
| | | | | | |
| *PETITIONER RELATED EXPENSES* | | | | | |
| Ira Shapiro (entity to be formed) Consulting Fee | 10,000 | 10,000 | 10,000 | 10,000 | - |
| 421-a Legal - Selden | | 25,000 | | | |
| Creditor's Committee Fee | 3,333 | 10,000 | 10,000 | 10,000 | 6,129 |
| Debtors Counsel - Pachulski, Stang, Ziehl & Jones | 75,000 | 50,000 | 50,000 | 50,000 | |
| US Trustee Fee | - | 19,500 | - | | 19,500 |
| Total Petitioner Related Expenses | 88,333 | 114,500 | 70,000 | 70,000 | 25,629 |
| | | | | | |
| TOTAL D.I.P. FINANCING | 137,577 | 262,232 | 217,732 | 217,732 | 116,175 |
| *Accumulated Total* | 137,577 | 399,810 | 617,542 | 835,275 | 951,449 |

**Notes:**
- All November 2010 expenses are being calculated on a pro-rata basis for the month; from the commencement of the Post-Petition Period
- All March 2011 expenses are being calculated on a pro-rata basis for the month; to the termination of the Post-Petition Period
- Commercial Parcel maintenance is excluded since property is not owned by debtor
- Op Ex is derived from the projected budget in the Offering Plan's 16th Amendment & is faitrly consistent with the lenders protevctive advances
- Bovis project management fees are specifically excluded
- Ira Shapiro (entity to be formed) Consulting Fee payable monthly starting November 20 and on the 20th of each subsequent month for a period t.b.d.
- Taxes for the 201/2011 fiscal years may be paid over five years as per the approved plan.
- Seiden & Schein to be retained for 421a abatement

**Exhibit B**

**Form of Interim DIP Order**

**To be Supplied at a Later Date**

# EXHIBIT C

## Form of Final DIP Order

**[Form of Final DIP Order to be Substantially in the Form of the Interim DIP Order]**