# EXHIBIT B

## Joint Plan Funding Commitment Letter

**Joint Plan Funding Commitment Letter**

November 18, 2010

FKF Madison Park Group Owner, LLC
JMJS 23rd Street Realty Owner, LLC
Madison Park Group Owner, LLC
Slazer Enterprises Owner, LLC
230 Congers Road
New City, NY 10956
Attn.: Ira Shapiro

Dear Mr. Shapiro:

This letter (the "<u>Joint Plan Funding Commitment Letter</u>") is intended to be a commitment by New One Madison Park Member I, LP ("<u>Sponsor</u>") to enter into the below described transactions with the Reorganized Debtor (as defined herein) on the terms set forth below and subject to satisfaction of the conditions precedent set forth herein. This Joint Plan Funding Commitment Letter is delivered to you with the understanding that neither it nor its substance shall be disclosed, without the prior written consent of Sponsor, to any third party, other than the Sponsor Creditors,[1] and except in connection with the filing and disclosure of a Joint Plan (as defined herein) or a Joint Plan Support Agreement in the Bankruptcy Cases (as defined herein) when such cases are converted to voluntary Chapter 11 Cases (as defined herein).

## I. **Defined Terms**

| | |
|---|---|
| **Debtors:** | FKF Madison Park Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC and Slazer Enterprises Owner, LLC, as involuntary debtors (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in Case Nos. 10-11867 (KG) through 10-11870 (KG) pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") pursuant to involuntary Chapter 7 filings on June 8, 2010 (the "<u>Bankruptcy Cases</u>") and the order(s) for relief and converting the Bankruptcy Cases to cases under Chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") to be entered by the Bankruptcy Court (the "<u>Conversion Order</u>"). The date upon which the Conversion Order is entered by the Bankruptcy Court shall be referred to as the |

---

[1] The Sponsor Creditors are: MAD 52, LLC, Stephen Kraus and Mitchell Kraus.

"Conversion Date."

| | |
|---|---|
| **Definitive Documents:** | The documents required to implement the transactions contemplated by the Joint Plan specifically including but not limited to: (A) the Operating Agreement for the Reorganized Debtor; (B) the Restructured iStar Debt Loan Documents; (C) the Net Proceeds Waterfall Plan Obligation; (D) the Consulting Agreement; (E) the Development Agreement; and (F) any other documents or agreements that are necessary to implement this Agreement and the transactions contemplated hereby, all of which shall not be inconsistent with this Agreement and the Exhibits and shall be in form and substance acceptable to the parties to such documents or agreements. |
| **Development Agreement:** | The development agreement by and between The Continuum Company LLC and the Reorganized Debtor for the development of the Project. |
| **Estates:** | The estates created under Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases. |
| **inconsistent with:** | The phrase "inconsistent with" or phrases of similar import, shall mean: (x) with respect to a particular class of Claims or Interests under the Joint Plan, that the proposed treatment of such Claims or Interests, respectively, shall have been altered to cause a material adverse change in the treatment of such claims and interests from that set forth in the Joint Plan of Reorganization Summary of Terms; and (y) with respect to the benefits or burdens conferred upon a party to this Agreement, as provided for in this Agreement or the transactions contemplated by this Agreement, that such benefits or burdens shall have been altered to cause a material adverse change in such benefits or burdens. |
| **iStar Secured Indebtedness:** | The Debtors' obligations owing to iStar under the Loan Documents. |
| **Joint Plan:** | The Debtors' joint chapter 11 plan as confirmed by the Bankruptcy Court that is in substantial conformity with and not inconsistent with the "Summary of Terms of Joint Plan of Reorganization" annexed hereto as Exhibit A (the "Joint Plan Summary") and made a part hereof by this reference. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Joint Plan Summary. |

**Loan Documents:**   a)   (i) Senior Loan and Security Agreement between Borrowers and SFT I, Inc. ("SFT") (as predecessor in interest to iStar Tara LLC ("iStar")) dated as of November 16, 2007; (ii) Project Loan and Security Agreement between Borrowers and SFT (as predecessor in interest to iStar) dated as of November 16, 2007; and (iii) Building Loan and Security Agreement between Borrowers and SFT (as predecessor in interest to iStar) dated as of November 16, 2007; each, as modified by that certain Modification Of Loan Agreements And Other Loan Documents (the "Modification Agreement") between Borrowers and iStar dated as of June 24, 2009;

b)   (i) Consolidated, Amended and Restated Promissory Note (Senior Loan) made by Borrowers in favor of SFT (as predecessor in interest to iStar) dated November 16, 2007, as modified by the Modification Agreement; (ii) Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; (iii) Amended and Restated Promissory Note (Building Loan) made by Borrowers in favor of iStar dated June 24, 2009;

c)   (i) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Senior Loan) made by Borrowers in favor of SFT I, Inc. (as predecessor in interest to iStar) dated November 16, 2007, as modified by the Modification Agreement; (ii) Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; and (iii) Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Building Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; and

d)   those certain UCC Financing Statement filings of record made by iStar (or its predecessor) with respect to the Borrowers (collectively, the "UCC Filings").

| | |
|---|---|
| **Material Adverse Effect:** | Any material adverse effect (i) in the business, assets, operations, results of operations or financial or other condition or prospects of the Property or the Debtors arising from war, terrorism, act of God, unusually adverse weather conditions or similar matters, or (ii) in the New York City residential condominium market arising from unusually adverse general economic conditions. |
| **Net Proceeds Waterfall Plan Obligation:** | Pursuant to the Joint Plan, the Reorganized Debtor shall be obligated to the Estates on account of the payments to be made under the Joint Plan to holders of Allowed Claims in Classes 5A-5D and 7A-7D. |
| **Sponsor:** | New One Madison Park Member I, LP, a Delaware limited partnership whose limited partners are Glimcher Bernard One Madison, LLC, Kraus OMP LLC and 45 Margaux LLC and whose general partner is New One Madison Park GP, LLC which shall have the requisite power and authority to enter into transactions on behalf of Sponsor and to bind Sponsor. |
| **Property/Project:** | The Debtors are the tenant in common owners of the land, the improvements, the unsold Units which have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story high rise tower containing sixty nine (69) residential units (of which fifty seven (57) Units remain unsold) with approximately 117,982 net sellable square feet, and amenities, and limited common elements (the "North Tower"), as well as a to be constructed mid-rise building located on an adjacent lot known as 23 East 22nd containing a ground level residential lobby and approximately 7,000 square feet of net sellable residential FAR (the "South Tower", together with the North Tower, the land underlying and abutting the North Tower and the South Tower, the improvements, the unsold Units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing, are referred to collectively herein as the "Property" or the "Project", such terms having identical meaning). |

| | |
|---|---|
| **Reorganized Debtor:** | The entity under the Joint Plan to which all of the assets of the Debtors' Estates shall be sold on the date upon which the Joint Plan becomes effective (the "Effective Date"). On the Effective Date, Sponsor shall be issued 100% of the membership/equity interests in the Reorganized Debtor. |
| **Restructured iStar Debt Loan Documents:** | The Amended and Restated Loan Documents to be executed by the Reorganized Debtor in favor of iStar under the Joint Plan restructuring the iStar Secured Indebtedness. |
| **Consulting Agreement:** | On the Effective Date, the Reorganized Debtor will enter into a consulting agreement with IJS Management, LLC to provide services (to be delineated in a consulting agreement to be executed on the Effective Date) as requested from time to time by Sponsor during the period from the Effective Date through entry into contracts for seventy-five percent (75%) of the Units that are being developed as part of the Project and in consideration for which IJS Management, LLC will be paid ten-thousand dollars ($10,000.00) per month during the term of such agreement, subject to the terms and conditions contained therein. The IJS Consulting Agreement will replace a similar consulting arrangement between the Debtors and IJS Management, LLC providing for the same $10,000 per month payment to the consultant that is being entered into effective on the Conversion Date. |
| **Units:** | The residential condominium units, together with any limited common elements appurtenant thereto and their respective percentage interests in the common elements , that currently are, or will in the future be, subject to a condominium regime effecting the Property. |

## II. Transactions

| | |
|---|---|
| **Joint Plan Funding Commitment:** | On the Effective Date, subject to the terms and conditions set forth herein, Sponsor shall, and 45 Margaux LLC, as a limited partner of Sponsor, shall provide up to Forty Million Dollars ($40,000,000) of funds to Sponsor to enable Sponsor to, make an equity investment in the Reorganized Debtor, with such funds to be used by the Reorganized Debtor for: |

1) Refinancing of the debtor in possession financing.

2) Payments to be made under the Joint Plan on account

of Claims that are unclassified under the Joint Plan;

3) Payments to be made under the Joint Plan to holders of Allowed Claims in Classes 2A, 2B, 2C and 2D under the Joint Plan.

4) Payment of the Expense Reimbursement.

5) Working capital for the Reorganized Debtor.

6) Development of the Property.

On the Effective Date, Sponsor shall be issued 100% of the membership/equity interests in the Reorganized Debtor.

**Development Agreement:** On the Effective Date, Sponsor shall cause the Reorganized Debtor to enter into the Development Agreement.

**Net Waterfall Proceeds Plan Obligation:** On the Effective Date, Sponsor shall cause the Reorganized Debtor to assume the Net Waterfall Proceeds Plan Obligation. Pursuant to the Net Waterfall Proceeds Plan Obligation, the Reorganized Debtor shall use a portion of the Net Waterfall Proceeds to fund payments to be made under the Joint Plan to holders of Allowed Claims in Classes 5A-5D and 7A-7D of the Joint Plan (and the costs of distribution thereof) which payments shall total in the aggregate an amount equal to ten percent (10%) of the Net Waterfall Proceeds when and if such funds are available. The costs for claims allowance/disallowance and distributing the payments from the Net Waterfall Proceeds shall be paid from such proceeds

**III. Conditions Precedent** The following are conditions precedent to Sponsor and 45 Margaux LLC's commitment to effect the transactions and financial accommodations described above:

**A. Conditions Precedent That Must be Satisfied or Waived Prior to Hearing on Disclosure Statement (45 Days from Conversion Date)**

45 Margaux LLC's obligation to make an equity investment in Sponsor, and Sponsor's obligation to make an equity investment in the Reorganized Debtor on the Effective Date in an amount required to fund the payments to be made under the Joint Plan as of the Effective Date are subject to the satisfaction in all respects (or the waiver in writing in the Sponsor's sole discretion) of the following conditions prior to the hearing on the Disclosure Statement which shall be not less than 45 days from the Conversion

Date:

1) Sponsor shall have approved the final plans and specifications for the construction of the North Tower and shall have confirmed that the same have been approved by all required governmental authorities, and that the same are in compliance with all applicable federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, covenants, restrictions, conditions, easements, reservations and or other matters affecting title to the Project (collectively, "Laws, Covenants and Regulations").

2) Sponsor shall have confirmed the structural integrity of the North Tower and that all heating, plumbing, electrical, air-conditioning and/or mechanical systems are in proper working order.

3) Sponsor shall have received a report(s) from a reputable environmental engineering company assessing the environmental condition of the Property and confirming that the Property is in compliance with all Laws, Covenants and Regulations relating to hazardous, nuclear or toxic wastes or substances.

4) Sponsor shall have confirmed that with respect to the North Tower, all required permits, licenses or other authorizations from the applicable governmental authorities and pursuant to all Laws, Covenants and Regulations (including, without limitation, building permits) have been obtained and are in full force and effect.

5) Sponsor shall have confirmed that a reputable title insurance company will issue an ALTA owner's policy of title insurance reasonably acceptable to the Sponsor insuring the Sponsor as having good and marketable fee title to the entire Property free and clear of all liens (including mechanics' liens, including any possible inchoate liens for work performed prior to the Closing Date) and encumbrances, whether of record or otherwise (except for the iStar Secured Indebtedness and such other matters as may otherwise be acceptable to the Sponsor), with such endorsements and affirmative coverage as may be reasonably required by Sponsor based upon its review of the title commitment and a boundary and location survey for the Property, and covering, without limitation, the land underlying the high-rise tower and the to be constructed mid-rise

structure, and confirmation that all of the same are located wholly within the land owned by the Debtors and do not encroach on any property not owned by the Debtors.

6) Sponsor shall have confirmed that sufficient insurance is in effect with respect to the Project.

7) Sponsor shall have confirmed that all construction completed as of the date hereof has been performed in compliance with the plans and specifications for the Project and all Laws, Covenants and Regulations.

8) Sponsor shall have been provided with (a) an opinion of counsel from a reputable law firm reasonably acceptable to Sponsor indicating that (i) all 421-a negotiable certificates referenced in the Offering Plan will be available to the Project in a timely manner, (ii) the Project will meet the requirements set forth in Chapter 6 of the Rules of the City of New York and all other applicable Laws, Covenants and Regulations for the Project to qualify for the 421-a tax benefits contemplated by the Offering Plan, (iii) such other matters with respect to the availability of 421-a negotiable certificates as the Sponsor may reasonably require, together with (b) such other evidence as Sponsor may deem reasonably necessary to confirm the availability of 421-a negotiable certificates benefiting the Project.

## B. Conditions Precedent To Funding The Payments Required Under The Joint Plan To Be Made On The Effective Date Of The Joint Plan That Must be Satisfied or Waived

45 Margaux LLC's obligation to make an equity investment in Sponsor, and Sponsor's obligation to make an equity investment in the Reorganized Debtor on the Effective Date in an amount required to fund the payments to be made under the Joint Plan as of the Effective Date are subject to the satisfaction in all respects of the following conditions:

1) Negotiation and confirmation of the Definitive Documents.

2) Authorizations, consents and regulatory approvals required, if any, in connection with implementation of the transactions described in the Joint Plan and herein

shall have been obtained.

3) Confirmation of the Joint Plan by the Bankruptcy Court by no later than March 18, 2011 (the "Outside Confirmation Date") unless extended by the Sponsor.

4) Entry of an order confirming the Joint Plan in form and substance satisfactory to Sponsor in its sole and absolute discretion (the "Confirmation Order"), which Confirmation Order shall not be appealed, or if appealed has not been stayed, and which shall provide among other things for/that:

(i) a sale under the Joint Plan of all of the Debtors' assets and property (real and personal) to the Reorganized Debtor free and clear of any liens, claims (including claims of successor liability), interests or encumbrances (including, without limitation, Claims of Holders in Classes 2A-2D and 5A-5D) except for the Restructured iStar Debt Loan Documents (which shall be in form and substance satisfactory to Sponsor in its sole and absolute discretion), with such sale (and the sale of Units) to be exempt from tax as provided for in Section 1146(a) of the Bankruptcy Code;

(ii) the Joint Plan has been proposed in good faith and not by any means forbidden by law in accordance with section 1129(a)(3) of the Bankruptcy Code;

(iii) the Debtors, Ira Shapiro ("Shapiro"), the Sponsor Creditors, Sponsor, 45 Margaux LLC, and their respective affiliates, have acted in good faith with respect to the Joint Plan and the transactions contemplated thereby;

(iv) the sale of assets and property by the Debtors to the Reorganized Debtor pursuant to the Joint Plan is deemed to constitute reasonably equivalent value or fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, and any state, territory, or possession thereof, or the District of Columbia;

(v) the sale of assets and property in the Reorganized Debtor pursuant to the Joint Plan shall not be subject to avoidance on any basis under the Bankruptcy Code or otherwise;

(vi) the assumption by Debtors and the sale and assignment to Reorganized Debtor of executory contracts and unexpired leases designated by Sponsor and the rejection of executory contracts and unexpired leases as designated by Sponsor;

(vii) authorization of the Reorganized Debtor upon the Effective Date to file, register or otherwise record any releases or satisfactions of mechanic's liens, lis pendens, Deeds held by Holders of Claims in Classes 5A-5D, or other documents pertaining to the title to the Property to the extent that such documents are not delivered by the respective claimants before the Effective Date and the release of such claims;

(viii) approval and authorization for the releases, exculpations and injunctions in favor of Sponsor, 45 Margaux LLC, Glimcher Bernard One Madison, LLC, Kraus OMP LLC and their affiliates and agents as set forth in the Joint Plan; and

(ix) vesting in Sponsor of 100% of the membership/equity interests in the Reorganized Debtor free and clear of any liens, claims, encumbrances or interests.

5) None of the Debtors or Shapiro shall have failed to comply with any of its respective material obligations set forth in that certain Plan Support Agreement dated November 18, 2010.

6) Sponsor shall have confirmed that: (a) the condominium offering plan (together with all amendments thereto, the "Offering Plan") accepted for filing by the New York State Department of Law, Investment Protection Bureau, including without limitation the amendment declaring the Offering Plan effective, does not (i) omit any material fact; (ii) contain any untrue statement of a material fact; (iii) contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale; and (iv) contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances or otherwise violates any applicable federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations (a "Plan Violation") that cannot be corrected by an amendment

to or restatement of the Offering Plan made by Sponsor without Sponsor incurring liability for any such Plan Violation and which is otherwise reasonably acceptable to Sponsor in the exercise of its reasonable discretion, (b) the Property has been legally subdivided into seventy-eight (78) residential Units and two (2) commercial Units, each constituting a separate tax lot, pursuant to the declaration of the Condominium (including the By-Laws and all exhibits thereto, the "Declaration"), submitting the land and the improvements to the provisions of Article 9B of the Real Property Law of the State of New York; (c) the Declaration recorded in the Office the City Register, New York County, Division of Land Records, New York City Department of Finance (the "Register's Office") and the condominium tax map drawings (the "Floor Plans") approved by the New York City Surveyor and recorded in the Register's Office conform to the exhibits for same contained in the Offering Plan, otherwise comply with all applicable law and contain no material inaccuracies that cannot be cured by an amendment thereto or restatement thereof for which the consent of no other unit owner, contract vendee or other non-governmental party is required; (d) the Sponsor, as successor sponsor, will be able to exercise all the rights of the declarant under the Declaration and sponsor under the Offering Plan (collectively, the "Former Sponsor"), and the Confirmation Order shall so provide; (iv) Sponsor will not be liable to any current unit owners for construction defects arising out of work performed prior to its acquisition of the unsold Units; and (v) confirmation from the New York State Department of Law that the Offering Plan is not "stale" and can be amended or amended and restated by Sponsor and that upon acceptance for filing of an amendment to or restatement of the Offering Plan disclosing Sponsor or an affiliate of Sponsor as the successor sponsor, Sponsor will be able to commence selling the unsold Units.

7) Sponsor shall have confirmed that no evidence has arisen indicating the existence of any latent or patent defects in the construction completed as of the Effective Date.

8) Sponsor shall have confirmed that the use and

occupancy of the Project, currently and when fully completed in accordance with the plans and specifications, with respect to the North Tower, will comply with all Laws, Covenants and Regulations.

9) From and after the Conversion Date, no Material Adverse Effect shall have occurred.

10) Neither the Property nor any part thereof shall have suffered any casualty or be subject to any existing or threatened condemnation or taking by eminent domain proceeding or otherwise.

11) There shall be no pending or threatened litigation known to the Reorganized Debtor, or its counsel, against the Reorganized Debtor or the Property, or the Sponsor or their respective affiliates with respect to the Reorganized Debtor or the Property.

## C. Conditions Precedent To Funding Reorganized Debtor After The Effective Date Of The Joint Plan That Must be Satisfied or Waived

45 Margaux LLC's obligation to make an equity investment in Sponsor, and Sponsor's obligation to make an equity investment in the Reorganized Debtor after the Effective Date in amounts that may be requested by the Reorganized Debtor to enable the Reorganized Debtor to fund development of the Property and working capital needs of the Reorganized Debtor, including interest payments on the iStar Secured Indebtedness as restructured under the Joint Plan, are subject to the satisfaction in all respects of the following conditions:

1) Neither the Property nor any part thereof shall have suffered any casualty or be subject to any existing or threatened condemnation or taking by eminent domain proceeding or otherwise.

2) There is no failure by iStar to take an action or refrain from taking an action required under the Restructured iStar Debt Loan Documents.

Except as set forth above, neither this letter nor its contents shall be disclosed publicly or privately. This letter shall not confer any rights or remedies upon any person or entity other than the parties hereto.

If you are in agreement with the foregoing, please sign the original of this letter.

This Joint Plan Funding Commitment Letter will expire if not accepted before the close of business on November 18, 2010.

We appreciate the opportunity to make this proposal and look forward to a mutually beneficial relationship.

* * * signature page follows * * *

Sincerely,

New One Madison Park Member I, LP
a Delaware limited partnership

By:    New One Madison Park GP, LLC
Its:    General Partner

By: _____
Name: Ian Bruce Eichner
Its:    Sole Member

## JOINDER

The undersigned, general partner of the Sponsor hereby joins in this Joint Plan Funding Commitment Letter and accepts and agrees to the terms and conditions contained herein, and agrees, in the capacity as the general partner of the Sponsor, to fulfill the obligations hereunder, subject to the terms and conditions hereof.

**New One Madison Park GP, LLC**

By:

Name:     Bruce Eichner

Its:       Sole Member

The undersigned, as a limited partner of the Sponsor, hereby joins in this Joint Plan Funding Commitment Letter and accepts and agrees to the terms and conditions contained herein, and agrees, in such capacities, to fulfill the obligations hereunder, subject to the terms and conditions hereof.

**45 Margaux LLC,**

By:

Name:     Ian Bruce Eichner

Its:

60,479,280

Accepted and agreed to this 18 day of November 2010.

FKF MADISON GROUP OWNER, LLC,
a Delaware limited liability company

By:     Slazer Enterprises LLC,
Its:     Manager

By: _____
Name: Ira J. Shapiro
Its:     Member


FKF MADISON GROUP OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Ira J. Shapiro
Its: President and Secretary

Accepted and agreed to this 18 day of November 2010.

JMJS 23RD STREET REALTY OWNER, LLC,
a Delaware limited liability company

By:    Slazer Enterprises LLC,
Its:     Manager

By: _____
Name: Ira J. Shapiro
Its:     Member


JMJS 23RD STREET REALTY OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Ira J. Shapiro
Its: President and Secretary

Accepted and agreed to this 18 day of November 2010.

MADISON PARK GROUP OWNER, LLC,
a Delaware limited liability company

By:    Slazer Enterprises LLC,
Its:    Manager

        By: _____
        Name: Ira J. Shapiro
        Its:    Member

MADISON PARK GROUP OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Ira J. Shapiro
Its: President and Secretary

Accepted and agreed to this 18 day of November 2010.

SLAZER ENTERPRISES OWNER, LLC,
a Delaware limited liability company

By:    Slazer Enterprises LLC,
Its:    Member

By: _____
Name: Ira J. Shapiro
Its:    Member


SLAZER ENTERPRISES OWNER, LLC,
a Delaware limited liability company

By: _____
Name:  Ira J. Shapiro
Its: President and Secretary

# EXHIBIT A

## Summary of Terms of Joint Plan of Reorganization

# JOINT PLAN OF REORGANIZATION SUMMARY OF TERMS

## I.  DEFINED TERMS

**"Allowed"** means a Claim or Interest that is allowed under the Bankruptcy Code or the Joint Plan.

**"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

**"Chapter 11 Cases"** means the pending involuntary chapter 7 cases of the Debtors pending in the Bankruptcy Court (Case Nos. 10-11867, 10-11868, 10-11869, and 10-11870) as and when converted to cases under chapter 11 of the Bankruptcy Code.

**"Claim"** has the meaning ascribed to such term under the Bankruptcy Code.

**"Debtors"** means the following entities with currently pending involuntary chapter 7 cases in the United States Bankruptcy Court for the District of Delaware: FKF Madison Park Group Owner, LLC (Case No. 10-11867 (KG)), JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868 (KG)), Madison Park Group Owner, LLC (Case No. 10-11869 (KG)), and Slazer Enterprises Owner, LLC (Case No. 10-11870 (KG)).

**"Deed"** means documents of title evidencing a transfer of an ownership interest from the Debtors to a Person.

**"Deed Holder Claim"** means the Holder of a Deed transferring title to a portion of the Property which Deed is not subject to a release executed by iStar.

**"Effective Date"** means the date on which the Debtors' Joint Plan becomes effective.

**"Entity"** means any Person, estate governmental unit, and United States trustee.

**"Equity Interests"** means an equity interest in the Debtors.

**"Estates"** means the estates created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Debtors' Chapter 11 Cases.

**"Existing iStar Indebtedness"** means the indebtedness owed by the Debtors to iStar as evidenced by the Loan Documents.

1

**"GAP Claim"** means a Claim Allowed pursuant to Section 502(f) of the Bankruptcy Code.

**"Gross Proceeds"** means the gross proceeds received by the Debtors from Unit Sales.

**"iStar"** means iStar Tara LLC.

**"Holder"** means an Entity holding a Claim against, or Equity Interest in, any debtor.

**"Joint Plan"** means the Debtors' joint chapter 11 plan of reorganization as confirmed by the Bankruptcy Court.

**"Joint Plan Funding Commitment"** means the equity funding from the Sponsor to capitalize the Reorganized Debtor as of the Effective Date such that the Reorganized Debtor has the funds available to make the payments required under the Joint Plan to be made on the Effective Date and has funds available after the Effective Date funds for developing the Property. The Debtors will be a beneficiary of the Joint Plan Funding Commitment.

**"Loan Agreements"** means collectively: (i) Senior Loan and Security Agreement between Borrowers and SFT I, Inc. (as predecessor in interest to iStar) dated as of November 16, 2007; (ii) Project Loan and Security Agreement between Borrowers and SFT I, Inc. (as predecessor in interest to iStar) dated as of November 16, 2007; and (iii) Building Loan and Security Agreement between Borrowers and SFT I, Inc. (as predecessor in interest to iStar) dated as of November 16, 2007; each, as modified by that certain Modification Of Loan Agreements And Other Loan Documents (the **"Modification Agreement"**) between Borrowers and iStar as lender dated as of June 24, 2009.

**"Loan Documents"** means collectively the Loan Agreements, the Modification Agreement, Mortgages, and Notes.

**"Modification Agreement"** shall have the meaning set forth within the definition of "Loan Agreements."

**"Mortgages"** means collectively: (i) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Senior Loan) made by Borrowers in favor of SFT I, Inc. (as predecessor in interest to iStar) dated November 16, 2007, as modified by the Modification Agreement; (ii) Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; and (iii) Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Building Loan) made by Borrowers in favor of iStar dated as of June 24, 2009.

2

"**Net Waterfall Proceeds**" means Gross Proceeds from Unit Sales less: (i) selling costs (brokerage, selling, taxes, marketing, customary closing costs, recording costs, etc.); (ii) ordinary course operating expenses of the Reorganized Debtor, including general marketing and administrative expenses, not otherwise paid with proceeds received by the Reorganized Debtor from the Joint Plan Funding Commitment; (iii) post-Effective Date payments of principal and interest and fees and costs, if any, to iStar until the Restructured iStar Debt is paid in full; and (iv) the return of capital to the Sponsor in an amount equal to the total amount funded under the Joint Plan Funding Commitment to Reorganized Debtor, plus interest on such capital at twenty percent (20%) per annum, compounded.

"**Net Waterfall Proceeds Plan Obligation**" means the obligation under the Joint Plan imposed upon, and assumed by, the Reorganized Debtor pursuant to the Joint Plan providing for payments from the Reorganized Debtor to the Estates in an aggregate amount equal to ten percent (10%) of the Net Waterfall Proceeds when and if such are available. The costs for claims allowance/disallowance and distributing the payments from the Net Waterfall Proceeds shall be paid from such proceeds.

"**Notes**" means collectively: (i) Consolidated, Amended and Restated Promissory Note (Senior Loan) made by Borrowers in favor of SFT I, Inc. (as predecessor in interest to iStar) dated November 16, 2007, as modified by the Modification Agreement; (ii) Second Consolidated, Amended and Restated Promissory Note (Project Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; and (iii) Amended and Restated Promissory Note (Building Loan) made by Borrowers in favor of iStar dated June 24, 2009.

"**Person**" means any individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any domestic or foreign government, governmental agency, or any subdivision, department or other instrumentality thereof.

"**Property**" means the land, the improvements, the unsold Units which have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story hi rise tower containing sixty nine (69) residential units of which fifty-seven (57) units remain unsold and contain approximately 117,982 net sellable square feet, and amenities, and limited common elements (the "**North Tower**"), as well as a to be constructed mid-rise building located on an adjacent lot known as 23 East 22nd containing a ground level residential lobby and approximately 7,000 square feet of net sellable residential FAR (the "**South Tower**") along with the land underlying and abutting the North Tower and the South Tower, the improvements, the unsold Units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing.

"**Reorganized Debtor**" means New One Madison Park, LLC, a Delaware limited liability company, the entity under the Joint Plan to which all of assets of the Debtors' Estates shall be sold.

"**Restructured iStar Debt**" means the Existing iStar Indebtedness as modified as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1.

"**Sponsor**" means New One Madison Park Member I, LP, a Delaware limited partnership, which shall receive one-hundred percent (100%) of the Equity Interests of the Reorganized Debtor.

"**Sponsor Creditors**" means collectively, Mad 52, LLC, Mitchell Kraus and Stephen Kraus.

"**Units**" means the residential condominium units, together with the common elements and limited common elements appurtenant thereto, that currently are, or will in the future be, subject to a condominium regime effecting the Property.

"**Unit Sales**" means the sale of one or more Units that comprise the Property.

## II.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.  Claims Against Debtor FKF Madison Park Group Owner, LLC

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against FKF Madison Park Group Owner, LLC ("FKF") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1A Allowed Secured Claim of iStar | Class 1A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, FKF shall grant iStar a release of any and all claims of FKF against iStar including, but not limited to, any preference claims. |
| Class 2A Mechanic's Liens Claims | Class 2A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against FKF shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such |

| | Holder's Class 2A Claim. |
|---|---|
| Class 3A<br>Other Secured Claims | Class 3A is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against FKF that are secured by assets of FKF, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4A<br>Property Tax Claims | Class 4A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the FKF and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against FKF that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5A<br>Deed Holder Claims | Class 5A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against FKF shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the |

| | |
|---|---|
| | Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed. |
| Class 6A<br>Other Priority Claims | Class 6A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against FKF shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as FKF and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7A<br>General Unsecured<br>Claims (including any<br>deficiency claim of<br>iStar based on the<br>Existing iStar<br>Indebtedness) | Class 7A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against FKF shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
| Class 8A<br>Equity Interests | Class 8A is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of FKF, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

CHI 60,479,278v12 11-18-10

**B.** **Claims Against Debtor JMJS 23rd Street Realty Owner, LLC**

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against JMJS 23rd Street Realty Owner, LLC ("JMJS") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1B Allowed Secured Claim of iStar | Class 1B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, JMJS shall grant iStar a release of any and all claims of JMJS against iStar including, but not limited to, any preference claims. |
| Class 2B Mechanic's Liens Claims | Class 2B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against JMJS shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such Holder's Class 2B Claim. |
| Class 3B Other Secured Claims | Class 3A is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against JMJS that are secured by assets of JMJS, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4B Property Tax Claims | Class 4B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the JMJS and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against JMJS that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years |

7

| | |
|---|---|
| | after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5B<br>Deed Holder Claims | Class 5B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against JMJS shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed. |
| Class 6B<br>Other Priority Claims | Class 6B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against JMJS shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as JMJS and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7B<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against JMJS shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D will be calculated based upon a fraction with the numerator |

| | equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
|---|---|
| Class 8B<br>Equity Interests | Class 8A is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of JMJS, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

### C.     Claims Against Debtor Madison Park Group Owner, LLC

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against Madison Park Group Owner, LLC ("Madison") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1C<br>Allowed Secured Claim of iStar | Class 1C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, Madison shall grant iStar a release of any and all claims of Madison against iStar including, but not limited to, any preference claims. |
| Class 2C<br>Mechanic's Liens Claims | Class 2C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against Madison shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such Holder's Class 2C Claim. |
| Class 3C<br>Other Secured Claims | Class 3A is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against Madison that are secured by assets of Madison, on or as |

9

| | |
|---|---|
| | soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4C Property Tax Claims | Class 4C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the Madison and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against Madison that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5C Deed Holder Claims | Class 5C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against Madison shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights |

CHI 60,479,278v12 11-18-10

| | to the Unit in respect of such Deed. |
|---|---|
| Class 6C<br>Other Priority Claims | Class 6C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against Madison shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as Madison and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7C<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against Madison shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
| Class 8C<br>Equity Interests | Class 8C is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of Madison, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

11

## D.    Claims Against Debtor Slazer Enterprises Owner, LLC

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against Slazer Enterprises Owner, LLC ("Slazer") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1D Allowed Secured Claim of iStar | Class 1D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan.  The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1.  In addition, Slazer shall grant iStar a release of any and all claims of Slazer against iStar including, but not limited to, any preference claims. |
| Class 2D Mechanic's Liens Claims | Class 2D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan.  Holders of properly and timely asserted mechanic's liens under applicable state law against Slazer shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such Holder's Class 2D Claim. |
| Class 3D Other Secured Claims | Class 3D is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan.  To the extent there exists any Other Secured Claims against Slazer that are secured by assets of Slazer, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4D Property Tax Claims | Class 4D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan.  Except to the extent that the Slazer and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against Slazer that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding |

12

| | |
|---|---|
| | five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5D Deed Holder Claims | Class 5D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against Slazer shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed. |
| Class 6D Other Priority Claims | Class 6D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against Slazer shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as Slazer and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7D General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against Slazer shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D |

13

| | will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
|---|---|
| Class 8D<br>Equity Interests | Class 8D is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of Slazer, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

## III.   MEANS OF IMPLEMENTATION OF THE JOINT PLAN

| Reorganized Debtor<br>Operating Agreement | The assets of the Debtors' Estates under the Joint Plan shall be sold to the Reorganized Debtor free and clear of any liens, claims (including claims of successor liability), interests or encumbrances (including, without limitation, claims of Holders of Claims in Classes 2A-2D and 5A-5D) except for the liens provided for in the Amended and Restated Loan Documents. |
|---|---|
| Capitalization of<br>Reorganized Debtor | (i) the Reorganized Debtor will assume the Restructured iStar Debt and enter into the Amended and Restated Loan Documents as described in Exhibit 1 hereto;<br><br>(ii) Sponsor will provide Reorganized Debtor with the Joint Plan Funding Commitment which will provide Reorganized Debtor with the funding for: (u) refinancing of the debtor in possession financing; (v) payments to be made on account of Claims that are unclassified under the Joint Plan; (w) payments to be made to Holders of Allowed Claims in Classes 2A, 2B, 2C and 2D under the Joint Plan; (x) (the Expense Reimbursement (as defined below); (y) working capital for the Reorganized Debtor; and (z) development of the Property.<br><br>(iii) The Reorganized Debtor will be obligated under the Joint Plan with respect to the Net Waterfall Proceeds Plan Obligation to the Estates to fund the payments to be made |

14

| | |
|---|---|
| | to Holders of Allowed Claims in Classes 5A-5D and 7A-7D;<br><br>(iv) Sponsor shall receive 100% of the membership interests in the Reorganized Debtor; and<br><br>(v) The Reorganized Debtor will enter into an agreement with The Continuum Company for services in connection with the development of the Property. |
| Sponsor | Sponsor means New One Madison Park Member I, LP, a Delaware limited partnership. Sponsor's limited partners are 45 Margaux LLC, a Delaware limited liability company, Kraus OMP LLC, a Delaware limited liability company, and Glimcher Bernard One Madison, LLC, a Delaware limited liability company. Sponsor's general partner and managing member is New One Madison Park GP, LLC, a Delaware limited liability company. The Reorganized Debtor will provide an indemnity in the favor of Sponsor and its affiliates. |
| Assumption or Rejection of Executory Contracts | Executory contracts and unexpired leases shall be assumed or rejected pursuant to schedules to be attached to the Joint Plan and/or the accompanying disclosure statement and approved by the Sponsor. |
| Preference Claims | As part of the restructuring of the Existing iStar Indebtedness, iStar shall be granted a release of any and all claims of the Debtors against iStar including, but not limited to, any preference claims.<br><br>As part of the restructuring, Holders of Allowed general unsecured claims against the Debtors shall be granted a limited release of preference claims held by the Debtors against such Holders pursuant to Section 547 of the Bankruptcy Code on account of cash payments made by the Debtors to such Holders. |
| Expense Reimbursement | The Reorganized Debtor will reimburse the Sponsor and Sponsor Creditors for their fees and expenses incurred in connection with the transactions contemplated by the Plan Support Agreement ("Expense Reimbursement"), which fees and expenses will be funded under the Joint Plan Funding Commitment. |

CHI 60,479,278v12 11-18-10

| | |
|---|---|
| Other Provisions | Customary provisions regarding: conditions precedent to confirmation and the Effective Date; disputed Claims/reserves, preservation of causes of action, disbursing agent, injunctions, releases, exculpation, retention of jurisdiction, tax exemption with respect to the sale of the Property and Unit Sales, etc. will be included in the Joint Plan. |

16

## EXHIBIT 1

## RESTRUCTURED SECURED DEBT TERM SHEET

| Borrower: | Reorganized Debtor |
|---|---|
| Lender: | iStar |
| **Restructured Existing iStar Indebtedness:** | The Existing iStar Indebtedness shall be consolidated into one loan in the amount of $124.5 million. The Reorganized Debtor and iStar shall enter into an amended and restated loan and security agreement, an amended and restated mortgage, and an amended and restated note consistent with the terms contained herein (the "Amended and Restated Loan Documents"). |
| **Interest:** | Prime rate as published in The Wall Street Journal + 50 basis points (0.50%). |
| | (A) Interest on the principal amount of the Restructured Existing iStar Indebtedness shall be payable monthly in arrears on the first business day of each calendar month as follows: (i) during the period commencing on the Effective Date and ending on the last day of the twelfth (12th) calendar month following the Effective Date (the "**Initial Period**"), interest shall accrue and be compounded monthly at the interest rate set forth above (such accrued interest together with interest thereon shall herein be referred to as the "**Accrued Interest**") and such Accrued Interest be paid as provided below; and (ii) from and after the first day following the Initial Period until the principal amount of the Restructured Existing iStar Indebtedness has been repaid in full, interest shall be paid (x) as provided in Section (C) 2 (i) below; (y) if same has not so been paid pursuant to said Section (C) 2 (i), then, from the funds, if any, on deposit in the Interest Reserve Account (as hereinafter defined) and (x) to the extent that there are not sufficient funds on deposit in the Interest Reserve Account to pay any such interest then due and payable, the Reorganized Debtor shall pay same from its own funds (excluding Net Unit Sales Proceeds, as hereinafter defined). |
| | (B) The following terms used herein shall have the respective meanings ascribed thereto as set forth below: |
| | "**Net Unit Sales Proceeds**" shall mean the gross proceeds from Unit Sales less: (i) selling costs (brokerage, selling, taxes, marketing, customary closing costs, recording costs, |

*CHI 60,479,278v12 11-18-10*

etc.); and (ii) ordinary course operating expenses of the Reorganized Debtor, including general marketing and administrative expenses, not otherwise paid with proceeds from the Equity Funding Commitment.

"**Interest Reserve Account**" shall mean a bank account maintained by the Reorganized Debtor at a bank reasonably acceptable to iStar. The Reorganized Debtor shall grant iStar a security interest in the Interest Reserve Account and the Interest Reserve Account shall be under the sole dominion and control of iStar.

"**First Interest Reserve Amount**" shall mean an amount, reasonably determined by Reorganized Debtor, to equal the amount of interest that will become payable in respect of the principal amount of the Restructured Existing iStar Indebtedness during the six (6) calendar month period immediately following the Initial Period (such six calendar month period is herein referred to as the "**Second Period**"), as reasonably determined by the Reorganized Debtor.

"**Second Interest Reserve Amount**" shall mean an amount, reasonably determined by Reorganized Debtor, to equal the amount of interest that will become payable in respect of the principal amount of the Restructured Existing iStar Indebtedness during the six (6) calendar month period immediately following the Second Period, as reasonably determined by the Reorganized Debtor.

(C) Net Unit Sales Proceeds shall be applied as follows:

1. Net Unit Sales Proceeds generated during the Initial Period shall be: (ii) first, applied toward payment of the Accrued Interest until the same is paid in full, (i) second, deposited into the Interest Reserve Account until the amount on deposit therein equals the First Interest Reserve Amount (iii) third, applied toward repayment of the principal amount of the Restructured Existing iStar Indebtedness.

2. Net Unit Sales Proceeds generated during the Second Period shall be (i) first, applied toward payment of interest then due and payable (excluding any Accrued Interest); (ii) second, deposited into the Interest Reserve Account until the amount on deposit therein equals the First Interest Reserve Amount minus any amount applied toward payment of current interest as provided in clause (i) immediately above; (iii) third, deposited into the Interest Reserve Account until the

| | |
|---|---|
| | aggregate amount so deposited pursuant to this clause (iii) equals the Second Interest Reserve Amount; (iv) fourth, applied toward payment of the Accrued Interest until the same is paid in full; and (v) fifth, toward repayment of the principal amount of the Restructured Existing iStar Indebtedness.<br><br>3. Net Unit Sales Proceeds generated after the Second Period shall be: (i) first, applied toward payment of the Accrued Interest until the same is paid in full and (ii) second, applied toward repayment of the principal amount of the Restructured Existing iStar Indebtedness. |
| **Principle Payments:** | After funding the Interest Reserve, payments from Net Unit Sale Proceeds. |
| **Maturity:** | Four (4) years after the Effective Date. |
| **Fees/Exit Fees:** | None. |
| **Prepayment** | Anytime in whole or in part without penalty. |
| **Guarantees/Env. Indem.** | None; all references to Guarantor or Indemnitor Deleted. |
| **Interest Rate Protection Products** | At option of Borrower; none required. |
| **Modifications To Existing Building Loan Agreement (LA):** | Amended and restated loan agreement will be based on existing building loan agreement as modified in accordance with this Exhibit 1 |
| **General** | Shall be restyled as Term Loan Agreement |
| **Conditions to Loan (to be renamed "Construction Completion"** | Section 3 of the Loan Documents shall be deleted except for Sections 3.5 (A), 3.7, 3.8, 3.9. Section 3.5 (A) shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Representations and Warranties** | Section 4 of the Loan Documents shall be deleted, except for the representations in Section 4.1, 4.2, 4.9, and 4.10, all of which shall be updated |
| **Affirmative Covenants** | Section 5 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Accounts/Cash Management** | Section 6 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Negative Covenants** | Section 7 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |

| | |
|---|---|
| **Default, Rights and Remedies** | Section 9 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as Exhibit 1A. |
| **Miscellaneous** | Other provisions of the Loan Documents will be modified, including without limitation Sections 1, 2, 6, 8, 9 and 11 of the Loan Documents as necessary to conform to and reflect the terms of the Restructured iStar Debt. |

## EXHIBIT 1A

## COVENANT OVERVIEW

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 3.5 | Performance of Development | | Completion of the 50 story hi-rise tower (which includes: (i) punch list for 38 units, (ii) build out of 19 units (currently four walls and concrete slab; (iii) amenities and (iv) lobby) shall be in accordance with all applicable laws, by a specified date, on a lien free basis (subject to contest rights) using equity funds of the Borrower. Borrower may change the plans and specifications for the unfinished portion of the hi-rise tower provided that such changes are non-structural, are consistent with a luxury hi-rise tower and can be completed for a cost using the additional equity funds of Borrower. |
| | | | Completion of the adjacent building shall be in accordance with all applicable laws, by a specified date, on a lien free basis (subject to contest rights) using equity funds of the Borrower. Borrower may change the plans and specifications for the adjacent building provided that (i) such building is at least approximately 10,000 sq. ft. (i.e., as currently permitted by applicable law) and (ii) such changes are complimentary to the luxury hi-rise tower, do not result in an impairment to the value of Lender's collateral, and can be completed for a cost using the additional equity funds of Borrower. |
| | | | The identity of architects, engineers, general contractors, subcontractors and other construction professionals shall be |

CHI 60,479,278v12 11-18-10

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| | | | within the discretion of Borrower, provided that such parties have the requisite skill and experience to complete their work consistent with a luxury hi-rise tower/or adjacent structure, as applicable. The terms of the contracts and agreements with such professionals shall be in Borrower's discretion consistent with the above cost requirements and industry terms and custom.<br><br>Borrower shall obtain such permits, licenses and governmental consents when and as the same may be required in connection with the construction and the sales of Units. |
| 5.1(a) and 5.1(b) | Financial Statements and Accountant Reports | Financial Statements | Financial Statements of Borrower to be provided and specifically excluding any information from members of the Borrower. |
| 5.1(C)(i) | General Requirements of Insurance Policies | All insurance policies shall be issued by an insurer or insurers with an AM Best rating of "A-IX" or better and a Standard and Poor's rating of "A" | All insurance policies shall be issued by an insurer or insurers with an AM Best rating of "A-IX" or better and a Standard and Poor's rating of "A." |
| 5.3 | Payment of Impositions and Claims | | Contest for claims for labor, services, materials and supplies to be governed by Section 3.8. |

2

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.3(B)(b) | Payment of Impositions and Lien Claims; Permitted Contests. | (b) at least thirty (30) days prior to the date on which such Imposition would otherwise have become delinquent, Borrower shall have deposited with Lender (or with a court of competent jurisdiction or other appropriate Person approved by Lender) such additional amounts or other security as are necessary to keep on deposit at all times, an amount equal to at least one hundred twenty-five percent (125%) (or such higher amounts as may be required by applicable law) of the total of (x) the balance of such Impositions or Claims then remaining unpaid, and (y) all interest, penalties, costs and charges accrued or accumulated thereon).... | Delete clause (b) and references in Section (B) to the deposit described in clause (b) |
| 5.4 (A)(e)(e) | Insurance, Requirements during and following Construction | Umbrella Liability, with minimum limits of $100,000,000.00 per occurrence with a per project aggregate of $100,000,000.... | Umbrella Liability, with minimum limits of $50,000,000.00 per occurrence with a per project aggregate of $50,000,000.00.... |
| 5.4(A)(e)(g) | Insurance, Requirements during and following construction | Performance and Payment Bonds, for 100% of the contract price as required by Lender. | Performance and Payment Bonds, for 100% of the contract price for all subcontractors in which the contract price exceeds $250,000 and as required by Lender. |
| 5.4(B)(vi) | Liquor Liability. | Liquor Liability. Upon Lender's reasonable request or prior to any tent | Delete as covenant not applicable. |

3

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.6 | Inspection; Lender Meeting | Requirement of Borrower to pay fees of appraiser once during the term of the Building Loan | Delete |
| 5.8 | Environmental Disclosure | Clause (4) – the discovery by Borrower or its agents of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property … | Delete reference to "in the vicinity" |
| 5.9 | Compliance with Laws, Employee Benefit Plans and Contractual Obligations | Borrower will promptly and faithfully … (C) perform, observe, comply and fulfill all of its obligations, covenants and conditions contained in the Loan Documents, the Leases and the Material Contracts … | Borrower may modify Material Contracts provided such contracts as amended continue to contain customary industry terms and conditions |
| 5.11 | Management; Sales Agent | All management agreements must contain termination provisions and must be otherwise reasonably satisfactory to Lender | All management agreements must contain customary industry terms and conditions. |
| 5.11 | Management; Sales Agent | All brokerage agreements must contain subordination and termination provisions and must be otherwise reasonably satisfactory to Lender | All brokerage agreements must contain customary industry terms and conditions and be with a Qualified Sales Broker, but may otherwise be entered into, amended, modified or terminated in Borrower's discretion. |
| 5.11 | Management; Sales Agent | Borrower shall not modify, or amend in any material respect or terminate any approved management agreement without Lender's written consent (not to be unreasonably withheld, conditioned or delayed). | All management agreements must contain customary industry terms and conditions, but may otherwise be entered into, amended, modified or terminated in Borrower's discretion. |

4

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.11 | Management; Sales Agent | No definition for Qualified Sales Broker | Definition of Qualified Sales Broker does not appear in the document. The definition should state a Qualified Sales Broker includes a broker affiliated with Borrower. The Qualified Sales Broker should be selected by the Borrower following the approval of the Joint Plan. |
| 5.12(A) (vi) and 5.12(A)(vii) | Use of the Project; Voting Rights of Borrower. Certain Restrictions | (v) materially and substantially modify, alter, remove or improve the Common Areas (other than for Tenant Improvements to retail space or as otherwise set forth in the Project Plans and Specifications), (vii) add or withdraw real property from the Project, or create additional Residential Units, beyond those existing or planned for, in accordance with, and pursuant to the Governing Instruments and Project Plans and Specifications, | Clauses (v) and (vii) are subject to rights of Borrower to make changes consistent with Section 3.5, as amended |
| 5.12(A)(viii) | Use of the Project; Voting Rights of Borrower. Certain Restrictions. | (viii) permit the Residential Units to be used other than for nonpermanent residential purposes; | (viii) permit the Residential Units to be used other than for nonpermanent residential purposes; provided, however, Borrower may use the Residential Units for project management or marketing purposes |
| 5.12(B) | Use by Public | Except as contemplated by the Governing Instruments, Borrower shall not cause, permit or suffer the Mortgaged Property (other than the Common Areas) to be used by the public without restriction (except as required by applicable law . . . | Except as contemplated by the Governing Instruments, Borrower shall not cause, permit or suffer the Mortgaged Property (other than the Common Areas) to be used by the public without restriction (except as required by applicable law . . .; provided, however, Borrower may use the Mortgaged Property for project management or marketing purposes |

CHI 60,479,278v12 11-18-10

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.12(D)(v) | Form of Documents | Borrower shall not amend, modify or materially alter . . . | The form of all documents must contain customary industry terms and conditions; but may otherwise be amended or modified in Borrower's discretion. |
| 5.12(F) | Contracts | Borrower shall not materially modify or amend | Definition of Material Contracts to be revised.<br><br>All Material Contracts must contain customary industry terms and conditions; but may otherwise be entered into, amended, modified or terminated in Borrower's discretion. |
| 5.15 | Lender's Verification of Subcontracts | | Deleted |
| 5.18 | Tenant in Common Covenants | Covenant related to Tenant in Common | Delete |
| 5.19 | Union Labor Requirement | Requirement that each Contractor and subcontractor comply with the Union Labor Requirement | Eliminates this requirement for the smaller lot located on 22nd street and for interior walls in Common Areas |
| 5.21 | Section 421-a Compliance | Borrower shall take all action to cause the Mortgaged Property to comply with Section 421-a | Eliminate this requirement for the smaller lot located on 22nd Street |
| 6.3 | Rate Cap Agreement Payments | Borrower shall cause all amounts payable by Rate Cap Issuer under the rate Cap Agreement to be paid directly to Lender | Deleted |

6

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 6.4(A)(ii) | Transfers From, and Allocations within, Operating Depository Account | After Debt Service, funds to remain on deposit with Lender | After Debt Service, funds to be held by Borrower and applied to operating expenses and reserves therefor |
| 7.3 | Material Rights | Without Lender's consent, Borrower shall not (a) amend, modify or waive the performance of material obligations with regard to the Material Contracts . . . | Deleted |
| 7.4 | Restriction on Fundamental Changes | Borrower will not (1) amend, modify or waive in any material respect any term of provision of its Organizational Documents | Borrower will not (1) amend, modify or waive in any material respect any term of provision of its Organizational Documents except to reflect changes otherwise permitted by this Agreement |
| 7.4 | Restriction on Fundamental Changes | No Borrower will issue, sell, assign pledge, convey, dispose of or otherwise encumber any partnership, stock, membership, beneficial or other ownership interests or grant any options, warrants, purchase rights or other similar agreements or understndings with respect thereto | Deleted |
| 7.6 | Transactions with Affiliates | Standard Transaction with Affiliates covenant | Schedule as a permitted Transaction: Affiliate agreement with a Qualified Sales Broker; and Development Agreement |
| 7.7 | Management Fees and Compensation; contracts | Borrower will not enter into management, brokerage or other such similar agreement unless it can be terminated with no more than 30 days written notice | Borrower will not enter into management, brokerage or other such similar agreement unless it is on customary industry terms and conditions. |

7

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 7.11(A)(3) | Due on Sale or Encumbrance | (3) at each and every tier or level of ownership, in Borrower's direct or indirect partners, shareholders, beneficial or constituent owners . . . | Delete clause (2) and (3). Transfers of direct or indirect interests in Borrower permitted so long as IBE controlled entity retains control of the day-to-day operations of the Borrower. |
| 7.11(B) | Sale of Units; Release for Units | | Definition of Units throughout document should exclude already sold Units |
| 7.11(B)(iii) | Sale of Units; Release for Units | The Sales Proceeds, but in no event less than the Minimum Sales Price for the applicable Unit . . . . | Change Schedule 3.11(FF) and provisions to reflect appropriate minimum gross sale prices and limitation that closing costs cannot exceed 7%. |
| | | | Net Unit Sales Proceeds will be applied in accordance with Waterfall. |
| | | | Definition of Unit to exclude already sold units and any units belonging to members of the Borrower. |
| | | | Delete reference to Participants in clause (vii) Net Sales Proceeds |
| 7.11(B)(iii)(ii) | Sale of Units; Release of Units | (ii) funds in the amount of $5,000 as an administrative fee to Lender for each Unit | Delete clause (ii) |
| 7.11(B)(iv) | Sale of Units; Release of Units | (iv) Borrower has complied with, and such sale shall comply with, all applicable Legal Requirements, including without limitation, the issuance of a certificate of temporary certificate of occupancy | (iv) Borrower has complied with, and sale of such Unit shall comply with, all applicable Legal Requirements, including without limitation, the issuance of a certificate of temporary certificate of occupancy |
| 7.12 | Payments; Distributions | References to McDonald's Cash Collateral | Delete Reference |

8

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 7.14 | Alterations | Following Completion of Construction of the Initial Project, Borrower shall not alter, remove or demolish or permit the remove or demolish or permit the Alteration, removal or demolition of, any Improvement, except as the same may be necessary in connection with (i) a Restoration in connection with a taking or casualty in accordance with the terms and conditions of the Agreement and (ii) other Alterations permitted in accordance with the terms and conditions of this Section 7.14. | Following Completion of Construction of the Initial Project, Borrower shall not alter, remove or demolish or permit the Alteration, removal or demolition of, any Improvement, except as the same may be necessary in connection with (i) a Restoration in connection with a taking or casualty in accordance with the terms and conditions of the Agreement, and (ii) other Alterations permitted in accordance with the terms and conditions of this Section 7.14. |
| 9(L) | TIC Agreement | Event of Default | Deleted |
| 9(N) | Cross Default | Event of Default | Deleted |
| 9(O) | Death of Guarantor | Event of Default | Deleted |
| 9(P) | Rate Cap Agreement | Event of Default | Deleted |
| 9(Q) | Independent Person | Event of Default | Deleted |
| 9 (R) | Insolvency Opinion | Event of Default | Deleted |
| 9(U) | Construction | Event of Default | Deleted |
| 9(W) | 22nd Street Approval | Event of Default | Deleted |
| 9(X) | McDonald's Resolution | Event of Default | Deleted |
| 9(Y) | Cessation of Construction | Event of Default | Deleted |

9

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 10 | Secondary Market Transaction | | Deleted |

10