## EXHIBIT C

## Joint Plan of Reorganization Summary of Terms

# JOINT PLAN OF REORGANIZATION SUMMARY OF TERMS

## I.   DEFINED TERMS

"**Allowed**" means a Claim or Interest that is allowed under the Bankruptcy Code or the Joint Plan.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Chapter 11 Cases**" means the pending involuntary chapter 7 cases of the Debtors pending in the Bankruptcy Court (Case Nos. 10-11867, 10-11868, 10-11869, and 10-11870) as and when converted to cases under chapter 11 of the Bankruptcy Code.

"**Claim**" has the meaning ascribed to such term under the Bankruptcy Code.

"**Debtors**" means the following entities with currently pending involuntary chapter 7 cases in the United States Bankruptcy Court for the District of Delaware: FKF Madison Park Group Owner, LLC (Case No. 10-11867 (KG)), JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868 (KG)), Madison Park Group Owner, LLC (Case No. 10-11869 (KG)), and Slazer Enterprises Owner, LLC (Case No. 10-11870 (KG)).

"**Deed**" means documents of title evidencing a transfer of an ownership interest from the Debtors to a Person.

"**Deed Holder Claim**" means the Holder of a Deed transferring title to a portion of the Property which Deed is not subject to a release executed by iStar.

"**Effective Date**" means the date on which the Debtors' Joint Plan becomes effective.

"**Entity**" means any Person, estate governmental unit, and United States trustee.

"**Equity Interests**" means an equity interest in the Debtors.

"**Estates**" means the estates created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Debtors' Chapter 11 Cases.

"**Existing iStar Indebtedness**" means the indebtedness owed by the Debtors to iStar as evidenced by the Loan Documents.

*CHI 60,479,278v12 11-18-10*

**"GAP Claim"** means a Claim Allowed pursuant to Section 502(f) of the Bankruptcy Code.

**"Gross Proceeds"** means the gross proceeds received by the Debtors from Unit Sales.

**"iStar"** means iStar Tara LLC.

**"Holder"** means an Entity holding a Claim against, or Equity Interest in, any debtor.

**"Joint Plan"** means the Debtors' joint chapter 11 plan of reorganization as confirmed by the Bankruptcy Court.

**"Joint Plan Funding Commitment"** means the equity funding from the Sponsor to capitalize the Reorganized Debtor as of the Effective Date such that the Reorganized Debtor has the funds available to make the payments required under the Joint Plan to be made on the Effective Date and has funds available after the Effective Date funds for developing the Property. The Debtors will be a beneficiary of the Joint Plan Funding Commitment.

**"Loan Agreements"** means collectively: (i) Senior Loan and Security Agreement between Borrowers and SFT I, Inc. (as predecessor in interest to iStar) dated as of November 16, 2007; (ii) Project Loan and Security Agreement between Borrowers and SFT I, Inc. (as predecessor in interest to iStar) dated as of November 16, 2007; and (iii) Building Loan and Security Agreement between Borrowers and SFT I, Inc. (as predecessor in interest to iStar) dated as of November 16, 2007; each, as modified by that certain Modification Of Loan Agreements And Other Loan Documents (the "Modification Agreement") between Borrowers and iStar as lender dated as of June 24, 2009.

**"Loan Documents"** means collectively the Loan Agreements, the Modification Agreement, Mortgages, and Notes.

**"Modification Agreement"** shall have the meaning set forth within the definition of "Loan Agreements."

**"Mortgages"** means collectively: (i) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Senior Loan) made by Borrowers in favor of SFT I, Inc. (as predecessor in interest to iStar) dated November 16, 2007, as modified by the Modification Agreement; (ii) Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; and (iii) Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Building Loan) made by Borrowers in favor of iStar dated as of June 24, 2009.

2

"**Net Waterfall Proceeds**" means Gross Proceeds from Unit Sales less: (i) selling costs (brokerage, selling, taxes, marketing, customary closing costs, recording costs, etc.); (ii) ordinary course operating expenses of the Reorganized Debtor, including general marketing and administrative expenses, not otherwise paid with proceeds received by the Reorganized Debtor from the Joint Plan Funding Commitment; (iii) post-Effective Date payments of principal and interest and fees and costs, if any, to iStar until the Restructured iStar Debt is paid in full; and (iv) the return of capital to the Sponsor in an amount equal to the total amount funded under the Joint Plan Funding Commitment to Reorganized Debtor, plus interest on such capital at twenty percent (20%) per annum, compounded.

"**Net Waterfall Proceeds Plan Obligation**" means the obligation under the Joint Plan imposed upon, and assumed by, the Reorganized Debtor pursuant to the Joint Plan providing for payments from the Reorganized Debtor to the Estates in an aggregate amount equal to ten percent (10%) of the Net Waterfall Proceeds when and if such are available. The costs for claims allowance/disallowance and distributing the payments from the Net Waterfall Proceeds shall be paid from such proceeds.

"**Notes**" means collectively: (i) Consolidated, Amended and Restated Promissory Note (Senior Loan) made by Borrowers in favor of SFT I, Inc. (as predecessor in interest to iStar) dated November 16, 2007, as modified by the Modification Agreement; (ii) Second Consolidated, Amended and Restated Promissory Note (Project Loan) made by Borrowers in favor of iStar dated as of June 24, 2009; and (iii) Amended and Restated Promissory Note (Building Loan) made by Borrowers in favor of iStar dated June 24, 2009.

"**Person**" means any individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any domestic or foreign government, governmental agency, or any subdivision, department or other instrumentality thereof.

"**Property**" means the land, the improvements, the unsold Units which have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story hi rise tower containing sixty nine (69) residential units of which fifty-seven (57) units remain unsold and contain approximately 117,982 net sellable square feet, and amenities, and limited common elements (the "**North Tower**"), as well as a to be constructed mid-rise building located on an adjacent lot known as 23 East 22nd containing a ground level residential lobby and approximately 7,000 square feet of net sellable residential FAR (the "**South Tower**") along with the land underlying and abutting the North Tower and the South Tower, the improvements, the unsold Units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing.

3

**"Reorganized Debtor"** means New One Madison Park, LLC, a Delaware limited liability company, the entity under the Joint Plan to which all of assets of the Debtors' Estates shall be sold.

**"Restructured iStar Debt"** means the Existing iStar Indebtedness as modified as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1.

**"Sponsor"** means New One Madison Park Member I, LP, a Delaware limited partnership, which shall receive one-hundred percent (100%) of the Equity Interests of the Reorganized Debtor.

**"Sponsor Creditors"** means collectively, Mad 52, LLC, Mitchell Kraus and Stephen Kraus.

**"Units"** means the residential condominium units, together with the common elements and limited common elements appurtenant thereto, that currently are, or will in the future be, subject to a condominium regime effecting the Property.

**"Unit Sales"** means the sale of one or more Units that comprise the Property.

## II.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.  Claims Against Debtor FKF Madison Park Group Owner, LLC

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against FKF Madison Park Group Owner, LLC ("FKF") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1A Allowed Secured Claim of iStar | Class 1A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, FKF shall grant iStar a release of any and all claims of FKF against iStar including, but not limited to, any preference claims. |
| Class 2A Mechanic's Liens Claims | Class 2A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against FKF shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such |

4

| | |
|---|---|
| | Holder's Class 2A Claim. |
| Class 3A<br>Other Secured Claims | Class 3A is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against FKF that are secured by assets of FKF, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4A<br>Property Tax Claims | Class 4A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the FKF and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against FKF that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5A<br>Deed Holder Claims | Class 5A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against FKF shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the |

5

| | |
|---|---|
| | Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed. |
| Class 6A<br>Other Priority Claims | Class 6A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against FKF shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as FKF and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7A<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7A is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against FKF shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
| Class 8A<br>Equity Interests | Class 8A is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of FKF, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

## B. Claims Against Debtor JMJS 23rd Street Realty Owner, LLC

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against JMJS 23rd Street Realty Owner, LLC ("JMJS") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1B Allowed Secured Claim of iStar | Class 1B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, JMJS shall grant iStar a release of any and all claims of JMJS against iStar including, but not limited to, any preference claims. |
| Class 2B Mechanic's Liens Claims | Class 2B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against JMJS shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such Holder's Class 2B Claim. |
| Class 3B Other Secured Claims | Class 3A is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against JMJS that are secured by assets of JMJS, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4B Property Tax Claims | Class 4B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the JMJS and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against JMJS that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years |

7

| | |
|---|---|
| | after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5B<br>Deed Holder Claims | Class 5B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against JMJS shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed. |
| Class 6B<br>Other Priority Claims | Class 6B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against JMJS shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as JMJS and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7B<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7B is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against JMJS shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D will be calculated based upon a fraction with the numerator |

8

| | equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
|---|---|
| Class 8B Equity Interests | Class 8A is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of JMJS, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

### C.    Claims Against Debtor Madison Park Group Owner, LLC

| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against Madison Park Group Owner, LLC ("Madison") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
|---|---|
| Class 1C Allowed Secured Claim of iStar | Class 1C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, Madison shall grant iStar a release of any and all claims of Madison against iStar including, but not limited to, any preference claims. |
| Class 2C Mechanic's Liens Claims | Class 2C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against Madison shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such Holder's Class 2C Claim. |
| Class 3C Other Secured Claims | Class 3A is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against Madison that are secured by assets of Madison, on or as |

9

| | |
|---|---|
| | soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4C<br>Property Tax Claims | Class 4C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the Madison and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against Madison that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
| Class 5C<br>Deed Holder Claims | Class 5C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against Madison shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights |

10

| | to the Unit in respect of such Deed. |
|---|---|
| Class 6C<br>Other Priority Claims | Class 6C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against Madison shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as Madison and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7C<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7C is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against Madison shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
| Class 8C<br>Equity Interests | Class 8C is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of Madison, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

11

## D.     Claims Against Debtor Slazer Enterprises Owner, LLC

| | |
|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | Holders of Claims that are unclassified under the Bankruptcy Code against Slazer Enterprises Owner, LLC ("Slazer") shall receive, on or as soon as practicable after the Effective Date, cash equal to the full Allowed amount of their Unclassified Claim(s) or otherwise be left unimpaired, unless otherwise agreed to by any such Holder. |
| Class 1D Allowed Secured Claim of iStar | Class 1D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. The Existing iStar Indebtedness shall be restructured as of the Effective Date such that iStar retains its existing liens and receives deferred cash payments with a present value equal to the value of its collateral with specific loan terms as set forth in the Restructured Secured Debt Term Sheet, annexed hereto as Exhibit 1. In addition, Slazer shall grant iStar a release of any and all claims of Slazer against iStar including, but not limited to, any preference claims. |
| Class 2D Mechanic's Liens Claims | Class 2D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Holders of properly and timely asserted mechanic's liens under applicable state law against Slazer shall receive a cash payment on the Effective Date equal to twenty percent (20%) of the Allowed amount of each such Holder's Class 2D Claim. |
| Class 3D Other Secured Claims | Class 3D is unimpaired under the Joint Plan, deemed to accept the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. To the extent there exists any Other Secured Claims against Slazer that are secured by assets of Slazer, on or as soon as practicable after the Effective Date, all such Allowed Other Secured Claims shall, as of the Effective Date, if not paid previously, be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. |
| Class 4D Property Tax Claims | Class 4D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Except to the extent that the Slazer and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim against Slazer that is due and payable on or before the Effective Date shall receive either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding |

CHI 60,479,278v12 11-18-10

| | five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Property Tax Claim. |
|---|---|
| Class 5D<br>Deed Holder Claims | Class 5D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed Deed Holder Claim against Slazer shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 5A-5D will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D, and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed. |
| Class 6D<br>Other Priority Claims | Class 6D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. Each Holder of an Allowed Other Priority Claim against Slazer shall receive either (i) cash equal to the full unpaid amount of such Allowed Other Priority Claim, or (ii) such other treatment as Slazer and the Holder of such Allowed Other Priority Claim shall have agreed. |
| Class 7D<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | Class 7D is impaired under the Joint Plan and shall be permitted to vote on the Joint Plan. From and after the Effective Date, each Holder of an Allowed General Unsecured Claim against Slazer shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the pro-rata distribution to be made on account of each Allowed Claim in Classes 7A-7D |

CHI 60,479,278v12 11-18-10

| | will be calculated based upon a fraction with the numerator equal to the gross proceeds received by the Estates on account of the Net Waterfall Proceeds Plan Obligation less the cost of making the distribution to Classes 5A-5D and 7A-7D and with the denominator equal to the aggregate total amount of Allowed Claims in Classes 5A-5D and 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Claim. |
|---|---|
| Class 8D Equity Interests | Class 8D is impaired under the Joint Plan, deemed to reject the Joint Plan and, as such, shall not be permitted to vote on the Joint Plan. Outstanding Equity Interests of Slazer, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Joint Plan. |

## III. MEANS OF IMPLEMENTATION OF THE JOINT PLAN

| Reorganized Debtor Operating Agreement | The assets of the Debtors' Estates under the Joint Plan shall be sold to the Reorganized Debtor free and clear of any liens, claims (including claims of successor liability), interests or encumbrances (including, without limitation, claims of Holders of Claims in Classes 2A-2D and 5A-5D) except for the liens provided for in the Amended and Restated Loan Documents. |
|---|---|
| Capitalization of Reorganized Debtor | (i) the Reorganized Debtor will assume the Restructured iStar Debt and enter into the Amended and Restated Loan Documents as described in Exhibit 1 hereto;

(ii) Sponsor will provide Reorganized Debtor with the Joint Plan Funding Commitment which will provide Reorganized Debtor with the funding for: (u) refinancing of the debtor in possession financing; (v) payments to be made on account of Claims that are unclassified under the Joint Plan; (w) payments to be made to Holders of Allowed Claims in Classes 2A, 2B, 2C and 2D under the Joint Plan; (x) (the Expense Reimbursement (as defined below); (y) working capital for the Reorganized Debtor; and (z) development of the Property.

(iii) The Reorganized Debtor will be obligated under the Joint Plan with respect to the Net Waterfall Proceeds Plan Obligation to the Estates to fund the payments to be made |

| | |
|---|---|
| | to Holders of Allowed Claims in Classes 5A-5D and 7A-7D; |
| | (iv) Sponsor shall receive 100% of the membership interests in the Reorganized Debtor; and |
| | (v) The Reorganized Debtor will enter into an agreement with The Continuum Company for services in connection with the development of the Property. |
| Sponsor | Sponsor means New One Madison Park Member I, LP, a Delaware limited partnership. Sponsor's limited partners are 45 Margaux LLC, a Delaware limited liability company, Kraus OMP LLC, a Delaware limited liability company, and Glimcher Bernard One Madison, LLC, a Delaware limited liability company. Sponsor's general partner and managing member is New One Madison Park GP, LLC, a Delaware limited liability company. The Reorganized Debtor will provide an indemnity in the favor of Sponsor and its affiliates. |
| Assumption or Rejection of Executory Contracts | Executory contracts and unexpired leases shall be assumed or rejected pursuant to schedules to be attached to the Joint Plan and/or the accompanying disclosure statement and approved by the Sponsor. |
| Preference Claims | As part of the restructuring of the Existing iStar Indebtedness, iStar shall be granted a release of any and all claims of the Debtors against iStar including, but not limited to, any preference claims. |
| | As part of the restructuring, Holders of Allowed general unsecured claims against the Debtors shall be granted a limited release of preference claims held by the Debtors against such Holders pursuant to Section 547 of the Bankruptcy Code on account of cash payments made by the Debtors to such Holders. |
| Expense Reimbursement | The Reorganized Debtor will reimburse the Sponsor and Sponsor Creditors for their fees and expenses incurred in connection with the transactions contemplated by the Plan Support Agreement ("Expense Reimbursement"), which fees and expenses will be funded under the Joint Plan Funding Commitment. |

15

| Other Provisions | Customary provisions regarding: conditions precedent to confirmation and the Effective Date; disputed Claims/reserves, preservation of causes of action, disbursing agent, injunctions, releases, exculpation, retention of jurisdiction, tax exemption with respect to the sale of the Property and Unit Sales, etc. will be included in the Joint Plan. |
| --- | --- |

CHI 60,479,278v12 11-18-10

# EXHIBIT 1

## RESTRUCTURED SECURED DEBT TERM SHEET

| | |
|---|---|
| **Borrower:** | Reorganized Debtor |
| **Lender:** | iStar |
| **Restructured Existing iStar Indebtedness:** | The Existing iStar Indebtedness shall be consolidated into one loan in the amount of $124.5 million. The Reorganized Debtor and iStar shall enter into an amended and restated loan and security agreement, an amended and restated mortgage, and an amended and restated note consistent with the terms contained herein (the "Amended and Restated Loan Documents"). |
| **Interest:** | Prime rate as published in The Wall Street Journal + 50 basis points (0.50%).

(A) Interest on the principal amount of the Restructured Existing iStar Indebtedness shall be payable monthly in arrears on the first business day of each calendar month as follows: (i) during the period commencing on the Effective Date and ending on the last day of the twelfth (12th) calendar month following the Effective Date (the "**Initial Period**"), interest shall accrue and be compounded monthly at the interest rate set forth above (such accrued interest together with interest thereon shall herein be referred to as the "**Accrued Interest**") and such Accrued Interest be paid as provided below; and (ii) from and after the first day following the Initial Period until the principal amount of the Restructured Existing iStar Indebtedness has been repaid in full, interest shall be paid (x) as provided in Section (C) 2 (i) below; (y) if same has not so been paid pursuant to said Section (C) 2 (i), then, from the funds, if any, on deposit in the Interest Reserve Account (as hereinafter defined) and (x) to the extent that there are not sufficient funds on deposit in the Interest Reserve Account to pay any such interest then due and payable, the Reorganized Debtor shall pay same from its own funds (excluding Net Unit Sales Proceeds, as hereinafter defined).

(B) The following terms used herein shall have the respective meanings ascribed thereto as set forth below:

"**Net Unit Sales Proceeds**" shall mean the gross proceeds from Unit Sales less: (i) selling costs (brokerage, selling, taxes, marketing, customary closing costs, recording costs, |

17

etc.); and (ii) ordinary course operating expenses of the Reorganized Debtor, including general marketing and administrative expenses, not otherwise paid with proceeds from the Equity Funding Commitment.

"**Interest Reserve Account**" shall mean a bank account maintained by the Reorganized Debtor at a bank reasonably acceptable to iStar. The Reorganized Debtor shall grant iStar a security interest in the Interest Reserve Account and the Interest Reserve Account shall be under the sole dominion and control of iStar.

"**First Interest Reserve Amount**" shall mean an amount, reasonably determined by Reorganized Debtor, to equal the amount of interest that will become payable in respect of the principal amount of the Restructured Existing iStar Indebtedness during the six (6) calendar month period immediately following the Initial Period (such six calendar month period is herein referred to as the "**Second Period**"), as reasonably determined by the Reorganized Debtor.

"**Second Interest Reserve Amount**" shall mean an amount, reasonably determined by Reorganized Debtor, to equal the amount of interest that will become payable in respect of the principal amount of the Restructured Existing iStar Indebtedness during the six (6) calendar month period immediately following the Second Period, as reasonably determined by the Reorganized Debtor.

(C) Net Unit Sales Proceeds shall be applied as follows:

1. Net Unit Sales Proceeds generated during the Initial Period shall be: (ii) first, applied toward payment of the Accrued Interest until the same is paid in full, (i) second, deposited into the Interest Reserve Account until the amount on deposit therein equals the First Interest Reserve Amount (iii) third, applied toward repayment of the principal amount of the Restructured Existing iStar Indebtedness.

2. Net Unit Sales Proceeds generated during the Second Period shall be (i) first, applied toward payment of interest then due and payable (excluding any Accrued Interest); (ii) second, deposited into the Interest Reserve Account until the amount on deposit therein equals the First Interest Reserve Amount <u>minus</u> any amount applied toward payment of current interest as provided in clause (i) immediately above; (iii) third, deposited into the Interest Reserve Account until the

18

| | |
|---|---|
| | aggregate amount so deposited pursuant to this clause (iii) equals the Second Interest Reserve Amount; (iv) fourth, applied toward payment of the Accrued Interest until the same is paid in full; and (v) fifth, toward repayment of the principal amount of the Restructured Existing iStar Indebtedness.<br><br>3. Net Unit Sales Proceeds generated after the Second Period shall be: (i) first, applied toward payment of the Accrued Interest until the same is paid in full and (ii) second, applied toward repayment of the principal amount of the Restructured Existing iStar Indebtedness. |
| **Principle Payments:** | After funding the Interest Reserve, payments from Net Unit Sale Proceeds. |
| **Maturity:** | Four (4) years after the Effective Date. |
| **Fees/Exit Fees:** | None. |
| **Prepayment** | Anytime in whole or in part without penalty. |
| **Guarantees/Env. Indem.** | None; all references to Guarantor or Indemnitor Deleted. |
| **Interest Rate Protection Products** | At option of Borrower; none required. |
| **Modifications To Existing Building Loan Agreement (LA):** | Amended and restated loan agreement will be based on existing building loan agreement as modified in accordance with this Exhibit 1 |
| **General** | Shall be restyled as Term Loan Agreement |
| **Conditions to Loan (to be renamed "Construction Completion"** | Section 3 of the Loan Documents shall be deleted except for Sections 3.5 (A), 3.7, 3.8, 3.9. Section 3.5 (A) shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Representations and Warranties** | Section 4 of the Loan Documents shall be deleted, except for the representations in Section 4.1, 4.2, 4.9, and 4.10, all of which shall be updated |
| **Affirmative Covenants** | Section 5 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Accounts/Cash Management** | Section 6 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Negative Covenants** | Section 7 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |

CHI 60,479,278v12 11-18-10

| | |
|---|---|
| **Default, Rights and Remedies** | Section 9 of the Loan Documents shall be changed in accordance with the Loan Overview, attached hereto as <u>Exhibit 1A</u>. |
| **Miscellaneous** | Other provisions of the Loan Documents will be modified, including without limitation Sections 1, 2, 6, 8, 9 and 11 of the Loan Documents as necessary to conform to and reflect the terms of the Restructured iStar Debt. |

*CHI 60,479,278v12 11-18-10*

**EXHIBIT 1A**

**COVENANT OVERVIEW**

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 3.5 | Performance of Development | | Completion of the 50 story hi-rise tower (which includes: (i) punch list for 38 units, (ii) build out of 19 units (currently four walls and concrete slab; (iii) amenities and (iv) lobby) shall be in accordance with all applicable laws, by a specified date, on a lien free basis (subject to contest rights) using equity funds of the Borrower. Borrower may change the plans and specifications for the unfinished portion of the hi-rise tower provided that such changes are non-structural, are consistent with a luxury hi-rise tower and can be completed for a cost using the additional equity funds of Borrower. |
| | | | Completion of the adjacent building shall be in accordance with all applicable laws, by a specified date, on a lien free basis (subject to contest rights) using equity funds of the Borrower. Borrower may change the plans and specifications for the adjacent building provided that (i) such building is at least approximately 10,000 sq. ft. (i.e., as currently permitted by applicable law) and (ii) such changes are complimentary to the luxury hi-rise tower, do not result in an impairment to the value of Lender's collateral, and can be completed for a cost using the additional equity funds of Borrower. |
| | | | The identity of architects, engineers, general contractors, subcontractors and other construction professionals shall be |

1

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| | | | within the discretion of Borrower, provided that such parties have the requisite skill and experience to complete their work consistent with a luxury hi-rise tower/or adjacent structure, as applicable. The terms of the contracts and agreements with such professionals shall be in Borrower's discretion consistent with the above cost requirements and industry terms and custom.

Borrower shall obtain such permits, licenses and governmental consents when and as the same may be required in connection with the construction and the sales of Units. |
| 5.1(a) and 5.1(b) | Financial Statements and Accountant Reports | Financial Statements | Financial Statements of Borrower to be provided and specifically excluding any information from members of the Borrower. |
| 5.1(C)(i) | General Requirements of Insurance Policies | All insurance policies shall be issued by an insurer or insurers with an AM Best rating of "A-:IX" or better and a Standard and Poor's rating of "A" | All insurance policies shall be issued by an insurer or insurers with an AM Best rating of "A-:IX" or better and a Standard and Poor's rating of "A." |
| 5.3 | Payment of Impositions and Claims | | Contest for claims for labor, services, materials and supplies to be governed by Section 3.8. |

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.3(B)(b) | Payment of Impositions and Lien Claims; Permitted Contests. | (b) at least thirty (30) days prior to the date on which such Imposition would otherwise have become delinquent, Borrower shall have deposited with Lender (or with a court of competent jurisdiction or other appropriate Person approved by Lender) such additional amounts or other security as are necessary to keep on deposit at all times, an amount equal to at least one hundred twenty-five percent (125%) (or such higher amounts as may be required by applicable law) of the total of (x) the balance of such Impositions or Claims then remaining unpaid, and (y) all interest, penalties, costs and charges accrued or accumulated thereon), . . . . | Delete clause (b) and references in Section (B) to the deposit described in clause (b) |
| 5.4 (A)(e)(e) | Insurance, Requirements during and following Construction | Umbrella Liability, with minimum limits of $100,000,000.00 per occurrence with a per project aggregate of $100,000,000. . . . | Umbrella Liability, with minimum limits of $50,000,000.00 per occurrence with a per project aggregate of $50,000,000.00. . . . |
| 5.4(A)(e)(g) | Insurance, Requirements during and following construction | Performance and Payment Bonds, for 100% of the contract price as required by Lender. | Performance and Payment Bonds, for 100% of the contract price for all subcontractors in which the contract price exceeds $250,000 and as required by Lender. |
| 5.4(B)(vi) | Liquor Liability. | Liquor Liability. Upon Lender's reasonable request or prior to any tent | Delete as covenant not applicable. |

3

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.6 | Inspection; Lender Meeting | Requirement of Borrower to pay fees of appraiser once during the term of the Building Loan | Delete |
| 5.8 | Environmental Disclosure | Clause (4) – the discovery by Borrower or its agents of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property . . . | Delete reference to "in the vicinity" |
| 5.9 | Compliance with Laws, Employee Benefit Plans and Contractual Obligations | Borrower will promptly and faithfully . . . (C) perform, observe, comply and fulfill all of its obligations, covenants and conditions contained in the Loan Documents, the Leases and the Material Contracts . . . | Borrower may modify Material Contracts provided such contracts as amended continue to contain customary industry terms and conditions |
| 5.11 | Management; Sales Agent | All management agreements must contain termination provisions and must be otherwise reasonably satisfactory to Lender | All management agreements must contain customary industry terms and conditions. |
| 5.11 | Management; Sales Agent | All brokerage agreements must contain subordination and termination provisions and must be otherwise reasonably satisfactory to Lender | All brokerage agreements must contain customary industry terms and conditions and be with a Qualified Sales Broker, but may otherwise be entered into, amended, modified or terminated in Borrower's discretion. |
| 5.11 | Management; Sales Agent | Borrower shall not modify, or amend in any material respect or terminate any approved management agreement without Lender's written consent (not to be unreasonably withheld, conditioned or delayed). | All management agreements must contain customary industry terms and conditions; but may otherwise be entered into, amended, modified or terminated in Borrower's discretion. |

4

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.11 | Management; Sales Agent | No definition for Qualified Sales Broker | Definition of Qualified Sales Broker does not appear in the document. The definition should state a Qualified Sales Broker includes a broker affiliated with Borrower. The Qualified Sales Broker should be selected by the Borrower following the approval of the Joint Plan. |
| 5.12(A) (vi) and 5.12(A)(vii) | Use of the Project; Voting Rights of Borrower. Certain Restrictions | (v) materially and substantially modify, alter, remove or improve the Common Areas (other than for Tenant Improvements to retail space or as otherwise set forth in the Project Plans and Specifications), (vii) add or withdraw real property from the Project, or create additional Residential Units, beyond those existing or planned for, in accordance with, and pursuant to the Governing Instruments and Project Plans and Specifications, | Clauses (v) and (vii) are subject to rights of Borrower to make changes consistent with Section 3.5, as amended |
| 5.12(A)(viii) | Use of the Project; Voting Rights of Borrower. Certain Restrictions. | (viii) permit the Residential Units to be used other than for nonpermanent residential purposes, | (viii) permit the Residential Units to be used other than for nonpermanent residential purposes; provided, however, Borrower may use the Residential Units for project management or marketing purposes |
| 5.12(B) | Use by Public | Except as contemplated by the Governing Instruments, Borrower shall not cause, permit or suffer the Mortgaged Property (other than the Common Areas) to be used by the public without restriction (except as required by applicable law . . . | Except as contemplated by the Governing Instruments, Borrower shall not cause, permit or suffer the Mortgaged Property (other than the Common Areas) to be used by the public without restriction (except as required by applicable law . . .; provided, however, Borrower may use the Mortgaged Property for project management or marketing purposes |

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 5.12(D)(v) | Form of Documents | Borrower shall not amend, modify or materially alter . . . | The form of all documents must contain customary industry terms and conditions; but may otherwise be amended or modified in Borrower's discretion. |
| 5.12(F) | Contracts | Borrower shall not materially modify or amend | Definition of Material Contracts to be revised. <br><br> All Material Contracts must contain customary industry terms and conditions; but may otherwise be entered into, amended, modified or terminated in Borrower's discretion. |
| 5.15 | Lender's Verification of Subcontracts | | Deleted |
| 5.18 | Tenant in Common Covenants | Covenant related to Tenant in Common | Delete |
| 5.19 | Union Labor Requirement | Requirement that each Contractor and subcontractor comply with the Union Labor Requirement | Eliminates this requirement for the smaller lot located on 22nd street and for interior walls in Common Areas |
| 5.21 | Section 421-a Compliance | Borrower shall take all action to cause the Mortgaged Property to comply with Section 421-a | Eliminate this requirement for the smaller lot located on 22nd Street |
| 6.3 | Rate Cap Agreement Payments | Borrower shall cause all amounts payable by Rate Cap Issuer under the rate Cap Agreement to be paid directly to Lender | Deleted |

6

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 6.4(A)(ii) | Transfers From, and Allocations within, Operating Depository Account | After Debt Service, funds to remain on deposit with Lender | After Debt Service, funds to be held by Borrower and applied to operating expenses and reserves therefor |
| 7.3 | Material Rights | Without Lender's consent, Borrower shall not (a) amend, modify or waive the performance of material obligations with regard to the Material Contracts . . . | Deleted |
| 7.4 | Restriction on Fundamental Changes | Borrower will not (1) amend, modify or waive in any material respect any term of provision of its Organizational Documents | Borrower will not (1) amend, modify or waive in any material respect any term of provision of its Organizational Documents except to reflect changes otherwise permitted by this Agreement |
| 7.4 | Restriction on Fundamental Changes | No Borrower will issue, sell, assign pledge, convey, dispose of or otherwise encumber any partnership, stock, membership, beneficial or other ownership interests or grant any options, warrants, purchase rights or other similar agreements or understndings with respect thereto | Deleted |
| 7.6 | Transactions with Affiliates | Standard Transaction with Affiliates covenant | Schedule as a permitted Transaction: Affiliate agreement with a Qualified Sales Broker; and Development Agreement |
| 7.7 | Management Fees and Compensation; contracts | Borrower will not enter into management, brokerage or other such similar agreement unless it can be terminated with no more than 30 days written notice | Borrower will not enter into management, brokerage or other such similar agreement unless it is on customary industry terms and conditions. |

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 7.11(A)(3) | Due on Sale or Encumbrance | (3) at each and every tier or level of ownership, in Borrower's direct or indirect partners, shareholders, beneficial or constituent owners … | Delete clause (2) and (3). Transfers of direct or indirect interests in Borrower permitted so long as IBE controlled entity retains control of the day-to-day operations of the Borrower. |
| 7.11(B) | Sale of Units; Release for Units | | Definition of Units throughout document should exclude already sold Units |
| 7.11(B)(iii) | Sale of Units; Release for Units | The Sales Proceeds, but in no event less than the Minimum Sales Price for the applicable Unit … | Change Schedule 3.11(FF) and provisions to reflect appropriate minimum gross sale prices and limitation that closing costs cannot exceed 7%.<br><br>Net Unit Sales Proceeds will be applied in accordance with Waterfall.<br><br>Definition of Unit to exclude already sold units and any units belonging to members of the Borrower.<br><br>Delete reference to Participants in clause (vii) Net Sales Proceeds |
| 7.11(B)(iii)(ii) | Sale of Units; Release of Units | (ii) funds in the amount of $5,000 as an administrative fee to Lender for each Unit | Delete clause (ii) |
| 7.11(B)(iv) | Sale of Units; Release of Units | (iv) Borrower has complied with, and such sale shall comply with, all applicable Legal Requirements, including without limitation, the issuance of a certificate of temporary certificate of occupancy | (iv) Borrower has complied with, and sale of such Unit shall comply with, all applicable Legal Requirements, including without limitation, the issuance of a certificate of temporary certificate of occupancy |
| 7.12 | Payments; Distributions | References to McDonald's Cash Collateral | Delete Reference |

8

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 7.14 | Alterations | Following Completion of Construction of the Initial Project, Borrower shall not alter, remove or demolish or permit the Alteration, removal or demolition of, any Improvement, except as the same may be necessary in connection with (i) a Restoration in connection with a taking or casualty in accordance with the terms and conditions of the Agreement and (ii) other Alterations permitted in accordance with the terms and conditions of this Section 7.14. | Following Completion of Construction of the Initial Project, Borrower shall not alter, remove or demolish or permit the Alteration, removal or demolition of, any Improvement, except as the same may be necessary in connection with (i) a Restoration in connection with a taking or casualty in accordance with the terms and conditions of the Agreement, and (ii) other Alterations permitted in accordance with the terms and conditions of this Section 7.14. |
| 9(L) | TIC Agreement | Event of Default | Deleted |
| 9(N) | Cross Default | Event of Default | Deleted |
| 9(O) | Death of Guarantor | Event of Default | Deleted |
| 9(P) | Rate Cap Agreement | Event of Default | Deleted |
| 9(Q) | Independent Person | Event of Default | Deleted |
| 9 (R) | Insolvency Opinion | Event of Default | Deleted |
| 9(U) | Construction | Event of Default | Deleted |
| 9(W) | 22nd Street Approval | Event of Default | Deleted |
| 9(X) | McDonald's Resolution | Event of Default | Deleted |
| 9(Y) | Cessation of Construction | Event of Default | Deleted |

9

| Existing Loan Document Section Reference | Description of Basket of Covenant | Term of Loan Documents | Terms of Amended and Restated Loan Documents |
|---|---|---|---|
| 10 | Secondary Market Transaction | | Deleted |

10

# EXHIBIT D

## Reorganized Debtor Operating Agreement

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## NEW ONE MADISON PARK, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT ("**Agreement**") is made and entered into as of the [___] day of [_____], 2010, by and between New One Madison Park Member I, LP (the "**Member**") and New One Madison Park, LLC (the "**Company**").

## ARTICLE I
## DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

"**Act**" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"**Capital Contribution**" shall mean any contribution to the capital of the Company in cash or property by the Member whenever made.

"**Cash Flow**" shall mean the gross cash proceeds from the operation of the Company's business less the portion thereof used to establish Reserves for or to pay Company expenses, debt payments and capital expenditures. "**Cash Flow**" shall include any net cash proceeds from the sale or disposition of Company property and from the refinancing of indebtedness of the Company, shall be increased by any reduction of Reserves previously established by the Member, and shall not be reduced by depreciation, cost recovery, amortization or similar non-cash deductions.

"**Certificate of Formation**" shall mean the Certificate of Formation of the Company as filed with the Secretary of State of Delaware, as amended from time to time.

"**Entity**" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"**Fiscal Year**" shall mean the period terminating on December 31 of each year during the term hereof or on such earlier date on which the Member's taxable year ends.

"**Member**" shall mean the Person who executed a counterpart of this Agreement as a Member and any Person who may hereafter become a member of the Company.

"**Net Profits**" and "**Net Losses**" shall mean the income, gain, loss, deductions and credits of the Company as determined for federal income tax purposes in the aggregate or separately stated, as appropriate, as of the close of each Fiscal Year.

"**Person**" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person," where the context so permits.

"**Representative**" shall mean the legally appointed guardian of a mentally incapacitated Member, the conservator of a mentally incapacitated Member's assets, the legally appointed and qualified executor or personal representative of the estate of a deceased Member or the legal representative or successor of a Member that is an Entity.

"**Reserves**" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Member for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

## ARTICLE II
## FORMATION OF COMPANY

**2.01  Formation**.  The Company shall be, or has been, organized as a Delaware limited liability company by executing and delivering a Certificate of Formation to the Delaware Secretary of State in accordance with and pursuant to the Act.

**2.02  Name**.  The name of the Company is "New One Madison Park, LLC."

**2.03  Principal Place of Business**.  The principal place of business of the Company shall be at such place as the Member may designate from time to time.  The Company may locate its places of business and registered office at any other place or places as the Member may deem advisable.

**2.04  Registered Office and Registered Agent**.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation of the Company filed with the Delaware Secretary of State or such other Person as the Member may designate from time to time in accordance with the Act.

**2.05  Term**.  The Company shall have a perpetual term and shall continue until it is dissolved in accordance with either the provisions of this Agreement or the Act.

## ARTICLE III
## BUSINESS OF COMPANY

**3.01  Purpose**.  The purpose of the Company and nature of the business to be

2

conducted by the Company is to acquire and own, finance, complete the construction of, sell individual condominium units and parking spaces at, administer, operate, hold, develop, lease, manage, maintain, and sell the Property, as applicable, and to engage in any further lawful business or activity for which a Delaware limited liability company may be organized under the Act. Except as specifically limited or prohibited by this Agreement, the Company is empowered to perform such actions and engage in such activities consistent with, useful, or necessary to carry out the purposes of the Company. As used herein, the "**Property**" means the real property commonly known as "One Madison Park," located at 22 East 23rd Street, New York, New York, and the buildings and other improvements located thereon.

## ARTICLE IV
## MANAGEMENT OF THE COMPANY

**4.01   Management of Company.**  The Member has the exclusive right to manage the Company's business. Accordingly, the Member shall: (i) manage the affairs and business of the Company; (ii) exercise the authority and powers granted to the Company; and (iii) otherwise act in all other matters on behalf of the Company.

**4.02   Execution of Documents.**  Any document or instrument of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind the Company or convey or encumber title to its real or personal property shall be valid and binding for all purposes only if executed by the Member.

**4.03   Action Without Meeting.**  Any action required to be taken by or on behalf of the Company may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Member.

**4.04   Tax Elections.**  No Member or any other Person shall make an election to have the Company treated as a corporation or other association taxable as a corporation for any tax purpose and no Member or other Person shall allow any equity interest in the Company to be traded on an established securities market or the substantial equivalent thereof.

## ARTICLE V
## RIGHTS AND OBLIGATIONS OF MEMBERS

**5.01   Limitation of Liability.**  No Member shall be liable to the Company or to any Member for any loss suffered by the Company unless such loss is caused by such Member's gross negligence, willful misconduct or fraud. The Member shall not be liable for errors in judgment or for any acts or omissions that do not constitute gross negligence, willful misconduct or fraud. The Member may consult with counsel and accountants and any member, manager, officer, employee or committee of the Company or other professional expert in respect of Company affairs, and provided that the choice of such person with whom the Member consulted did not constitute gross negligence and the Member acts in good faith reliance upon the advice or opinion of such counsel or accountants or other persons, the Member shall not be liable for any loss suffered by the Company in reliance thereon. It is expressly acknowledged that the indemnification provided in this Article V could involve indemnification for negligence or under

3

theories of strict liability.

**5.02    Right to Indemnification.** Subject to the limitations and conditions as provided in this Article V, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Member of the Company, an officer of the Company, or a manager, member, officer, director or employee of a Member of the Company or while any such Person is or was serving at the request of the Company or the Member as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise (each, an "**Indemnified Person**"), shall be indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article V shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.

**5.03    Survival.** Indemnification under this Article V shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article V shall be deemed contract rights, and no amendment, modification or repeal of this Article V shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

**5.04    Advance Payment.** The right to indemnification conferred in this Article V shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by an Indemnified Person entitled to be indemnified under Section 5.02 that was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Indemnified Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification under this Article V and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Article V or otherwise.

**5.05    Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred by this Article V shall not be exclusive of any other right which a Person may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation, agreements, vote of members or otherwise.

4

**5.06**  **Savings Clause.**  If Section 5.02 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article V that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE VI
## CONTRIBUTIONS TO THE COMPANY

**6.01**  **Member's Capital Contributions.**  The Member may, but is not obligated to, make Capital Contributions to the Company.

**6.02**  **Loans by Members.**  The Member may, but is not obligated to, loan to the Company such sums as the Member determines to be appropriate for the conduct of the Company's business.  Any such loans shall be on such terms as the Member may agree.

## ARTICLE VII
## ALLOCATIONS AND DISTRIBUTIONS

**7.01**  **Allocations of Profits and Losses.**  All of the Net Profits and Net Losses of the Company for each Fiscal Year shall be allocated to the Member.

**7.02**  **Distributions of Cash Flow.**  Cash Flow shall be distributed to the Member at such time or times as the Member shall determine in its sole discretion.

## ARTICLE VIII
## TRANSFERS OF MEMBERSHIP INTERESTS

**8.01**  **Right to Transfer.**  The Member may sell, assign, pledge, hypothecate, or otherwise transfer or encumber its limited liability company interest without limitation or restriction.

**8.02**  **Rights of Transferees.**  If the Member sells, assigns or otherwise transfers all of its limited liability company interest, the Member will cease to be a member of the Company, the assignee will become the successor member of the Company and the assignee may exercise all of the rights and powers of the Member under this Agreement and the Act.  This Section 8.02 applies not only to voluntary transfers of the Member's limited liability company interest, but also to involuntary transfers on account of the Member's liquidation, bankruptcy or termination.

**8.03**  **Events of Bankruptcy.**  Following the occurrence of any of the events set forth in Section 18-304(a)(4) or 18-304(b) of the Act, the Member shall continue to be a member and may continue to exercise the rights and powers of the Member under this Agreement and the Act.

**8.04**  **New Members.**  Except as provided in Section 8.02, no Person may become a

5

member of the Company without the prior written consent of the Member, whether such Person acquires a limited liability company interest from the Company or from the Member.

**8.05** **Opt-in to Article 8 of the Uniform Commercial Code**. The Member hereby agrees that the limited liability company interests in the Company shall be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction).

## ARTICLE IX
## DISSOLUTION AND TERMINATION

**9.01** **Dissolution**. The Company shall be dissolved upon the occurrence of any of the following events:

    (a)    the entry of a decree of judicial dissolution under the Act;

    (b)    by the written consent of the Member; or

    (c)    at any time there are no members of the Company; provided, however, within 120 days after the occurrence of the event that terminated the membership of the last remaining member, the Representative of such member shall agree in writing to continue the Company and to admit the Representative or its nominee or designee to the Company as a member, effective as of the date of the occurrence of the event that terminated the membership of the last remaining member, in which case the Company will not be dissolved.

**9.02** **Winding Up, Liquidation and Distribution of Assets**.

    (a)    If the Company is dissolved and its affairs are to be wound up, the Member (or his Representative) is directed to:

    (1)    sell or otherwise liquidate such of the Company's assets as may be required to discharge all liabilities of the Company, including any liabilities to the Member and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company; and

    (2)    distribute the remaining assets to the Member, such distribution to be made either in cash or in kind, as determined by the Member (or his Representative).

    (b)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**9.03** **Certificate of Cancellation.** When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all

6

of the remaining property and assets of the Company have been distributed, a certificate of cancellation, as required by the Act, shall be executed and filed with the Delaware Secretary of State.

**9.04** **Effect of Filing of Certificate of Cancellation**. Upon the filing of a certificate of cancellation with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Member (or his Representative) shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

**10.01** **Choice of Law**. This Agreement, and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Delaware (other than its conflicts of laws rules) and specifically the Act.

**10.02** **Amendments**. This Agreement may not be amended except in writing signed by the Member.

**10.03** **Headings**. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

**10.04** **Severability**. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**10.05** **Successors and Assigns**. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

**10.06** **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or of the Member; provided, however, each Person that is from time to time a limited partner in New One Madison Park Member I, LP, is intended to and shall be an express third party beneficiary of this Agreement.

[Signature page follows]

*CHI 60,475,690v4*

# EXHIBIT E

## Joinder

*CHI 60,470,167v13*

# JOINDER TO PLAN SUPPORT AGREEMENT

The Undersigned (the **"Transferee"**) has acquired [CLAIM/INTEREST] from [NAME OF TRANSFEROR] (the **"Transferor"**) pursuant to that certain [IDENTIFY TRANSFER INSTRUMENT] dated as of [DATE], a fully executed copy is attached hereto.

The Transferee hereby acknowledges that it has read the Plan Support Agreement, dated as of November [▒▒▒], 2010 (the **"Agreement"**), by and among FKF Madison Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC, Slazer Enterprises Owner, LLC, Ira Shapiro, Stephen Kraus, Mitchell Kraus, Mad 52, LLC, and New One Madison Park Member I, LP.

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

The Transferee, in accordance with Section 9(b) of the Agreement, agrees to be bound by the terms and conditions of the Agreement from and including the date hereof and shall hereby become a Sponsor Creditor under the Agreement, and thereby makes each of the representations, warranties, covenants and agreements applicable to a Sponsor Creditor contained therein.

The [CLAIM/INTEREST] transferred by the Transferor to the Transferee is as follows: [DESCRIPTION OF CLAIM/INTEREST]

For the purposes of Section 34 of the Agreement, any notices or other communications required or permitted under, or otherwise in connection with the Agreement, and addressed to the Transferee, shall be addressed as follows:

[NAME]
[ADDRESS 1]
[ADDRESS 2]
[CITY, STATE, ZIP]
[TELEPHONE]
[FACSIMILE]
[EMAIL]

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

Date Executed: _____, [2010/2011]

                                                       [NAME],
                                                       A [STATE OF ORGANIZATION] [TYPE OF
                                                       ENTITY]

                                                    _____

By:    [INSERT]
Its:    [INSERT]

           By:    [INSERT]
           Its:    [INSERT]

                      By:    [INSERT]
                      Its:    [INSERT]

CHI 60,470,167v13