# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FKF MADISON PARK GROUP OWNER, LLC, *et al.*,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 10-11876 (KG)<br><br>(Joint Administration Pending)<br><br>Hearing Date: December 16, 2010 at 2:00 p.m. ET<br>Obj. Deadline: December 16, 2010 at 10:00 a.m. ET |

**EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTY AND (III) SCHEDULING A FINAL HEARING**

FKF Madison Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC and Slazer Enterprises Owner, LLC the debtors and debtors in possession in the above cases (collectively, the "Debtors"), respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1. By this motion (the "Motion"), the Debtors request entry of interim (the "Interim DIP Order") and final orders (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), pursuant to sections 105(a), 361, 362, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing the Debtors to enter into a debtor-in-possession financing loan (the "DIP Loan") with New One Madison

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6651); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) 4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

Park Member I, LP ("DIP Lender") and to obtain first priority secured postpetition financing on a priming basis in the aggregate principal amount of $315,000 on an interim basis and approximately $1,100,000 in the aggregate on a final basis; (b) providing adequate protection to iStar Tara, LLC ("iStar") and other lienholders as applicable; (c) scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of a final order approving the Motion; and (d) granting related relief. The terms of the DIP Loan are substantially set forth in the Amended Debtor-in-Possession Loan Commitment Letter (the "Amended DIP Loan Commitment Letter")[2] attached hereto as Exhibit 1 and the proposed form of Interim Order attached hereto as Exhibit 2.

## JURISDICTION

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 361, 362, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## GENERAL BACKGROUND

3. The Debtors are the tenant in common owners of the land, the improvements, the unsold units which have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story hi rise tower containing sixty nine (69) residential units of which fifty-seven (57) units remain unsold and contain approximately 117,982 net sellable square feet, and amenities, and limited common elements (the "North

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Amended DIP Loan Commitment Letter. To the extent this Motion and the Amended DIP Loan Commitment Letter conflict in any way, the Amended DIP Loan Commitment Letter shall control.

Tower"), as well as an adjacent lot known as 23 East 22nd, together with the land underlying and abutting the North Tower and the adjacent lot, the improvements, the unsold units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing (the "Property").

4.  On June 8, 2010 (the "Petition Date"), involuntary chapter 7 petitions were filed in this Court against each of the Debtors by creditors Stephen Kraus, Mitchell Kraus, Barbara Kraus and Kraus Hi-Tech Home Automation, Inc. (the "Original Petitioning Creditors") thereby commencing against the Debtors involuntary chapter 7 cases (the "Chapter 7 Cases"). Various creditors subsequently joined in the involuntary petitions.[3] The Debtors filed a motion to dismiss the involuntary petitions (the "Dismissal Motion").

5.  On November 18, 2010, the Petitioning Creditors filed a motion (the "Conversion Motion") seeking immediate entry of orders for relief followed by conversion of the Chapter 7 Cases to proceedings under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., (the "Bankruptcy Code").

6.  On the same date, the Debtors filed concurrently their Withdrawal Of Opposition To Involuntary Petitions, Notice Of Non-Opposition To Entry Of Order For Relief, And Joinder In Motion To Convert To Cases To Chapter 11 Cases (the "Notice of Withdrawal") [Docket No. 113 in 10-11867, Docket No. 105 in 10-11868, Docket No. 106 in 10-11-11869, and 111 in 10-11870]. In the Notice of Withdrawal, the Alleged Debtors stated that (i) they do not intend to file an answer or otherwise controvert the Petitions or the entry of

---

[3] These creditors are: Joe Coffey, Harvey Schiller, Pace Plumbing, Gotham Greenwich Construction, LLC and Mad 52, LLC (the "Joining Creditors" together with the Original Petitioning Creditors, the "Petitioning Creditors")

3

orders for relief and (ii) affirmatively join in the Petitioning Creditors motion to convert the Chapter 7 Cases to chapter 11 cases (the "Chapter 11 Cases").

7. On November 19, 2010, the Court entered orders for relief in the Chapter 7 Cases and entered orders converting the Chapter 7 Cases to Chapter 11 Cases (the "Conversion Date"). [Docket Nos. 119 in 10-11867, Docket No. 111 in 10-11868, Docket No. 112 in 10-11-11869, and 117 in 10-11870].

8. In support of this Motion, the Debtors rely on the Declaration of Ira Shapiro, which is filed contemporaneous herewith and incorporated herein by reference.

**The Foreclosure Proceeding and the Appointment of the Receiver**

9. On February 18, 2010, iStar commenced a foreclosure proceeding against the Debtors in the Supreme Court of the State of New York, County of New York (the "State Court") styled as iStar Tara LLC v. FKF Madison Group Owner LLC, et al., No. 600423/2010 (the "Foreclosure Proceeding") asserting, *inter alia*, that the Debtors had committed numerous defaults under the Loan Documents. Subsequently, upon application of iStar, on May 7, 2010, the State Court entered an order appointing Jonathan H. Newman (the "Receiver") as receiver during the pendency of the Foreclosure Proceeding and vesting the Receiver with full possession and control of the Property as against any other person or entity.

**The Debtors' Existing Loans**

10. All of the Debtors are alleged parties to the following loan agreements with iStar: (a) Senior Loan and Security Agreement between Debtors and SFT I, Inc. as lender ("SFT") dated as of November 16, 2007 (the "Senior Loan"); (b) Project Loan and Security Agreement between Debtors and SFT dated as of November 16, 2007 (the "Project Loan"), and (c) Building Loan and Security Agreement between Debtors and SFT dated as of November 16, 2007 (the "Building Loan"), as such Senior Loan, Project Loan and Building

4

Loan (the "Loans"). The Loans allegedly have been modified by that certain Modification Of Loan Agreements And Other Loan Documents between Debtors and iStar Tara LLC ("iStar") (as successor in interest to SFT) as lender dated as of June 24, 2009 (collectively, the "Loan Agreements"). iStar asserts that as of the Petition Date, the total outstanding obligations due and owing under the Loan Agreements and related promissory notes (collectively, the "Notes") was approximately $233.5 million[4] (collectively, the "iStar Prepetition Obligations").

11. The Loan Agreements and the Notes are purportedly secured by the Debtors' real property, the leases and rents from the real property and substantially all of the Debtors' personal property and fixtures (collectively, the "Prepetition Collateral") pursuant to the following security documents: (a) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Senior Loan) dated November 16, 2007; (b) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) dated November 16, 2007; (c) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Building Loan) dated November 16, 2007; (d) Second Gap Mortgage With Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) dated June 24, 2009; (e) Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) dated June 24, 2009 (collectively, the "Mortgages"); and (f) certain UCC Financing Statement filings of record made by iStar (or its predecessor) with respect to the Debtors (collectively, the "iStar Prepetition Liens").

---

[4] The iStar Prepetition Obligations are compromised of: (i) principal due and owing in the approximate amount of $207.8 million and (ii) interest and fees (exclusive of legal fees) in the approximate amount of $25.7 million.

### iStar's Protective Advances During the Chapter 7 Cases

12. Following the commencement of the Chapter 7 Cases, iStar filed a motion [Docket No. 13] (the "First Funding Motion") seeking authority to continue making protective advances during June and July 2010 in an amount up to $488,610 pursuant to an approved budget, in order to fund (i) operating and maintenance expenses for the Property, including payroll for staff, payment of the Building's managing agent, utilities, insurance, permits and warranty-related costs and (ii) "emergency repairs and construction to ensure the safety of the Building and the health and welfare of the residents and the public." First Funding Motion at ¶3. iStar stated in First Funding Motion, the disbursements to be made by the Receiver after the filing of the Chapter 7 Cases from iStar's protective advances "will be necessary to preserve the value" of the Property. First Funding Motion at ¶ 38. By the same line of reasoning, iStar inferred that if it protective advances were made to fund the essential expenses of the Property, iStar would be adequately protected. First Funding Motion at ¶ 5 ("[i]f the Court concludes that the automatic stay prevents iStar from making such protective advances, then iStar submits that its inability to make such advances constitutes a lack of adequate protection of iStar's interest in the Mortgaged Property and . . . that relief from stay is warranted under section 362(d)(1) of the Bankruptcy Code . . ."). The First Funding Motion was approved by order of the Court on June 30, 2010 [Docket No. 26].

13. On July 16, 2010, iStar filed a second motion [Docket No. 34] (the "Second Funding Motion") for authority to make protective advances to fund expenses of the Property (consistent with the First Funding Motion) through September 30, 2010 in an amount up to $584,615 pursuant to the budget attached to the Second Funding Motion. Additionally, the Second Funding Motion sought authority to pay the premium to renew the Debtors'

6

DOCS_DE:165806.2

construction liability insurance policy through January 20, 2011 estimated in the amount of $65,000. The Second Funding Motion was approved by order of the Court on July 30, 2010 [Docket No. 38].

14. On September 8, 2010, iStar filed a motion [Docket No. 80] (the "Third Funding Motion") for authority to make protective advances in pay certain professional fees of the Receiver in connection with his management of the Property upon a determination by the New York Supreme Court of the amount of fees the Receiver and his professionals are entitled to be paid under New York law with such advances to be secured by liens on the real and personal property comprising the Prepetition Collateral having the same validity extent and priority as the iStar Prepetition Liens. The Third Funding Motion was approved by order of the Court on September 22, 2010 [Docket No. 88].

15. On September 23, 2010, iStar filed a fourth motion [Docket No. 87] (the "Fourth Funding Motion," and together with the First Funding Motion, the Second Funding Motion, and the Third Funding Motion, the "Funding Motions") for authority to make protective advances to fund the expenses of the Property (consistent with the First and Second Funding Motions) through December 31, 2010 in an amount of up to $664,369 pursuant to the budget attached to the Fourth Funding Motion. The Fourth Funding Motion also requested authority to pay the real estate taxes due to the City of New York with respect to the Property for the third and fourth quarters of 2010 in the estimate amount of $430,845.76 for third quarter (and unpaid second quarter) taxes and $248,643.75 for fourth quarter taxes. Third Funding Motion at ¶ 21, and Ex. A. The Fourth Funding Motion was approved by order of the Court on October 6, 2010 [Docket No. 98].

16. iStar asserts that as of October 31, 2010, the total amount of protective advances it has disbursed to the Receiver and third parties since the commencement of the Chapter 7 Cases is $886,114.85 (the "iStar Postpetition Obligations" together with iStar Prepetition Obligations, the "iStar Obligations").

17. As with the Receiver Funding Motion, under the orders granting the Funding Motions, iStar was granted non-avoidable liens and security interests in real and personal property constituting the Prepetition Collateral to secure its postpetition protective advances having the same priority, validity and extent as the iStar Prepetition Liens.

18. In support of its Funding Motions, iStar stated:

   a. "[T]he application of the protective advances under the Critical Expenses Budget will provide value to the estate by funding ongoing operating expenses and emergency construction and repairs to ensure the safety of the Building." First Funding Motion, at ¶ 34; Second Funding Motion, at ¶ 27; Fourth Funding Motion, at ¶ 29.

   b. Absent the protective advances under the Critical Expenses Budget, iStar's interest in the Mortgaged Property as well as the health and welfare of the existing residents will suffer. The protective advances are necessary to adequately protect the value of iStar's collateral. First Funding Motion, at ¶ 41.

   c. "The advances will be used to pay the fees and expenses of the Receiver and his professionals who play an integral role in maintaining and continuing to develop the Property for the benefit of all creditors of the estates, and also preventing additional claims against the estates in the form of liabilities that might otherwise result if the Property is not safely maintained for residents and visitors. Absent the Receiver's ongoing efforts, there will be no one to oversee the development and maintenance on an ongoing basis and a valuable estate asset will stand to significantly diminish in value." Third Funding Motion, at ¶ 24.

### iStar's Motion for Relief from Stay

19. On November 3, 2010, iStar filed a motion seeking relief from the automatic stay to continue the state court Foreclosure Proceeding against the Debtors and with respect to the Property and to obtain and enforce a judgment of foreclosure and sale with

8
DOCS_DE:165806.2

respect to the Property under sections 362(d)(1) and (d)(2) of the Bankruptcy Code [Docket No. 105] (the "Relief from Stay Motion"). With respect to section 362(d)(1), iStar asserts that its interest in the Property is not adequately protected because it has no equity cushion has been compelled to make the protective advances to fund critical operating expenses without receiving any form of adequate protection in return. Relief from Stay Motion, at ¶ 37.

20. As to the relief it seeks under section 362(d)(2), iStar rests its case on the Debtors' alleged lack of equity in the Property based upon an appraisal estimating the fair market value of the Property as of October 1, 2010 to be approximately $130.7 million to $137.5 million. Relief from Stay Motion at ¶¶ 29-30. Notably, iStar declines to address in the Relief from Stay Motion whether the Debtors would have any prospect of reorganizing through a confirmable plan if their cases were converted to chapter 11 cases. A status conference on the Relief from Stay Motion is presently scheduled for December 16, 2010.

### The Receiver Motion and the Joint Plan

21. The Debtors have filed concurrently with this Motion a motion requiring the Receiver to immediately comply with its obligation to turn over all property of the estate under section 543(b) of the Bankruptcy Code (the "Receiver Motion").

22. The Debtors have also entered into that certain Plan Support Agreement dated November 18, 2010[5] to support a joint plan of reorganization (the "Joint Plan"). In broad brush strokes, the Joint Plan will provide for the following, among other things:

- Revesting of the Debtors' assets and property in a Reorganized Debtor, 100% of the equity of which Reorganized Debtor will be owned by a newly formed entity owned by certain of the Petitioning Creditors and New One Madison Park Member I, LLP.

---

[5] The Plan Support Agreement was appended as Exhibit B to the Debtors' *Emergency Motion for Immediate Entry of Orders for Relief and Conversion of Cases from Chapter 7 to Chapter 11* filed on November 18, 2010 [Docket No. 114].

9

- The provision for funding the Joint Plan through an equity infusion into Reorganized Debtor as contemplated by the Joint Plan Funding Commitment Letter.
- Payment in full in cash on the effective date of the Joint Plan all administrative expenses and provisions for payment of other priority claims.
- Cash payments to the holders of allowed mechanic's lien claimants.
- Establishment of a Net Proceeds Waterfall Plan Obligation from the Reorganized Debtor to the estates which will fund payments on account of the allowed claims of general unsecured creditors.
- Amendment and restructuring of the iStar Obligations.
- Entry by the Reorganized Debtor into a consulting agreement with Mr. Shapiro requiring Mr. Shapiro to provide historical information, aid in the construction and development of the Property and other services as requested by Sponsor.

## RELIEF REQUESTED

23. By this Motion, the Debtors request that the Court: (a) approve the Debtors' entry into the DIP Loan and to borrow up to $315,000, on an interim basis, and up to $1,100,000 in the aggregate, on a final basis, thereunder; (b) authorize the Debtors' providing adequate protection to iStar, and other holders of liens ("Other Lienholders")[6] on the Collateral (as defined below) whose alleged liens are being primed by up to $1.1 million of the DIP Loan; (c) schedule the Final Hearing on the Motion; and (d) grant such other and related relief necessary.[7] The Debtors submit that obtaining the relief requested herein is in the best interest of the Debtors, their estates and creditors and presents the best and only opportunity for the Debtors to maximize the value of their assets and their estates and reorganize for the benefit of all stakeholders.

---

[6] The prepetition liens of the Other Lienholders on the Collateral are referred to as the "Other Liens".

[7] Neither the Debtors nor DIP Lender object to iStar providing debtor-in-possession financing to the Debtors on the exact same terms as DIP Lender has agreed to provide, as set forth herein. Alternatively, if iStar is willing to continue making protective advances to fund only operating expenses included in the Approved Budget on the exact terms as set forth herein, the DIP Lender is willing to advance the remainder of the expenses set forth in the Approved Budget on the exact same terms as set forth herein, pari passu with iStar..

10

24. The proceeds from the DIP Loan will pay the necessary and critical ordinary course expenses of maintaining and preserving the Property. The budgeted expenses as detailed in the Approved Budget annexed to the DIP Loan Commitment Lender are substantially the same as the expenses for which iStar sought approval through its Funding Motions to pay as protective advances. As was true of the iStar advances, the Debtors are seeking to pay the actual and necessary costs and expenses of preserving and maintaining the Property. If such expenses are not paid --- as iStar recognized in its Funding Motions --- the value of the Property will be significantly impaired.

A. <u>Priming iStar's and Other Lienholders' Liens</u>

25. The Debtors are requesting in connection with their obtaining the DIP Loan, that the Court authorize the priming of iStar's Prepetition Liens and the prepetition liens of the Other Lienholders in favor of the DIP Liens. The Debtors have proposed Adequate Protection Packages that the Debtors believe adequately protects the interests of iStar and the Other Lienholders in their respective prepetition collateral during the brief span of time between the entry of the DIP Orders and the hearing on confirmation of the Joint Plan.

26. The Debtors have no source of available cash to fund their operations absent obtaining postpetition financing. The financing proposed under the DIP Loan provides the Debtors with the financing necessary to maintain and preserve the Property while the Debtors seek to reorganize and maximize the value of their estates through the transactions contemplated in the Joint Plan. In so doing, the Debtors will stave off a foreclosure of the Property by iStar and consummate a reorganization for the benefit of all stakeholders. Unquestionably, the Debtors' creditors would stand to receive nothing on account of their claims in the foreclosure scenario sought by iStar.

B.   iStar's Adequate Protection.

27.   The Debtors are requesting the priming of the iStar Prepetition Liens.[8] Most critically, the DIP Loan (a) will enable the Debtors to cover ongoing operating and maintenance expenses and insurance premiums, (b) will relieve iStar from having to make any further protective advances, and (c) will stem any further increase in iStar's Obligations, *i.e.* by eliminating the need for additional protective advances.[9] The DIP Loan will further enable the Debtors to maintain the present value of the Property pending a hearing to confirm the Joint Plan. Indeed, iStar concedes in the Funding Motions and the Relief from Stay Motion that payment of the expenses covered by its Protective Advances will prevent "significant impairment" of the value of the Property. Relief from Stay Motion at ¶ 30; see also, First Funding Motion at 41. And, though iStar points out that there has not been an increase in the fair market value of the Property to cover the protective advances, it does not contend that the Property's fair market value is declining. Id.

28.   In order to provide iStar with additional adequate protection, pursuant to section 364(d)(1), the Debtors propose the following (the "iStar Adequate Protection Package"):

> d.   *iStar Replacement Liens*. Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the interests of iStar in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) the use of the Prepetition Collateral

---

[8] Of course, iStar can avoid such priming, in full or in part, by agreeing to fund the Debtors on the same terms as being offered by the DIP Lender.

[9] Indeed, the priming lien sought through the DIP Loan is the functionally equivalent of a section 506(c) surcharge under these circumstances. In order to recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property, and (2) the expenditures provide a direct benefit to the secured creditors. Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp., 884 F.2d 80, 86-87 (3d Cir. 1989); In re McKeesport Steel Castings Co., 799 F.2d 91, 94-95 (3d Cir. 1986). Here, iStar has openly admitted in its Funding Motions and Relief from Stay Motion that the operating and maintenance expenses that will be paid with the proceeds of the DIP Loan are essential to prevent a "significant impairment" to its interest in the Debtors' interest in the Property.

from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, the Debtors will grant to iStar, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "iStar Replacement Liens"). The iStar Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out (as described below); and (iii) to the extent that the Other Liens (as described below) are senior to the Prepetition Liens, the Other Liens and the Other Lienholder Replacement Liens; and will be of the same priority, validity and enforceability as the iStar Prepetition Liens. The iStar Replacement Liens shall be senior to all other liens.

  e. *iStar Adequate Protection Priority Claim*. As further adequate protection of the interests of iStar in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) the use of the Prepetition Collateral from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, iStar shall have a superpriority administrative expense claim in the Chapter 11 Cases (the "iStar Adequate Protection Priority Claim"). Except as set forth in the Interim DIP Order, the Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the iStar Adequate Protection Priority Claim shall be junior in priority to the Superpriority Claim of the DIP Lender, the Carve-Out and the Other Lienholder Adequate Protection Claims to the extent that the Other Liens are senior to the iStar Prepetition Liens.

29. In order to provide the Other Lienholders with additional adequate protection, pursuant to section 364(d)(1), the Debtors propose the following (the "Other Lienholder Adequate Protection Package"):

  f. *Other Lienholder Replacement Liens*. Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the interests Other Lienholders against any diminution in value of such interests in the Collateral on account of (i) the use of the Collateral from and after the funding of the Loan Advances and (ii) the granting of the DIP Liens, the Debtors will grant to such Other Lienholders, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "Other Lienholder Replacement Liens"). The Other Lienholder Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out (as described below); and (iii) the iStar

13

Prepetition Liens and the iStar Replacement Liens to the extent that the iStar Prepetition Liens are senior to the Other Liens; and will be of the same prior, validity and enforceability as the Other Liens. The Other Lienholders Replacement Liens shall be senior to all other liens.

  g.  *Other Lienholder Adequate Protection Claims.* As further adequate protection of the interests of Other Lienholders in the Collateral against any diminution in value of such interests in the Collateral on account of (i) the use of the Collateral from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, Other Lienholders shall have superpriority administrative expense claims in the Chapter 11 Cases (the "Other Lienholder Adequate Protection Priority Claims"). Except as set forth in the Interim DIP Order, the Other Lienholder Adequate Protection Priority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the Other Lienholder Adequate Protection Priority Claims shall be junior in priority to the Superpriority Claim of the DIP Lender, the Carve-Out and the iStar Adequate Protection Priority Claim to the extent the iStar Prepetition Liens are senior to Other Liens.

30.  In order to provide iStar and the Other Lienholders with further adequate protection, a condition of the DIP Loan is the entry of an order authorizing the Debtors to employ and retain Lee Buchwald of Buchwald Capital Advisors LLC as the Chief Restructuring Officer ("CRO") of each of the Debtors. The Debtors have no objection to the entry of such an order. As CRO, Mr. Buchwald will be authorized to operate and manage the day to day business activities of the Debtors, including administering the DIP Loan. The terms of Mr. Buchwald's proposed engagement with the Debtors is annexed to his Affidavit of Disinterestedness which has been filed in support of the Receiver Motion.

31. The Debtors are requesting the authorization to enter into the DIP Loan and to prime iStar's Prepetition Liens on a non-consensual basis. The pertinent terms of the DIP Loan are:[10]

    a. <u>Borrowers.</u> The Debtors (i) FKF Madison Park Group Owner, LLC, (ii) JMJS 23rd Street Realty Owner, LLC, (iii) Madison Park Group Owner, LLC and (iv) Slazer Enterprises Owner, LLC on a joint and several basis as debtors in possession under chapter 11 of the United States Bankruptcy Code in jointly administered cases in the United States Bankruptcy Court for the District of Delaware.

    b. <u>DIP Lender</u>. New One Madison Park Member I, LP, including its assignees and participants.

    c. <u>Loan Advances</u>. The DIP Lender shall make advances (the "<u>Loan Advances</u>") to the Debtors in an aggregate amount up to approximately $1,100,000, with such Loan Advances to be used only for Approved Expenses (as defined below) in accordance with the Use of Proceeds (as described below). An amount up to $315,000 and approved by the Court in the Interim DIP Order, and which amount shall be reasonably acceptable to the DIP Lender, shall be available during the period from the date of entry of the Interim DIP Order by the Court through the date of entry of the Final DIP Order, and the remainder of Loan Advances shall be available after entry of the Final DIP Order. The DIP Orders shall, in each case, approve the Loan Advances and the other obligations of the Debtors hereunder (collectively, the "<u>DIP Obligations</u>"), and the terms and conditions set forth in the Amended DIP Loan Commitment Letter, all in form and substance satisfactory to the DIP Lender in its sole and absolute discretion. Upon entry of the Interim DIP Order, the Debtors shall open a new deposit account, at a bank acceptable to DIP Lender, in which the proceeds of the Loan Advances shall be held and from which disbursements in accordance with the Approved Budget shall be made. The Debtors will be jointly liable for the full amount of the DIP Obligations and each Debtor shall waive all rights of indemnification or contribution against the other Debtors until such time as the DIP Obligations are indefeasibly paid in cash in full. No Loan Advances shall be made if there is an Event of Default (as described below) that has occurred and has not been cured or waived.

    d. <u>Use of Proceeds</u>. Proceeds from Loan Advances shall be used exclusively for funding the expenses (collectively, the "<u>Approved Expenses</u>") which

---

[10] The description of the DIP Loan set forth herein are fully qualified by the Amended DIP Loan Commitment Letter (as amended) and the Interim Order, and parties in interest are advised to review both of these document in their entirety. Unless otherwise defined herein, all capitalized terms used in this description of the DIP Loan shall have the meanings ascribed to them in the Amended DIP Loan Commitment Letter.

15

are set forth in amount on the budget (the "Approved Budget") annexed as Exhibit A to the Amended DIP Loan Commitment Letter), including: (x) normal operating expenses consistent with past practices, including (i) insurance (ii) payroll expenses, (iii) operating service and maintenance, and (iv) utility expenses, including electricity, gas and telephone; and (y) fees of the United States Trustee and allowed professional fees of the Debtors and any official committee of unsecured creditors (the "Committee") appointed in the Chapter 11 Cases in amounts not to exceed that set forth in the Approved Budget and accrued and unpaid prior to the occurrence of an Event of Default (as defined below), and, in the case of allowed professional fees of the Debtors, the lesser of $75,000 and the remainder of the amount set forth in the Approved Budget for fees and expenses of the Debtors' professionals and not expended as of the occurrence of such Event of Default. The Debtors will be permitted variances of up to 110% for each line item on the Approved Budget, exclusive of restructuring, legal and professional fees, and shall be permitted to carry forward from a prior month to the next succeeding month any unused portion of the aggregated actual amounts attributable to the prior month. None of the proceeds from Loan Advances, the collateral securing the DIP Loan or the Carve-Out may be used by the Borrowers or the Committee to investigate or challenge the validity, perfection, priority, extent or enforceability of the DIP Obligations, the liens securing the DIP Obligations, or the claims of the DIP Lender with respect to the foregoing.

    *e.*    *Frequency of Loan Advances.* Loan Advances shall occur no more frequently than once monthly and shall be in a minimum amount of $100,000 unless less than $100,000 remains to be funded hereunder, and shall not exceed for each month the amount set forth in the Approved Budget. During the period from the entry of the Interim Order until the Final Order becomes a final order, Loan Advances shall not exceed $315,000. The DIP Orders approving the DIP Obligations shall include the Approved Budget. No later than the third (3rd) business day of every week commencing with the week following the week of the approval of the Interim DIP Order, the Debtors shall deliver: (i) a variance report detailing: (x) the cash expenditures for the prior week and a comparison to the Approved Budget for that week; (y) the cumulative cash expenditures for all of the prior weeks since the Conversion Date and a comparison to the Approved Budget for such weeks; and (z) a narrative explanation of the variances between the actual weekly expenditures and the budgeted weekly expenditures; and (ii) an updated weekly cash flow forecast for the then remaining period of the Approved Budget (the "Updated Budget"), consistent with the Approved Budget (collectively, the "Weekly Reports"). The Weekly Reports shall be subject to the review and approval by the DIP Lender, which approval shall not be unreasonably withheld. Subject to the approval of the DIP Lender, which shall not be unreasonably withheld and which shall not require any further Bankruptcy

16

Court approval, the Updated Budget shall be deemed the Approved Budget.

f. *Closing Date*. The interim closing date (the "Interim Closing Date") shall be the date upon which all Conditions Precedent (as outlined below) to such date have been satisfied and the final closing date (the "Final Closing Date," and along with the Interim Closing Date, the "Closing Date") shall be the date upon which all Conditions Precedent to the such date have been satisfied.

g. *Term*. All DIP Obligations shall be due and payable, and repaid in full, in cash, on the date (the "Maturity Date") that is the first to occur of: (i) March 31, 2011; (ii) the effective date of a plan of reorganization confirmed in one or more of the Chapter 11 Cases; (iii) conversion or dismissal of one or more of the Chapter 11 Cases; (iv) appointment of a trustee in one or more of the Chapter 11 Cases; or (v) the occurrence of an Event of Default under, or as otherwise set forth in, the DIP Orders.

h. *Priority*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the Debtors under the DIP Loan at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out.

i. *Security*. The DIP Obligations shall be secured by: (I) valid, properly perfected, first priority senior liens on all now existing and hereafter acquired (whether before or after the Petition Date) assets of the Debtors, including, without limitation, all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, including without limitation, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, development orders, environmental permits or other approvals to develop any real property, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, tax refunds, and all rights, claims, and other causes of action of the Debtors and the Debtors' estates (including any actions asserted by the Debtors or any subsequently appointed trustee or representative of the Debtors' estates under any section of the Bankruptcy Code, and in each case, all proceeds resulting therefrom, excluding, however, avoidance actions ("Avoidance Actions") under sections 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code) (collectively, the "Collateral") pursuant to section 364(d)(1) of the Bankruptcy Code, with such liens securing the DIP Obligations to prime and be deemed senior to all other liens maintained with respect to any of Debtors' now existing or hereafter acquired property; provided, however, if it is determined that the Debtors have an interest in any commercial tort

17

claims or tax refunds that is property of the Debtors' estates, the proceeds of such interests shall be part of the Collateral; and (II) perfected, first-priority senior liens, pursuant to Section 364(c)(2) of the Bankruptcy Code, on that portion of the Collateral that is unencumbered property of Debtors.

In each case, the Collateral shall also include any and all rents, issues, products, offspring and profits generated by any item of Collateral, without the necessity of any further action or any kind or nature the DIP Lender in order to claim or perfect such interests.

j. *Carve Out*. The liens and the superpriority claims securing the DIP Loan, the iStar Replacement Liens, the iStar Adequate Protection Priority Claim, the Other Lienholder Replacement Liens and the Other Lienholder Adequate Protection Claims shall be subject to a carve-out (the "Carve-Out") which shall mean collectively: (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and all fees required to be paid to the Clerk of the Bankruptcy Court, which are incurred after the first business day after effective delivery of a Carve-Out Trigger Notice (as defined immediately below); (ii) allowed fees, expenses and costs of attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors (the "Debtors' Professionals") or any official committee of unsecured creditors (the "Committee Professionals") pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 to the extent permitted under the Approved Budget for such respective professionals in each case through such date of the Carve-out Trigger Notice , which are actually incurred and unpaid prior to the business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (the "Carve-Out Trigger Date"), whether allowed prior to or after such date; and (iii) in the case of the Debtors' Professionals, an amount equal to the lesser of $75,000 and the amount of remaining amount of the Approved Budget for the Debtors' Professionals after payment of their allowed fees and expenses incurred through the Carve-out Trigger Date. In all instances, the payment of fees and expenses is subject to the rights of the DIP Lender to object to the allowance of any such fees and expenses. No portion of the Carve-Out may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, objection or other litigation against the DIP Lender.

The "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Debtors and their counsel which notice may be delivered at any time following the occurrence and during the continuation of an Event of Default.

k. *Interest Rate; Default Rate*. Interest on the DIP Obligations shall accrue at a variable rate, adjusted monthly, equal to the Prime Rate plus fifty (50) basis points percent (0.50%), and be paid payable monthly in arrears

18

calculated on the basis of actual days elapsed in a year of three hundred and sixty (360) days. The Prime Rate shall be the prime rate as reported in The Wall Street Journal. The default rate of interest will be two percent (2%) higher than the rate otherwise payable.

l. *Conditions Precedent*. The following are conditions precedent to the occurrence of the Closing Date (except as otherwise noted) and the extension of any financial accommodation by the DIP Lender:

1) Completion of a satisfactory pre-loan collateral audit review and site visit by the DIP Lender's collateral analysts prior to the commencement of the interim hearing on approval of the Loan Advances.

2) The entry of an order pursuant to section 543 of the Bankruptcy Code requiring the receiver that is currently in possession of the Debtors' assets to turn over the assets (and all related documents and information) to the Debtors.

3) With respect to the Interim Closing Date, entry of the Interim DIP Order (with no stay thereof), and with respect to the Final Closing Date, entry of the Final DIP Order, by the Court (with no stay thereof) consistent in all material respects with the forms attached as Exhibits B and C to the Amended DIP Loan Commitment Letter respectively, after proper and sufficient notice to all parties entitled to notice under the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, which, among other provisions: (i) finds that the DIP Lender has acted in good faith in connection with the proposed financing and is entitled to the benefits of Section 364(e) of the Bankruptcy Code such that the validity of any debt incurred under the DIP Orders, or any priority or DIP Lien granted to the DIP Lender hereunder will not be affected by any reversal or modification of the DIP Orders on appeal; (ii) provides that the DIP Liens granted to the DIP Lender under the DIP Orders are deemed perfected without the necessity of the DIP Lender filing for record of any documents, notices or other filings (but Debtors agree to execute and deliver to the DIP Lender, and to authorize the DIP Lender to file, any such documents); (iii) with respect to the Interim DIP Order, finds that the financing arrangement evidenced by the DIP Orders is vital to avoid immediate and irreparable harm to Debtors' Estates and to permit a successful reorganization; (iv) includes a factual finding that the specific standard and required elements of Section 364 have been satisfied; and (v) contains such other findings and provisions as the DIP Lender shall find acceptable in its reasonable discretion.

4) Debtors will waive, and the DIP Orders shall effect Debtors' waiver of, any right to obtain alternative post-petition financing senior to the DIP

Obligations pursuant to Section 364 of the Bankruptcy Code or otherwise unless the proceeds of any such financing are to be applied to the indefeasible payment, in full, in cash, of the DIP Obligations.

5) No Material Adverse Effect shall have occurred. "Material Adverse Effect" shall mean: any material adverse effect in the business, assets, operations, results of operations or financial or other condition or prospects of the Property or the Debtors, or the occurrence of any fact or circumstance which materially and adversely affects the rights, remedies or benefits of or conferred by the transactions contemplated in the Amended DIP Loan Commitment Letter and the DIP Orders, including, without limitation, strike, lockout, war, terrorism, act of God, fire or other casualty, unusually adverse weather conditions, inability to obtain labor or materials or governmental restriction or other act or thing.

6) Neither the Property nor any part thereof shall have suffered any material casualty or be subject to any material existing or threatened condemnation or taking by eminent domain proceeding or otherwise.

7) Interim Funding of the Loan Advances shall occur not later than December 23, 2010, and final approval of the DIP Obligations shall occur not later than December 31, 2010, subject in each case to the terms and conditions of the Interim DIP Order and the Final DIP Order.

8) As of the Closing Date, there shall be no litigation commenced or existing which, if successful, would prevent the Debtors' repayment of the DIP Obligations.

9) Delivery of a four (4) month forecast, prepared on a monthly basis, with line item detail to, through, and including March 31, 2011, (the "DIP Budget") reviewed and approved by the DIP Lender and to be attached to the Interim DIP Order and the Final DIP Order entered by the Bankruptcy Court as the Approved Budget.

10) Confirmation of sufficient insurance coverage for all property of Debtors, general liability insurance and other forms of insurance in amounts with deductibles reasonably satisfactory to the DIP Lender, and providing that the DIP Lender is an additional insured and loss payee.

m. *Events of Default*. An Event of Default under the DIP Orders shall exist upon the occurrence of any of the following:

1) the failure to pay the DIP Obligations in cash in full upon the Maturity Date, or when due if prior to the Maturity Date;

20