2) breach by the Debtors of any of their representations, warranties or covenants under the Amended DIP Loan Commitment Letter and the DIP Orders, which breach is not cured within ten business days of written notice by the DIP Lender to the Debtors of such breach;

3) the filing of a plan of reorganization for one or more of the Debtors that does not provide for the payment in cash in full of the DIP Obligations;

4) entry of an order in the Chapter 11 Cases to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; and

5) the commencement of any litigation which, if successful, would have a material adverse impact on Debtors, their business, or their ability to repay the DIP Obligations or which would challenge in any respect the DIP Obligations or the DIP Liens.

n. *Remedies*. Upon the occurrence of an Event of Default, the DIP Lender may: (x) immediately (A) deliver a notice of an Event of Default; and (B) terminate or suspend any outstanding Loan Advances; and (y) upon five (5) business days' written notice (within which period the Debtors may only dispute the DIP Lender's declaration of an Event of Default on the basis of m(2) or m(5), above, in the Bankruptcy Court on an expedited basis), the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Court, with the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lender to do any one or more of the following: (A) charge the default rate of interest on the Loan Advances; and (B) declare the principal of and accrued interest, fees and expenses constituting the DIP Obligations to be due and payable. Upon and after the occurrence of an Event of Default, except as provided in the preceding sentence, the DIP Lender shall be required to file a motion seeking relief from the automatic stay to enforce any of its other rights or remedies. Debtors shall waive, and the DIP Orders shall effect such waiver of, any rights of the Debtors under Section 105 of the Bankruptcy Code to stay or otherwise enjoin the exercise of the rights and remedies of the DIP Lender upon the occurrence of an Event of Default.

o. *Indemnification*. The Debtors shall indemnify and hold harmless the DIP Lender, its affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or

21

DOCS_DE:165806.2

relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loan, the DIP Orders or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Loan, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated by the Amended DIP Loan Commitment Letter are consummated. The Debtors further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any of their security holders or creditors for or in connection with the transactions contemplated by the Amended DIP Loan Commitment Letter, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

p. *DIP Lender's Expenses*. The Debtors shall pay, without court review and approval, the reasonable expenses of the DIP Lender including, without limitation, the reasonable fees and disbursements of counsel and third party appraisers, collateral agents, consultants, advisors and auditors engaged in connection with the DIP Obligations; expenses in connection with periodic field audits; the periodic and other monitoring of the DIP Collateral; other miscellaneous disbursements in connection with the preparation and negotiation of the Amended DIP Loan Commitment Letter and related agreements and documents and any amendments thereto; and the fees, costs and expenses in taking any action in connection with the DIP Obligations during, or after, the Chapter 11 Cases to monitor, investigate, negotiate, or enforce any right or remedy under this Commitment Letter and the DIP Orders (collectively, the "DIP Lender Expenses"). The DIP Lender Expenses shall be part of the DIP Obligations and shall be deemed Loan Advances when incurred by the DIP Lender and shall accrue interest at the rates specified herein until paid in full. DIP Lender Expenses incurred prior to the Closing Date shall not exceed $25,000.

q. *Amendments and Waivers*. Amendments and waivers shall be in writing and shall require the consent of the DIP Lender.

32. In accordance with Local Rule 4001-2(a)(i), the Debtors highlight for the Court the following provisions included in the DIP Loan:

    *a.*    Local Rule 4001-2(a)(i)(B) requires disclosure of, among other things, the waiver of claims against a secured creditor without first providing parties-in-interest 75 days, and the creditors committee 60 days from its formation, to investigate the claims being waived. The Interim Order waives claims related to (i) any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Orders, and (ii) any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the DIP Liens and Superpriority Claims, which may be held or asserted against the DIP Lender and affiliated parties. Interim Order at ¶ 13. The Debtors believe that this provision of the Local Rules is intended to address prepetition claims against existing lenders for events occurring prior to the commencement of a debtor's bankruptcy case and is not applicable to waivers granted with respect to entering into a new money debtor-in-possession facility. Accordingly, the Debtors submit that Local Rule 4001-2(a)(i)(B) is not applicable to the waiver but the Debtors are nonetheless highlighting it for purposes of full disclosure.

    *b.*    Local Rule 4001-2(a)(i)(C) requires disclosure of any provision which seeks to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. While the Debtors do not believe any disclosure is necessary under this provision of the Local Rules, the DIP Orders do provide that the entry of an order surcharging the Collateral pursuant to section 506(c) constitutes an Event of Default. Additionally, the Interim Order provides that, effective upon entry of the Interim Order, no party may seek to charge the Carve-Out of the Collateral, including charges under section 506(c). Interim Order at ¶ 12(e). The Debtors believe that the Local Rule seeks to address waivers of 506(c) rights as to prepetition secured claims and does not apply to the contest of postpetition borrowings from a new money lender.

    *c.*    **Local Rule 4001-2(a)(i)(G) requires disclosure of any provision which seeks to prime any secured lien without the consent of that lienor. The DIP Loan provides for the priming of the iStar Prepetition Liens and Other Liens and the Debtors do not believe that iStar or Other Lienholders consent to such priming. Interim Order at ¶ 5. Nonetheless, the priming of such liens was a necessary condition to entering into the DIP Loan, and the Debtors believe that the DIP Loan presents the Debtors' only and best available financing proposal. Moreover, as demonstrated below, iStar and Other Lienholders are adequately protected for the priming of their**

23

respective liens. Accordingly, the Debtors believe that the proposed priming provisions are appropriate.

  d. **Local Rule 4001-2(a)(i)(F) requires disclosure of disparate treatment of the Debtors' Professionals and the Committee's Professionals with respect to a professional fee carve-out. The DIP Loan includes as part of the Approved Budget funding for professional fees. Interim Order at ¶ 12. The Approved Budget provides for a larger budgeted amount for the Debtors' Professionals than the Committee's Professionals commensurate with the different scope of responsibilities and demands placed upon such professionals, and in recognition that what is a reasonable budget amount of fees and expenses for the Debtors' Professionals and what is a reasonable budget amount of fees and expenses for the Committee's Professionals is not the same amount. Accordingly, the Debtors submit that the treatment of professional fees is reasonable and appropriate under the circumstances and does not constitute "disparate treatment."**

## APPLICABLE AUTHORITY

A. <u>The DIP Loan Should Be Approved</u>

  33. The Debtors propose to obtain financing under the DIP Loan by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. §364(c). Indeed, section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. See <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

34. Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

 (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

 (b) the credit transaction is necessary to preserve the assets of the estate; and

 (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.

35. Given their litigation with iStar, the appointment of the Receiver and iStar's pending Relief from Stay Motion, a debtor-in-possession loan from iStar has never been a viable option. The Sponsor is not prepared to provide the debtor-in-possession financing on an unsecured, non-priming, basis. Without postpetition financing, the Debtors would be unable to fund operating and maintenance expenses for the Property or maintain insurance on the Property. As iStar has acknowledged, the failure to pay such expenses would significantly impair the value of the Property to the detriment of all stakeholders. Furthermore, the postpetition financing will prevent a decline in the value of the Property and further maximize the value of the Property for the benefit of all creditors by completing development of the Property and providing a return to creditors. Finally, the terms of the DIP Loan are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

B.  Approval of Priming Liens and Adequate Protection under Section 364(d)

36. If a debtor is unable to obtain adequate credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

(a) the trustee is unable to obtain such credit otherwise; and

(b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

37. As stated, the Debtors are unable to obtain the DIP Loan without the priming liens.

38. Bankruptcy Code section 361 provides that adequate protection is with respect to the decrease in the value of such entity's interest in such collateral. 11 U.S.C. § 361(1), (2), (3); see also United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 369-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" that secures the claim). Pursuant to Bankruptcy Code section 361, adequate protection may be provided by cash payments, replacement liens, and other relief, "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

39. Timbers informs that iStar is entitled to "adequate protection" only against diminution of its interest in the Prepetition Collateral. Id. To the extent iStar's interest

26

in the value of the Prepetition Collateral is not diminishing by its use, sale, or lease, it follows that its interest is adequately protected. See id.; In re Gunnison Center Apartments, LP, 320 B.R. 391 (Bankr. D. Colo. 2005); In re McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop VI, Ltd), 88 B.R. 261, 266 (Bankr. C.D. Cal. 1988). The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). The secured creditor "must, therefore, prove this decline in value-or the threat of a decline-in order to establish a prima facie case." In re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

40. Here, iStar is adequately protected because the Debtors will use the bulk of the DIP Loan proceeds to pay essential expenses at the Property will prevent in a decline in the value of iStar's collateral. As iStar has admitted, the payment of such expenses will *prevent* a decline in the value of the Property. See, Affidavit of John F. Kubicko in Support of Motion of iStar Tara LLC for Relief from Automatic Stay to Foreclose on Mortgaged Property, at ¶ 26 ("[o]f course, halting the protective advances is not a viable option either because such funding is necessary to pay critical expenses of the Building which, if left unpaid, would result in a precipitous decline in the value of the Building . . . )" The payment of such expenses also functions to maintain the "going concern value" of the Debtors' assets by preserving the marketability of the condo units that will be sold in conjunction with the development of the Property. The positive differential between the going concern value of the Debtors' assets as preserved by the DIP Loan and the decreased value that invariably

27

DOCS_DE:165806.2

would result if the above expenses are not paid therefore represents an enhancement to iStar's interest in its collateral.

41. In the related context of cash collateral usage, courts have found that a debtor's use of cash collateral to maintain the value of property from which rents are being generated suffices as adequate protection even without an equity cushion. In re McCombs supra, 88 B.R. 261 at 267 (holding that rents could be used to make repairs or renovations that would prevent a diminution in rent flow even if no equity cushion existed); In re Stein, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (holding that debtor could use cash collateral of undersecured creditor to meet operating expenses as such use would not result in a decrease of the creditor's security but rather a likely increase in the same); see also In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral applied to normal operating and maintenance expenditures on collateral property).

42. The remaining portion of the DIP Loan proceeds will be used to fund the administrative expenses of the Chapter 11 Cases pending a hearing to confirm the Joint Plan and also serve as a measure of adequate protection of iStar's collateral. In addition, the appointment of the CRO will vest a third party with the responsibility of managing the day to day operations of the Property, including administering the DIP Loan. The usage of the DIP Loan proceeds to pay chapter 11 administrative expenses, including the CRO, is no different than the usage of iStar's protective advances (pursuant to the Third Funding Motion) to pay

28

DOCS_DE:165806.2

the fees of the Receiver, his attorneys and other professionals[11]. As iStar explained in the Third Funding Motion:

> The advances will be used to pay the fees and expenses of the Receiver and his professionals who play an integral role in maintaining and continuing to develop the Property for the benefit of all creditors of the estates, and also preventing additional claims against the estates in the form of liabilities that might otherwise result if the Property is not safely maintained for residents and visitors.

Third Funding Motion, at ¶ 24. Here, the CRO and the Debtors' professionals will serve the same functional purposes as the professionals retained by the Receiver in seeking approval of the Joint Plan and maximizing the value of the Property for the Debtors' creditors (including iStar) and safeguarding the estates and the Property from additional liabilities and claims.

43. The Debtors in addition have proposed the iStar Adequate Protection Package, consisting of: (a) replacement liens, junior in right only to the (i) the Carve-Out (ii) the DIP Liens and (iii) the Other Liens and the Other Lienholder Replacement Liens, as applicable; (b) a superpriority administrative expense claim pursuant to section 507(b) for any diminution in the value of the Prepetition Collateral, junior in priority to the Superpriority Claim, the Carve-Out and the Other Lienholder Adequate Protection Claim, as applicable; and (iii) the provision of the same documentation and reports provided to the DIP Lender under the Amended DIP Loan Commitment Letter, the Interim Order and Final Order. The Debtors have proposed the Adequate Protection Package to further protect iStar's interest in the Prepetition Collateral to the extent that there is any diminution in iStar's interest therein.

44. Further, the nascent stage of the Debtors' cases and the fact that relief is being sought on an interim basis, has bearing on the measurement of adequate protection. It is

---

[11] The Receiver's professionals are David J. Spector & Associates, Inc., as construction/architectural consultant, Tamarkin Anderson LLC as development consultant and Wilkie Farr & Gallagher LLP as counsel. Third Funding Motion, at ¶ 9.

well established that a bankruptcy court, where possible, should resolve issues in favor of a reorganization particularly in the early part of a chapter 11 case:

> The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F. 2d 1393, 1397-98 (10th Cir. 1987) (citation omitted); In re Plaza de Retiro, Inc., 2009 WL 3633356 at *4 (Bankr. D. N.M. 2009).

45. Because the Debtors have demonstrated that (i) the same or superior financing is otherwise unavailable, and (ii) iStar will be adequately protected, Section 364(d) has been met and the Court should authorize the priming of iStar's Liens by the DIP Liens in connection with the DIP Loan.

46. For the reasons articulated above, the Other Lienholders also are adequately protected by the Other Lienholder Adequate Protection Package which provides for the Other Lienholder Replacement Liens and the Other Lienholder Adequate Protection Priority Claims.

C. <u>No Adequate Alternative to the DIP Loan is Currently Available</u>

47. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

48. Substantially all of the Debtors' assets are subject to iStar's Liens. Because of the amount of iStar's secured claims, obtaining the financing needed by the

30

DOCS_DE:165806.2

Debtors as unsecured debt or debt which would be secured by liens junior to the liens of iStar was not a realistic option, especially given the current state of the capital markets. To date, iStar has not indicated that it will provide the DIP Loan on the exact terms and conditions as set forth herein.

49. The debtor in possession financing provided by the Sponsor, and the transactions contemplated by the Joint Plan, are the only options available for the Debtors to reorganize and maximize value for all stakeholders. The terms of the DIP Loan, taken as a whole, provided the Debtors with liquidity and significant non-monetary accommodations which, in the Debtors' belief, will preserve and maximize the value of their estates. As a result and under the circumstances, the Debtors determined that the instant DIP Loan was the best proposal received by the Debtors. Based on the foregoing, the Debtors determined that the proposed debtor-in-possession financing with the DIP Lender is the best financing option available to the Debtors under the circumstances and is in the best interests of the Debtors' estates.

50. Accordingly, the Debtors have satisfied the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

D. The DIP Loan Terms are Fair, Reasonable, and Appropriate

51. The proposed terms of the DIP Loan and the other DIP Loan Documents are fair, reasonable, and adequate under the circumstances. The terms of the DIP Loan were negotiated among the Sponsor, the Sponsor Creditor and the Debtors.

52. The terms and conditions of the DIP Loan were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses at the Property and

DOCS_DE:165806.2

fund administration of the Chapter 11 Cases during the period between the Conversion Date and confirmation of a joint plan of reorganization.

53.     The proposed DIP Loan provides that the security interests and administrative expense claims granted to the DIP Lenders and iStar are subject to the Carve-Out. In In re Ames Dep't Stores, the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. 115 B.R. at 40.

54.     Likewise, the minimal due diligence expenses required by the DIP Lender under the DIP Loan are reasonable and appropriate under the circumstances. Notably, the DIP Loan contains a modest rate of interest, no origination fees or other fees to be paid to the DIP Lender, no interim milestones, or other heavy-handed provisions. Yet, courts routinely authorize lucrative lender incentives and stringent covenants beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

55.     Accordingly, given the circumstances, the terms of the DIP Loan are fair, reasonable and adequate, and the DIP Lenders under the DIP Loan should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

E.      Interim Approval Should Be Granted

56.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion

and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

57. The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim DIP Order until the Final Hearing to borrow under the DIP Loan in an amount not less than $315,000. This relief will enable the Debtors to pay critical operating and maintenance expenses at the Property in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### REQUEST FOR FINAL HEARING

58. The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, by first-class mail upon (i) the United States Trustee for the District of Delaware; (ii) counsel to the DIP Lender; (iii) counsel to iStar; (iv) any known lienholders of the Debtors; (v) the United States Internal Revenue Service; (vi) the parties included on the Debtors' list of thirty (30) creditors holding the largest unsecured claims; (vii) counsel to any the Committee appointed; (viii) counsel to the Petitioning Creditors; and (ix) any party who filed a request for notices in these chapter 11 cases prior to the date set forth in the Interim DIP Order for service of notice of the Final Hearing or would otherwise be entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[12]

---

[12] Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service

33

# **NOTICE**

59. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to iStar; (iv) counsel to the DIP Lender; (iv) any known lienholders of the Debtors (including, without limitation, any mechanic's lienholders); (v) the United States Internal Revenue Service; (vi) counsel to the Petitioning Creditors; and (vii) such other parties entitled to notice pursuant to Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

---

of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made on the 20 largest unsecured creditors in the case in lieu of the committee."

WHEREFORE, the Debtors respectfully request immediate entry of the Interim Order, in the form annexed hereto, granting the Debtors the relief requested herein; following additional notice and a hearing, the entry of a Final Order granting the relief requested herein; and granting such other and further relief as is just.

Dated: December 10, 2010  
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ B. Grohsgal*

Bruce Grohsgal (No. 3583)  
919 North Market Street  
17th Floor  
Wilmington, Delaware 19801  
Telephone: (302) 652-4100  
Facsimile: (302) 652-4400  
Email: bgrohsgal@pszjlaw.com

*[Proposed] Counsel to the Debtors and Debtors in Possession*