# EXHIBIT 2
## (Interim DIP Order)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FKF MADISON PARK GROUP OWNER, LLC, *et al.*,[1] | Case No. 10-11867 (KG) |
| | (Joint Administration Pending) |
| Debtors. | Related Docket No. [ ] |

## INTERIM DIP ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES AND (III) SCHEDULING A FINAL HEARING

FKF Madison Park Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC and Slazer Enterprises Owner, LLC (collectively, the "Debtors")[2] having moved on November 22, 2010 (the "Motion") for interim and Final DIP Orders authorizing them to, among other things, (i) incur postpetition secured indebtedness, (ii) grant security interests and superpriority claims, and (iii) grant adequate protection, pursuant to sections 105(a), 362, and 364(c), (d), and (e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having sought the following relief:

(a)     This Court's authorization, pursuant to Bankruptcy Code sections 105(a), 362, and 364(c), (d), and (e) and Bankruptcy Rules 2002, 4001 and 9014, for (i) FKF Madison Park

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6651); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) (4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Amended DIP Loan Commitment Letter.

Group Owner, LLC, (ii) JMJS 23rd Street Realty Owner, LLC, (iii) Madison Park Group Owner, LLC and (iv) Slazer Enterprises Owner, LLC, in their capacity as borrowers (the "Borrowers"), to enter into a debtor in possession financing loan pursuant to the terms and conditions of that certain Amended Debtor In Possession Loan Commitment Letter (as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "Amended DIP Loan Commitment Letter"), a copy of which is attached to the Motion as Exhibit A with New One Madison Park Member I, LP (the "DIP Lender"), to obtain a debtor-in-possession financing loan (the "DIP Loan") in an aggregate principal amount not to exceed $1,100,000 on the terms and conditions of the Amended DIP Loan Commitment Letter (together with the Interim DIP Order (as defined below), the Final DIP Order (as defined below) (the "DIP Loan Documents").

(b)     This Court's ordering, pursuant to Bankruptcy Code sections 364(c)(1) and (2) and 364(d)(1), that the obligations of the Debtors under the DIP Loan Documents (collectively, the "DIP Obligations") are, as more specifically set forth in this Interim DIP Order, the grant of security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all obligations of the Debtors under and with respect to the DIP Loan;

(c)     This Court's approval pursuant to Bankruptcy Code sections 361 and 364 of the form and manner of adequate protection set forth herein to be provided to iStar Tara, LLC ("iStar") and other lienholders as applicable (the "Other Lienholders") including, without limitation, authorizing and directing the Debtors to employ and retain Lee Buchwald of

Buchwald Capital Advisors LLC as the Chief Restructuring Officer of each of the Debtors (the "CRO");

(d)     This Court's scheduling of an interim hearing (the "Interim Hearing") pursuant to Bankruptcy Rule 4001(c)(2) to consider the entry of an Interim DIP Order in the form hereof (this "Interim DIP Order") which, among other things, (i) approves, on an interim basis, the postpetition secured financing to be made pursuant to the DIP Loan Documents, (ii) authorizes the Debtors to obtain Loan Advances on an interim basis in accordance with the DIP Loan Documents following the entry of this Interim DIP Order, in the aggregate principal amount of up to $315,000 (the "Interim Borrowing"), and (iii) grants adequate protection to iStar and the Other Lienholders for as provided in this Interim DIP Order;

(e)     This Court's scheduling, pursuant to Bankruptcy Rule 4001(c)(2), of a hearing (the "Final Hearing") to consider entry of a Final DIP Order (the "Final DIP Order") which, among other things, (i) approves, on a final basis, the DIP Loan Documents, (ii) authorizes, on a final basis, the DIP Loans to be made pursuant to the DIP Loan Documents in an aggregate principal amount of up to $1,100,000 the availability of which shall be limited pursuant to the budget attached hereto as Exhibit A (the "Approved Budget") and the variances from such Approved Budget permitted herein, and (iii) grants, on a final basis, adequate protection to iStar and the Other Lienholders as provided in the Final DIP Order;

(f)     This court's finding, pursuant to Bankruptcy Rules 2002 and 4001(c)(l), and the Local Rules of this Court that notice of the Interim Hearing was sufficient having been given to (i) the United States Trustee (the "U.S. Trustee"), (ii) counsel to the DIP Lender, (iii) counsel to any known secured creditors of record, (iv) counsel to iStar, (v) the thirty (30) largest unsecured creditors of the Debtors, (vi) any party asserting a lien against any of the Debtors' assets, and

(vii) the Internal Revenue Service (collectively, the "Notice Parties"); and such notice being sufficient and adequate, and no other or further notice being required; and

(g)    The Interim Hearing having been held on December 16, 2010; and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and this Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and their creditors; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS HEREBY FOUND:**[3]

A.    The Property. The Debtors are the tenant in common owners of the land, the improvements, the unsold units which have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story hi rise tower containing sixty nine (69) residential units of which fifty-seven (57) units remain unsold and contain approximately 117,982 net sellable square feet, and amenities, and limited common elements (the "North Tower"), as well as an adjacent lot known as 23 East 22nd, together with the land underlying and abutting the North Tower and the adjacent lot, the improvements, the unsold units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing.(the "Property").

B.    Petition Date. On June 8, 2010 (the "Petition Date"), involuntary chapter 7 petitions were filed against each of the Debtors by creditors Stephen Kraus, Mitchell Kraus,

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052

Barbara Kraus and Kraus Hi-Tech Home Automation, Inc. (the "Original Petitioning Creditors")
thereby commencing against the Debtors involuntary chapter 7 cases (the "Chapter 7 Cases").
Various creditors subsequently joined in the involuntary petitions.[4]

    C.  The Dismissal Motion and the Conversion Orders. On or about June 29,
2010, the Debtors filed a motion to dismiss the Petitions (the "Motion to Dismiss"). On
November 18, 2010, the Petitioning Creditors filed a motion (the "Conversion Motion") seeking
immediate entry of orders for relief followed by conversion of the Chapter 7 Cases to
proceedings under chapter 11 of title 11 of the Bankruptcy Code. On the same date, the Debtors
filed concurrently their Withdrawal Of Opposition To Involuntary Petitions, Notice Of Non-
Opposition To Entry Of Order For Relief, And Joinder In Motion To Convert To Cases To
Chapter 11 Cases (the "Notice of Withdrawal") [Docket No. 113 in 10-11867, Docket No. 105 in
10-11868, Docket No. 106 in 10-11-11869, and 111 in 10-11870]. On November 19, 2010, the
Court entered orders for relief in the Chapter 7 Cases and entered orders converting the Chapter
7 Cases to chapter 11 cases (the "Conversion Date") [Docket Nos. 119 in 10-11867, Docket No.
111 in 10-11868, Docket No. 112 in 10-11-11869, and 117 in 10-11870].

    D.  Jurisdiction; Venue. This Court has jurisdiction over the Chapter 11
Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §§157(b)(2)(D) and 1334.
This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue for the Chapter 11 Cases
and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

    E.  iStar Prepetition Loan Agreements. All of the Debtors are alleged parties
to the following loan agreements with iStar: (a) Senior Loan and Security Agreement between
Debtors and SFT I, Inc. as lender ("SFT") dated as of November 16, 2007 (the "Senior Loan");

---

[4] These creditors are: Joe Coffey, Harvey Schiller, Pace Plumbing, Gotham Greenwich Construction, LLC and Mad
52, LLC (the "Joining Creditors" together with the Original Petitioning Creditors, the "Petitioning Creditors")

(b) Project Loan and Security Agreement between Debtors and SFT dated as of November 16, 2007 (the "Project Loan"), and (c) Building Loan and Security Agreement between Debtors and SFT dated as of November 16, 2007 (the "Building Loan"), as such Senior Loan, Project Loan and Building Loan (the "Loans"). The Loans allegedly have been modified by that certain Modification Of Loan Agreements And Other Loan Documents between Debtors and iStar Tara LLC ("iStar") (as successor in interest to SFT) as lender dated as of June 24, 2009 (collectively, the "Loan Agreements").

      F.    iStar Prepetition Obligations. For purposes of this Interim DIP Order, (i) the term "iStar Prepetition Obligations" shall mean all indebtedness and other amounts owed, as of the Petition Date, iStar under the Loan Agreements. iStar asserts that as of the Petition Date, the total outstanding obligations due and owing under the Loan Agreements and related promissory notes (collectively, the "Notes") was approximately $233.5 million (collectively, the "iStar Prepetition Obligations").

      G.    iStar Prepetition Liens. To secure the iStar Prepetition Obligations under the Loan Agreements, iStar asserts that the Debtors granted iStar liens and security interests (collectively, the "iStar Prepetition Liens") upon and in substantially all of the Debtors' real property, the leases and rents from the real property and substantially all of the Debtors' personal property and fixtures (collectively, the "Prepetition Collateral") pursuant to the following security documents: (a) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Senior Loan) dated November 16, 2007; (b) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) dated November 16, 2007; (c) Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases

6

and Rents and Fixture Filing (Building Loan) dated November 16, 2007; (d) Second Gap Mortgage With Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) dated June 24, 2009; (e) Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Project Loan) dated June 24, 2009 (collectively, the "Mortgages"); and (f) certain UCC Financing Statement filings of record made by iStar (or its predecessor) with respect to the Debtors.

H.    iStar Postpetition Obligations.  Following the commencement of the Chapter 7 Cases, iStar filed a motion [Docket No. 13] (the "First Funding Motion") seeking authority to continue making protective advances during June and July 2010 in an amount up to $488,610 pursuant to an approved budget, in order to fund (i) operating and maintenance expenses for the Property, including payroll for staff, payment of the Building's managing agent, utilities, insurance, permits and warranty-related costs and (ii) "emergency repairs and construction to ensure the safety of the Building and the health and welfare of the residents and the public."  The First Funding Motion was approved by order of the Court on June 30, 2010 [Docket No. 26].  On July 16, 2010, iStar filed a second motion [Docket No. 34] (the "Second Funding Motion") for authority to make protective advances to fund expenses of the Property (consistent with the First Funding Motion) through September 30, 2010 in an amount up to $584,615 pursuant to the budget attached to the Second Funding Motion.  Additionally, the Second Funding Motion sought authority to pay the premium to renew the Debtors' construction liability insurance policy through January 20, 2011 estimated in the amount of $65,000.  The Second Funding Motion was approved by order of the Court on July 30, 2010 [Docket No. 38]. On September 8, 2010, iStar filed a motion [Docket No. 80] (the "Third Funding Motion") for authority to make protective advances in pay certain professional fees of the Receiver in

7

connection with his management of the Property upon a determination by the New York Supreme Court of the amount of fees the Receiver and his professionals are entitled to be paid under New York law with such advances to be secured by liens on the real and personal property comprising the Prepetition Collateral having the same validity extent and priority as the iStar Prepetition Liens. The Receiver Funding Motion was approved by order of the Court on September 22, 2010 [Docket No. 88]. On September 23, 2010, iStar filed a fourth motion [Docket No. 87] (the "Fourth Funding Motion," and together with the First Funding Motion, the Second Funding Motion, and the Third Funding Motion, the "Funding Motions") for authority to make protective advances to fund the expenses of the Property (consistent with the First and Second Funding Motions) through December 31, 2010 in an amount of up to $664,369 pursuant to the budget attached to the Third Funding Motion. The Third Funding Motion also requested authority to pay the real estate taxes due to the City of New York with respect to the Property for the third and fourth quarters of 2010 in the estimate amount of $430,845.76 for third quarter (and unpaid second quarter) taxes and $248,643.75 for fourth quarter taxes. Third Funding Motion at ¶ 21, and Ex. A. The Third Funding Motion was approved by order of the Court on October 6, 2010 [Docket No. 98]. iStar asserts that as of October 31, 2010, the total amount of protective advances it has disbursed to the Receiver and third parties since the commencement of the Chapter 7 Cases is $886,114.85 (the "iStar Postpetition Obligations" together with iStar Prepetition Obligations, the "iStar Obligations").

      I.    Other Lienholders and the Other Liens. The Debtors believe that certain Other Lienholders may assert that their liens also attach to the Collateral (as defined below) (the "Other Liens") to secure certain prepetition obligations of the Debtors to the Other Lienholders.

J.    Debtors' Stipulations.  In requesting postpetition financing under the DIP Loan Documents, the Debtors acknowledge, represent, stipulate, and agree that:

(i)    in entering into the DIP Loan Documents, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments related thereto are terminated in accordance with the terms of the DIP Loan Documents, the Debtors shall not in any way grant, seek to grant, or cause to be granted any lien and/or claim that is senior to or *pari passu* with any of the liens, security interests and claims provided under this Interim DIP Order to the DIP Lender, including, without limitation, by offering a subsequent lender or any other party a superior or *pari passu* lien or claim pursuant to Bankruptcy Code section 364(d), or otherwise, except with respect to the Carve-Out;

(ii)    the DIP Lender is not and shall not be deemed to be a control person or insider of the Debtors by virtue of any of the actions taken by such parties in respect of or in connection with the DIP Obligations;

(iii)    as of the Petition Date, the Debtors have not brought, and are not aware of, any claims or causes of action belonging to the Debtors that exist or are likely to arise against the DIP Lender; and

K.    Purpose and Necessity of Financing.  The Debtors require the financing described in the Motion to fund the necessary and critical ordinary course expenses of maintaining and preserving the Property consistent with the terms set forth in the DIP Loan Documents, and for other purposes permitted by the DIP Loan Documents.  If the Debtors do not obtain authorization to borrow under the DIP Loan Documents and the DIP Loan is not approved, the Debtors will suffer immediate and irreparable harm.  The Debtors are unable to

9

obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code

section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more

favorable terms than those set forth in the DIP Loan Documents based on the totality of the

circumstances. Moreover, loan advances in the amount provided by the DIP Loan Documents

are not available to the Debtors without granting the DIP Lender superpriority claims, priming

liens, and security interests, pursuant to Bankruptcy Code sections 364(c)(1), (2) and 364(d), as

provided in this Interim DIP Order and the DIP Loan Documents. After considering all

alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that

the DIP Loan provided under the DIP Loan Documents represents the best financing package

available to it and is in the best interests of the estate and its creditors. The adequate protection

provided herein and other benefits and privileges contained herein are consistent with and

authorized by the Bankruptcy Code and adequately protect any non-consenting parties' interests

in the Collateral.

   L. <u>Good Faith</u>. The DIP Loan Documents have been negotiated in good faith

and at arm's-length by and among the Debtors and the DIP Lender. The DIP Loan and/or other

financial accommodations made to the Debtors by the DIP Lender pursuant to this Interim DIP

Order and/or the DIP Loan Documents shall be deemed to have been extended by the DIP

Lender in good faith, as that term is used in Bankruptcy Code section 364(e), and the DIP Lender

shall be entitled to all protections afforded thereunder, including, without limitation, the full

protection of Bankruptcy Code section 364(e) in the event that this Interim DIP Order or any

provision thereof is vacated, reversed or modified, on appeal or otherwise. The terms of the DIP

Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.    <u>Consideration</u>. The Debtors will receive and have received fair and reasonable consideration in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim DIP Order.

N.    <u>Notice</u>. Sufficient and adequate notice of the Interim Hearing and the entry of this Interim DIP Order have been given in accordance with Bankruptcy Rule 4001, and no other or further notice need be given for entry of this Interim DIP Order.

O.    <u>Immediate Entry of Interim DIP Order</u>. The Debtors have requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The Motion and this Interim DIP Order comply with Local Bankruptcy Rule 4001-2. The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim DIP Order is in the best interests of the Debtors' estates and their creditors as its implementation will provide for payment of the necessary and critical ordinary course expenses of maintaining and preserving the Property and further enhance the Debtors' prospects for a successful restructuring. Based upon the foregoing findings, acknowledgements, and conclusions, aid upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED:**

1.    <u>Disposition</u>. The Motion is granted on an interim basis, subject to the terms set forth herein, and the terms and provisions of the Amended DIP Loan Commitment Letter annexed hereto as Exhibit A are approved in all respects. Any objections to the Motion that have

not previously been withdrawn or resolved are hereby overruled on their merits. This Interim DIP Order shall be valid, binding on all parties-in-interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014. The terms and provisions of the DIP Loan Documents are approved on an interim basis.

2.  Authorization.

(a)  The Debtors are hereby authorized to immediately obtain a DIP Loan, pursuant to the terms of this Interim DIP Order and subject to the terms of the DIP Loan Documents, in the aggregate principal amount of up to the Interim Borrowing. Available financing and advances under the Amended DIP Loan Commitment Letter shall be made to fund, in accordance with the DIP Loan Documents, the necessary and critical ordinary course expenses of maintaining and preserving the Property and the costs of the Chapter 11 Cases in accordance with the Approved Budget (and the variances permitted thereto).

3.  Authority to Execute and Deliver Necessary Documents.

(a)  The Debtors are authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto. The Debtors are further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, and mortgages or deeds of trust encumbering all of the Collateral and securing all of the Debtors' obligations under the DIP Loan Documents

(b)  The Debtors are hereby further authorized to (i) perform all of their obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim DIP Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim DIP Order, including, without limitation, the payment of fees, and the reimbursement of

present and future costs and expenses (including without limitation, the DIP Lender's attorneys' and other advisors' fees and expenses), paid or incurred by the DIP Lender as provided for in the DIP Loan Documents. All such unpaid fees, costs, and other expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the DIP Liens.

(c)     All obligations under the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against them and their successors and assigns (including, without limitation, any successor trustee or other estate representative in the Chapter 11 Cases or subsequent or superseding chapter 7 or Chapter 11 Cases (each, a "Successor Case")), in accordance with the terms of the DIP Loan Documents and the terms of this Interim DIP Order, and no obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim DIP Order shall be voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Bankruptcy Code section 502(d)) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.     DIP Lender's Superpriority Claim. The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to Bankruptcy Code section 364(c)(1) for all DIP Obligations, having priority over any and all other administrative claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 or otherwise, whether or not such expenses or claims may

become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation, but subject to the entry of the Final DIP Order; _provided_ that the Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to the payment of the Carve-Out and shall not extend to the proceeds of Avoidance Actions (hereinafter defined). Except as set forth herein, no other superpriority claims shall be granted or allowed in the Chapter 11 Cases.

  5.  <u>DIP Liens.</u>

    (a)  The DIP Obligations shall be secured by:

      i.  valid, properly perfected, first priority senior liens on all now existing and hereafter acquired (whether before or after the Petition Date) assets of the Debtors, including, without limitation, all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, including without limitation, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, development orders, environmental permits or other approvals to develop any real property, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, tax refunds, and all rights, claims, and other causes of action of the Debtors and the Debtors' estates (including any actions asserted by the Debtors or any subsequently appointed trustee or representative of the Debtors' estates under any section of the Bankruptcy Code, and in each case, all proceeds resulting therefrom, excluding, however, avoidance actions ("<u>Avoidance Actions</u>") under sections 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code) (collectively, the "<u>Collateral</u>") pursuant to section 364(d)(1) of the Bankruptcy Code, with such liens securing the DIP Obligations to prime and be deemed senior to

all other liens maintained with respect to any of Debtors' now existing or hereafter acquired property; provided, however, if it is determined that the Debtors have an interest in any commercial tort claims or tax refunds that is property of the Debtors' estates, the proceeds of such interests shall be part of the Collateral; and

ii.　perfected, first-priority senior liens, pursuant to Section 364(c)(2) of the Bankruptcy Code, on that portion of the Collateral that is unencumbered property of Debtors.

(b)　In each case, the Collateral shall also include any and all rents, issues, products, offspring and profits generated by any item of Collateral, without the necessity of any further action or any kind or nature by the DIP Lender in order to claim or perfect such interests.

(c)　The DIP Liens shall not at any time be (i) made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under Bankruptcy Code section 364(d) or otherwise, other than the Carve-Out or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(d)　The DIP Liens, Superpriority Claim, and other rights and remedies granted under this Interim DIP Order to the DIP Lender, shall continue in the Chapter 11 Cases and in any Successor Case, and such liens and security interests shall maintain their first priority as provided in this Interim DIP Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitments have been terminated in accordance with the DIP Loan Documents.

6.　　Fees. All fees, costs and/or expenses payable or reimbursable by the Debtors as set forth in the DIP Loan Documents are hereby approved. The Debtors are hereby authorized to

15

pay all such fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this Interim DIP Order, without the DIP Lender or its counsel having to file any further application with this Court for approval or payment of such fees, costs or expenses.

7.    <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors and the DIP Lender may enter into any non-material amendments, consents, waivers or modifications to the DIP Loan Documents without the need for further notice and hearing or any order of this Court; including amendments to the Approved Budget, <u>provided</u>, <u>however</u>, that without the consent of the DIP Lender, no such amendment or waiver shall increase the lending commitment of any DIP Lender; <u>provided</u>, <u>further</u>, <u>however</u>, that the Debtors shall provide any official committee appointed in the Chapter 11 Cases and the U.S. Trustee with notice of any material modification to the DIP Loan Documents.

8.    <u>Term</u>.  All DIP Obligations shall be due and payable, and repaid in full, in cash, on the date (the "<u>Maturity Date</u>") that is the first to occur of: (i) March 31, 2011; (ii) the effective date of a plan of reorganization confirmed in one or more of the Chapter 11 Cases; (iii) conversion or dismissal of one or more of the Chapter 11 Cases; (iv) appointment of a trustee in one or more of the Chapter 11 Cases; or (v) the occurrence of an Event of Default including any applicable notice or cure period under, or as otherwise set forth in, the DIP Orders.

9.    <u>Interest on DIP Obligations</u>.  Interest on the DIP Obligations shall accrue at a variable rate, adjusted monthly, equal to the Prime Rate plus fifty (50) basis points (0.50%), and be paid payable monthly in arrears calculated on the basis of actual days elapsed in a year of three hundred and sixty (360) days.  The Prime Rate shall be the prime rate as reported in The Wall Street Journal.  The default rate of interest will be two percent (2%) higher than the rate otherwise payable.

10.     Adequate Protection for iStar.  iStar has not consented to the incurrence of the DIP Obligations by the Debtors under the DIP Loan Documents and the Debtors' granting of priming liens in connection therewith.  The Debtors acknowledge and stipulate that iStar is entitled, pursuant to Bankruptcy Code sections 361 and 364(d)(1), to adequate protection of its interests in the Prepetition Collateral, in exchange for the priming of iStar's security interests and liens in the Prepetition Collateral by the DIP Liens being granted to the DIP Lender pursuant to the DIP Loan Documents and this Interim DIP Order.  As adequate protection, iStar is hereby granted the protections described in clauses (a), (b), (c) and (d) below, which shall be referred to collectively as the "iStar Adequate Protection Obligations"):

(a)     Adequate Protection Liens.  Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the interests of iStar in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) the use of the Prepetition Collateral from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, the Debtors will grant to iStar, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "iStar Replacement Liens").  The iStar Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out (as described below); and (iii) to the extent that the Other Liens (as described below) are senior to the Prepetition Liens, the Other Liens and the Other Lienholder Replacement Liens; and will be of the same priority, validity and enforceability as the iStar Prepetition Liens.  The iStar Replacement Liens shall be senior to all other liens.

(b)     Adequate Protection Claim.  As further adequate protection of the interests of iStar in the Prepetition Collateral against any diminution in value of such interests in the Property on account of (i) the use of the Prepetition Collateral from and after the funding of the

Loan Advances, or (ii) the granting of the DIP Liens, iStar shall have a superpriority administrative expense claim in the Chapter 11 Cases (the "iStar Adequate Protection Priority Claim"). Except as set forth in the Interim DIP Order, the Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the iStar Adequate Protection Priority Claim shall be junior in priority to the Superpriority Claim of the DIP Lender, the Carve-Out and the Other Lienholder Adequate Protection Claims to the extent that the Other Liens are senior to the iStar Prepetition Liens and shall not extend to the proceeds of Avoidance Actions (hereinafter defined).

(c)     Appointment of CRO. As additional adequate protection for the use of the Prepetition Collateral by the Debtors, and in accordance with Bankruptcy Code sections 361 and 364, the Debtors are hereby authorized and directed to employ and retain Lee Buchwald of Buchwald Capital Advisors LLC as the Chief Restructuring Officer ("CRO") of each of the Debtors on the terms and conditions set forth in Mr. Buchwald's proposed retention agreement with the Debtors annexed to the Declaration of Lee Buchwald Regarding Disinterestedness filed as Docket No. [   ]. The CRO is authorized to operate and manage the day-to-day business activities of the Debtors including, without limitation, the administration of the DIP Loan.

(d)     Reporting. As additional adequate protection for the use of the Prepetition Collateral by the Debtors, and in accordance with Bankruptcy Code sections 361 and 364(d), iStar shall receive, as applicable, from the Debtors the same documentation and reports provided

18

by the Debtors to the DIP Lender pursuant to the terms of the Amended DIP Loan Commitment Letter, this Interim DIP Order or the Final DIP Order.

11. <u>Adequate Protection for Other Lienholders.</u>

(a) Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the interests of Other Lienholders against any diminution in value of such interests in the Collateral on account of (i) the use of the Collateral from and after the funding of the Loan Advances and (ii) the granting of the DIP Liens, the Debtors will grant to such Other Lienholders, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "<u>Other Lienholder Replacement Liens</u>"). The Other Lienholder Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out (as described below); and (iii) the iStar Prepetition Liens and the iStar Replacement Liens to the extent that the iStar Prepetition Liens are senior to the Other Liens; and will be of the same priority, validity and enforceability as the Other Liens. The Other Lienholder Replacement Liens shall be senior to all other liens.

(b) As further adequate protection of the interests of Other Lienholders in the Collateral against any diminution in value of such interests in the Collateral on account of (i) the use of the Collateral from and after the funding of the Loan Advances, or (ii) the granting of the DIP Liens, Other Lienholders shall have superpriority administrative expense claims in the Chapter 11 Cases (the "<u>Other Lienholder Adequate Protection Priority Claims</u>"). Except as set forth in the Interim DIP Order, the Other Lienholder Adequate Protection Priority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to

19

Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the Other Lienholder Adequate Protection Priority Claims shall be junior in priority to the Superpriority Claim of the DIP Lender, the Carve-Out and the iStar Adequate Protection Priority Claim to the extent the iStar Prepetition Liens are senior to Other Liens and shall not extend to the proceeds of Avoidance Actions (hereinafter defined).

(c)     Appointment of CRO.  The Debtors' employment and retention of the CRO shall serve as further adequate protection for the use of the Collateral by the Debtors.

12.     Carve-Out.

(a)     The liens and the superpriority claims securing the DIP Loan, the iStar Replacement Liens, the iStar Adequate Protection Priority Claim, the Other Lienholder Replacement Liens and the Other Lienholder Adequate Protection Claims shall be subject to a carve-out (the "Carve-Out") which shall mean collectively: (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and all fees required to be paid to the Clerk of the Bankruptcy Court, which are incurred after the Conversion Date; (ii) allowed fees, expenses and costs of attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors (the "Debtors' Professionals") or any official committee of unsecured creditors (the "Committee Professionals") pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 to the extent permitted under the Approved Budget for such respective professionals in each case through such date of the Carve-out Trigger Notice, which are actually incurred and unpaid prior to the business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (the "Carve-out Trigger Date"), whether allowed prior to or after such date; and (iii) in the case of the Debtors' Professionals, an amount equal to the lesser of $75,000 and the amount of remaining

20

amount of the Approved Budget for the Debtors' Professionals after payment of their allowed

fees and expenses incurred through the Carve-Out Trigger Date. In all instances, the payment

fees and expenses is subject to the rights of the DIP Lender to object to the allowance of any

such fees and expenses.

(b)     No portion of the Carve-Out may be used in connection with the

investigation (including discovery proceedings), initiation or prosecution of any claims, causes

of action, objection or other litigation against the DIP Lender.

(c)     The DIP Lender shall not be responsible for the direct payment or

reimbursement of any fees or disbursements of any Professionals in the Chapter 11 Cases

incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the

Bankruptcy Code. Nothing in this Interim DIP Order or otherwise shall be construed to obligate

the DIP Lender in any way to pay compensation to or reimburse expenses of any Professional in

the Chapter 11 Cases, or to guarantee that the Debtors have sufficient funds to pay such

compensation or reimbursement, except to the extent of the Carve-Out.

(d)     No liens, claims, interests or priority status, other than the Carve-Out,

having a lien or administrative priority superior to *pari passu* with that of the DIP Liens or the

Superpriority Claim granted by this Interim DIP Order, shall be granted while any portion of the

DIP Obligations remain outstanding, or any commitment under the DIP Loan Documents

remains in effect, without the prior written consent of the DIP Lender.

(e)     Effective upon entry of this Interim DIP Order, no party shall be entitled,

directly or indirectly, to (i) charge the Carve-Out or the Collateral, whether by operation of

Bankruptcy Code sections 105, 506(c) or 552(b) or otherwise or (ii) direct the exercise of

remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control

the disposition of Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

13.    Release.  Upon entry of this Interim DIP Order, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in any Chapter 11 Cases or Successor Case), forever and irrevocably (i) release, discharge, and acquit the DIP Lender, and each of its respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Loan Documents, and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the DIP Liens and Superpriority Claims.

14.    Limitation on Additional Surcharges.  So long as the Maturity Date has not occurred, no action, inaction or acquiescence by the DIP Lender, including funding the Debtors' ongoing operations under this Interim DIP Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender to a charge against the Collateral pursuant to Bankruptcy Code sections 506(c), 552(b) or 105(a), and no such costs, fees or expenses shall be so charged against the Collateral without the prior written consent of the DIP Lender, to the extent of its interests in such Collateral.  The DIP Lender shall not be subject in any way

22

whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

15. <u>Additional Perfection Measures</u>. The DIP Liens, the iStar Replacement Liens and the Other Lienholder Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim DIP Order. None of the Debtors, the DIP Lender, iStar or the Other Lienholders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction, or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens, the iStar Replacement Liens or the Other Lienholder Replacement Liens.

(a) The DIP Lender, iStar and Other Lienholders may, but shall not be obligated to, obtain consents from any landlord, licensor or other party in interest, file mortgages, financing statements, notices of lien or similar instruments, or otherwise record or perfect such security interests and liens, in which case:

i. all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim DIP Order; and

ii. no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b) In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lender, iStar and Other Lienholders may, but shall not be obligated to, file a true and complete copy of this Interim DIP Order in any place at which any such instruments would or could be filed, together with a description of

23

Collateral or Prepetition Collateral, as applicable, and such filings by the DIP Lender, iStar and the Other Lienholders shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim DIP Order.

16.     Events of Default. The occurrence of any of the following shall constitute an Event of Default under this Interim DIP Order upon notice to the Debtors by the DIP Lender:

(a)     the failure to pay the DIP Obligations in cash in full upon the Maturity Date, or when due if prior to the Maturity Date;

(b)     breach by the Debtors of any of their representations, warranties or covenants under the Amended DIP Loan Commitment Letter and the DIP Orders, which breach is not cured within ten business days of written notice by the DIP Lender to the Debtors of such breach;

(c)     the filing of a plan of reorganization for one or more of the Debtors that does not provide for the payment in cash in full of the DIP Obligations;

(d)     entry of an order in the Chapter 11 Cases to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; and

(e)     the commencement of any litigation which, if successful, would have a material adverse impact on Debtors, their business, or their ability to repay the DIP Obligations or which would challenge in any respect the DIP Obligations or the DIP Liens.

17.     Automatic Stay Vacated and Modified.

(a)     Notwithstanding section 362 of the Bankruptcy Code, the automatic stay is hereby vacated and modified to the extent necessary to permit the DIP Lender, to:  (x)

immediately (A) deliver a notice of an Event of Default; and (B) terminate or suspend any outstanding Loan Advances; and (y) upon five (5) business days' written notice (within which period the Debtors may only dispute the DIP Lender's declaration of an Event of Default on the basis of the events described in Paragraph 16(b) or 16(e), above, in the Bankruptcy Court on an expedited basis), the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Court, with the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lender to do any one or more of the following: (A) charge the default rate of interest on the Loan Advances; and (B) declare the principal of and accrued interest, fees and expenses constituting the DIP Obligations to be due and payable. Upon and after the occurrence of an Event of Default, except as provided in the preceding sentence, the DIP Lender shall be required to file a motion seeking relief from the automatic stay to enforce any of its other rights or remedies. The Debtors are deemed to waive any right under Section 105 of the Bankruptcy Code to enjoin the exercise of the rights and remedies by DIP Lender following an Event of Default.

(b)     The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Loan Documents or otherwise. The Debtors shall cooperate fully with the DIP Lender in their exercise of rights and remedies, whether against the Collateral or otherwise.

(c)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim DIP Order and relating to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a) or other injunctive relief requested.

18.     <u>Loan Advances, Budget and Reporting.</u>

(a)     Proceeds from Loan Advances shall be used exclusively for funding the expenses (collectively, the "Approved Expenses") which are set forth in amount on the budget (the "Approved Budget") annexed hereto as Exhibit A, including: (x) normal operating expenses consistent with past practices, including (i) management expenses (ii) insurance (iii) payroll expenses, (iv) operating service and maintenance, and (v) utility expenses, including electricity, gas and telephone; and (y) fees of the United States Trustee and allowed professional fees of the Debtors and any official committee of unsecured creditors (the "Committee") appointed in the Chapter 11 Cases in amounts not to exceed that set forth in the Approved Budget and accrued and unpaid prior to the occurrence of an Event of Default, and, in the case of allowed professional fees of the Debtors, the lesser of $75,000 and the remainder of the amount set forth in the Approved Budget for fees and expenses of the Debtors' professionals and not expended as of the occurrence of such Event of Default.  The Debtors will be permitted variances of up to 110% for each line item on the Approved Budget, exclusive of restructuring, legal and professional fees, and shall be permitted to carry forward from a prior month to the next succeeding month any unused portion of the aggregated actual amounts attributable to the prior month.  For the avoidance of doubt, no portion of the DIP Loan, the collateral securing the DIP Loan, the proceeds of the DIP Loan or the Carve-Out may be used in connection with discovery proceedings, initiation or prosecution of any claims, causes of action, objection or other litigation against the DIP Lender or with respect to the DIP Obligations.

(b)     Loan Advances shall occur no more frequently than once a month and shall be in a minimum amount of $100,000 unless less than $100,000 remains to be funded hereunder.  During the period from the entry of the Interim DIP Order until the Final DIP Order becomes a Final DIP Order, Loan Advances shall not exceed $315,000.  The DIP Orders

26

approving the DIP Obligations shall include the Approved Budget. No later than the third (3rd) business day of every week commencing with the week following the week of the approval of the Interim DIP Order, the Debtors shall deliver: (i) a variance report detailing: (x) the cash expenditures for the prior week and a comparison to the Approved Budget for that week; (y) the cumulative cash expenditures for all of the prior weeks since the Conversion Date and as compared to the Approved Budget for such weeks; and (z) a narrative explanation of the variances between the actual weekly expenditures and the budgeted weekly expenditures; and (ii) an updated weekly cash flow forecast for the then remaining period of the Approved Budget (the "Updated Budget"), consistent with the Approved Budget (collectively, the "Weekly Reports"). The Weekly Reports shall be subject to the review and approval by the DIP Lender, which approval shall not be unreasonably withheld. Subject to the approval of the DIP Lender, which shall not be unreasonably withheld and which shall not require any further Bankruptcy Court approval, the Updated Budget shall be deemed the Approved Budget.

(c)     The Debtors shall additionally provide to the DIP Lender the following reports and information:

i.     monthly financial statements, operating reports, and budget and operating plans for each such monthly period (the "Monthly Reports");

ii.     on an as-requested basis all such other reports and information respecting the Debtors' business, financial condition or prospects as the DIP Lender from time to time reasonably requests; and

iii.     copies of all pleadings, motions, applications, judicial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court or the U.S. Trustee.

(d)     The delivery of the Weekly Reports and the Monthly Reports shall be accompanied by a certification from the Debtors that such Weekly Reports and Monthly Reports are true and correct in all material respects.

19.     <u>Access</u>.  The DIP Lender and its respective agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtors' business records, business premises, and to the Collateral to enable the DIP Lender or its agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' business and the Property, and (c) evaluate the Debtors' overall financial condition and all other records relating to the operations of the Debtors and the Property.  The Debtors shall fully cooperate with the DIP Lender regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the DIP Lender and its professionals and consultants to conduct such reviews, evaluations, and inspections.

20.     <u>Insurance Policies</u>.  Upon entry of this Interim DIP Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates to the Collateral.  The Debtors are authorized and directed to take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy.

21.     <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Lender, its affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation,

28

reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loan, the DIP Orders or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Loan, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated by the Amended DIP Loan Commitment Letter are consummated. The Debtors further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any of their security holders or creditors for or in connection with the transactions contemplated by the DIP Loan Documents, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

22. <u>Successors and Assigns</u>. The DIP Loan Documents and the provisions of this Interim DIP Order shall be binding upon the Debtors, the DIP Lender, iStar and the Other Lienholders, and each of their respective successors and assigns, and shall inure to the benefit of

the Debtors, the DIP Lender, iStar and the Other Lienholders and each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtors under any chapter of the Bankruptcy Code. The provisions of this Interim DIP Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest.

23. <u>Binding Nature of Agreement</u>. Each of the DIP Loan Documents to which the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lender by the Debtors no later than one business day after entry of this Interim DIP Order. The rights, remedies, powers, privileges, liens, and priorities of the DIP Lender provided for in this Interim DIP Order and in the DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of the Chapter 11 Cases or in any Successor Case under the Bankruptcy Code unless and until the DIP Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with the DIP Loan Documents.

24. <u>Subsequent Reversal or Modification</u>. This Interim DIP Order is entered pursuant to Bankruptcy Code section 364, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender all protections afforded by Bankruptcy Code section 364(e). If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Lender, prior to the date of receipt by the DIP Lender of written notice of the effective

30

date of such action or (ii) the validity and enforceability of any lien or priority authorized or created under this Interim DIP Order or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by the Debtors to the DIP Lender prior to written notice to the DIP Lender of the effective date of such action, shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

25.    <u>Restriction on Use of DIP Lender's Funds</u>. The Superpriority Claim, the DIP Liens, the iStar Prepetition Liens, iStar Replacement Liens, Other Liens and Other Lienholder Replacement Liens shall be valid and binding liens and claims, enforceable in accordance with the provisions hereof, and no proceeds from the DIP Loan, Collateral or proceeds thereof, or any portion of the Carve-Out may be used to pay, any claims for services rendered by any of the Professionals retained by the Debtors (or any successor trustee or other estate representative in the Chapter 11 Cases or any Successor Case), any creditor or party in interest, any committee or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Lender; and/or (b) investigate, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender or any of its respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any Avoidance

Actions or other actions arising under Chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity and extent of the DIP Obligations or the validity, extent, and priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens; and/or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Lender's assertion, enforcement or realization on the Collateral in accordance with the DIP Loan Documents or this Interim DIP Order.

26. <u>Priming and Subordination of Liens</u>. For avoidance of doubt, and notwithstanding anything to the contrary herein, all liens on the Collateral in existence on the date hereof shall be primed by the DIP Liens, iStar Replacement Liens and Other Lienholder Replacement Liens, and shall be subordinate to the DIP Liens, iStar Replacement Liens and Other Lienholder Replacement Liens.

27. <u>Collateral Rights</u>. In the event that any party who has both received notice of the Interim Hearing and holds a lien or security interest in Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, iStar Replacement Liens and Other Lienholder Replacement Liens in such Collateral or Prepetition Collateral receives or is paid the proceeds of such Collateral or Prepetition Collateral, or receives any other payment with respect thereto from any other source, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents and the termination of the commitments in accordance with the DIP Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Collateral in trust for the DIP Lender and shall immediately turn over such proceeds (i) first for application to the DIP Obligations under the DIP Loan Documents in accordance with the DIP Loan Documents and this Interim

32

DIP Order until indefeasibly paid in full, and (ii) second for application to the Adequate Protection Claims of iStar and the Other Lienholders.

28.     No Waiver.  This Interim DIP Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

29.     No Waiver by Failure to Seek Relief.  The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim DIP Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights thereunder, or otherwise of the DIP Lender.

30.     Limits on DIP Lender's Liability.  Nothing in this Interim DIP Order or in any of the DIP Loan Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtors in the operation of their business or in connection with their restructuring efforts.

31.     Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim DIP Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents, the terms and provisions of this Interim DIP Order shall govern.

32.     No Third Party Beneficiary.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

33.     Survival.  Except as otherwise provided herein, (a) the protections afforded to the DIP Lender, iStar and the Other Lienholders under this Interim DIP Order, and any actions taken pursuant thereto, shall survive the entry of an order (1) dismissing any of the Chapter 11 Cases or (2) converting the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, iStar Replacement Liens, Other Lienholder Replacement Liens, the Superpriority Claim, the iStar Adequate Protection Claim and Other Lienholder Adequate Protection Claims shall continue in the Chapter 11 Cases, in any such Successor Case or after any such dismissal.  Except as otherwise provided herein, the DIP Liens, iStar Replacement Liens, Other Lienholder Replacement Liens, the Superpriority Claim, the iStar Adequate Protection Claim and Other Lienholder Adequate Protection Claims shall maintain their priorities as provided in this Interim DIP Order, the Final DIP Order, and the DIP Loan Documents, and shall not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Lender in accordance with the Final DIP Order), or any conversion of the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of the Chapter 11 Cases, or by any other act or omission until all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the DIP Loan Documents are terminated in accordance therewith.

34.     Final Hearing Date.  The Final Hearing to consider the entry of the Final DIP Order approving the relief sought in the Motion shall be held on **December [___], 2010 at [_]:00 [_].m.** (as the same may be adjourned or continued by this Court) before the Honorable Kevin Gross, at the United States Bankruptcy Court for the District of Delaware.

LA-129,207,737v5

35.     Adequate Notice.  The Debtors shall promptly mail copies of this Interim DIP

Order and notice of the Final Hearing to the Notice Parties, any known holder of a lien in any of

the Collateral (including, without limitation, any holders of mechanic's liens on the Property),

and any other party requesting notice after the entry of this Interim DIP Order.  Any objection to

the relief sought at the Final Hearing shall be made in writing setting forth with particularity the

grounds thereof, and filed with this Court and served so as to be actually received no later than

five business (5) days prior to the Final Hearing by the following: (i) Pachulski Stang Ziehl &

Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-

8705 (Attn:  Bruce Grohsgal, Esq. (bgrohsgal@pszjlaw.com), Debtors' counsel; (ii) Greenberg

Traurig, LLP, 2450 Colorado Avenue, Suite 400E, Santa Monica, California, 90404 (Attn:

Michael H. Goldstein, Esq. (goldsteinmh@gtlaw.com), counsel to DIP Lender and (iii) the

Office of the United States Trustee, J. 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE

19081 (Attn: Jane Leamy, Esq.).

36.     Proofs of Claim.  The DIP Lender is hereby relieved of the requirement to file

proofs of claim in these Chapter 11 Cases with respect to any DIP Obligations and any other

claims or liens granted hereunder or created hereby.

37.     Entry of Interim DIP Order; Effect.  This Interim DIP Order shall take effect

immediately upon execution hereof, notwithstanding the possible application of Bankruptcy

Rules 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter

this Interim DIP Order on this Court's docket in the Chapter 11 Cases.

38.     Retention of Jurisdiction.  This Court shall retain jurisdiction overall all matters

pertaining to the implementation, interpretation and enforcement of this Interim DIP Order

and/or the DIP Loan Documents.

39.     <u>Binding Effect of Interim DIP Order</u>.  The terms of this Interim DIP Order shall

be binding on any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.


Dated: December ___, 2010

<div style="margin-left:40%;">

_____

The Honorable Kevin Gross
UNITED STATES BANKRUPTCY JUDGE.

</div>

*LA-129,207,737v5*