UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>FKF MADISON PARK GROUP OWNER, *et al.*<br><br>Debtors. | Chapter 11 Case No. 10-11867 (KG)<br><br>(Joint Administration Pending)<br><br>**Hearing Date: Dec. 16, 2010 at 2:00 p.m.**<br>**Objection Deadline: Dec. 16, 2010 at 10:00 a.m.** |

## OBJECTION OF ISTAR TARA LLC TO DEBTORS' EMERGENCY MOTION TO APPROVE DEBTOR IN POSSESSION FINANCING

iStar Tara LLC ("iStar"), through its undersigned counsel, submits this objection to the motion, dated December 10, 2010 (the "DIP Motion") of FKF Madison Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC and Slazer Enterprises Owner, LLC (collectively, the "Debtors") for interim and final orders, pursuant to sections 105(a), 361, 362, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Fed. R. Bankr. P. 4001 and Del. Bankr. L.R. 4001-2, approving debtor in possession financing secured by a priming lien on iStar's collateral. In support of its objection, iStar respectfully represents as follows:

### INTRODUCTION

1. Under the Debtors' respective limited liability company agreements, the business and affairs of each Debtor is managed by non-debtor Slazer Enterprises, LLC ("Slazer Enterprises"). Yet, over the past several weeks, Ira Shapiro ("Shapiro"), a minority member of Slazer Enterprises and the Debtors' President,[1] has acted improperly and without the requisite

---

[1] Shapiro was previously replaced by a receiver appointed by the New York State court in the foreclosure action following allegations of widespread fraud and gross mismanagement committed by Shapiro. Upon information and belief, Shapiro's egregious conduct has included a scheme whereby numerous purchase agreements

consent of members holding a controlling interest in Slazer Enterprises to purportedly cause the Debtors to support a chapter 11 reorganization strategy, including the DIP Motion, sponsored by Ian Bruce Eichner ("Eichner"). Consequently, the Court should deny the DIP Motion at the outset because its filing was not authorized by the Debtors.[2]

2. With Shapiro's assistance, Eichner, a real estate developer who owes no fiduciary duty to the estates or their creditors, has seized *de facto* control of the Debtors, and of these cases, to facilitate his chapter 11 plan to the exclusion of all others. Unless modified in a manner acceptable to iStar, under Eichner's plan, he would seek to cram down iStar with a below market restructured mortgage, invest $40 million in new capital to fund plan distributions and develop the Debtors' uncompleted condominium project, mechanic's lienors would receive only a 20% recovery, while an Eichner-controlled entity would receive all of the equity interests in a newly formed entity that would take possession of the Mortgaged Property (as defined below). Should his plan be confirmed, Eichner stands to receive an enormous return on his investment in a relatively short period of time. For his part, Shapiro will be granted a contract to provide "consulting services" to the Debtors and, subsequently, the reorganized debtor, for $10,000 per month. Among other shortcomings, Eichner's plan is protected from competition through exclusivity and practical constraints that would exist if the DIP Motion is granted, yet no

---

for condominium units in the Mortgaged Property were entered into between the Debtors and their affiliates and/or other third parties without iStar's knowledge or approval. The purchase rights under these undisclosed agreements were then apparently assigned as collateral for millions of dollars in loans to the Debtors and their affiliates, the proceeds of which are unaccounted for. (See Affirmation of Matthew D. Parrott in Further Support of Plaintiff's Application for Appointment of Receiver in Mortgage Foreclosure Action, dated April 6, 2010, a copy of which, without exhibits, was attached as Exhibit C to iStar's initial motion to make protective advances during the gap period (ECF Doc. 13).) Notably, a term sheet for the plan proposed by the group led by Shapiro and Ian Bruce Eichner contains a unique class consisting of those who received deeds to units without the release of iStar's mortgage liens, requiring such deed holders to surrender those deeds.

[2] On December 15, 2010, Green Bridge Capital, S.A. and Special Situation, S.A., which entities hold a controlling voting interest in the Slazer Enterprises, LLC, commenced an adversary proceeding in this Court seeking injunctive and declaratory relief concerning Shapiro's lack of authority to control the Debtors.

mechanism is in place to market test the value of the Debtors' property or the equity of the reorganized debtor. iStar is aware of at least one other group who is challenging the authority of Shapiro to act for the Debtors and may wish to propose a plan in these cases. Indeed, iStar itself may seek to propose a plan if another satisfactory outcome is not presented.

3. After gaining *de facto* control of the Debtors and their exclusive right to propose a plan, the DIP Motion is Eichner's next attempt to facilitate his chapter 11 strategy and prevent competition from outside sponsors. Eichner is offering to provide the Debtors approximately $1.1 million in post-petition financing secured by a priming lien on all of the Debtors' assets, but only with significant limitations. The DIP loan will terminate and all obligations thereunder will be immediately due and payable if, among other things, (i) the cases are converted to chapter 7, (ii) a chapter 11 trustee is appointed, or (iii) any event of default occurs, including the proposal of any competing plan that fails to provide for the payment in full of Eichner's DIP loan. In addition, the proposed DIP financing order prohibits the Debtors from granting any lien to another DIP lender of senior or equal priority to Eichner's DIP lien as long as Eichner's DIP loan remains outstanding. Putting aside that the proposed DIP loan cannot satisfy the standards of section 364(d)(1) of the Bankruptcy Code, these restrictions are particularly inappropriate where the estates are in the control of Shapiro who has shown that he cannot be trusted to act as a fiduciary and the DIP lender is also the plan proponent.

4. Shapiro's authority and trustworthiness are central issues, the Debtors have been co-opted by Eichner, and termination of exclusivity and/or the appointment of a trustee is more than a remote possibility. Eichner's DIP loan should not be used to discourage better plans and alternative DIP financing proposals. As iStar has offered and is prepared to continue to fund the operating expenses of the Mortgaged Property on an administrative expense basis, the primary

purpose of Eichner's DIP loan will be to pay the professional fees and expenses of Pachulski Stang Ziehl & Jones ("Pachulski") as purported counsel to the Debtors, whose retention will not be approved should the Court determine that Shapiro lacks authority to control the Debtors. Accordingly, approval of the DIP motion at this time is not urgent and is not in the best interests of the estates.

5. The DIP Motion must also be denied because the proposed DIP financing fails to satisfy the requirements of section 364(d)(1). The DIP Motion proposes to secure Eichner's $1.1 million DIP loan with a priming lien on all of the Debtors' assets senior in priority to iStar's mortgages liens and security interests in the very same collateral. However, DIP financing secured by a priming lien on a pre-petition lender's collateral may be granted *only if* "the trustee is unable to obtain such credit otherwise," and there is adequate protection of the pre-petition lender's secured interest. Neither requirement is met here.

6. First, there is a readily available alternative to Eichner's DIP loan: iStar will continue funding protective advances under its loan agreements with the Debtors – on an administrative priority basis and with none of the onerous restrictions in Eichner's proposal – in order to pay the critical expenses of the of the Mortgaged Property. iStar would also be willing to fund the reasonable fees and expenses of an independent Chief Restructuring Officer, should one be appointed by the Court, but will not fund the fees and expenses of Pachulski, or prospective committee counsel, whose efforts may well be used to litigate against and seek to cram down iStar, or Shapiro's consulting fees, given his prior fraudulent conduct. Eichner has made a calculated decision to seize control of the Debtors for the purpose of trying to propose a plan under which he stands to make tens of millions of dollars if he is successful. The costs associated with that effort, including the cost of counsel to act for the Debtors who are working

with Eichner, should not be borne by iStar or the Mortgaged Property if for any reason Eichner is unsuccessful.

7. The current DIP financing proposal also fails for lack of adequate protection of iStar's secured interests. While the Debtors concede that they have no equity in the Mortgaged Property and are unable to offer any cash payments or additional property as replacement collateral, the Debtors nonetheless seek to prime iStar's liens, which will impair iStar's secured claims dollar-for-dollar to the extent of any DIP loan advances, by offering worthless "replacement liens" in the Mortgaged Property and administrative claims, both of which would be junior to the DIP liens, as well as a post-default carve-out for chapter 11 professional fees.

8. In addition, the proposed DIP financing budget fails to account for the payment of certain critical expenses, including real property taxes (which are secured by priming statutory liens) and contemplates the replacement of the Mortgaged Property's existing general contractor and construction manger, Bovis Lend Lease, LMB ("Bovis"). At least until the authority issue concerning the Debtors is resolved, it is entirely inappropriate and ill-advised to replace Bovis, who is needed to maintain worksite safety and compliance with New York City Department of Buildings regulations. Therefore, despite the Debtors' assertions to the contrary, the proposed DIP financing would not preserve the value of the Mortgaged Property.

9. Finally, if, notwithstanding the foregoing, the Court is inclined not to permit iStar to provide protective advances and to grant the DIP Motion on an interim basis pending a final hearing, iStar submits that the amount of interim financing needed to avoid immediate and irreparable harm to the estates is significantly less than the $315,000 that the Debtors are requesting and should be reduced to an amount not to exceed $150,000. If iStar is permitted to make protective advances on an administrative expense basis, there is no need for interim

financing as the payment of professionals prior to a final hearing is unnecessary and certainly not an emergency.

## BACKGROUND

10. The Debtors, as tenants-in-common, own certain real property in Manhattan, commonly known as the One Madison Park Condominium, located at 23 East 22nd Street, New York, New York (the "Mortgaged Property"). iStar is the holder of certain mortgages and security interests[3] encumbering the Mortgaged Property, which are valid, enforceable, have been duly recorded, and secure obligations of the Debtors to iStar in the approximate amount of at least $235 million.

11. On June 8, 2010 (the "Petition Date"), involuntary chapter 7 petitions were filed in this Court against each of the Debtors by Stephen Kraus, Mitchell Kraus, Barbara Kraus and Kraus Hi-Tech Home Automation, Inc (collectively, the "Krause Petitioners"). On June 29, 2010, the Debtors filed motions to dismiss the involuntary cases on the basis that each of the petitioning creditor's claims is subject to a bona fide dispute as to liability or amount. In August 2010, several additional alleged creditors of the Debtors, including Mad 52, LLC – an entity which is owned and controlled by Eichner – joined in the involuntary petitions.

12. On November 3, 2010, iStar filed its motion for relief from the automatic stay to foreclose on the Mortgaged Property (the "Stay Relief Motion").

13. On November 18, 2010, the Krause Petitioners filed a motion seeking entry of orders for relief and orders converting the Debtors' chapter 7 cases to chapter 11 (the "Conversion Motion"). At the same time, the Krause Petitioners filed an objection to the Stay

---

[3] iStar's mortgages and security interests are more particularly described in the *Affidavit of John F. Kubicko in Support of Motion of iStar Tara LLC for Relief from the Automatic Stay to Foreclose on Mortgaged Property*, sworn to November 3, 2010 (ECF Doc. 105 (Part 4)) (the "Kubicko Affidavit").

Relief Motion (the "Stay Relief Objection") supported by an affidavit of Eichner (ECF Doc. 115 (Part 2), the "Eichner Affidavit"). Also on November 18, 2010, Shapiro purported to authorize the Debtors to file a notice of withdrawal of the Debtors' motions to dismiss, a consent to the entry of orders for relief, and a joinder in the Conversion Motion.

14. On November 19, 2010, the Court entered orders for relief in each of the Debtors chapter 7 cases and orders converting the chapter 7 cases to chapter 11. However, as set forth in iStar's motion, dated December 1, 2010 (ECF Doc. 131), for reconsideration of the order converting the chapter 7 cases to chapter 11 (the "Reconsideration Motion"), acting singly, Shapiro lacks authority to take any material action on behalf of the Debtors including causing the Debtors' joinder in the Conversion Motion. Consequently, the Debtors' purported joinder in the conversion motion and each of the Debtors' other filings since November 18, 2010, including the DIP motion, were unauthorized.

15. Attached as an exhibit to the Conversion Motion, the Krause Petitioners submitted a copy of a Plan Support Agreement, dated November 18, 2010, purportedly among the Debtors, Shapiro, Mad 52, LLC, Stephen and Mitchell Krause and New One Madison Park I, LP (the "Plan Sponsor"). The Plan Sponsor is apparently a joint venture among Eichner, Stephen and Mitchell Krause and an unrelated hedge fund, but will be funded and controlled by Eichner. Eichner and his co-proponents intend to propose a chapter 11 plan that, based on its current proposed terms, would cram down iStar's secured claim and provide for a newly formed entity to take possession and complete the development of the Mortgaged Property[4] and sell the

---

[4] The development of the Mortgaged Property is to be completed by The Continuum Company, which, upon information and belief, is owned and controlled by Eichner.

condominium units. Financing would be provided through a $40 million equity infusion contributed by Eichner through the Plan Sponsor.

16. Upon the effective date of the plan, the Plan Sponsor (and, therefore, substantially, Eichner) will own 100% of the equity interests in the reorganized debtor and the $40 million equity infusion would be used to (i) pay off the DIP loan, (ii) satisfy all administrative expenses, priority tax claims and involuntary gap claims, (iii) pay 20% of allowed mechanic's lien claims, (iv) reimburse the Plan Sponsor for all expenses incurred in connection with the chapter 11 cases, (v) provide working capital to the reorganized debtor, and (vi) pay for the remaining development of the Mortgaged Property. (See Joint Plan Funding Commitment Letter, dated November 18, 2010, at 5-6, attached as Exhibit B to the Plan Support Agreement.)

17. As set forth in the DIP Motion, the Debtors are purportedly seeking to enter into an agreement with the Plan Sponsor under which the Plan Sponsor will provide approximately $1.1 million in post-petition financing ($315,000 on an interim basis) for the payment of expenses detailed in the budget annexed to the DIP Motion (the "Proposed DIP Budget"), including approximately $333,000 in chapter 11 professional fees and monthly consulting fees for Shapiro. In consideration for such financing, the Debtors propose to grant the Plan Sponsor a priming lien in the Mortgaged Property senior in priority to all liens and security interests held by iStar. As adequate protection for the diminution of iStar's prepetition interests in the Mortgaged Property resulting from the priming lien, the Debtors propose to grant iStar worthless "replacement liens" consisting of continuing liens on the Mortgaged Property as well as super-priority administrative expense claims under section 507(b) of the Bankruptcy Code. Therefore, while the Plan Sponsor's priming lien would subordinate iStar's prepetition liens in the Mortgage Property dollar-for-dollar, the Debtors have failed to offer replacement liens in any

collateral upon which iStar does not already have a lien, as adequate protected for the diminution of iStar's secured interest. In addition, iStar "replacement liens" and super-priority administrative expense claims are subject to the prior payment of accrued but unpaid fees and expenses of chapter 11 professionals retained by the Debtors and a creditors' committee pursuant to a defined "Carve Out" under the DIP orders.

18. As set forth in the Stay Relief Motion, the Debtors clearly have no equity in the Mortgaged Property. The amount due to iStar by the Debtors totals in excess of $235 million and, while iStar valued the Mortgaged Property between approximately $131 million and $138 million, depending on the extent of future development, Eichner valued the Mortgaged Property at $124.5 million and conceded that the amount of iStar's claims are not significantly different from the amounts set forth in the Stay Relief Motion. (Eichner Affidavit ¶ 7.) Furthermore, Eichner and the other plan proponents have not disputed iStar's assertion that the Debtors own no other property other than the Mortgaged Property upon which replacement liens of any value could be granted to iStar as adequate protection.

19. The nature and extent of expenses to be paid by the Debtors under the Proposed DIP Budget is also troubling. Unlike the critical expenses budget approved by the Court in connection with iStar's most recent motion to make protective advances on behalf of the Debtors during the gap period, the Proposed DIP Budget (i) fails to provide for the payment of real property taxes due on January 1, 2011 in the estimated amount of $248,644 – which taxes are secured by first priority statutory liens on the Mortgaged Property under New York law,[5] and (ii) includes approximately $330,000 in chapter 11 professional fees that effectively serve only the

---

[5] See New York Real Property Tax Law § 902.

9

private interests of Eichner and his co-proponents and do nothing to preserve the value of the Mortgaged Property.

20. Moreover, the Proposed DIP Budget contemplates the replacement of Bovis for an unnamed (and, likely, undetermined) general contractor and construction manager. Bovis' presence at the worksite is necessary to comply with local building and safety regulations and maintain various permits and licenses to continue construction. Bovis also possesses substantial plans and knowledge concerning the Mortgaged Property that cannot easily be replaced without disruption to the project. Certainly, until the authority issue concerning the Debtors is resolved, a major decision such as replacing Bovis should not be permitted.

## OBJECTION TO DIP MOTION

### I. The DIP Motion was an Unauthorized Filing.

21. Preliminarily, the DIP Motion was filed on behalf of the Debtors at the sole direction of Shapiro. As set forth in the Reconsideration Motion, iStar believes that Shapiro is without authority to act for the Debtors, particularly with respect to something as significant as DIP financing or a plan of reorganization. Consequently, the filing of the DIP Motion was an *ultra vires* act that should be deemed a nullity. At a minimum, the Court should not grant the DIP Motion until the issue of who is authorized to act for the Debtors is resolved.

### II. The DIP Motion is Designed to Favor Eichner's Plan and is not in the Best Interests of the Estates.

22. Even if the DIP Motion was somehow an authorized filing, the Court should still consider the proposed DIP financing for what it is – an inappropriate attempt by Eichner to facilitate his own chapter 11 plan and gain control of the Mortgaged Property. Given the uncertainty surrounding the Debtors' management and Shapiro's prior fraudulent conduct, the appointment of chapter 11 trustee, or at least termination of exclusivity, are more than remote

possibilities. Under the Debtors' proposed interim order approving DIP financing (the "Interim DIP Order"), however, appointment of a chapter 11 trustee, as well as conversion to chapter 7, or the mere filing of any chapter 11 plan that fails to provide for the payment in full of the Plan Sponsor's DIP loan, would cause the immediate acceleration of all DIP loan obligations (Interim DIP Order ¶¶ 8, 16.) In addition, the Debtors or a trustee are prohibited from granting any liens or claims of senior or equal priority to the super-priority claims and liens granted to the Plan Sponsor under the Interim DIP Order as long as any portion of the Plan Sponsor's DIP loan remains outstanding. (Id. at ¶ 12(a).) Consequently, any chapter 11 trustee or, if Shapiro is found to be without authority, the entities who are determined to have the authority to control the Debtors, will be faced with the difficult prospect of being required to repay the Plan Sponsor's DIP loan immediately without any apparent means to do so. There is simply no reason to limit the Debtors' options in this manner, other than to further Eichner's ability to pursue his chapter 11 plan, especially in light of iStar's willingness to extend continued protective advances to fund the critical expenses of the Mortgaged Property.

### III. The Proposed DIP Financing Fails to Satisfy Section 364(d) of the Bankruptcy Code.

23. The DIP Motion must also be denied because the Debtors have failed to offer any basis as to why granting the Plan Sponsor a priming lien in the Mortgaged Property is necessary or appropriate under section 364(d)(1)(A) of the Bankruptcy Code, and have utterly failed to provide iStar any form of adequate protection to compensate it for the diminution in value of its secured interest caused by the priming lien as required by section 364(d)(1)(B) of the Bankruptcy Code. In addition, the Proposed DIP Budget is insufficient to address the critical expenses of the Mortgaged Property and, absent modification, will result in further impairment in the value of iStar's liens.

### A. Applicable Law

24. A debtor may seek to obtain super-priority financing that primes existing liens only if "(A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d). As a general principle, bankruptcy courts recognize that the Code protects the "primacy of prepetition contractual liens and seeks to preserve the financial interests created thereby." In re Mosello, 195 B.R. 277, 297 (Bankr. S.D.N.Y. 1996). Section 364 of the Bankruptcy Code furthers this principle by permitting the priming of an existing lien "only as a last resort." In re Qualitech Steel Corp., 276 F.3d 245, 248 (7th Cir. 2001) (noting also that courts disfavor using section 364(d) to grant super-priority financing).

25. Furthermore, the Debtors bear the burden of proof of establishing that the priming lien is justified under section 364(d). See 11 U.S.C. § 364(d)(2); In re Swedeland Development Group, Inc., 16 F.3d 552, 563 (3rd Cir. 1994). This proof must be supported by facts or projections that have a firm evidentiary basis, as opposed to mere speculation. See In re Mosello, 195 B.R. 277, 294 (Bankr. S.D.N.Y. 1996). Additionally "[g]iven the consequences to the existing creditor of a priming lien, the court must be 'particularly cautious' when evaluating whether the subordinated creditor is adequately protected." In re Stoney Creek Technologies, LLC, 364 B.R. 882 (Bankr. E.D. Pa. 2007) (quoting In re First South Savings Ass'n, 820 F.2d 700, 710 (5th Cir. 1987).

### B. The Debtors Have Failed to Prove That Credit is Otherwise Unobtainable

26. Under section 364(d)(1)(A), prior to obtaining court authorization to enter into a priming lien, the Debtors must first demonstrate an inability to obtain credit otherwise or with

more favorable terms. See In re Harborwalk, LP, 2010 WL 346298 *2 (Bankr. S.D. Tex. 2010); In re Reading Tube Industries, 72 B.R. 329, 331 (Bankr. E.D. Pa. 1987). Yet the Debtors have offered no evidence with respect to any attempts to find alternative financing and the only justification offered by the Debtors for the current proposal is the self-serving statement that "the [Plan] Sponsor is not prepared to provide the debtor-in-possession financing on an unsecured, non-priming basis." (DIP Motion ¶ 35.) But given that the proposed plan provides for the *Plan Sponsor's* DIP loan to be repaid in full with interest on the effective date from the proceeds of the $40 million equity infusion to be provided *by the Plan Sponsor*, there would not appear to be any need for a priming lien in the Mortgaged Property. Certainly, if Eichner is serious about his plan, there should be little question that the DIP loan will be repaid. On the other hand, if, as iStar believes, Eichner is uncertain that his plan can be confirmed or whether he will obtain all of the necessary financing (as evidenced by the numerous conditions precedent to the equity commitment letter), iStar and its collateral should not be expected to bear the risk that the DIP loan will not be repaid. Indeed, the request for a priming lien to secure the DIP loan does not inspire confidence in Eichner's view of the plan's likelihood of success.

27. Eichner made a calculated choice, in the hopes of making tens of millions of dollars in profit, to engage Shapiro and seize *de facto* control of the Debtors. Eichner, who is sophisticated and has his own sophisticated counsel, understood the basic costs of chapter 11. He should not be permitted to pursue his plan, potentially involving a cram down of iStar, at iStar's expense.

### C. iStar is Prepared to Continue Funding Protective Advances.

28. The Court's denial of the DIP Motion will not jeopardize the Mortgaged Property or the unit owners who occupy several of the units. iStar, as it has since it commenced

foreclosure proceedings in New York and all through the gap period, is willing to continue funding the critical expenses of the Mortgaged Property, including the reasonable fees and expenses of an independent CRO, if applicable, on an administrative priority basis and without any of the onerous termination events and other restrictions in Eichner's proposal. However, iStar is unwilling (and should not be indirectly compelled through the use of improper priming liens on its collateral) to fund the professional fees and expenses of the Debtors and other plan proponents.

### D. The Debtors Have Failed to Provide iStar with Adequate Protection

29. Even if the Court were to find that the Debtors have met their burden of demonstrating that alternative financing was unavailable, the DIP financing request must fail because the Debtors have not provided iStar with adequate protection as required by section 364(d)(1)(B) of the Bankruptcy Code. Neither the purported "replacement liens" nor the proposed administrative priority claims to be granted to iStar come remotely close to providing iStar with the adequate protection.

30. Although adequate protection is not defined by the Bankruptcy Code, section 361 states that adequate protection may be provided by, (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest in the property, but expressly not including the granting of an administrative claim.

31. Post-petition financing authorized under section 364(d) must "provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." In re Swedeland Development Group, 16 F.3d at 564. Under section 364, whether purported adequate protection is in fact adequate "'depends directly

on how effectively it compensates the secured creditor for loss of value' caused by the superpriority given to the post-petition loan." In re Swedeland, 16 F.3d 552 at 664 (quoting In re American Mariner Industries, Inc., 734 F.2d 426, 432 (9th Cir. 1984).

32. Here, in a wholly illusory attempt to satisfy their burden to provide iStar with adequate protection, the Debtors offer to provide "replacement liens" to the extent of any diminution caused by the priming DIP lien on the exact same collateral which secures iStar's pre-petition liens and security interests. Obviously, because there is no equity in the Mortgaged Property, such replacement liens are completely worthless. See In re Swedeland Development Group, Inc., 16 F.3d at 565-566 ("*We are at a total loss to understand how a court can suggest that a pre-petition creditor with a lien being subordinated to a superpriority lien can be thought to have adequate protection because an asset encumbered by its lien will remain so encumbered*") (Emphasis added); In re Goode, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) (where there is no equity cushion, and a creditor already has a lien on all of debtor's collateral, no additional or replacement lien can be offered).

33. The Debtors' argument that iStar is adequately protected because Eichner's DIP loan will be used to pay the critical expenses of the Mortgaged Property is without merit for several reasons. The DIP loan is secured by a priming lien so even if, as the Debtors incorrectly suggest, it will be used merely to maintain the value of the Mortgaged Property, iStar's secured interests therein are going to be impaired in an amount equal to the DIP loan. Because iStar is already undersecured, the effect of the priming lien will be to take money directly out of iStar's pocket. The Debtors' argument would only be correct if the DIP loan was used to pay critical expenses <u>and</u> was extended on an unsecured basis. The Debtors disingenuously argue that because iStar sought to make protective advances as a means of adequate protection during the

15

gap period (as iStar effectively had no practical economic choice), that protective advances by Eichner which <u>prime</u> iStar's lien and permit Eichner to foreclose in the event of a default, is no different. iStar's rights to advance its own funds – even though the value of the Mortgaged Property does not provide meaningful security for those advances – does not confer upon any DIP financier the right to advance funds secured by a priming lien to iStar's detriment.

34. Additionally, the Debtors seem to ignore the fact that approximately one-third of the Proposed DIP Budget will be used to pay the fees and expenses of chapter 11 professionals and Shapiro, who will work to confirm a plan that, as currently proposed, seeks to cram down iStar's claims, and otherwise act against iStar's interests. Finally, as discussed below, the Proposed DIP Budget is actually not sufficient to maintain the value of the Mortgaged Property.

35. Rather than provide iStar with adequate protection that would compensate iStar for the loss attributed to a DIP priming lien, or more easily, forego the unnecessary priming lien and fund solely on an administrative priority basis, the Debtors and Eichner are unjustifiably attempting to force iStar to bear the risk of loss in the event that the proposed reorganization fails. This burden shifting is clearly unacceptable. See In re Mosello, 195 B.R. at 289 (the "important question in determining the adequacy of protection under Section 364(d)(1)(B) is whether the interests of the secured creditor whose lien is to be primed is being unjustifiably jeopardized"); In re Windsor Hotel, LLC, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) ("'authorization to prime an existing lien should not be read as an authorization to substantially increase the risk [to the primed creditor] in order to provide security for the [DIP lender]'") (quoting 3 Collier on Bankruptcy ¶ 364.05[1]).

36. The Debtors further propose to provide iStar with adequate protection by granting iStar a super-priority administrative expense claim under the plan, but which is still

subject to repayment of the DIP Loan and the fees and expenses of chapter 11 professionals. However, in the absence of any meaningful alternative protection provided by the Debtors, as the Mortgaged Property is the only certain source of payment currently possessed by the estates, an administrative expense claim is too speculative to serve as adequate protection as required by section 364(d). See In re Gasel Transp. Lines, Inc., 326 B.R. 683. 691-92 (6th Cir. B.A.P. 2005); In re Koopmans, 22 B.R. 395, 404 (Bankr. Utah 1982) (discussing legislative history regarding adequate protection and speculative nature of administrative claims); see also 11 U.S.C. § 361(3).

### E. The Proposed DIP Budget is Insufficient to Preserve the Value of the Mortgaged Property.

37. Even if the DIP financing was not secured by a priming lien on the Mortgaged Property, the Proposed DIP Budget fails to provide for certain critical expenses of the Mortgaged Property, which will result in the further impairment of iStar's secured interests. Among other things, the Proposed DIP Budget does not provide for the payment of approximately $250,000 in real estate property taxes due on January 1, 2011, or for any payments to Bovis and, indeed, contemplates replacement of Bovis with an unnamed construction manager. The failure to pay property taxes will result in the attachment of priming statutory liens in favor of New York City against the Mortgaged Property as well as the accrual of significant interest and penalties while any attempt to replace Bovis without careful planning and coordination among the Debtors, may run afoul of New York City Department of Building regulations and jeopardize insurance and permits provided by or obtained through Bovis. Certainly, a major decision such as replacing the construction manager should not be made while the issue of who has authority to manage these Debtors is outstanding.

## IV. The Request for $315,000 of DIP Financing on an Interim Basis is Unnecessary and Unjustified under Bankruptcy Rule 4001(c)(2).

38. Although iStar firmly contends that the DIP Motion should be denied, at a minimum, the Debtors' request for $315,000 of DIP financing on an emergency, interim basis pending a final hearing is unjustified and should be denied. Under Bankruptcy Rule 4001(c)(2), the Court may conduct a hearing to approve DIP financing on an interim basis on less than fourteen days notice "*only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.*" Fed. R. Bankr. P. 4001(c)(2) (Emphasis added.). Pursuant to the Proposed DIP Budget, even if iStar is not permitted to make protective advances on an administrative expense basis, the most that would be needed to fund the operating expenses of the Mortgaged Property through year end would be approximately $150,000. Moreover, the need for any interim DIP financing is avoided here because iStar is prepared to continue funding protective advances. Accordingly, there is absolutely no reason to authorize the Debtors to receive $315,000 in DIP financing on a priming lien basis prior to a final hearing, particularly where the only use for those funds if iStar provides protective advances would be to pay professionals.

## RESERVATION OF RIGHTS

39. iStar submits this objection in advance of the interim hearing to approve the DIP Motion and reserves all rights to supplement this objection and to submit additional briefing, including additional or different grounds for objecting to the DIP Motion, in advance of any final hearing to approve the DIP Motion. iStar further reserves all other rights in these cases including, without limitation, the right to seek appointment of a trustee, the right to seek termination of the exclusive periods and the right to pursue its motion for relief from the stay.

WHEREFORE, iStar respectfully requests that the Court enter an order denying the DIP Motion and grant such other and further relief as is necessary or appropriate.

Dated: Wilmington, Delaware
December 15, 2010

Jeffrey C. Wisler (Del. Bar No. 2795)
Marc J. Phillips (Del. Bar No. 4445)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141

- and -

Jeff J. Friedman (admitted *pro hac vice*)
Matthew D. Parrott (admitted *pro hac vice*)
Matthew W. Olsen (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022
212-940-8800

*Attorneys for iStar Tara LLC*

#987622