IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>FKF MADISON PARK GROUP OWNER, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 10-11867 (KG) |
| IN RE:<br><br>JMJS 23RD STREET REALTY OWNER, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 10-11868 (KG) |
| IN RE:<br><br>MADISON PARK GROUP OWNER, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 10-11869 (KG) |
| IN RE:<br><br>SLAZER ENTERPRISES OWNER, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 10-11870 (KG) |

**OBJECTION OF BOVIS LEND LEASE LMB, INC. TO
EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2),
364(d)(1) AND 364(e) AND FED. R. BANKR. P. 2002, 4001, AND 9014 (I)
AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED
FINANCING; (II) GRANTING ADEQUATE PROTECTION TO
<u>PRE-PETITION PARTY AND (III) SCHEDULING A FINAL HEARING</u>**

Bovis Lend Lease LMB, Inc. ("Bovis"), by and through its undersigned attorneys, hereby objects (the "Objection") to the Emergency Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Post-Petition Secured Financing; (II) Granting Adequate Protection to Pre-Petition Party and (III) Scheduling a Final Hearing (the "DIP Motion") filed by the above-captioned debtors and debtors in possession (the "Debtors"). In support of its Objection, Bovis respectfully represents as follows:

## BACKGROUND

### A    The Bovis Liens

1.    Bovis, as Construction Manager, was engaged by Slazer Enterprises, LLC ("Slazer"), as Owner, for the performance of certain pre-construction services for the project now known as One Madison Park (the "Project") at the Debtors' property located at 22 East 23rd Street or 23 East 22nd Street, New York, New York, 10010 (the "Property") pursuant to a written agreement dated as of May 22, 2006 (the "Pre-Con Agreement"). Thereafter, Bovis, as Construction Manager, was engaged by Slazer, as Owner, for the performance of additional preconstruction and construction phase services for the Project, pursuant to a written agreement dated as of June 12, 2007 (the "CM Agreement" and collectively with the Pre-Con Agreement, the "Construction Agreements"). Bovis performed pursuant to the Construction Agreements and was paid by Slazer or its designees, from time to time, for the work performed.

2. Prior to the Petition Date (defined below), payments to Bovis in connection with the Project stopped.[1]

3. On September 17, 2010, Bovis filed two mechanic's liens with respect to the Project totaling $10,243,529, one in the amount of $488,452 and the other in the amount of $9,755,077 (collectively, the "Bovis Liens"), thereby perfecting its statutory liens under New York law. Copies of the Bovis Liens are attached hereto as Exhibit A. Upon information and belief, the Bovis Liens are superior to the mortgages of iStar Tara, LLC ("iStar") pursuant to New York State Mechanics' Lien Law.

**B. The Bankruptcy Case**

4. On June 8, 2010 (the "Petition Date"), Barbara Kraus, Mitchell Kraus, Stephen Kraus, and Kraus Hi-Tech Home Automation, Inc. (the "Petitioning Creditors") filed involuntary petitions for relief against the Debtors.

5. On June 29, 2010, the Debtors filed the Motion to Dismiss the Involuntary Petitions Filed Against the Alleged Debtors FKF Madison Park Group, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group LLC and Slazer Enterprises Owner, LLC (the "Motion to Dismiss") seeking the entry of an order dismissing the involuntary petitions.

6. On November 18, 2010, the Petitioning Creditors filed the Emergency Motion for Immediate Entry of Orders for Relief and Conversion of Cases from Chapter 7 to Chapter 11 (the "Conversion Motion") seeking, *inter alia*, the immediate entry of orders for relief and conversion of the cases from Chapter 7 to Chapter 11. The Conversion Motion stated that the Debtors obtained debtor in possession financing to fund

---

[1] After the bankruptcy proceeding was filed, payments for post-petition obligations resumed. The Bovis Liens represent pre-petition monies due only.

their Chapter 11 cases. In addition, the Conversion Motion states that the Debtors intend to file a proposed plan of reorganization (the "Proposed Plan") in the near future and attached as an exhibit a summary of the proposed plan (the "Plan Summary").

7. The Plan Summary provides, *inter alia*, that New One Madison Park Member I, LP (the "Sponsor" or the "DIP Lender") will sponsor the Proposed Plan and provide plan funding to New One Madison Park, LLC, the Reorganized Debtor. The Proposed Plan provides that all assets of the Debtors will be sold to the Reorganized Debtor free and clear of all liens on the Effective Date and the Sponsor shall receive 100% of the membership interests in the Reorganized Debtor. The general partner of the Sponsor is New One Madison Park GP, LLC, of which I. Bruce Eichner is the sole member. Moreover, on Effective Date, the Sponsor shall cause the Reorganized Debtor to enter into the Development Agreement with The Continuum Company to develop the Property. Upon information and belief, I. Bruce Eichner owns or has an interest in The Continuum Company.

8. The Plan Summary further provides that Class 2D Mechanic's Liens Claims, Class 7D General Unsecured Claims, and Class 8D Equity Interests are all impaired under the Proposed Plan. Class 2D Mechanic's Liens Claimants are to receive a cash payment on the Effective Date equal to twenty percent (20%) of the allowed amount of their respective Class 2D Claim. Class 8D Equity Interests, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled as of the Effective Date and the Holders thereof shall neither retain nor receive any property under the Proposed Plan.

9. Class 7D General Unsecured Claimants shall receive a pro-rata distribution from the Estates to the extent funds are available to the Estates for

{BAY:01692108v2}
4

distribution from payments received by Estates on account of the Net Waterfall Proceeds Plan Obligation. Net Waterfall Proceeds Plan Obligation is defined as Gross Proceeds from Unit Sales less: (i) selling costs (brokerage, selling, taxes, marketing, customary closing costs, recording costs, etc.); (ii) ordinary course operating expenses of the Reorganized Debtor, including general marketing and administrative expenses, not otherwise paid with proceeds received by the Reorganized Debtor from the Joint Plan Funding Commitment; (iii) post-Effective Date payments of principal and interest and fees and costs, if any, to iStar until the Restructured iStar Debt is paid in full; and (iv) the return of capital to the Sponsor in an amount equal to the total amount funded under the Joint Plan Funding Commitment to Reorganized Debtor, plus interest on such capital at twenty percent (20%) per annum, compounded.

10. On November 18, 2010, the Debtors filed a Withdrawal of Motion to Dismiss Involuntary Petitions, Notice of Non-Opposition to Entry of Order for Relief, and Joinder in Motion to Convert Cases to Chapter 11 thereby withdrawing the Motion to Dismiss and joining in the Conversion Motion.

11. On November 19, 2010, the Court entered the Orders for Relief Under Chapter 7 of the Bankruptcy Code.

12. On that same date, the Court entered the Order Converting Cases From Chapter 7 to Chapter 11 thereby converting these cases from Chapter 7 to Chapter 11.

C. **The DIP Motion**

13. On December 10, 2010, the Debtors filed the DIP Motion seeking the entry of an order that, *inter alia*, authorizes the Debtors to enter into debtor in possession financing (the "DIP Loan") with New One Madison Park Member I, LP (the "DIP Lender"). Attached as Exhibit 1 to the DIP Motion is the Amended Debtor in Possession

Loan Commitment Letter and its related attachments (collectively, the "DIP Loan Documents").

14. The DIP Loan Documents provide that the DIP Lender shall make Loan Advances to the Debtors in the amount of $315,000 on an interim basis and up to "approximately" $1.1 million on a final basis.[2] The Loan Advances are to be used for approved expenses as set forth in a budget attached as Exhibit A to the DIP Loan Documents (the "Approved Budget") which includes operating expenses, fees of the United States Trustee, fees of the Debtors' professionals and the professionals of any official committee of unsecured creditors, a consulting fee to Ira Shapiro, and a General Contractor PM Fee, Insurance & Temp Heat. Presumably, the General Contractor PM Fee will be paid to The Continuum Company as the general contractor.

15. The DIP Loan Documents provide that the DIP Lender shall be granted as security for the DIP Obligations (i) a super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) valid, perfected, first priority senior liens on all assets of the Debtors and proceeds thereof (the "DIP Liens") that prime and are senior to all other existing or future liens on the Debtors' assets pursuant to section 364(d)(1) of the Bankruptcy Code, and (iii) perfected first priority senior liens on unencumbered assets of the Debtors pursuant to section 364(c)(2) of the Bankruptcy Code.

16. The DIP Loan Documents further provide that holders of existing liens on the Collateral shall receive as adequate protection for their respective liens perfected post-petition security interests in and liens on the Collateral (the "Replacement Liens")

---

[2] Terms not defined herein shall have the meaning ascribed to them in the DIP Motion.

that shall be junior in priority to the DIP Liens, the Carve-Out and the iStar Prepetition Liens and the iStar Replacement Liens to the extent that such liens are senior. In addition, as further adequate protection, the holders of existing liens on the Collateral shall have a superpriority administrative expense claim which shall be junior in priority to the Superpriority Claim of the DIP Lender, the Carve-Out and the iStar Adequate Protection Priority Claim to the extent the iStar Prepetition Liens are senior to the Other Liens

17. The proposed Interim DIP Order provides for certain findings by the Court, including, *inter alia*, that (i) the financing proposed in the DIP Motion is necessary and critical to ordinary course expenses of maintaining and preserving the Property, (ii) the Debtors will suffer immediate and irreparable harm if they do not obtain authorization to borrow under the DIP Loan Documents and the DIP Loan, (iii) the Debtors are unable to obtain other financing on equal or more favorable terms that those set forth in the DIP Loan Documents, (iv) that the adequate protection provided in the Interim Order adequately protects any non-consenting parties' interests in the Collateral, (v) the DIP Loan was made in good faith as such term is used in section 364(e) of the Bankruptcy Code.

18. Paragraph 7 of the Interim Order provides that the Debtors and the DIP Lender may enter into any non-material amendment, consents, waivers or modification to the DIP Loan Documents, including the Approved Budget provided that no amendment, consents, waivers or modification shall increase the lending commitment of the DIP Lender without the consent of the DIP Lender and that the Debtors shall provide notice of any material modification to the DIP Loan Documents to any official committee appointed in these cases and the U.S. Trustee.

19. Paragraph 18(b) of the Interim Order provides that the Debtors shall submit to the DIP Lender certain weekly reports, including an updated weekly cash flow forecast for the remaining period of the Approved Budget (the "Updated Budget") and that, subject to the approval of the DIP Lender but which shall not require any further Court approval, the Updated Budget shall be deemed the Approved Budget.

## **OBJECTION**

### A. The Debtors Have Failed to Demonstrate That the DIP Loan Should Be Approved

20. The Debtors have failed to meet their burden and demonstrate that the DIP Loan should be approved. In order to obtain approval of post-petition financing, a debtor bears the burden of proving that: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) the financing is in the best interests of the estate and its creditors; (c) the transaction is necessary to preserve the assets of the estate, and is necessary, essential and appropriate for the continued operation of the debtor's business; (d) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender; and (e) the financing was negotiated in good faith and at arms' length by the debtor, on the one hand, and the lender, on the other. See In re Farmland Indus., Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (proposed financing should be beneficial and reasonable); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (court should focus on terms of proposed financing to ascertain whether they are reasonable).

21. A court should deny approval of post-petition financing if it is a product of lender overreaching. See In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985)

("[T]he Court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors."); In re Aqua Assocs., 123 B.R. at 195-96 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); In re Ames Dep't Stores, 115 B.R. at 37 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); In re Mid-State Raceway, Inc., 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.").

22. Bankruptcy courts have substantial discretion in approving debtor-in-possession financing under section 364 of the Bankruptcy Code. See In re Aqua Assoc., 123 B.R. at 195-96; In re Ames Dep't Stores, Inc., 115 B.R. at 37-40. In considering whether the terms of a debtor-in-possession financing facility are fair, reasonable, and adequate courts consider the given circumstances of the debtor-borrower's relationship with the proposed lender, including whether the proposed financing is primarily for the economic benefit of the proposed lender. In re Ames Dep't Stores, Inc., 115 B.R. at 37.

23. Whether the DIP Loan is in the best interest of the estates and its creditors and negotiated in good faith and at arms' length is extremely questionable. The Debtors assert in the DIP Motion that the DIP Loan presents the best and only opportunity for the Debtors to maximize the value of their assets and their estates and reorganize for the benefit of all stakeholders and that the financing proposed under the DIP Loan provides the funding necessary to maintain and preserve the Property while the Debtors seek to

reorganize and maximize value of their estates through transactions contemplated in the Joint Plan (as defined in the DIP Motion). *See* DIP Motion, ¶¶ 23, 26.

24. However, the DIP Loan (and the Proposed Plan) appears to provide value solely to the DIP Lender (which is also the Sponsor) and the Reorganized Debtors (owned by the Sponsor), and not to these estates and its creditors. The Proposed Plan provides that on the Effective Date, the Property will transfer to the Reorganized Debtor free and clear of all liens, including mechanics liens. Mechanics Lien claimants will receive 20% on their secured claims and the equity claimants will receive nothing.

25. General unsecured creditors are purported to receive a pro-rata distribution to the extent that funds are received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. However, it appears unlikely that any recovery by general unsecured creditors will occur. The Net Waterfall Proceeds Plan Obligation is proceeds received from sales of units after deduction of (i) selling costs, (ii) ordinary course operating expenses, (iii) payments of principal and interest and fees and costs, if any, to iStar until the proposed restructured iStar debt is paid in full and (iv) the return of capital to the Sponsor in an amount equal to the total amount funded under the Joint Plan Funding Commitment plus interest on such capital at twenty percent (20%) per annum, compounded. Even if funds are available to the Estates from the Net Waterfall Proceeds Plan Obligation, the timing of such funds is unclear given that the funds are proceeds from the sale of units in the Property in the present economy.

26. The DIP Loan provides that the interest rate on the DIP Obligations shall accrue at a variable rate, adjusted monthly, equal to the Prime Rate plus 50 base points (.50%) which is excessive.

27. The DIP Loan and Approved Budget provide that Mr. Shapiro will be hired as a consultant and receive a fee in the amount of $13,333 for the month of December and $10,000 a month thereafter. It is unclear why Mr. Shapiro's consulting services are necessary, particularly since the Property has been managed by a receiver since May 7, 2010. In addition, the Approved Budget provides a General Contractor PM Fee, which presumably is the general contractor fee to The Continuum Company, a company owned by Mr. Eichner.

28. The Debtors have failed also to show that the DIP Loan, on the terms provided therein, is necessary to preserve the assets of the estate and is essential and appropriate for the continued operation of the Debtors' business. Bovis recognizes that certain monthly operating expenses are needed to protect and preserve the Property. However, the Debtors have merely alleged that the DIP Loan is the only and best financing that they have been able to obtain and have made no showing that they have attempted and been unsuccessful finding financing with equal or better terms than the DIP Loan.[3] iStar has funded since the Petition Date the necessary operating expenses to preserve the Property and has represented that it will continue to do so for a period of time.

29. It is unclear at this juncture whether the DIP Motion is an exercise of sound and reasonable business judgment by the Debtors. The DIP Loan Documents attached to the DIP Motion were not signed by the Debtors but provide for the signature of Ira Shapiro on behalf of the Debtors. Presently, Mr. Shapiro's sole authority to act on behalf of the Debtors is in question.

---

[3] The declaration of Mr. Shapiro referenced in the DIP Motion has not been filed as of the filing of this Objection.

30. In sum, the Debtors have failed to meet their burden authorizing the DIP Loan and providing the DIP Lender with a superpriority lien. To the contrary, the DIP Loan and Proposed Plan appear to benefit only the DIP Lender/Sponsor and Mr. Eichner. At the least, sufficient questions exist regarding to prevent a finding of good faith under section 364(e).

**B.     The Debtors Have Failed to Establish that a Superiority Lien Is Warranted**

31. Section 364(d)(1) of the Bankruptcy Code provides that the Court may authorize post-petition financing supported by a superpriority lien only if the debtors are unable to obtain such credit otherwise and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). In an hearing under section 364(d), the trustee has the burden of proof on the issue of adequate protection. 11 U.S.C. § 364(d)(2).

32. Bovis objects to the DIP Motion to the extent that it provides the DIP Lender with a superpriority lien on all the Debtors' assets that primes the Bovis Liens because the Debtors have failed to satisfy the requirements of section 364(d) of the Bankruptcy Code.

33. First, the Debtors have failed to make any showing that they have attempted and have been unsuccessful obtaining financing with equal or better terms than the DIP Loan. To the contrary, iStar has obtained authority and has funded the necessary post-petition operating expenses needed to maintain and preserve the Property and is willing to continue to do so

34. In addition, the Debtors have failed to provide adequate protection to justify priming the Bovis' Liens. A debtor has the burden to establish that the holder of

the lien to be subordinated has adequate protection. See In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 376, 386 (Bankr. E.D. Pa.), aff'd, 75 B.R. 819 (E.D. Pa.1987). The Bankruptcy Code does not expressly define adequate protection, but section 361 states that it may be provided by: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest in such property. 11 U.S.C. § 361.

35. A determination of whether there is adequate protection is made on a case by case basis. Mbank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1397 (10th Cir. 1987). Whether protection is adequate "depends directly on how effectively it compensates the secured creditor for loss of value" caused by the superpriority given to the post-petition loan. Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.), 734 F.2d. 426, 432 (9th Cir. 1983). In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing. In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994).

36. Bovis has valid and perfected liens against the Property. Upon information and belief, the Bovis Liens are senior in priority to other perfected secured interests in the Property, including any mortgages. The proposed Other Lienholders Replacement Liens under the DIP Loan will be junior to the DIP Liens, the Carve Out and any existing perfected and senior liens. The DIP Loan provides that the Loan Advances are to be used to pay operating expenses and professionals fees until the proposed plan is confirmed. The Loan Advances are not being utilized to improve the Property in any manner and to protect the value of Bovis' secured interests In essence, the replacement liens offered by the Debtors do nothing more than push the priority of

{BAY:01692108v2}

13

the Bovis Liens down in the secured interest scheme relating to the Property. The Debtors are unable to demonstrate what the value of the Property is at this juncture. Therefore, the Debtors have failed to demonstrate that the Bovis' Liens are adequately protected.

37. Moreover, the Debtors have failed to meet their burden of adequate protection because the language in the Interim Order appears to allow the Debtors and DIP Lender to increase the lending commitment without Court approval or notice to creditors. The Interim Order provides that the Debtors and the DIP Lender may enter into any non-material amendment or modification to the DIP Loan Documents, including the Approved Budget provided that no amendment or modification shall increase the lending commitment of the DIP Lender without the consent of the DIP Lender and that the Debtors shall provide notice of any material modification to the DIP Loan Documents to any official committee appointed in these cases and the U.S. Trustee. *See* Interim Order, ¶ 7.

38. The Interim Order also provides that the Debtors shall submit to the DIP Lender the Updated Budget providing an updated weekly cash flow forecast for the remaining period of the Approved Budget. The Updated Budget is subject to the approval of the DIP Lender, but shall not require any further Court approval, and "shall be deemed the Approved Budget." *See* Interim Order, ¶ 18(b). Proceeds from Loan Advances (which constitute DIP Obligations) are to be used exclusively to pay the Approved Budget. *See* Interim Order, ¶ 18(a).

39. Thus, as drafted, the Interim Order appears to allow the Debtors and the DIP Lender to increase the amount of the DIP Loan, and consequently the DIP Liens, without Court authority and without providing notice to the holders of liens and security

interests on the Collateral. Neither the Debtors nor the DIP Lender should be permitted to increase the amount of the DIP Obligations without providing parties the opportunity to object and authorization from the Court.

40. Bovis reserves the right to supplement and amend this Objection prior to the Final Hearing on the DIP Motion.

WHEREFORE, for all of the foregoing reasons, Bovis respectfully requests that this Court enter an order denying the DIP Motion and any priming of the Bovis Liens and granting such other and further relief as is just and proper.

| | |
|---|---|
| Dated: December 15, 2010<br>Wilmington, Delaware | BAYARD, P.A.<br><br>*/s/ Evan T. Miller*<br>Neil B. Glassman (No. 2087)<br>Ashley B. Stitzer (No.3891)<br>Evan T. Miller (No. 5364)<br>222 Delaware Avenue, Suite 900<br>Wilmington, DE 19899<br>Telephone: (302) 655-5000<br>Facsimile: (302) 658-6395<br><br>*Counsel for Bovis Lend Lease LMB, Inc.* |