# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FKF MADISON PARK GROUP OWNER, LLC, *et al.,*[1] | Case No. 10-11867 (KG) |
| Debtors. | (Joint Administration Pending) |

## DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT PLAN OF REORGANIZATION FOR FKF MADISON PARK GROUP OWNER, LLC AND ITS AFFILIATED DEBTORS

| **PACHULSKI, STANG, ZIEHL & JONES LLP** | **GREENBERG TRAURIG, LLP** |
|---|---|
| Bruce Grohsgal, Esq. (No. 3583) | Michael H. Goldstein, Esq. |
| 919 North Market Street | 2450 Colorado Avenue |
| 17th Floor | Suite 400E |
| Wilmington, DE 19801 | Santa Monica, CA 90404 |
| Telephone: (302) 652-4100 | Telephone: (310) 586-7750 |
| Facsimile: (302) 652-4400 | Facsimile: (310) 586-0250 |
| | |
| *[Proposed] Counsel to the Debtors and Debtors in Possession* | Scott Cousins, Esq. |
| | The Nemours Building |
| | 1007 North Orange Street |
| | Suite 1200 |
| | Wilmington, DE 19801 |
| | Telephone: (302) 661-7373 |
| | Facsimile: (302) 661-7175 |
| | |
| | *Counsel to New One Madison Park Member 1, LP* |

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE JOINT PLAN. ACCEPTANCES OF THE JOINT PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6651); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) (4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

**IMPORTANT DATES**

- Date by which Ballots must be received: [DATE/TIME], prevailing Eastern Time.

- Date by which objections to Confirmation of the Joint Plan must be Filed and served: [DATE/TIME], prevailing Eastern Time.

- Hearing on Confirmation of the Joint Plan: [DATE/TIME], prevailing Eastern Time.

CHI-60,494,511v12

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   OVERVIEW OF THE PLAN ............................................................... 3

     A.    Summary of Classification and Treatment of Allowed Claims
           Against and Interests in Each of the Debtors Under the Joint Plan ...... 5

III.   GENERAL INFORMATION ............................................................... 10

     A.    The Debtors' Business ................................................................. 10

     B.    Management of the Debtors ........................................................ 11

     C.    Description of Development to Date ............................................ 11

     D.    Future Development ................................................................... 12

     E.    Future Marketing and Sales ...................................................... 13

     F.    Prepetition Debt and Capital Structure of the Company ............ 14

     G.    Pending Litigation Against the Debtors ..................................... 16

     H.    Events Leading Up to the Chapter 11 Cases ............................. 16

IV.   EVENTS DURING THE CHAPTER 11 CASES ............................... 19

     A.    Administrative Motions ............................................................. 19

     B.    Other Requested Relief ............................................................. 19

     C.    Committee ................................................................................ 20

V.    THE JOINT PLAN OF REORGANIZATION ................................... 21

     A.    General ..................................................................................... 21

     B.    Purpose of Disclosure Statement .............................................. 21

     C.    Solicitation Package ................................................................. 22

     D.    Voting Procedures, Ballots, and Voting Deadline ..................... 22

     E.    Parties Entitled to Vote on the Joint Plan ................................. 23

     F.    Confirmation Hearing and Deadline for Objections to
           Confirmation ............................................................................ 24

     G.    Classification of Claims and Interests ....................................... 24

     H.    Treatment of Unclassified Claims ............................................. 25

     I.    Classification of Claims and Equity Interests ............................ 27

     J.    Treatment of Classified Claims and Equity Interests ................. 28

     K.    Acceptance or Rejection of the Joint Plan ................................ 32

i

L.     Means for Implementation of the Joint Plan .......................................... 32

M.    Provisions Governing Distributions ................................................... 39

N.     Treatment of Executory Contracts, Unexpired Leases, and Pension Plans ................................................................................................ 44

O.    Provisions for Resolving Disputed Claims and Disputed Equity Interests ............................................................................................ 47

P.      Confirmation and Consummation of the Joint Plan ............................ 48

Q.    Effect of Joint Plan Confirmation ..................................................... 50

R.     Retention of Jurisdiction ................................................................... 55

S.     Miscellaneous Joint Plan Provisions ................................................. 57

VI.    VOTING PROCEDURES AND REQUIREMENTS ....................................... 63

A.    Voting Deadline ............................................................................... 63

B.     Holders of Claims Entitled to Vote ................................................... 64

C.     Vote Required for Acceptance by a Class of Claims ........................... 64

D.    Voting Procedures ............................................................................ 65

VII.   CONFIRMATION OF THE PLAN ............................................................. 66

A.    Confirmation Hearing ....................................................................... 66

B.     Statutory Requirements for Confirmation of the Joint Plan ................ 67

VIII.  RISK FACTORS ................................................................................... 72

A.    General Bankruptcy Law Considerations ........................................... 72

B.     Other Risk Factors ........................................................................... 73

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............... 75

A.    Allocation of Plan Distributions between Principal and Interest ......... 77

B.     Information Reporting and Backup Withholding ................................ 77

C.     Importance of Obtaining Professional Tax Assistance ....................... 78

X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................................................................ 78

A.    Continuation of the Chapter 11 Cases ............................................... 78

B.     Liquidation Under Chapter 7 or Chapter 11 ...................................... 78

XI.    CONCLUSION AND RECOMMENDATION ................................................ 79

ii

## INDEX OF EXHIBITS

**Exhibit A** - Joint Plan of Reorganization of FKF Madison Park Group Owner, LLC, and its Affiliated Debtors

**Exhibit B** - Litigation Schedule

*CHI-60,494,511v12*

# I.    INTRODUCTION

The Debtors and Sponsor (the "Proponents") in these Chapter 11 Cases are proposing the *Joint Plan of Reorganization for FKF Madison Park Group Owner, LLC and its Affiliate Debtors* (the "Joint Plan")[1] attached hereto as **Exhibit A** to facilitate their emergence from bankruptcy. The purpose of this Disclosure Statement is to describe the Joint Plan and its provisions and provide certain information, as required of the Proponents under Section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Joint Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Joint Plan. Creditors entitled to vote to accept or reject the Joint Plan have received a ballot ("Ballot") together with this Disclosure Statement to enable them to vote on the Joint Plan.

This Disclosure Statement includes, among other things, (1) information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 7 Cases, entry of the Conversion Order and the commencement of the Chapter 11 Cases; (2) information respecting significant events that have occurred during the Chapter 7 Cases and then the Chapter 11 Cases; (3) an overview of the Joint Plan, which sets forth certain terms and provisions of the Joint Plan, the effects of confirmation of the Joint Plan, certain risk factors associated with the Joint Plan, and the manner in which Distributions will be made under the Joint Plan; (4) a discussion of the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote on the Joint Plan in order for their votes to be counted; and (5) information regarding the implementation and feasibility of the Joint Plan.

A Ballot for the acceptance or rejection of the Joint Plan is enclosed with the Disclosure Statement transmitted to each Holder of a Claim entitled to vote on the Joint Plan.

The Proponents may supplement or amend this Disclosure Statement, or any Exhibits attached hereto, at any time prior to the hearing to approve this Disclosure Statement.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES AND CONFIRMATION OF THE JOINT PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE JOINT PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE JOINT PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE JOINT PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE JOINT PLAN. JOINT PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Joint Plan, but is defined in Title 11 of the United States Code, Sections 101-1523 (the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1

ENTIRETY BY REFERENCE TO THE JOINT PLAN AND THE EXHIBITS, APPENDICES, AND SCHEDULES ATTACHED TO THE JOINT PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS, OTHER NON-BANKRUPTCY LAWS, OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE JOINT PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, ESTIMATES THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE X, "RISK FACTORS". IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS, NOR THE REORGANIZED DEBTOR UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN

PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE SPONSOR, CONTINUUM, AND THEIR ADVISORS, PREPARED THE ESTIMATES AND FORECASTS PROVIDED IN THIS DISCLOSURE STATEMENT. WHILE CERTAIN ESTIMATES AND FORECASTS ARE PRESENTED WITH NUMERICAL SPECIFICITY, THEY ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE SPONSOR, CONTINUUM, AND THEIR ADVISORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTOR'S CONTROL. THE SPONSOR CAUTIONS THAT IT CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF ANY ESTIMATES AND FORECASTS CONTAINED HEREIN OR TO THE REORGANIZED DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT BE REALIZED. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS DISCLOSURE STATEMENT WAS PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. ANY ESTIMATE AND/OR FORECAST CONTAINED HEREIN, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER ANY DEBTOR OR THE REORGANIZED DEBTOR.

## II.     OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Joint Plan. For a more detailed description of the terms and provisions of the Joint Plan, see Article V, "The Joint Plan of Reorganization." The Proponents, moreover, reserve the right to modify the Joint Plan consistent with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The Joint Plan is based primarily upon a Plan Support Agreement between the Debtors, the Sponsor, Ira J. Shapiro, and the Sponsor Creditors, and provides for the sale of all of the

Debtors' assets in the Reorganized Debtor and for one hundred percent (100%) of the equity interests in the Reorganized Debtor to be issued to Sponsor. Pursuant to the Plan Support Agreement, the parties thereto have agreed (subject to the terms and conditions of the Plan Support Agreement) to accept and support the confirmation of a plan of reorganization that is materially consistent with the Joint Plan of Reorganization Summary of Terms attached as **Exhibit D** to the Plan Support Agreement. These terms are reflected in the Joint Plan, a copy of which is attached as **Exhibit A** to this Disclosure Statement. At its core, the Joint Plan provides that:

- On the Effective Date, all of the assets of the Debtors will be sold to the Reorganized Debtor and one hundred percent (100%) of the equity in which shall be issued to Sponsor;

- On the Effective Date, the Debtor in Possession Financing shall be paid in full from the Joint Plan Funding Commitment;

- On the Effective Date, the Existing iStar Indebtedness will be restructured and assumed by the Reorganized Debtor;

- On the Effective Date, the Reorganized Debtor shall enter into the Development Agreement in connection with the post-Effective Date development of the Property;

- On the Effective Date, the Cure Amount under each executory contract and unexpired lease to be assumed and assigned shall be paid.

- As soon as practicable after the Effective Date, Holders of Mechanic's Liens will receive a cash payment equal to twenty percent (20%) of the Face Amount of the Allowed Amount of each such Holder's Class 2A-2D Claim;

- As soon as practicable after the Effective Date, Allowed Other Secured Claims will be either satisfied in full in cash, Reinstated or afforded other treatment as necessary to satisfy Section 1129 of the Bankruptcy Code;

- As soon as practicable after the Effective Date, Allowed Property Tax Claims will be either satisfied in full in case or, pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, receive deferred cash payments over a period not exceeding five (5) years after the Petition Date.

- Following the Effective Date, Allowed Deed Holder Claims and Allowed General Unsecured Claims against each of the Debtors will receive a Distribution from the Estates to the extent funds are available to the Estates pursuant to the Net Waterfall Proceeds Plan Obligation; and

- On the Effective Date, the outstanding Equity Interests in the Debtors shall be terminated and cancelled as of the Effective Date.

4

## A. Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors Under the Joint Plan

The following charts summarize the projected Distributions to Holders of Allowed Claims against, and Equity Interests in, each of the Debtors under the Joint Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of the Allowed amount of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. In addition, the ability to receive Distributions under the Joint Plan depends upon the ability of the Debtors to obtain confirmation of the Joint Plan and meet the conditions to confirmation and effectiveness of the Joint Plan, as discussed in this Disclosure Statement. The estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. Furthermore, Disputed Claims are subject to disallowance or allowance in a reduced amount.[2] Reference should be made to the entire Disclosure Statement and the Joint Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

### 1. Summary of Classification and Treatment of Claims and Equity Interests Against Debtor FKF Madison Park Group Owner, LLC

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|-------|--------------------------|-------------------------------|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Full payment in cash or as otherwise agreed to by the Debtor and the Holder |
| Class 1A Allowed Secured Claim of iStar | [$_____] | Est. Percentage Recovery: [___%]<br><br>Form of Recovery: Cash payments on account of the Restructured iStar Debt |
| Class 2A Mechanic's Liens Claims | [$_____] | Est. Percentage Recovery: 20%<br><br>Form of Recovery: Cash |

---

[2] For a detailed description of the treatment of Disputed Claims, see Section V.I of this Disclosure Statement.

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Class 3A<br>Other Secured Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash, Reinstatement, or such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code |
| Class 4A<br>Property Tax Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or deferred cash payments. |
| Class 5A<br>Deed Holder Claims | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 6A<br>Other Priority Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Full payment in cash or as otherwise agreed to by the Debtor and the Holder |
| Class 7A<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 8A<br>Equity Interests | N/A | Est. Percentage Recovery: 0%<br><br>Form of Recovery: N/A |

CHI-60,494,511v12

2. **Summary of Classification and Treatment of Claims and Equity Interests Against Debtor JMJS 23rd Street Realty Owner, LLC**

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or as otherwise agreed to by the Debtor and the Holder |
| Class 1B<br>Allowed Secured Claim of iStar | [$_____] | Est. Percentage Recovery: [___%]<br><br>Form of Recovery: Cash payments on account of the Restructured iStar Debt |
| Class 2B<br>Mechanic's Liens Claims | [$_____] | Est. Percentage Recovery: 20%<br><br>Form of Recovery: Cash |
| Class 3B<br>Other Secured Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash, Reinstatement, or such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code |
| Class 4A<br>Property Tax Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or deferred cash payments. |
| Class 5B<br>Deed Holder Claims | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 6B<br>Other Priority Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Full payment in cash or as otherwise agreed to by the Debtor and the Holder |

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Class 7B<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 8B<br>Equity Interests | N/A | Est. Percentage Recovery: 0%<br><br>Form of Recovery: N/A |

### 3. Summary of Classification and Treatment of Claims and Equity Interests Against Debtor Madison Park Group Owner, LLC

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or as otherwise agreed to by the Debtor and the Holder |
| Class 1C<br>Allowed Secured Claim of iStar | [$_____] | Est. Percentage Recovery: [___%]<br><br>Form of Recovery: Cash payments on account of the Restructured iStar Debt |
| Class 2C<br>Mechanic's Liens Claims | [$_____] | Est. Percentage Recovery: 20%<br><br>Form of Recovery: Cash |
| Class 3C<br>Other Secured Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash, Reinstatement, or such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code |
| Class 4C<br>Property Tax Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or deferred cash payments. |

CHI-60,494,511v12

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Class 5C<br>Deed Holder Claims | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 6C<br>Other Priority Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Full payment in cash or as otherwise agreed to by the Debtor and the Holder |
| Class 7C<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 8C<br>Equity Interests | N/A | Est. Percentage Recovery: 0%<br><br>Form of Recovery: N/A |

4. **Summary of Classification and Treatment of Claims and Equity Interests Against Debtor Slazer Enterprises Owner, LLC**

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Unclassified Claims (consisting of Administrative Claims, GAP Claims and Priority Tax Claims) | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or as otherwise agreed to by the Debtor and the Holder |
| Class 1D<br>Allowed Secured Claim of iStar | [$_____] | Est. Percentage Recovery: [___%]<br><br>Form of Recovery: Cash payments on account of the Restructured iStar Debt |
| Class 2D<br>Mechanic's Liens Claims | [$_____] | Est. Percentage Recovery: 20%<br><br>Form of Recovery: Cash |

| Class | Estimated Allowed Amount | Treatment under the Joint Plan |
|---|---|---|
| Class 3D<br>Other Secured Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash, Reinstatement, or such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code |
| Class 4D<br>Property Tax Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or deferred cash payments. |
| Class 5D<br>Deed Holder Claims | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 6D<br>Other Priority Claims | [$_____] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Full payment in cash or as otherwise agreed to by the Debtor and the Holder |
| Class 7D<br>General Unsecured Claims (including any deficiency claim of iStar based on the Existing iStar Indebtedness) | [$_____] | Est. Percentage Recovery: Unknown<br><br>Form of Recovery: Payments received by Estate pursuant to the Net Waterfall Proceeds Plan Obligation |
| Class 8D<br>Equity Interests | N/A | Est. Percentage Recovery: 0%<br><br>Form of Recovery: N/A |

## III.    GENERAL INFORMATION

### A.    The Debtors' Business

Each of the Debtors is a Delaware limited liability company formed for the single purpose of the acquisition, ownership and development of the Property. The Debtors own the Property as tenants in common with FKF Madison owning a 6% undivided interest; JMJS owning a 4% undivided interest; Madison Park owning a 12% undivided interest; and Slazer Owner owning a 78% undivided interest. The Property consists of the land, the improvements, the unsold Units which have been or will be developed, designed, and constructed at 23 East

22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story high-rise tower containing sixty-nine (69) residential Units of which fifty-seven (57) Units remain unsold and contain approximately 117,982 net sellable square feet, and amenities, and limited common elements (the "North Tower"), as well as an adjacent lot known as 23 East 22nd (the "Southern Parcel") upon which will be constructed a ground level residential lobby (the "Lobby"), along with the land underlying and abutting the North Tower and the Southern Parcel, the improvements, the unsold Units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing.

## B.     Management of the Debtors

Each Debtor's purpose clause provides for such Debtor to acquire, own, develop, operate, lease, mortgage, sell and/or otherwise deal with its undivided ownership interest (the "TIC Interests"), as a tenant-in-common together with the other Debtors in the Property. All powers necessary, convenient or incidental to accomplish the purposes of each Debtor are delegated to Slazer Enterprises, LLC and the officers of each Debtor, as set forth in such Debtor's respective Limited Liability Company Agreements. Specifically, other than Slazer Enterprises Owner, LLC, each Debtor is managed by Slazer Enterprises, LLC and its President. Slazer Enterprises Owner, LLC is also managed by its President and by Slazer Enterprises, LLC, but in its capacity as the sole member of Slazer Enterprises Owner, LLC. The officers of each Debtor are Ira Shapiro, as President and Secretary, and Marc Jacobs, as the Vice President and Treasurer.[3] Slazer Enterprises, LLC is a member managed vehicle.

## C.     Description of Development to Date

Of the sixty-nine (69) residential Units in the North Tower, forty-nine (49) have received temporary certificates of occupancy (each such certificate a "TCO"). Of those forty-nine (49) Units, twelve (12) have closed and thirty-seven (37) remain to be sold. The remaining twenty (20) Units have not received TCO's (the "Unfinished Units") and the Reorganized Debtor must complete the build-out of the Units in order to receive the required TCO's. The Unfinished Units are each in various stages of completion; (1) completely raw space being used for storage (2) partially framed with limited mechanical, electrical, plumbing ("MEP") rough-in, (3) drywall and with substantially complete MEP rough-in, and concrete floors (4) drywall and with substantially complete MEP rough-in, cabinet boxes partially installed, sub-flooring placed, door frames set, bathrooms substantially complete, (5) Unit substantially complete with cabinet boxes installed (no drawers or doors), appliances installed, bathrooms finished (except for glass and glazing), wood flooring installed and shade boxes set. The North Tower also contains two fire stairwells and is serviced by two oversized handicapped accessible passenger elevators. The elevators stop in the cellar, and on floors one (1) and two (2) and on each residential floor. While the Debtors' development plan contemplated building a mid-rise building above the Lobby, such a building is not part of the Reorganized Debtor's current development plan.

---

[3] Mr. Jacobs commenced his personal bankruptcy proceeding under Chapter 7 of the Bankruptcy Code on October 27, 2010 in the United States Bankruptcy Court for the Southern District of New York, case no. 10-24232 (RDD).

The third (3rd) and fourth (4th) floors in the North Tower contain an aggregate of nine thousand square feet (9,000 sf) currently allocated, which allocation may be subject to change, for common area amenity space (the "Amenity Space") for use by all of the residential Unit owners in the Property. These floors are serviced by two passenger elevators and an additional service elevator that also reaches the cellar level. The Amenity Space remains to be completed. However, the stainless steel lap pool structure has been assembled and set in place.

As to the adjacent lot, the Debtors have completed the underpinning of the neighboring buildings, and installed test piles. The Reorganized Debtor intends to construct on the Southern Parcel a new Lobby, which will, when constructed, contain up to approximately three thousand four hundred square feet (3,400 sf), of which approximately one thousand square feet (1,000 sf) will be allocated for retail, building amenity or limited common element purposes (the "Retail Purposes"). The main lobby entrance for the Property is currently a temporary entrance on 23rd Street, which passes through a commercial unit which the Debtors conveyed to an affiliate of Ira J. Shapiro on May 14, 2008. Concurrent with the conveyance, iStar released its lien on that commercial unit. Upon information and belief, Mr. Shapiro's affiliate has granted two (2) mortgages on the commercial unit. Upon its completion, the Lobby will serve as the entrance for the North Tower. Under the current plans, the lobby will contain a concierge desk, a mailroom, elements, if any, in the Retail Purposes, certain furniture and will potentially sit atop certain storage units that may be constructed beneath the Lobby.

## D. Future Development

Prior to confirmation of the Joint Plan, the Sponsor, in conjunction with Continuum, intends to undertake actions to be in a position to begin construction as soon as is commercially reasonable after entry of the Confirmation Order. Such steps may include, but not be limited to the following: (i) reviewing all existing contracts with all subcontractors; (ii) reviewing all pending scope changes; (iii) reviewing all pending change orders; (iv) reviewing all contractors' open applications; and (v) reviewing all Department of Buildings and Environmental Control Board violations so that such issues may be resolved as part of any settlements of any liens and the execution of any new contracts with subcontractors. Such a review will aid in the final determination of the actual remaining scope and pricing for the envisioned construction of the Property. After these initial steps are taken by the Sponsor, in conjunction with Continuum, the Reorganized Debtor intends to do the following (although not necessarily in the order presented):

- Complete a review of the existing insurance policies (Builders Risk, General Liability and any Wrap Policies) as well as any bonds currently in place. New policies or extensions and transfers of the existing policies will be procured to the extent required. The Reorganized Debtor anticipates that a new Directors and Officers liability policy will be purchased upon confirmation of the Plan.

- Retain Seiden and Schein, PC, or a similarly capable firm, to continue the 421a Tax Abatement application. Pursuant to the December 18, 2009 memorandum from Seiden and Schein, PC to Ira Shapiro and Lisa Radetsky, upon completion and acceptance of the Amended 421a application the North Tower should be eligible to receive ten (10) years of 421a benefits and up to three (3) years of construction period benefits.

12

- Submit to the New York State Department of Law, Investment Protection Bureau an amended Offering Plan and an amended Declaration of Condominium, along with any related documents that require amendment in order to comport with the Reorganized Debtor's development plan, as described herein. The amended Offering Plan, amongst other things, will contain guidelines by which the condominium board shall operate. The existing condominium board members will be replaced with a new condominium board and operate pursuant to the guidelines of the amended Offering Plan.

- Commence the development of the twenty (20) Units that currently do not have TCO's. Continuum and Continuum's punch list manager will also survey existing Units to determine what remaining finishing work is required under the Offering Plan (and/or the amended Offering Plan) and undertake to construct such Units as so required.

- Construct the exterior of the North Tower, to the extent not currently completed, which work shall include the installation of missing glass and louvers.

- Construct, as required by the Offering Plan (and/or the amended Offering Plan), of the Amenity Spaces in the North Tower.

- Engage architects, engineers and consultants to complete, to the extent not already completed, the drawings for the Lobby and build the Lobby. Subsequently, the Reorganized Debtor, in conjunction with Continuum, will apply for all necessary licenses and permits to begin construction of the foundation and the Lobby.

While the Debtors' development plan contemplated building a mid-rise building above the Lobby, such a building is not part of the Reorganized Debtor's current development plan.

## E.    **Future Marketing and Sales**

The Reorganized Debtor, in conjunction with Continuum, intends to conduct a comprehensive marketing and sales strategy post-confirmation of the Joint Plan. The marketing of the North Tower is currently scheduled to begin in Q1 2012, shortly following the completion of the Unfinished Units and the Amenity Space in the North Tower. The marketing and sales program will consist of the following elements:

**1.**    <u>Sales and Marketing Team</u>. Continuum has extensive experience marketing and selling luxury residential units in Manhattan. This experience will allow Continuum to leverage its long-standing relationships in the brokerage community, as that community understands that Continuum has a reputation for delivering high-quality residential units. An in-house sales staff directed by an experienced sales director and overseen by the Continuum will be responsible for sales and marketing, as well as the day-to-day operations of the sales center.

13

2.    Public Relations.  Due to the precarious history of the Property, the Property will need to be reintroduced to the brokerage community, the press, and the public in its new iteration.  This process should include:

- Retention of a public relations firm (a "PR Firm").

- The creation of a branding/turnaround strategy together with a PR Firm and an advertising agency (the "Advertising Agency").

- The marketing team will schedule on-going public relations events and press releases in accordance with the strategy determined by Continuum, the PR Firm and the Advertising Agency.

- Continuum intends to leverage the extensive press coverage the Property will realize upon its reintroduction, by promoting the Property through interviews and features in numerous media outlets.

- The launching of a broad digital and print advertising campaign.

- The hosting of broker events to reintroduce the Property to the brokerage community.

3.    Model Unit.  The Reorganized Debtor intends to have an interior designer create a model apartment in one of the existing finished Units.  The model unit, designed to reflect the high level of finishing typical of a prospective purchaser's expectations will be an extraordinarily valuable tool for the marketing team to facilitate sales in the Property.  Additionally, the sales office will be located in the building in one of the finished Units.

**F.    Prepetition Debt and Capital Structure of the Company**

**1.    Secured Debt**

(a)    The Existing iStar Indebtedness.  Each of the Debtors is obligated to iStar pursuant to the terms of the Loan Documents evidencing the Existing iStar Indebtedness.  iStar asserts that is has perfected first priority mortgage liens on and to the Property.  iStar further asserts that is owed no less than $235 million pursuant to the Loan Documents.

(b)    Mechanic's Liens.  Numerous parties have filed or asserted Mechanic's Liens Claims against the Property.  Mechanic's Liens Claims have been asserted and are being adjudicated as part of the Foreclosure Action.

**2.    GAP Claims**

The Debtors believe that the amount of GAP Claims to arise between the Petition Date and the date of entry of the Conversion Order total approximately [$_____].

### 3. Unsecured debt

The Debtors owe numerous creditors amounts relating to various promissory notes, contracts, deposits and judgments. The Debtors estimate that such claims exceed approximately [$_____].

### 4. Property Taxes

In light of the Funding Motions (as defined below), the Debtors believe that property taxes are current.

### 5. Deed Holders Claims

Six (6) Deeds to Units in the Property were issued by the Debtors to individuals. One (1) one of these six (6) Deeds was recorded. iStar did not release the lien it held on the Units for which these Deeds were issued. The validity of the Deeds is currently in dispute. As such, the Holders of such Deeds have Claims against the Debtors are estimated in the amount of [$_____].

### 6. Equity

The Debtors are organized as limited liability companies under the state of Delaware. The Debtors' membership interests are held in accordance with the following chart:

| Debtor: | Members: | Manager: | Officers: |
| --- | --- | --- | --- |
| FKF Madison | John Magee<br>Burt Dorfman<br>Mitchell Klein | Slazer Enterprises, LLC<br>Beth L. Peoples and Julia A. McCullough (as independent managers) | Ira Shapiro - President and Secretary<br>Marc Jacobs - Vice President and Treasurer |
| JMJS | Scott Haber<br>Michael Haber<br>Jerome Haber<br>Jeffrey Haber | Slazer Enterprises, LLC<br>Beth L. Peoples and Julia A. McCullough (as independent managers) | Ira Shapiro - President and Secretary<br>Marc Jacobs - Vice President and Treasurer |
| Madison Park | Kevin Romano<br>Howard Josephs<br>Mitchell Klein<br>Walter Klauser | Slazer Enterprises, LLC<br>Beth L. Peoples and Julia A. McCullough (as independent managers) | Ira Shapiro - President and Secretary<br>Marc Jacobs - Vice President and Treasurer |
| Slazer Owner | Slazer Enterprises, LLC | N/A (member managed)<br>Beth L. Peoples and Julia A. McCullough (as independent managers) | Ira Shapiro - President and Secretary<br>Marc Jacobs - Vice President and Treasurer |

CHI-60,494,511v12

### G.    Pending Litigation Against the Debtors

#### 1.    iStar Foreclosure Action

On March 4, 2010, iStar commenced an action (the "Foreclosure Action") by filing its Verified Amended Complaint (the "Foreclosure Complaint") in the Supreme Court of the State of New York (the "State Court") to foreclose its mortgages on the Property. In connection with the Foreclosure Action, iStar sought and obtained from the State Court appointment of a receiver to manage and control the Property during the pendency of the Foreclosure Action. On May 7, 2010, the State Court entered an order (the "Receiver Order") appointing Jonathan H. Newman as receiver (the "Receiver") of the Property, with the powers outlined in the Receiver Order. The Receiver remained in control of the Property until the Conversion Date, at which time he was required pursuant to Section 543 of the Bankruptcy Code to turn over any and all Estate property in his possession to the Debtors.

In its Foreclosure Complaint, iStar named as defendants, in addition to the Debtors, all parties known to it who asserted a claim against the Property, including mechanic's lien and contract claimants, taxing authorities and John Does.

Following the Petition Date, the State Court held a number of status conferences in the Foreclosure Action but for the most part the entire action had been stayed during the "gap period" of the Chapter 7 Cases. Following the Conversion Date, the Debtors filed a Suggestion of Bankruptcy in the Foreclosure Action, thus notifying all parties thereto of the commencement of the Chapter 11 Cases.

#### 2.    Other litigation

The Debtors are party to a number of pre-Petition Date lawsuits, primarily in the State Court, relating to the Property, including claims for return of deposits on Units, claims on promissory notes and claims relating to ownership of certain Units in the Property.

The Debtors anticipate that all such pending litigation will be resolved following the Effective Date of the Joint Plan (including through the claims allowance process during the Chapter 11 Cases). Any adverse judgment against or liability of the Debtors arising out of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan and the Bankruptcy Code. A schedule of such pending litigation is attached hereto as **Exhibit B**.

### H.    Events Leading Up to the Chapter 11 Cases

#### 1.    The Involuntary Petitions

On the Petition Date, Stephen Kraus, Mitchell Kraus, Barbara Kraus and Kraus Hi-Tech Home Automation, Inc. (the "Petitioning Creditors") filed involuntary petitions (the "Involuntary Petitions") under Chapter 7 of the Bankruptcy Code against the Debtors, thus commencing the Chapter 7 Cases. On June 29, 2010, the Debtors filed a motion to dismiss the Involuntary Petitions [Docket No. 23] (the "Motion to Dismiss"). On August 12, 2010, prior to a hearing on the Motion to Dismiss, joinders to the Involuntary Petitions were filed by (i) Dr. Harvey Schiller,

16

(ii) Mr. Joe Coffey, (iii) Mad 52, LLC, (iv) Pace Plumbing Corp. (collectively, the "August 12 Joinders"). On August 20, 2010, another joinder to the Involuntary Petitions was filed by Gotham Greenwich Construction Co., LLC (the "August 20 Joinder," and, together with the August 12 Joinders, the "Joinders"). On September 3, 2010, following briefing on the issue, the Bankruptcy Court entered an order ruling that the Joinders related back to the Petition Date [Docket No. 79].

### 2. iStar's Protective Advance Motions

On June 24, 2010, iStar filed a motion [Docket No. 13] (the "First Funding Motion") seeking authority to continue making protective advances during June and July 2010 in an amount up to $488,610 pursuant to an approved budget, in order to fund (i) operating and maintenance expenses for the Property, including payroll for staff, payment of the Building's managing agent, utilities, insurance, permits and warranty-related costs and (ii) emergency repairs and construction to ensure the safety of the Building and the health and welfare of the residents and the public. The First Funding Motion was approved by order of the Court on June 30, 2010 [Docket No. 26].

On July 16, 2010, iStar filed a second motion [Docket No. 34] (the "Second Funding Motion") seeking authority to make protective advances to fund expenses of the Property (consistent with the First Funding Motion) through September 30, 2010 in an amount up to $584,615 pursuant to the budget attached to the Second Funding Motion. Additionally, the Second Funding Motion sought authority to pay the premium to renew the Debtors' construction liability insurance policy through January 20, 2011 estimated in the amount of $65,000. The Second Funding Motion was approved by order of the Court on July 30, 2010 [Docket No. 38].

On September 8, 2010, iStar filed a motion [Docket No. 80] (the "Third Funding Motion") seeking authority to make protective advances to pay certain professional fees of the Receiver in connection with his management of the Property upon a determination by the New York Supreme Court of the amount of fees the Receiver and his professionals are entitled to be paid under New York law with such advances to be secured by liens on the real and personal property comprising the Prepetition Collateral having the same validity extent and priority as the iStar Prepetition Liens.[4] The Receiver Funding Motion was approved by order of the Court on September 22, 2010 [Docket No. 88].

---

[4] On November 17, 2010, the State Court entered such an order approving a total of $955,407.09 in fees and expenses of the Receiver and his professionals during the period of April 15, 2010 to September 30, 2010.

*CHI-60,494,511v12*

On September 23, 2010, iStar filed a third motion [Docket No. 87] (the "Fourth Funding Motion," and together with the First Funding Motion, the Second Funding Motion, and the Third Funding Motion, the "Funding Motions") for authority to make protective advances to fund the expenses of the Property (consistent with the First and Second Funding Motions) through December 31, 2010 in an amount of up to $664,369 pursuant to the budget attached to the Third Funding Motion. The Third Funding Motion also requested authority to pay the real estate taxes due to the City of New York with respect to the Property for the third and fourth quarters of 2010 in the estimate amount of $430,845.76 for third quarter (and unpaid second quarter) taxes and $248,643.75 for fourth quarter taxes. The Third Funding Motion was approved by order of the Court on October 6, 2010 [Docket No. 98].

iStar asserts that as of October 31, 2010, the total amount of protective advances it has disbursed to the Receiver and third parties since the commencement of the Chapter 7 Cases totals $886,114.85.

### 3.    iStar's Motion for Relief from Stay

On November 3, 2010, iStar filed its Motion for Relief From the Automatic Stay to Foreclose on Mortgaged Property (the "iStar Lift Stay Motion"). By the iStar Lift Stay Motion, iStar seeks entry of an order modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to permit iStar to proceed with the Foreclosure Action pending in the State Court. An initial hearing on the iStar Lift Stay Motion is scheduled for December 2, 2010 at 10:00 a.m. The Petitioning Creditors filed an objection to the iStar Lift Stay Motion in which the Debtors joined. both the Debtors and the Petitioning Creditors intend to vigorously oppose the iStar Lift Stay Motion at the hearing.

### 4.    Conversion Order

On November 18, 2010, the Debtors withdrew the Motion to Dismiss [Docket No. 113]. Shortly thereafter, on November 18, 2010, the Petitioning Creditors filed a motion to have the Bankruptcy Court immediately enter orders for relief and convert the Chapter 7 Cases to cases under Chapter 11 of the Bankruptcy Code [Docket No. 114]. On November 19, 2010 (the "Conversion Date") the Bankruptcy Court entered orders for relief under chapter 7 of the Bankruptcy Code in the Chapter 7 Cases and also entered the Conversion Order, thus commencing the Chapter 11 Cases.

### 5.    Reconsideration

On December 1, 2010, iStar filed a motion to reconsider the Conversion Order [Docket No. 131] (the "Conversion Order"). A hearing on the Conversion Order has not to date been scheduled.

CHI-60,494,511v12

## IV. EVENTS DURING THE CHAPTER 11 CASES

The following is a brief description of certain major events which have occurred in the Chapter 11 Cases following entry of the Conversion Order.

### A. Administrative Motions

#### 1. Motion for Joint Administration

On December 2, 2010, the Debtors filed a motion to procedurally consolidate and jointly administer the Chapter 11 Cases [Docket No. 137] (the "Joint Administration Motion"). The Bankruptcy Court entered an order granting the Joint Administration Motion on [DATE] [Docket No. [    ]].

#### 2. Motion for Extension of Time to File Schedules and Statements of Financial Affairs

On December 2, 2010, the Debtors filed a motion requesting an extension of time within which to file their schedules of assets and liabilities and their statements of financial affairs [Docket No. 138] (the "Schedules Extension Motion") seeking the deadline from December 6, 2010 to, through and including December 20, 2010. The Bankruptcy Court approved the relief sought through the Schedules Extension Motion on [DATE] [Docket No. [    ]].

#### 3. Bar Date Motion

On [DATE], 2010, the Debtors filed a motion seeking to establish the Claims Bar Dates [Docket No. [    ]] (the "Bar Date Motion"). Specifically, the Debtors requested that the Bankruptcy Court establish as the Claims Bar Dates: (i) [DATE] as the date by which all entities, other than governmental units, must submit prepetition proofs of claim against the Debtors and the Debtors' Estates, and (ii) [DATE] as the date by which governmental units must submit prepetition proofs of claim against the Debtor and the Debtors' Estates. The Claims Bar Dates requested through the Bar Date Motion were approved by the Bankruptcy Court on [DATE] [Docket No. [    ]].

### B. Other Requested Relief

#### 1. Debtor in Possession Financing

On December 10, 2010, in order to have the liquidity necessary to pursue confirmation of the Joint Plan, following entry of the Conversion Order, the Debtors filed the *Emergency Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 36(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Post-Petition Secured Financing, (II) Granting Adequate Protection to Pre-Petition Secured Party, and (III) Scheduling a Final Hearing* [Docket No. 145] (the "Debtor in Possession Financing Motion") seeking authority to obtain the Debtor in Possession Financing from Sponsor. On [DATE], the Bankruptcy Court entered an order approving the Debtor in Possession Financing Motion on an interim basis [Docket No. [    ]]

and on [DATE], entered an order approving the Debtor in Possession Financing Motion on a final basis [Docket No. [ ]].

    **2.**    **Turnover Motion**

On December 10, 2010, the Debtors filed the *Debtors' Motion for Order (I) Appointing Chief Restructuring Officer, and (2) Requiring Receiver to Deliver Immediately to the Debtors All Property of the Bankruptcy Estate Pursuant to Section 543(b)(1) of the Bankruptcy Code* [Docket No. 146] (the "Turnover Motion"). The Turnover Motion (1) seeks authorization for the Debtors to employ and retain Lee E. Buchwald of Buchwald Capital Advisors LLC as the Debtors' Chief Restructuring Officer, and (2) requests an order requiring the Receiver to immediately deliver to the Debtors the property of the Debtors' Estates. On [DATE], the Bankruptcy Court entered an order approving the relief sought under the Receiver Motion [Docket No. [ ]].

    **3.**    **Retention of Professionals**

On [DATE], the Debtors applied for authority to retain the law firm of Pachulski Stang Ziehl & Jones, LLP as their general bankruptcy counsel (the "PSZJ Retention Application"). The Bankruptcy Court approved the PSZJ Retention Application on [DATE] [Docket No. [ ]].

    **4.**    **Disclosure Statement/Solicitation Procedures Motion**

On [DATE], the Debtors filed the *Motion of the Debtors for an Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Plan of Reorganization, (III) Scheduling a Hearing to Consider Confirmation of the Debtors' Joint Plan of Reorganization and Establishing Notice and Objection Procedures in Respect Thereto* [Docket No. [ ]] (the "Disclosure Statement Motion") seeking approval of this Disclosure Statement and approving the process by which the Proponents of the Joint Plan will solicit votes on the Joint Plan. On [DATE], the Bankruptcy Court entered an order approving the relief sought under the Disclosure Statement Motion [Docket No. [ ]].

**C.**    <u>Committee</u>

To date, no official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

**D.**    <u>341(a) Meeting of Creditors</u>

By notice dated December 3, 2010 [Docket No. 140], the U.S. Trustee notified the Debtors' creditors and other parties in interest that a meeting of creditors, pursuant to Section 341(a) of the Bankruptcy Code, will be held on December 29, 2010.

# V. THE JOINT PLAN OF REORGANIZATION

## A. General

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders. In addition to permitting rehabilitation of the debtor, another goal of Chapter 11 is to promote equality of treatment of creditors and equity security holders, respectively, who hold substantially similar claims or interests with respect to the Distribution of the value of a debtor's assets. In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's Chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the Joint Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of prepetition equity security holders.

The confirmation requirements of Section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Joint Plan for purposes of, among other things, economy and efficiency, the Joint Plan shall be deemed a separate Chapter 11 plan for each such Debtor.

## B. Purpose of Disclosure Statement

After a plan of reorganization has been filed in a Chapter 11 case, certain holders of claims against, or equity interests in, a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to Holders of Claims against and Equity Interests in each Debtor in order to satisfy the requirements of Section 1125 of the Bankruptcy Code.

21

## C.     Solicitation Package

Accompanying this Disclosure Statement is a package of materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court's order approving this Disclosure Statement and procedures for soliciting and tabulating votes on the Joint Plan (the "Voting Procedures Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets the procedures for distributing Solicitation Packages to the Holders of Claims against and Equity Interests in the Debtors, approves the form of Ballot, establishes the procedures for tabulating Ballots used in voting on the Joint Plan, and fixes the deadline for objecting to confirmation of the Joint Plan;

- the Notice of Hearing to Consider Confirmation of the Joint Plan; and

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Joint Plan), which will be used by creditors who are entitled to vote on the Joint Plan.

## D.     Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Joint Plan by voting in favor of or against the Joint Plan. In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided (copies will not be accepted). In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a Disputed Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Joint Plan. Accordingly, in voting to accept or reject the Joint Plan, a Holder must use only the coded Ballot or Ballots sent with this Disclosure Statement.

In order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and actually received by the Debtors no later than [DATE] at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline").

Any executed Ballot that does not indicate either an acceptance or rejection of the Joint Plan or indicates both an acceptance and rejection of the Joint Plan will not be counted as a vote either to accept or reject the Joint Plan.

If you are a Holder of a Claim who is entitled to vote on the Joint Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please call the undersigned Debtors' counsel at: (302) 652-4100.

CHI-60,494,511v12

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain at your own expense an additional copy of this Disclosure Statement and its appendices, schedules and exhibits, please contact the undersigned Debtors' counsel.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Joint Plan, each Holder of a Claim in Classes that are entitled to vote on the Joint Plan should read, in its entirety, this Disclosure Statement, the Joint Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

**E.      Parties Entitled to Vote on the Joint Plan**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a Chapter 11 plan. Creditors or Holders of Equity Interests whose Claims or interests are not impaired by a plan are deemed to accept that plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or Equity Interest holders whose claims or interests are impaired by the Joint Plan, and who will receive no Distribution under the Joint Plan, are also not entitled to vote because they are deemed to have rejected the Joint Plan under Section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Joint Plan" of this Disclosure Statement.

The following sets forth which classes are entitled to vote on the Joint Plan and which are not:

- The Debtors are seeking votes from the Holders of Claims in Classes 1A-1D, 2A-2D, 4A-4D, 5A-5D, 6A-6D, and 7A-7D.

- The Debtors are not seeking votes from the Holders of Claims in Classes 3A-3D because those Claims are Unimpaired under the Joint Plan, and the Holders of Claims in that Class are conclusively presumed to have accepted the Joint Plan and are not entitled to vote on the Joint Plan.

- The Debtors are not seeking votes from the Holders of Equity Interests in Classes 8A-8D because those Claims and Equity Interests are Impaired under the Joint Plan and the Holders are receiving no Distribution on account of such Claims and Equity Interests. These Holders of Equity Interests will be deemed to have voted to reject the Joint Plan.

23

**F.    Confirmation Hearing and Deadline for Objections to Confirmation**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Bankruptcy Court has scheduled the Confirmation Hearing on [DATE AND TIME], prevailing Eastern Time, before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Sixth Floor, Courtroom No. 3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing. Any objection to confirmation of the Joint Plan must be made in accordance with the requirements of Section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014 and the procedures set forth in Article VII, Section A of this Disclosure Statement.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE JOINT PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE JOINT PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>. THE TERMS OF THE JOINT PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE JOINT PLAN. THE COURT HAS NOT YET CONFIRMED THE JOINT PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE JOINT PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE JOINT PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS. CAPITALIZED TERMS USED IN THIS SECTION V OF THE DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS SECTION V OF THE DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT PLAN.**

**G.    Classification of Claims and Interests**

**1.    Classification and Allowance of Claims and Equity Interests Generally**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, Section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Joint Plan creates numerous "Classes" of Claims and Equity Interests. These Classes take into account the differing nature and priority of Claims against and Equity Interests in the Debtors. Administrative Claims, GAP Claims, and Priority Tax Claims are not classified for purposes of voting or receiving Distributions under the Joint Plan, but are treated separately as unclassified Claims.

24

The Joint Plan provides specific treatment for each Class of Claims and Equity Interests. Only Holders of certain Allowed Claims are entitled to vote on and receive Distributions under the Joint Plan. Unless otherwise provided in the Joint Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Joint Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Equity Interest.

## H.  **Treatment of Unclassified Claims**

### 1.  **Administrative Claims**

Administrative Expense Claims are any Claims for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date under Sections 328, 330, 363, 364(c)(1), 365, 503(b), and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors from and after the Petition Date (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audits) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date or later incurred or assumed prior to the Petition Date, or subject to a lien dating prior to the Petition Date; (b) all compensation for actual and necessary legal, financial, advisory, accounting and other services provided by the Professionals and the reimbursement of actual and necessary expenses incurred by the Professionals pursuant to Sections 328 or 330 of the Bankruptcy Code; (c) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; (d) any payment to be made under the Joint Plan or otherwise to cure a default under an executory contract or unexpired lease that has been or will be assumed by the Debtors; and (e) any fees and charges assessed against the Estates under Section 1930, Chapter 123, of Title 28 of the United States Code.

The Bankruptcy Code does not require that administrative claims be classified under a plan. It does, however, require that allowed administrative claims be paid in full in cash in order for a plan to be confirmed, unless the holder of such claim consents to different treatment.

Pursuant to the Joint Plan, subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Claim against a Debtor shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, either cash equal to the full unpaid amount of such Allowed Administrative Claim, or such other treatment as the Sponsor and the Holder of such Allowed Administrative Claim shall have agreed.

Notwithstanding anything to the contrary, Allowed Administrative Claims representing the Debtors' postpetition liabilities incurred in the ordinary course of business will continue to be paid by the Debtors during the Chapter 11 Cases in accordance with the terms and conditions of the particular transactions and any agreement or Court order relating thereto.

## 2. GAP Claims

GAP Claims are unsecured Claims arising from the date of commencement of the Chapter 7 Cases to the date of entry of the orders for relief in the Chapter 7 Cases that are Allowed pursuant to Section 502(f) of the Bankruptcy Code.

Pursuant to the Joint Plan, each Holder of an Allowed GAP Claim against a Debtor shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed GAP Claim, either cash equal to the full unpaid amount of such Allowed GAP Claim, or such other treatment as the Sponsor and the Holder of such Allowed GAP Claim shall have agreed.

## 3. Priority Tax Claims

Priority Tax Claims are Claims of governmental units for taxes owed by the Debtors that are entitled to priority in payment pursuant to Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The taxes entitled to priority are: (a) taxes on income or gross receipts that meet the requirements of Section 507(a)(8)(A); (b) property taxes meeting the requirements of Section 507(a)(8)(B); (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C); (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(4), to the extent such taxes also meet the requirements of Section 507(a)(8)(D); (e) excise taxes of the kind specified in Section 507(a)(8)(E); (f) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F); and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G).

The Bankruptcy Code does not require that Priority Tax Claims be classified under a plan. It does, however, require that such claims receive the treatment described below in order for a plan to be confirmed unless the holder of such claims consents to different treatment.

Pursuant to the Joint Plan, except to the extent that the applicable Debtor and the Holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Tax Claim that is due and payable on or before the Effective Date shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the Debtors' sole discretion, either (i) cash equal to the amount of such Allowed Priority Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtor in accordance with the applicable non-bankruptcy law governing such Claims.

26

# I.   Classification of Claims and Equity Interests

The categories of Claims and Equity Interests listed below, which exclude Administrative Claims, GAP Claims, and Priority Tax Claims in accordance with Section 1123(a)(1) of the Bankruptcy Code, are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Joint Plan, as follows:

### 1.   Claims Against Debtor FKF Madison Park Group Owner, LLC

| Classes | Designation | Impairment | Entitled to Vote |
|---------|-------------|------------|------------------|
| 1A | Allowed Secured Claim of iStar | Impaired | Yes |
| 2A | Mechanic's Liens Claims | Impaired | Yes |
| 3A | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4A | Property Tax Claims | Impaired | Yes |
| 5A | Deed Holder Claims | Impaired | Yes |
| 6A | Other Priority Claims | Impaired | Yes |
| 7A | General Unsecured Claims | Impaired | Yes |
| 8A | Equity Interests | Impaired | No (deemed to reject) |

### 2.   Claims Against Debtor JMJS 23rd Street Realty Owner, LLC

| Classes | Designation | Impairment | Entitled to Vote |
|---------|-------------|------------|------------------|
| 1B | Allowed Secured Claim of iStar | Impaired | Yes |
| 2B | Mechanic's Liens Claims | Impaired | Yes |
| 3B | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4B | Property Tax Claims | Impaired | Yes |
| 5B | Deed Holder Claims | Impaired | Yes |
| 6B | Other Priority Claims | Impaired | Yes |
| 7B | General Unsecured Claims | Impaired | Yes |
| 8B | Equity Interests | Impaired | No (deemed to reject) |

### 3.   Claims Against Debtor Madison Park Group Owner, LLC

| Classes | Designation | Impairment | Entitled to Vote |
|---------|-------------|------------|------------------|
| 1C | Allowed Secured Claim of iStar | Impaired | Yes |
| 2C | Mechanic's Liens Claims | Impaired | Yes |
| 3C | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4C | Property Tax Claims | Impaired | Yes |
| 5C | Deed Holder Claims | Impaired | Yes |
| 6C | Other Priority Claims | Impaired | Yes |
| 7C | General Unsecured Claims | Impaired | Yes |
| 8C | Equity Interests | Impaired | No (deemed to reject) |

CHI-60,494,511v12

### 4. Claims Against Debtor Slazer Enterprises Owner, LLC

| Classes | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1D | Allowed Secured Claim of iStar | Impaired | Yes |
| 2D | Mechanic's Liens Claims | Impaired | Yes |
| 3D | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4D | Property Tax Claims | Impaired | Yes |
| 5D | Deed Holder Claims | Impaired | Yes |
| 6D | Other Priority Claims | Impaired | Yes |
| 7D | General Unsecured Claims | Impaired | Yes |
| 8D | Equity Interests | Impaired | No (deemed to reject) |

## J. Treatment of Classified Claims and Equity Interests

### 1. Allowed Secured Claim of iStar (Classes 1A-1D)

The Allowed Secured Claim of iStar consists of the Existing iStar Indebtedness, which is evidenced by the Loan Documents.

On the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, the Existing iStar Indebtedness, the Existing iStar Indebtedness shall be modified as set forth in the Restructured Secured Debt Term Sheet annexed to the Joint Plan as **Exhibit 1**. The Restructured iStar Debt shall be evidenced by the Restated iStar Loan Documents. Accordingly, under the Joint Plan, the Existing iStar Indebtedness shall be treated as an Allowed Secured Claim in the amount of $124,500,000. Pursuant to the Restated iStar Loan Documents, the Restructured iStar Debt shall be secured by the same liens evidenced by the Loan Documents, to the same extent, validity, priority and enforceability of such liens; provided, however, any and all Causes of Action that the Debtors or the Estates may have against iStar are, and shall be, released, waived and extinguished under the Joint Plan as of the Effective Date. The Reorganized Debtor shall repay the Restructured iStar Debt with interest on a monthly basis at the rate specified in, and accordance with the terms contained in, the Restructured Secured Debt Term Sheet annexed to the Joint Plan as **Exhibit 1** and with principal payments made from Net Unit Sale Proceeds or funds otherwise available to the Reorganized Debtor. To the extent the Allowed amount of the Existing iStar Indebtedness exceeds $124,500,000, the difference shall be classified as a General Unsecured Claim in Classes 7A-7D under the Joint Plan.

Classes 1A-1D are impaired under the Joint Plan, and iStar shall be entitled to vote on the Joint Plan.

### 2. Mechanic's Lien Claims (Classes 2A-2D)

The Mechanic's Lien Claims are all Claims derived from Holders who have properly and timely asserted mechanic's liens against the Property under applicable state law.

CHI-60,494,511v12

On the Effective Date, each Holder of an Allowed Mechanic's Lien Claim against a Debtor shall, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Mechanic's Lien Claim, receive a cash payment equal to twenty percent (20%) of the face amount of the Allowed amount of each such Holder's Allowed Mechanic's Lien Claim. On the Effective Date, the Lien asserted by the Holder of a Mechanic's Lien Claim shall be null and void, the Holder of the Mechanic's Lien Claim shall execute all documents requested by the Reorganized Debtor to effectuate the cancellation of its Lien, including the release and/or termination of any recording of the Lien, and the Holder of the Mechanic's Lien Claim shall be enjoined from taking any action against the Reorganized Debtor or the Property to enforce, perfect, or record the Mechanic's Lien.

Classes 2A-2D are impaired under the Joint Plan, and each Holder of an Allowed Mechanic's Lien Claim shall be entitled to vote on the Joint Plan.

### 3. Other Secured Claims (Classes 3A-3D)

An Other Secured Claim is a Claim, other than the Allowed Secured Claim of iStar or a Mechanic's Lien Claim, that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code or, in the case of the setoff, pursuant to Section 553 of the Bankruptcy Code.

The Joint Plan provides that, on or as soon as reasonably practicable after the Effective Date, at the election of the Sponsor, Holders of Allowed Other Secured Claims shall, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Other Secured Claims, have their Claims satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Reorganized Debtor to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Holder of such Claim. Nothing in the Joint Plan or elsewhere shall preclude the Reorganized Debtor from challenging the validity of any alleged Lien on any asset of any Debtor or the Reorganized Debtor or the value of any such collateral.

Classes 3A-3D are Unimpaired under the Joint Plan, and each Holder of an Other Secured Claim shall be conclusively deemed to have accepted the Joint Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Joint Plan.

### 4. Property Tax Claims (Classes 4A-4D)

Property Tax Claims are Claims of governmental units for property taxes owed by the Debtors that are not entitled to treatment as a Priority Tax Claim or otherwise accorded priority in payment pursuant to Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The Joint Plan provides that, except to the extent that the Sponsor and the Holder of an Allowed Property Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Property Tax Claim that is due and payable on or before the Effective Date shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Property Tax Claim, at the election of the Reorganized Debtor, either (i) cash equal to the amount of such Allowed Property Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, five (5) annual payments each made on the first Business Day following each successive anniversary of the Effective Date during the period not exceeding five (5) years after the Petition Date, with interest on the outstanding Allowed Property Tax Claim at the rate required under Section 511 of the Bankruptcy Code.

Classes 4A-4D are impaired under the Joint Plan, and each Holder of an Allowed Property Tax Claim shall be entitled to vote on the Joint Plan.

### 5. Deed Holder Claims (Classes 5A-5D)

The Deed Holder Claims are those Claims asserted against the Debtors by Holders of Deeds to Units, for which Units, iStar did not release its lien on the Unit.

The Joint Plan provides that, from and after the Effective Date, each Holder of an Allowed Deed Holder Claim against any Debtor shall, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Deed Holder Claim, receive a Distribution from the Estates to the extent funds are available to the Estates for Distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. For purposes hereof, Distribution to be made to each Holder of an Allowed Deed Holder Claim in Classes 5A-5D is the amount calculated by multiplying the Net Waterfall Percentage by the amount of the Holder's Allowed Deed Holder Claim in Classes 5A-5D. To the extent the Claim of a Holder of an Allowed Deed Holder Claim is a Claim against one or more Debtors, the amount of the Allowed Claim shall only be counted once in an amount equal to the amount of the Allowed Deed Holder Claim. On the Effective Date, the Deeds issued to the Holder of a Deed Holder Claim shall be null and void, the Holder of the Deed Holder Claim shall return the Deed to the Estates, shall execute all documents requested to effectuate the cancellation of the Deed, including the release and/or termination of any recording of the Deed, and the Holder of the Deed shall be enjoined from taking any action against the Reorganized Debtor or the Property to enforce, perfect, record the Deed or assert any ownership or other rights to the Unit in respect of such Deed.

Classes 5A-5D are impaired under the Joint Plan, and each Holder of an Allowed Deed Holder Claim shall be entitled to vote on the Joint Plan.

### 6. Other Priority Claims (Classes 6A-6D)

An Other Priority Claim includes any Claim entitled to priority in payment pursuant to Section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a GAP Claim, or a Priority Tax Claim.

CHI-60,494,511v12

The Joint Plan provides that each Holder of an Allowed Other Priority Claim against a Debtor shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Other Priority Claim, either cash equal to the full unpaid amount of such Allowed Other Priority Claim, or such other treatment as the applicable Sponsor and the Holder of such Allowed Other Priority Claim shall have agreed.

Classes 6A-6D are impaired under the Joint Plan, and each Holder of an Other Priority Claim shall be entitled to vote on the Joint Plan.

## 7. General Unsecured Claims (Classes 7A-7D)

A General Unsecured Claim is any Claim against a Debtor that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, or a Mechanic's Lien Claim and shall not include Claims that are Disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Joint Plan or otherwise.

The Joint Plan provides that, from and after the Effective Date, each Holder of an Allowed General Unsecured Claim against any Debtor shall, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, receive a Distribution from the Estates to the extent funds are available to the Estates for Distribution from payments received by the Estates on account of the Net Waterfall Proceeds Plan Obligation. General Unsecured Claims shall include any deficiency claim of iStar on account of the Existing iStar Indebtedness. For purposes hereof, (i) the Distribution to be made to each Holder of an Allowed General Unsecured Claim in Classes 7A-7D is the amount calculated by multiplying the Net Waterfall Percentage by the amount of the Holder's Allowed General Unsecured Claim in Classes 7A-7D; and (ii) to the extent the Claim of a Holder of an Allowed General Unsecured Claim is a Claim against one or more Debtors, the amount of the Allowed General Unsecured Claim shall only be counted once in an amount equal to the amount of the Allowed General Unsecured Claim

Classes 7A-7D are impaired under the Joint Plan, and each Holder of an Allowed General Unsecured Claim in such shall be entitled to vote on the Joint Plan.

## 8. Equity Interests (Classes 8A-8D)

Equity Interests are, collectively, all of the equity interests in the Debtors.

As of the Effective Date, all Equity Interests in each Debtor, including any outstanding warrants, options, or other rights to acquire outstanding Equity Interests, shall be terminated and cancelled and the Holders thereof shall neither retain nor receive any property under the Joint Plan.

Equity Interests are terminated under the Joint Plan, and therefore Holders of Equity Interests are deemed to have rejected the Joint Plan and are not entitled to vote on the Joint Plan

CHI-60,494,511v12

**K. Acceptance or Rejection of the Joint Plan**

    **1. Acceptance by an Impaired Class**

In accordance with Section 1126(c) of the Bankruptcy Code and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Joint Plan if the Joint Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Joint Plan.

    **2. Presumed Acceptances by Unimpaired Classes**

Pursuant to Section 1126(f) of the Bankruptcy Code, Classes of Claims designated as Unimpaired are conclusively presumed to accept the Joint Plan and the votes of the Holders of such Claims or Equity Interests will not be solicited. Classes 3A-3D are Unimpaired by the Joint Plan and, as such, shall not be entitled to vote to accept or reject the Joint Plan.

    **3. Presumed Rejection by Certain Impaired Classes**

Holders of Equity Interests in Classes 8A-8D will not receive or retain any property under the Joint Plan on account of such Equity Interests. Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of such Equity Interests are conclusively presumed to have rejected the Joint Plan and therefore shall not be entitled to vote to accept or reject the Joint Plan.

    **4. Impaired Classes of Claims Entitled to Vote on the Joint Plan**

Holders of Claims in Classes 1A-1D, 2A-2D, 4A-4D, 5A-5D, 6A-6D, and 7A-7D are Impaired and shall be entitled to vote to accept or reject the Joint Plan.

**L. Means for Implementation of the Joint Plan**

    **1. Description of the Reorganized Debtor**

Pursuant to Section 1123(a)(5)(D) of the Bankruptcy Code, all property of the respective Estate of each Debtor, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Joint Plan, shall be sold to the Reorganized Debtor on the Effective Date (subject to the effects of any transactions contemplated by this Joint Plan). Thereafter, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Liens, Claims and Equity Interests, including the Liens and Claims of the Holders of Mechanic's Liens and the Deed Holder Claims, Claims of successor liability, Claims of any owner of a Unit who is an owner as of the Effective Date, including without limitation any claim based on the actions or inactions of the Debtors or their agents, representatives, employees or contractors with respect to the development, construction or sale of the Property or any Unit, or any patent or latent construction defects, except as specifically provided in the Joint Plan or the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized

Debtor may, without the need for any application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional services and expenses.

The Operating Agreement for the Reorganized Debtor is attached as **Exhibit 2** to the Joint Plan. On the Effective Date, the Proponents are authorized and directed to take all action necessary, and to execute all documents required, to effectuate the sale of the assets of the Debtors' Estates in the Reorganized Debtor. One-hundred percent (100%) of the equity interests in the Reorganized Debtor shall be held by Sponsor, New One Madison Park Member I, LP. The limited partners of Sponsor shall be: (i) 45 Margaux LLC, a Delaware limited liability company, (ii) Kraus OMP LLC, a Delaware limited liability company, and (iii) Glimcher Bernard One Madison, LLC, a Delaware limited liability company. 45 Margaux LLC is controlled by Ian Bruce Eichner, Kraus OMP LLC is controlled by Stephen Kraus, and Glimcher Bernard One Madison, LLC is controlled by Daniel Glimcher and Jeremy Bernard. The general partner of the Sponsor shall be New One Madison Park GP, LLC, a Delaware limited liability company which is controlled by Ian Bruce Eichner. The developer for the Property to be engaged by the Reorganized Debtor is Continuum.

## 2. Description of The Continuum Company, LLC

(a) <u>General Description</u>. Continuum is a privately-held real estate development firm based in New York City. Continuum's core business is the acquisition and development of residential (both for sale and rental housing), office, hospitality and retail space in New York, Miami, and Las Vegas. Under the direction of Ian Bruce Eichner, the Continuum's founder, Continuum's team of real estate professionals has a successful track record of developing complex, multi-phased projects from inception to occupancy. The company is involved in all aspects of development including acquisition and finance, design and construction, sales and marketing and project management.

(b) <u>Development Portfolio</u>. Since the 1970's, Continuum has developed more than 12 million square feet totaling over $6 billion. Some properties in Continuum's development portfolio include, but are not limited to, the following:

(i) <u>The Cosmopolitan Resort and Casino</u>. The Cosmopolitan Resort and Casino is a 6.5 million square foot hotel/condo/casino centrally located on the Las Vegas Strip. The 8.5 acre resort consists of two towers containing 2,200 condo hotel units and 800 hotel rooms. The development features approximately 150,000 square feet of convention and meeting space, a 100,000 square foot casino, 250,000 square feet of retail and restaurant space, a 40,000 square foot spa and fitness facility, a 1,800 seat theater, and multiple beach decks with a Beach Club overlooking the Las Vegas Strip.

(ii) <u>Continuum on South Beach</u>. The Continuum on South Beach is the only gated oceanfront community at the southern tip of Miami Beach. The 12 acre property totals approximately 1.4 million square feet and consists of two towers, one with 317 condominiums (including 14 townhouses) and 14 cabanas, and a second with 213 condominiums (including 7 townhouses and 7 lofts) and 14 cabanas.

*CHI-60,494,511v12*

(iii)  180 Montague Street.  180 Montague Street is a 33 story luxury rental and retail development located on Montague Street in Brooklyn Heights, New York The building totals approximately 212,000 square feet and consists of 192 units, a fitness center, outdoor roof deck, retail space on the ground floor and a parking garage.

(iv)  The Richmond.  The Richmond is a 25 story luxury condominium building located at Third Avenue and 80th Street in New York City.  The building totals approximately 250,000 square feet and consists of 101 residential units and 40,000 square feet of retail, professional offices and storage space.

(v)  The Manhattan Club.  The Manhattan Club is a 26-story urban timeshare located at 200 West 56th Street, between 7th Avenue and Broadway in New York City.  The 215,000 square foot building consists of 286 units, representing 14,872 ownership weeks. The Manhattan Club owners have access to a private bar/lounge, business center, meeting rooms, fitness facility, library, and two sun lounge terraces. The Manhattan Club was the first timeshare in New York City.  It adapted the notion of traditional timeshares to an urban environment by allowing buyers to purchase 7-day intervals for use in single-day increments.

(vi)  One Broadway Place.  One Broadway Place is a 44-story mixed use development located on Broadway and 45th Street in Times Square, New York City. The building totals approximately 1,100,000 square feet and consists of 900,000 net rentable square feet, including a 150,000 square foot multi-level retail space which houses a Loews multiplex theatre and a 50,000 square foot below-grade parking garage.

(vii)  The Boulevard.  The Boulevard is a 36-story luxury condominium building located at Second Avenue and 85th Street in New York City.  The building totals approximately 220,000 square feet and consists of 200 residential units, retail space and a parking garage.

(vi)  Cityspire.  Cityspire is a 72-story mixed-use skyscraper located on 56th Street between Sixth and Seventh Avenues in New York City.  The building totals over 850,000 square feet and consists of 340 residential units, a health club, 24 floors of office and retail space, and a two-level parking garage.

(vii)  The America.  The America is a 36-story luxury condominium building located at Second Avenue and 85th Street in New York City. The building totals approximately 220,000 square feet and consists of 200 residential units, retail space and a parking garage.

(viii)  The Royale.  The Royale is a 42-story luxury condominium building located at Third Avenue between 63rd and 64th Streets in New York City.  The building totals approximately 250,000 square feet and consists of 205 residential units and 25,000 square feet of retail space, including an underground supermarket and a 17,000 square foot parking garage.

34

(ix)    The Kingsley.  The Kingsley is a 40-story luxury condominium building located at First Avenue and 70th Street in New York City. The 216,000 square foot building consists of 210 residential units, retail space and a parking garage.

(c)    The Continuum Company, LLC Development Team

(i)    Ian Bruce Eichner.  Mr. Eichner, a seasoned developer of urban mixed-use properties, has a proven track record in real estate spanning more than three decades. Mr. Eichner's acute business sense has produced a series of visionary real estate developments that have been characterized by a creative mix of distinctive purpose-built properties. Each of these properties illustrates his extensive real estate expertise and ability to take situations which others may find unachievable and off-putting, and design and execute solutions that realize value for the developer. Mr. Eichner's successful career in real estate follows almost a decade in the criminal justice system, including terms as an assistant District Attorney and program development chief of a gubernatorial agency during Nelson Rockefeller's tenure.

(ii)    Scott Aaron.  Since 1996, Scott has been involved with and directed the development of over $450 million worth of residential rental, condominium and hospitality projects in New York and Miami. His brief departure from Continuum from 2006 to 2009 was highlighted by his development of 100 West 18th Street, Chelsea's most successful boutique residential development. Mr. Aaron has since returned as Chief Acquisitions and Development Officer of Continuum. He is responsible for the firm's strategic oversight of acquisitions and development. In 2009, Mr. Aaron was named as one of New York's "Developers on the Rise" by Globe Street Magazine.

(iii)    Michael Merola.  Michael Merola joined Continuum in 2010 as General Counsel. With more than a decade of legal experience at major Manhattan law firms including Weil Gotshal & Manges and Cahill Gordon & Reindel, Mr. Merola has structured, negotiated and managed a variety of acquisition and finance transactions for major financial institutions and public and private companies. Additionally, he has served as the outside general counsel to companies from their nascent stages through their development into more mature companies. In this capacity, he has become intimately engaged in the business affairs of these companies and provided counsel on an array of legal and operational matters. Most recently, Mr. Merola served in a business capacity in the institutional wealth management group of a major financial institution. Mr. Merola holds a Juris Doctor with honors from Harvard Law School and a Bachelor's degree from Franklin & Marshall College.

(iv)    Seth Goldman.  Seth Goldman joined Continuum in 2004 and is currently the Development Director. With over 10 years of experience completing over $200 million in hospitality, residential condominium, student housing, commercial retail and parking garage development projects, Mr. Goldman is valued for his wide range of expertise and proven track record in the field. Over the course of his career, Mr. Goldman has been involved in all aspects of the development process including analysis, acquisition, planning, approval, implementation, delivery, and management. Mr.

35

Goldman holds a Master's Degree in Real Estate Finance from New York University and a Bachelor's of Arts Degree from Ithaca College.

(v)     Leslie Eichner.    Leslie is a seasoned real estate professional specializing in design and marketing.  She has served as both President of The Manhattan Club and Chief Creative Officer for the Cosmopolitan Resort in Las Vegas.  With a professional career focused on real estate product design and development as well as sales and marketing, Mrs. Eichner is a critical part of the team that shapes each Continuum development.  Mrs. Eichner's career has spanned three decades with both corporate and entrepreneurial experiences.  Prior to her work in real estate, she headed a consulting practice which specialized in creative problem solving and the design of strategic sales and marketing initiatives for financial institutions and small business owners.  Her 30-year career also includes 17 years as an executive at a major financial institution.

(vi)     Jenna Mitchell.  Jenna Mitchell joined Continuum in 2009.  She is responsible for asset management and market analysis.  Prior to joining The Continuum Company, Jenna was a Project Manager at Ferzan, Robbins and Associates in Manhattan. In this capacity, she was responsible for overseeing commercial interior build-outs for Fortune 500 clients that ranged in size from 10,000 to 100,000 square feet with transaction costs ranging from $1,000,000 to $15,000,000.  Jenna holds a Masters of Science in Real Estate Development from Columbia University and a Bachelor of Science in Urban and Regional Planning from Cornell University.

3.     Capitalization of Reorganized Debtor

As set forth in, and pursuant to the terms and conditions of the Joint Plan Funding Commitment Letter, Sponsor will provide approximately $40 million of equity capital for the Reorganized Debtor. On the Effective Date, the Sponsor shall receive 100% of the membership interests in the Reorganized Debtor.

The equity capital provided by Sponsor to the Reorganized Debtor pursuant to the terms and conditions of the Joint Plan Funding Commitment Letter will be used by the Reorganized Debtor to fund on the Effective Date:

(a)     payment of the Debtor in Possession Financing;

(b)     payments to be made on account of Claims that are unclassified under the Joint Plan;

(c)     payments to be made to Holders of Allowed Claims in Classes 2A-2D;

(d)     payments of Cure Amounts under the executory contracts and unexpired leases to be assumed and assigned under the Joint Plan; and

(e)     the Expense Reimbursement.

36

In addition, on the Effective Date the Reorganized Debtor will:

    (a)    assume the Restructured iStar Debt and execute the Restated iStar Loan Documents in substantial conformity with the terms and conditions described in **Exhibit 1** to the Joint Plan;

    (b)    assume the Net Waterfall Proceeds Plan Obligation; and

    (c)    execute the Development Agreement.

The Reorganized Debtor shall make payments on account of the Net Waterfall Proceeds Plan Obligation as Net Waterfall Proceeds are received but no more frequently than twice in any twelve (12) month period. For purposes of calculating the Net Waterfall Proceeds at any date of Distribution, the ordinary course operating expenses of the Reorganized Debtor that have been paid to such date and not paid from the proceeds of the Equity Funding Commitment shall be taken into account (without duplication) in such calculation and the costs for the allowance/disallowance of Claims in Classes 5A-5D and 7A-7D and distributing the payments from the Net Waterfall Proceeds that have been paid to date shall be taken into account (without duplication) in such calculation.

From and after the Effective Date, the equity capital provided to Reorganized Debtor pursuant to the terms and conditions of the Joint Plan Funding Commitment Letter will be used by the Reorganized Debtor to pay for working capital expenses and to pay the cost of development of the Property and the marketing and sale of the Units.

### 4. The Expense Reimbursement

The Reorganized Debtor will reimburse the Sponsor Creditors and the Sponsor for their fees and expenses incurred in connection with the transaction contemplated by the Joint Plan ("Expense Reimbursement"), which fees and expenses shall be included in the approved used of funds under the Equity Funding Commitment

### 5. Additional Transactions Authorized Under the Joint Plan

On the Effective Date, the Reorganized Debtor will enter into a consulting agreement with IJS Management, LLC to provide services (to be delineated in a consulting agreement to be executed on the Effective Date) as requested from time to time by Sponsor during the period from the Effective Date through entry into contracts for seventy-five percent (75%) of the Units that are being developed as part of the Project and in consideration for which IJS Management, LLC will be paid ten-thousand dollars ($10,000) per month during the term of such agreement, subject to the terms and conditions contained therein. The IJS Consulting Agreement will replace a similar consulting arrangement between the Debtors and IJS Management, LLC providing for the same ten-thousand dollars ($10,000) per month payment to the consultant that is being entered into effective on the Conversion Date.

In accordance with the provisions of the Joint Plan and the Confirmation Order, on or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be

37