# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FKF MADISON PARK GROUP OWNER, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-11867 (KG)<br><br>Jointly Administered<br><br>**Hearing Date: February 8, 2011 at 2:00 p.m. (ET)**<br>**Obj. Deadline: February 1, 2011 at 4:00 p.m. (ET)** |

## NOTICE OF MOTION

On January 25, 2011, creditors Stephen Kraus, Mitchell Kraus, Barbara Kraus, Kraus Hi-Tech Home Automation, Inc. and Mad 52, LLC (the "Moving Creditors") filed the attached Motion of Certain Petitioning Creditors for Order: (I) Directing the Appointment of a Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1)-(2); or (II) in the Alternative, Terminating the Debtors' Exclusive Rights Pursuant to 11 U.S.C. § 1121(d) to Allow the Filing of Competing Plans of Reorganization by Green Bridge Capital S.A. and Special Situation S.A., and New One Madison Park Member I, LLC (the "Motion").

You are required to respond by filing a response, if any, to the Motion on or before **February 1, 2011 at 4:00 p.m.**

At the same time, you must serve a copy of the response upon counsel to the Moving Creditors:

Mary F. Caloway, Esq.
Buchanan Ingersoll & Rooney PC
1105 North Market Street, Suite 1900
Wilmington, DE 19801

A HEARING ON THE MOTION WILL BE HELD ON **FEBRUARY 8, 2011, AT 2:00 P.M.**

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY APPROVE THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Date: January 25, 2011

/s/ Mary F. Caloway
Mary F. Caloway (No. 3059)

*Counsel to the Moving Creditors*

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6651); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) (4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FKF MADISON PARK GROUP OWNER, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-11867 (KG)<br><br>Jointly Administered<br><br>**Hearing Date: February 8, 2011 at 2:00 p.m. (ET)**<br>**Obj. Deadline: February 1, 2011 at 4:00 p.m. (ET)** |

**MOTION OF CERTAIN PETITIONING CREDITORS FOR ORDER: (I) DIRECTING THE APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. §§ 1104(a)(1)-(2); OR (II) IN THE ALTERNATIVE, TERMINATING THE DEBTORS' EXCLUSIVE RIGHTS PURSUANT TO 11 U.S.C. § 1121(d) TO ALLOW THE FILING OF COMPETING PLANS OF REORGANIZATION BY GREEN BRIDGE CAPITAL S.A. AND SPECIAL SITUATION S.A., AND NEW ONE MADISON PARK MEMBER I, LLC**

Creditors Stephen Kraus, Mitchell Kraus, Barbara Kraus, Kraus Hi-Tech Home Automation, Inc. and Mad 52, LLC (the "Moving Creditors") by and through their undersigned counsel, hereby file this motion (the "Motion") for an order (1) pursuant to 11 U.S.C. § 1104(a) directing the appointment of a trustee to be in possession, and to manage the affairs and operations, of the Debtors' estates in place of the Debtors; or, in the alternative (2) pursuant to 11 U.S.C. § 1121(d) terminating the Debtors' exclusive rights under 11 U.S.C. § 1121 to allow the filing of competing plans of reorganization by Green Bridge Capital S.A. and Special Situation S.A. (collectively, "Plaintiffs") and New One Madison Park Member I, LLC ("Madison Park Member"). In support of this Motion, the Moving Creditors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6651); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) (4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

## PRELIMINARY STATEMENT

These cases have been pending before this Court since June 2010 when involuntary petitions for relief under chapter 7 of title 11 of title 11, United States Code §§ 101-1532 (the "Bankruptcy Code") were filed against the Debtors by Stephen Kraus, Mitchell Kraus, Barbara Kraus and Kraus Hi-Tech Home Automation, Inc. (collectively, the "Original Petitioning Creditors"). The involuntary petitions halted an impending foreclosure by the Debtors' secured lender iStar Tara, LLC ("iStar") that would almost certainly have precluded any recovery by creditors. As expected, in November 2010, iStar ultimately moved for relief from stay to complete its State Court Foreclosure Proceeding, as defined below, with a response date of November 18, 2010 and a hearing date on December 2, 2010.

The landscape of these cases and the fortunes of creditors shifted dramatically on November 19, 2010, when the Court entered orders for relief and converted the chapter 7 cases to cases under chapter 11 of the Bankruptcy Code following the Debtors' withdrawal of their opposition to the involuntary petitions and Original Petitioning Creditors' filing of a motion for conversion. The Debtors' and Original Petitioning Creditors' actions were taken in furtherance of a Plan Support Agreement dated November 18, 2010, among the Debtors, Mr. Ira Shapiro ("Mr. Shapiro"), Stephen Kraus, Mitchell Kraus and Mad 52, LLC ("Mad 52," together with Stephen Kraus and Mitchell Kraus, the "Sponsor Creditors") and Madison Park Member.[2] Most significantly, conversion put an end to the litigation over the involuntary petitions. With the Plan Support Agreement, the Debtors had a counterweight to iStar's *Motion of iStar Tara LLC for Relief from the Automatic Stay to Foreclose on Mortgaged Property* [D.I. 105] (the "Relief From Stay Motion"), creating, for the first time, the possibility that creditors other than iStar might

[2] The Plan Support Agreement is attached as Exhibit B to the *Emergency Motion for Immediate Entry of Orders for Relief and Conversion of Cases from Chapter 7 to Chapter 11* [D.I. 114].

obtain a recovery. Indeed, even the Plaintiffs' principal, Mr. Caner, acknowledged that the conversion to chapter 11 and the focus on a reorganization plan were unequivocally positive steps.[3]

In particular, the *Joint Plan Of Reorganization For FKF Madison Park Group Owner, LLC And Its Affiliated Debtors* [D.I. 160] (the "Madison Park Member Plan") provides for: (i) new equity funding for developing the Debtors' Property (as described below); (ii) satisfaction from sales of units within the Property of the allowed secured claim of iStar in an amount equal to the value of the Property; (iii) an immediate cash payment to holders of allowed mechanic's lien claims; (iv) payment in full of unpaid administrative expenses and certain priority claims on the effective date of such plan; and (v) a potential recovery to holders of allowed general unsecured claims.

Mr. Caner has testified that Plaintiffs will soon be in a position to file their own plan of reorganization (the "Green Bridge Plan"), with the support of HFZ Capital Group ("HFZ").[4] However, the terms of the Green Bridge Plan have not yet been disclosed.

The prosecution of the Madison Park Member Plan has come to a standstill as a result of Plaintiffs' challenges to Mr. Shapiro's authority to act on behalf of the Debtors. Rather than these cases being fully-financed and on the path of solicitation and confirmation of a plan under the management of an independent Chief Restructuring Officer, the Debtors are mired in a bitter dispute and ensuing trial on the issue of who has the authority to manage and control their affairs.

---

[3] Transcript of Hearing on January 11, 2011 ("January 11th Trial Transcript"), 17:7-9 ("I am not of the opinion that the Chapter 11 thing was a mistake. I think it was a good thing to do."), attached hereto as Exhibit A.

[4] January 11th Trial Transcript, 44:1-15, attached hereto as Exhibit B.

Regardless of which faction is legally entitled to control the Debtors, the Debtors' fiduciary duties as debtors in possession remain the same—to maximize the value of these estates for the benefit of creditors. Here, the fiduciary duty of the Debtors to, and interests of, creditors is paramount given that the Debtors are undisputedly insolvent. By way the *Joinder of Ira Shapiro in Debtors' Motion for the Appointment of a Chapter 11 Trustee or to Terminate Exclusivity* [D.I. 218] (the "Shapiro Trustee Joinder"), Mr. Shapiro has acknowledged the paramount interests of creditors. True to form, Plaintiffs have continued to ignore the interests of the Debtors' creditors and remain singularly focused on obtaining control of the Debtors and securing exclusivity by way of their lawsuit against Mr. Shapiro.

The ongoing authority dispute does not serve the interests of all creditors as the dispute has delayed the confirmation process. The beneficiary of the disputes between Plaintiffs and Mr. Shapiro is iStar, whose relief from stay motion threatens to signal the death knell for any potential reorganization. Notwithstanding, iStar complains that it is prejudiced by delay and the absence of adequate protection. See *Supplement to Motion for Relief from the Automatic Stay to Foreclose on Mortgaged Property and Request to Make Additional Protective Advances to be Granted Administrative Expense Priority* [D.I. 191] (the "Relief from Stay Supplement"), pp. 5. The only manner of safeguarding the interests of creditors is by permitting the proposed competing plans to move forward. Indeed, the interests of all stakeholders are best served by the progression of these cases towards confirmation without further delay.

"Cause" exists to appoint a Chapter 11 Trustee for several reasons. First, one of the warring factions in these cases, Mr. Shapiro, has joined in the *Debtors' Motion for the Appointment of a Chapter 11 Trustee or to Terminate Exclusivity* [D.I. 212] (the "Debtors' Trustee Motion") voicing his support for the appointment of an independent fiduciary. Second,

there are cross-allegations of dishonesty, incompetence, gross mismanagement and breach of fiduciary duty by Mr. Shapiro and Plaintiffs that, standing alone, provide ample "cause" to appoint a Chapter 11 Trustee. Third, Plaintiffs' blatant disregard of their fiduciary duties and their inveterate profiteering at the expense of the Debtors and their creditors are historical facts. Plaintiffs' behavior in the context of these cases has been no different. Plaintiffs advocated dismissal of these cases in the face of iStar's foreclosure, had no plan for conversion of these cases to Chapter 11 and failed to contest iStar's motion relief from stay. Plaintiffs' interest in the Debtors was not renewed by the Debtors' plight but by the prospect of pecuniary gain through exclusivity. Finally, appointment of a Chapter 11 Trustee is in the best interests of the Debtors' estates and creditors.

The appointment of a Chapter 11 Trustee will catalyze reorganization efforts, quell the authority dispute and therefore serve the best interest of all parties. Accordingly, the Moving Creditors submit that the Court can and must appoint a Chapter 11 Trustee over the Debtors under either Section 1104(a)(1) or Section 1104(a)(2) of the Bankruptcy Code. A Chapter 11 Trustee can serve as a neutral arbiter as to which plan and reorganization strategy is in the best interests of the estates.

If the Court is not inclined to appoint a Chapter 11 Trustee, Moving Creditors submit that the Court should terminate exclusivity to allow for a competing plan process whereby the Madison Park Member Plan and the Green Bridge Plan can be prosecuted immediately. Like the appointment of a Chapter 11 Trustee, terminating exclusivity will allow these cases to move toward a double-track confirmation process. As discussed herein, the very same factors warranting the appointment of a Chapter 11 Trustee also constitute "cause" to terminate the Debtors' exclusivity.

## I. BACKGROUND

### A. The Debtors And The Property

1. The Debtors are the tenant in common owners of the land, the improvements, the unsold units which have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of a fifty (50) story hi rise tower containing sixty nine (69) residential units with approximately 117,982 net sellable square feet remaining with respect to fifty-seven (57) residential units, and amenities, and limited common elements, as well as an adjacent lot known as 23 East 22nd (the "Property").

### B. The Foreclosure Proceeding And The Involuntary Chapter 7 Cases

2. iStar is the holder of various mortgages encumbering the Property, or units thereof, which secure certain obligations to iStar in the approximate alleged amount of $234 million (the "Existing iStar Indebtedness").

3. On February 18, 2010, iStar commenced a foreclosure proceeding against the Debtors in the Supreme Court of the State of New York, County of New York (the "State Court") styled as iStar Tara LLC v. FKF Madison Group Owner LLC, et al., No. 600423/2010 (the "Foreclosure Proceeding") asserting, *inter alia*, that the Debtors had committed numerous defaults under the Loan Documents. Subsequently, upon application of iStar, on May 7, 2010, the State Court entered an order appointing a receiver over the Property during the pendency of the Foreclosure Proceeding and vesting the receiver with full possession and control of the Property as against any other person or entity.

### C. The Involuntary Petitions

4. On June 8, 2010 (the "Petition Date"), the Original Petitioning Creditors filed involuntary chapter 7 petitions against each of the Debtors thereby commencing involuntary

chapter 7 cases (the "Chapter 7 Cases") and staying the State Court Foreclosure Proceeding. The involuntary petitions were later joined by creditors Joe Coffey, Harvey Schiller, Pace Plumbing, Gotham Greenwich Construction Co., LLC, and Mad 52 (collectively with the Original Petitioning Creditors, the "Petitioning Creditors"). Original Petitioning Creditors' purpose for filing the involuntary petitions against the Debtors was twofold: (i) to preserve potential preference actions against iStar and the Debtors' affiliate entity FKF3, LLC and (ii) to stay the State Court Foreclosure Proceeding.

5. On June 29, 2010, the Debtors filed a motion to dismiss the involuntary petitions [D.I. 23] (the "Dismissal Motion"). On November 18, 2010, the Debtors filed the *Debtors' Withdrawal of Motion to Dismiss Involuntary Petitions, Notice of Non-Opposition to Entry of Order for Relief, and Joinder in Motion to Convert Cases to Chapter 11 Cases* [D.I. 113] (the "Notice of Withdrawal"), effectively withdrawing the Dismissal Motion.

**D. iStar's Protective Advances And Relief From Stay Motion**

6. Following the commencement of the involuntary Chapter 7 Cases in June 2010 through October 2010, iStar sought and obtained authority from the Court to make a series of protective advances to the Receiver on behalf of the Debtors in order to fund critical operating and maintenance expenses for the Property and such protective advances were secured by replacement liens. [D.I. 26, 38, 88, 98] (the "Protective Advance Orders"). Following the conversion of these cases to chapter 11, iStar has continued to make protective advances under the auspices of the Protective Advance Orders, and has obtained authority to make a limited interim advance to the Debtors as an allowed administrative claim to fund certain expenses for December and the first two weeks of January 2011. [D.I. 207].

7. On November 3, 2010, iStar filed its Relief from Stay Motion seeking relief from the automatic stay to continue the Foreclosure Proceeding with respect to the Property and to

obtain and enforce a judgment of foreclosure and sale with respect to the Property. iStar asserted two bases in support of stay relief. First, it asserted that the stay should be modified due to a lack of adequate protection in that the Debtors lack the funds necessary to preserve and maintain the Property. Second, it asserted that the Property was not necessary to an effective reorganization because the Debtors' cases were chapter 7 cases. In the Relief from Stay Supplement, iStar again asserts that it "is entitled to relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code, for cause, resulting from the failure of the Debtors to adequately protect iStar's interests in the Mortgaged Property." Relief from Stay Supplement, ¶13. The initial hearing on the Relief from Stay Motion was scheduled for December 2, 2010 but was continued by stipulation of the parties as discussed below, and is currently trailing the authority trial.

### E. The Plan Support Agreement, Conversion Of The Cases To Chapter 11 And The Debtors' Initial Reorganization Efforts

8. After extensive negotiations between the Debtors, Mr. Shapiro, the Sponsor Creditors and Madison Park Member, the parties entered into the Plan Support Agreement on November 18, 2010 which outlined the terms of a joint plan of reorganization for the Debtors providing, among other things:

- Revesting of the Debtors' assets and property in a Reorganized Debtor, 100% of the equity of which Reorganized Debtor will be owned by a newly formed entity owned by Madison Park Member.
- The provision for funding the Madison Park Member Plan through an equity infusion into Reorganized Debtor.
- Payment in full in cash on the effective date of the Madison Park Member Plan of all administrative expenses and provisions for payment of other priority claims.
- Cash payments to the holders of allowed mechanic's lien claimants.
- Establishment of a payment obligation from the Reorganized Debtor to the estates which will fund payments on account of the allowed claims of general unsecured creditors.

- Amendment and restructuring of the Debtors' obligations to iStar.
- Entry by the Reorganized Debtor into a consulting agreement with IJS Management, LLC ("IJS") requiring IJS to provide historical information and other services as requested by Madison Park Member in such consulting agreement.

In conjunction with the Plan Support Agreement, the Debtors also secured a commitment for debtor-in-possession financing (the "DIP Loan") from Madison Park Member to fund the Debtors' chapter 11 cases through confirmation of the Madison Park Member Plan.

9. In tandem with the Notice of Withdrawal, on November 18, 2010, the Original Petitioning Creditors filed their *Emergency Motion for Immediate Entry of Orders for Relief and Conversion of Cases from Chapter 7 to Chapter 11* [D.I. 114].

10. On November 18, 2010, the Original Petitioning Creditors also filed their *Objection to Motion of iStar Tara LLC for Relief from the Automatic Stay* [D.I. 115] (the "Stay Objection"), to which the Debtors joined through the *Debtors' Joinder in Petitioning Creditors' Objection to Motion of iStar Tara LLC for Relief from the Automatic Stay* [D.I. 116]. The focal points of the Stay Objection were that: (i) the DIP Loan that the Debtors had secured would provide for payment of the critical operating expenses at the Property thus preventing any decline in the value of iStar's collateral; and (ii) that the conversion of the Debtors' cases to chapter 11 and the Madison Park Member Plan entirely negated iStar's second argument for relief from stay under the Bankruptcy Code.

11. On November 19, 2010, the Court entered orders for relief in the Debtors' chapter 7 cases [D.I. 119] and entered orders converting the chapter 7 cases to chapter 11 cases. [D.I. 118].

12. On December 10, 2010, the Debtors began implementing their chapter 11 reorganization efforts by filing two motions. The Debtors filed a motion for approval of the DIP

Loan whereby the Debtors sought authority to borrow up to an aggregate principal of $1,000,000 from Madison Park Member [D.I. 145] (the "DIP Motion"). The Debtors also filed a motion seeking (i) the appointment of a Chief Restructuring Officer for the Debtors,[5] and (ii) requiring the Receiver to turnover all property of the estate in accordance with Bankruptcy Code section 543(b)(1) [D.I. 146] (the "Receiver/CRO Motion").[6] The hearings on the DIP Motion and Receiver/CRO Motion were scheduled for December 16, 2010.

13. On December 15, 2010, the Debtors filed the Madison Park Member Plan [D.I. 160] and the Disclosure Statement related thereto [D.I. 159].

**F. The Plaintiffs' Complaint, The TRO Motion And The Trial**

14. On the eve of the December 16, 2010 hearings on the DIP Motion and Receiver/CRO Motion, Plaintiffs filed their Verified Complaint for Declaratory Judgment and Injunctive Relief against Mr. Shapiro [Adv. Pro. D.I. 1] (the "Complaint") and their Motion for Temporary Restraining Order and Preliminary Injunction [Adv. Pro. D.I. 5] (the "TRO Motion") thus commencing the adversary proceeding styled as Green Bridge Capital S.A., et al. v. Shapiro, Adv. Pro. No. 10-11867 (KG).[7] By way of the Complaint, the Plaintiffs essentially seek a declaration of rights that (i) they have voting control of Slazer Enterprises, LLC ("Slazer Enterprises") (the sole member of debtor Slazer Enterprises Owner, LLC and the manager of each of the other Debtors), and (ii) Mr. Shapiro had no authority to file the Madison Park Member Plan, seek approval of the DIP Loan or seek appointment of a Chief Restructuring Officer on behalf of the Debtors. Through the TRO Motion, Plaintiffs sought to enjoin Mr.

[5] The appointment of a Chief Restructuring Officer was a condition of the DIP Loan and a part of the adequate protection to be provided to iStar in connection therewith. See Receiver/CRO Motion, p. 3.

[6] Objections to the DIP Motion and Receiver/CRO Motion were filed by iStar, Plaintiffs and Bovis Lend Lease LMB, Inc. [D.I. 155, 156, 157, and 158].

[7] References to the docket of the Adversary Proceeding shall take the form of [Adv. Pro. D.I. ___].

Shapiro from taking any other action on behalf of the Debtors, including the filing of any pleadings in these cases pending a determination of the Complaint. See TRO Motion, p. 1.

15. In light of Plaintiffs' challenge to Mr. Shapiro's authority at the December 16, 2010 hearings on the DIP Motion and Receiver/CRO Motion, the Court continued such hearings pending an evidentiary trial on the merits of TRO Motion. See Minutes of 12/16/10 Hearing [D.I. 163]

16. Following a series of discovery disputes between the Debtors and Plaintiffs over depositions of witnesses, and a snowstorm the week of December 30, 2010, the trial on the TRO Motion was continued to January 10, 2011. The first two days of the trial were devoted exclusively to the examination and cross-examination of Mr. Caner, the Plaintiffs' Chief Executive Officer and Managing Director. Among other things, Mr. Caner testified that Plaintiffs will file their own plan of reorganization within days of having their authority over the Debtors confirmed. The trial on the TRO Motion resumed on January 20, 21, and 24, 2011. As of the filing of this Motion, the Court has not issued a ruling in connection with the TRO Motion.[8]

17. Against this backdrop, iStar's Relief from Stay Motion remains pending and a potential foreclosure threatens to deprive creditors of any recovery on their claims.[9]

---

[8] The Court's ultimate ruling on the TRO Motion should not have any bearing on the relief sought herein.

[9] Undeniably, the authority dispute has inhered to iStar's advantage as the approval of debtor-in-possession financing necessary to fund the estates through a confirmation process must await the outcome of the trial. In the interim, iStar has sought and obtained authority to make further protective advances on an administrative claim basis. See *Order Authorizing iStar Tara LLC to Extend Protective Advances on Behalf of Debtors and Granting Administrative Priority for Such Protective Advances* [D.I. 207], *Order [SECOND] Authorizing iStar Tara LLC to Extend Protective Advances on Behalf of Debtors and Granting Administrative Priority for Such Protective Advances* [D.I. 216].

### G. The Debtors' Motion For The Appointment Of A Chapter 11 Trustee

18. On January 20, 2011, the Debtors filed the Debtors' Trustee Motion for which a hearing is set for February 8, 2011. Mr. Shapiro filed the Shapiro Trustee Joinder on January 24, 2011. The Debtors' Trustee Motion seeks similar relief sought herein and states that the appointment of a Chapter 11 Trustee will "end the wasteful battle for control of the out-of-the-money equity in Slazer Enterprises LLC, and hence for control of the equally underwater equity in the Debtors" and "terminate the Debtors' exclusivity, thus enabling Green Bridge, Madison Park Member and any other plan proponent to propose their plans and the plan confirmation process at long last can begin." Debtors' Trustee Motion, p. 6.

### H. Committee Formation

19. The U.S. Trustee conducted a meeting on January 12, 2010 to form an official committee of unsecured creditors (the "Committee") in these cases. On January 20, 2011, the U.S. Trustee formed the Committee. The members of the Committee are: The Wills Group Family Limited Partnership, Mr. Uri Sasson and Mr. Larry Adler.

## II. RELIEF REQUESTED

### A. The Court Should Appoint A Chapter 11 Trustee

20. This is the paradigm case for the appointment of a Chapter 11 Trustee. The authority to act on behalf of the Debtors is the subject of an untried complaint seeking declaratory relief as to which members of Slazer Enterprises, LLC have authority to act for Slazer Enterprises, LLC—a non debtor—and a pending TRO Motion seeking simply to enjoin Mr. Shapiro from taking unilateral action. Mr. Shapiro has filed a joinder to the Debtors' Trustee Motion thus advocating the appointment of a Chapter 11 Trustee. Despite having disregarded their fiduciary duties to the Debtor in the past and having irreconcilable conflicts of interest, Plaintiffs maintain a myopic focus on obtaining control of the Debtors with the aim of

exclusivity and pecuniary gain. Appointment of a Chapter 11 Trustee would effectively moot the dispute over authority and install an independent fiduciary that can shepherd these cases through a competitive plan process that will best serve the estates and their constituents.

**1. Legal Standards Governing Appointment Of A Chapter 11 Trustee.**

21. Section 1104 of the Bankruptcy Code sets forth the grounds for the appointment of a trustee. Section 1104(a)(1) provides for the mandatory appointment of a trustee when "cause" exists. See 11 U.S.C. § 1104(a)(1). Section 1104(a)(2) affords a court discretion to appoint a trustee in the absence of cause where such appointment is in the best interests of the parties. See 11 U.S.C. § 1104(a)(2).

**2. The "Cause" Required To Appoint A Chapter 11 Trustee Is Broad And Intended To Serve The Interest Of Creditors.**

22. Section 1104(a)(1) of the Bankruptcy Code provides, in pertinent part, as follows:

> The court shall order the appointment of a trustee: (1) for cause, **including** fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

See 11 U.S.C. § 1104(a)(1) (emphasis added). The use of the term "including" in section 1104(a)(1) means that fraud, dishonesty, incompetence, or gross mismanagement are not exclusive grounds for cause. 11 U.S.C. § 102(3). Other grounds may constitute cause based upon the facts of the particular case. See, e.g., In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989) (affirming bankruptcy court appointment of a trustee on the basis of gross mismanagement); In re X10 Wireless Tech., Inc., 2004 WL 3131910 (Bankr. W.D. Wash. Nov. 10, 2004) (ruling that debtor's established dishonesty in producing falsified documents in a state court proceeding mandated appointment of a Trustee); In re Warwick Park, Inc., 100 B.R. 179, 180 (Bankr. D. Del. 1989) (debtor's majority shareholder lacked understanding and experience

to operate business; her failure to seek outside assistance reflected incompetence and gross mismanagement); see also In re Marvel Entm't Group, Inc., 140 F.3d 463, 473 (3d Cir. 1998) (rejecting a per se rule that necessitates the appointment of a chapter 7 trustee in favor of a case-by-case analysis).[10]

23. Once a court finds that "cause" exists, a trustee shall be appointed; there is no discretion to deny relief. See In re V. Savino Oil & heating Co., Inc., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989); In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).

### 3. Mr. Shapiro Is In Favor Of Appointment Of A Chapter 11 Trustee And The Cross-Allegations Between Mr. Shapiro And Plaintiffs Alone Provide "Cause" For Appointment Of A Chapter 11 Trustee.

24. As noted above, Mr. Shapiro filed a joinder to the Debtors' Trustee Motion and is in favor of the appointment of a Chapter 11 Trustee.

25. Significantly, prepetition conduct, which comprises much of the allegations between the parties, alone is sufficient to warrant the appointment of a trustee. See 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case") (emphasis added); In re Rivermeadows Assoc., Ltd., 185 B.R. 615, 619 (Bankr. D. Wyo. 1995); see also In re V. Savino Oil, 99 B.R. at 526 ("[t]his prepetition course of conduct, in and of itself, constitutes 'cause' for the appointment of a chapter 11 trustee.")

---

[10] Courts have historically required cause to be established by "clear and convincing evidence." However, recent authority, citing the Supreme Court's 1991 decision in Grogan v. Garner, 498 U.S. 279, 286-91 (1991) establishes a "preponderance of the evidence" as the general level of proof required in bankruptcy cases. See Tradex Corp. v. Morse, 339 B.R. 823, 831-32 (D. Mass. 2006) (rejecting clear and convincing evidentiary standard in context of a motion to appoint a trustee in favor of following the Grogan rationale that a heightened standard of review should not be applied when "Congress has not explicitly adopted a standard different from the traditional preponderance standard"); see also In re Altman, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999) (same), vacated in part on other grounds, 254 B.R. 509 (D. Conn. 2000). The distinction here is immaterial since the evidence presented satisfies the higher standard. See, e.g., Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC), 2004 Bankr. LEXIS 1113, at *6-*7 (Bankr. N.D. Ga. Apr. 28, 2004).

26. In addition, a party seeking appointment of a trustee need not, and should not, delay filing a motion for such relief until after the debtor has had an opportunity to prove its suitability (or lack thereof) as a debtor in possession. See In re Colorado-Ute Electric Ass'n, Inc., 120 B.R. 164, 175 (Bankr. D. Colo. 1990) ("if the facts and circumstances warrant the appointment of a trustee, it is not appropriate to wait to file the motion . . . . Such a deferral will only further delay the progress toward the effective rehabilitation and reorganization of the debtor."); see also 11. U.S.C. §1104(e) (requiring the U.S. Trustee to move for appointment of a trustee under subsection (a) of Section 1104 if "there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer . . . participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor [.]"). Thus this Court should not wait until these cross-allegations are fully tried and determined before appointing a Chapter 11 Trustee.

27. Plaintiffs have alleged gross prepetition mismanagement, non-disclosure and dishonesty by Mr. Shapiro. See *Plaintiffs' Pretrial Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction* (the "GB Pretrial Brief") [Adv. Pro. D.I. 51] at pp. 11-13. In turn, the Debtors have made numerous allegations that Plaintiffs acted in dereliction of their fiduciary duties of care and loyalty to the Debtors and their creditors. See *Debtors' Brief in Opposition to Motion of Plaintiffs Capital S.A. and Special Situations S.A. for Temporary Restraining Order and Preliminary Injunction* [Adv. Pro. D.I. 53] ("Debtors' Trial Brief"), pp. 23-24 and 29-33. Leaving aside the merits of the cross-allegations, such allegations themselves are precisely the type that courts have readily relied upon in appointing a Chapter 11 Trustee. See supra ¶23.

**4. Plaintiffs Have Demonstrated That They Cannot Act As Fiduciaries To Creditors And Are Beset By Irreconcilable Conflicts Of Interest.**

28. Given Mr. Shapiro's support for the appointment of a Chapter 11 Trustee, the focus of the inquiry into "cause" under section 1104(a)(1) must be on Plaintiffs' ability to carry out the fiduciary duties of debtors in possession. An example of "cause" that will justify the appointment of a trustee is where a debtor cannot fulfill its fiduciary responsibilities. Courts will permit a debtor to remain a debtor in possession only where current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985).

29. The responsibility of Plaintiffs to manage the Debtors as fiduciaries is well established. "A trustee in bankruptcy is the 'representative of the estate.' In a chapter 11 case, the debtor in possession ('DIP') has all the rights and powers and shall perform all the functions and duties of a trustee." In re Microwave Products of America, Inc., 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989) (citing 11 U.S.C. § 1107). Chief among these functions and duties "is that the debtor in possession is a fiduciary to all of its creditors and equity security holders." In re Bellevue Place Assoc., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). "Because the [debtor in possession's] fiduciary obligation is to the estate, and not to one group, the [debtor in possession] must act to benefit the estate as a whole." In re Microwave Products, 102 B.R. at 671. As a fiduciary, the debtor in possession is "proscribed from acting solely in its self interest to the exclusion of the other interests which the debtor in possession has the fiduciary obligation to protect." In re Bellevue Place Assoc., 171 B.R. at 624. Fiduciary obligations include the duty of loyalty and good faith which forbid "directors and other business operators from using their position of trust and control over the rights of other parties to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their

position." In re SunCruz Casinos, LLC, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003) (quoting In re Microwave Products, 102 B.R. at 672). Here, neither Plaintiffs or Mr. Shapiro can be relied upon to act as a fiduciary.

30. Where the debtor in possession cannot act as a fiduciary, appointment of a Chapter 11 Trustee is essential. "The willingness of Congress to leave a debtor in possession is premised on the expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor in possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee." In re Marvel, 140 F.3d at 474 (quoting In re V. Savino Oil, 99 B.R. at 526).

31. When a debtor in possession is incapable of performing its fiduciary duties, or when creditors' confidence evaporates, a Chapter 11 trustee must be appointed. See In re McCorhill Publ'g, Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (Chapter 11 trustee appointed where debtor's directors had conflicting interests in affiliated entities to which transfers were made); In re Marvel, 140 F.3d at 473. "[I]n the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." See In re SunCruz Casinos, 298 B.R. at 828 (quoting In re Intercat, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)); see also In re V. Savino Oil, 99 B.R. at 525-26 ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

32. Numerous courts have found the presence of conflicts of interest sufficient to constitute "cause" for the appointment of a trustee. See, e.g., In re SunCruz Casinos, 298 B.R. at

830 (conflicting interests rendered management unable to fulfill its fiduciary duties as debtor-in-possession); In re Fiesta Homes of Georgia, 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the Debtor-in-possession from administration of this case."); In re Nautilus of New Mexico, Inc., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (where individual who controlled debtor in possession had conflicts with interests of the estate, trustee was warranted); Cajun Elec. Power Coop. v. Central La. Elec. Coop (In re Cajun Elec. Power Coop., Inc.), 74 F.3d 599, 600 (5th Cir. 1995) (adopting on rehearing the dissent in 69 F.3d 746, 751 (5th Cir. 1995)) (recognizing that the "inherent conflict" caused by debtors' (a utility cooperative) board members being managers or members of the debtor's individual utility companies was sufficient by itself for the appointment of a trustee).

33. Here, the evidence is overwhelming that Plaintiffs have shirked their fiduciary duties in the past and are plagued by multiple conflicts of interest that would preclude them from properly carrying out their fiduciary duties to creditors going forward.

**a. Green Bridge Is An Out-Of-The-Money Mezzanine Lender Who Previously Abandoned The Property And Now Attempts To Hijack These Chapter 11 Cases For Pecuniary Gain.**

34. In the face of the Foreclosure Proceeding, Green Bridge and Special Situation deserted the Debtors.[11] Plaintiffs' return to these cases tellingly coincided with the Debtors' entry into the Plan Support Agreement and filing of the DIP Motion and Receiver/CRO Motion. Put another way, Plaintiffs' interest in the Property was renewed when they saw an opportunity to profit from what they had written off as a bad investment by leveraging exclusivity.[12] In this

---

[11] *Transcript of Deposition of Cevdet Caner* (hereinafter, "Caner Depo."), at 350:18-351:20-361:17; *see also* 362:8 ("Q: You didn't file the project in Chapter 11 before the foreclosure was filed. A: We did not do that because of the advice of our lawyers. Q: And you didn't take any action in the bankruptcy - excuse me - in the foreclosure too? A: No, we didn't.")

[12] Caner Depo. at 128:2.

regard, Plaintiffs now purport to have a plan to rival the Madison Park Member Plan under which the Plaintiffs will receive $2 million in post-confirmation "consulting fees."[13]

35. Despite the filing of the Madison Park Member Plan and the Debtors' initial march towards confirmation, a simple fact remains: the Debtors are hopelessly insolvent as the fair market value of the Property is approximately $100 million less than the debt claimed to be owed to iStar.

36. It is axiomatic that when a debtor is insolvent, its principals lack equity in the debtor and are supplanted by creditors as the real parties in interest. See In re Johns-Manville Corp., 801 F.2d 60, 65, n.6 (2d Cir. 1986). Accordingly, the Debtors' creditors—not Green Bridge or Special Situation—are the real parties in interest in these cases and those creditors are best served by the appointment of a Chapter 11 Trustee.

**b. Green Bridge Has Engaged In Self Dealing**

37. In October 2009, Green Bridge required the Debtors to execute promissory notes aggregating $33 million on pre-existing debt of Slazer Enterprises, LLC.[14] The incurrence of this debt was a violation of a covenant contained in the Debtors' loan documentation with iStar that prohibited the incurrence by the Debtors of additional secured debt on the Property.[15] However, Green Bridge concealed this fact from iStar in its presentation on January 21, 2010. See Debtors' Trial Brief, at 22.

38. This was not Plaintiffs' principals' first attempt to obtain security from the Debtors for its loans to Slazer Enterprises, LLC. The loan documents of the initial mezzanine lender to Slazer Enterprises, LLC (and Green Bridge's predecessor in interest) Level One US

[13] Caner Depo. at 283:15–285:20.

[14] *See* Debtors' Trial Exhibits 156, 157, 158, and 159.

[15] See, e.g., Consolidated Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing (Senior Loan), at §5.1(m), annexed as Exhibit C to Relief from Stay Motion, supra.

Properties LLC ("Level One") provided Level One with an option to purchase 35% of the membership interests in Slazer Enterprises, LLC.[16] This is the option that was ultimately assigned to Green Bridge (without written approval by Jacobs and therefore in violation of the subject operating agreement), and upon which Plaintiffs rely in claiming to control Slazer Enterprises, LLC. Section 1.2.4(ii) of the October 20, 2006 Level One Agreement provides that if the "option" is exercised and Level One receives the return of its $15 million investment, plus $14 million of profit, the membership interests revert back to Jacobs and Mr. Shapiro. See Exhibit B to Debtor's Trial Brief at §1.2.2.

39. Indeed, Green Bridge's principals appear to have little compunction about garnering personal benefits from the Debtors as they also obtained favorable terms for acquiring units in the Property.[17] In addition, Plaintiffs' principals attempted to profit from brokerage commissions on the sale of condominium units through an affiliation with one of the brokers associated with the Property.[18]

**c. Green Bridge Is The Target Of A Fraudulent Conveyance Action.**

40. Moreover, Green Bridge is the target of a potential fraudulent conveyance action by the Debtors by virtue of its having obtained a note from the Debtors in October 2009, as discussed above, obligating the Debtors for approximately $33 million in debt they had no obligation to pay, in breach of the iStar loan documents and in violation of the fraudulent conveyance laws.

---

[16] See Exhibits B and C to *Debtors' Brief in Opposition to Motion of Plaintiffs Capital S.A. and Special Situations S.A. for Temporary Restraining Order and Preliminary Injunction* [Adv. Pro. D.I. 53] ("Debtors' Trial Brief"),

[17] Caner Depo. at 219:7-19.

[18] Caner Depo. at 222-223.

**d. Special Situation Obtained And Is Seeking To Use An Illegal Proxy To Exert Control Over The Debtors.**

41. As discussed in greater detail in the Debtors' Trial Brief, the Debtors have alleged that Special Situation obtained a proxy to control Jacobs' interest in Slazer Enterprises, LLC knowing full well that such proxy that violated the plain terms of the subject operating agreement. While that proxy was null and void, Special Situation's conduct further demonstrates that Plaintiffs are unfit to serve as fiduciaries to creditors.

**e. Plaintiffs Have Failed To Take Any Action For The Benefit Of The Debtors' Estates And Their Creditors.**

42. It does not appear to Moving Creditors that Plaintiffs' actions during and prior to these cases were gauged to benefit creditors.

43. First, and most notably, Plaintiffs failed to defend the Foreclosure Action and supported the dismissal of the Debtors' involuntary cases only when asked to do so by Mr. Shapiro. Not surprisingly, when asked at trial why the dismissal of the involuntary cases and the continuation of the iStar Foreclosure Proceeding would be a good result, Mr. Caner was evasive and unable to offer any concrete response other than to express his dissatisfaction with Mr. Shapiro and Moving Creditors.[19] Moreover, Mr. Caner testified that he had never looked into the prospect of converting these cases to chapter 11. Id.

44. Second, as with the Foreclosure Proceeding, Plaintiffs did nothing to oppose iStar's Relief from Stay Motion which, if granted, would put an end to the Debtors' reorganization efforts.

45. Third, Plaintiffs elected to proceed with litigation rather than a motion to terminate exclusivity. If Plaintiffs' only objective was to ensure a competitive plan process, they could have moved to terminate the Debtors' exclusivity rather than engage in protracted

[19] Transcript of January 11, 2011 Hearing at 14:12-25, 15:1-27, 17:1-9.

litigation. The fact that Plaintiffs did not do so and have yet to file their own plan is revealing. As fiduciaries, and with no particular expertise relating to the Property itself, Plaintiffs' only duties are to promote competition and maximize value. Yet, Plaintiffs' only interest in a plan process appears to be one in which Plaintiffs have exclusivity. See id. at fn. 12, supra.

### 5. Appointment Of A Trustee Should Be Ordered Under 11 U.S.C. § 1104(a)(2) Because Such Appointment Is In The Interests Of The Estate And All Other Parties.

46. Section 1104(a)(2) of the Bankruptcy Code provides, in pertinent part, as follows:

> The court shall order the appointment of a trustee:
>
> (2) if such appointment is in the interest of creditors, any equity security holders and other interest of the estate, without regard to the number of holders of the securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(2).

47. Even where no "cause" exists under Section 1104(a)(1) to appoint a Chapter 11 Trustee, Section 1104(a)(2) creates a flexible standard whereby the court shall appoint a trustee when it is in the best interests of the creditors and the estate. See 11 U.S.C. § 1104(a)(2); Sharon Steel Corp., 871 F.2d at 1226; In re Cardinal Indus., Inc., 109 B.R. 755, 767 (Bankr. S.D. Ohio 1990); In re Microwave Products, 102 B.R. at 671-73. In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers . . . [e]quitable remedies are a special blend of what is necessary, what is fair and what is workable." See In re Hotel Assocs., Inc., 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); see also In re Wings Digital Corp., 2005 WL 3789334, at *5 (Bankr. S.D.N.Y. May 16, 2005) (noting that Section 1104(a)(2) is a "lesser standard" than Section 1104(a)(1)). In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers . . . . [e]quitable remedies are a special blend of what is necessary, what is fair and what is workable." See In re Hotel Assocs., 3 B.R. at 345; see also

In re Wings Digital, 2005 WL 3789334, at *5 (noting that Section 1104(a)(2) is a "lesser standard" than Section 1104(a)(1)). In exercising their equitable powers to appoint a trustee under Section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." See In re Hotel Assocs., 3 B.R. at 345.

48. When determining whether the appointment of a trustee is in the best interests of the creditors and the estate, courts consider many factors, including: (i) the trustworthiness of the debtor, In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation, In re Parker Grande Dev., Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); (iii) the confidence—or lack thereof—of the business community and of creditors in present management, In re Concord Coal Corp., 11 B.R. 552, 554 (Bankr. S.D.W.Va. 1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, In re Microwave Products, 102 B.R. at 675; see also In re Sharon Steel Corp., 86 B.R. at 466 (noting that "[i]n a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in . . . management."); In re Madison Management Group, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992); In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

a. **Trustworthiness**. Resolution of the TRO Motion will only address the limited issue of Mr. Shapiro's unilateral ability to act; it will not resolve the ultimate issue of who has authority. Moreover, resolution of the authority dispute will not resolve on the merits the cross-allegations of misconduct, or automatically instill confidence in either party. In

contrast, the appointment of a Chapter 11 Trustee will enable creditors to have faith and confidence in a neutral fiduciary.[20]

b. **Performance**. The Debtors' performance in these cases has been thwarted by the continued dispute over authority. Adjudication of the TRO Motion will result in one of two outcomes: (i) Mr. Shapiro cannot act without Plaintiffs' consent; or (ii) Mr. Shapiro can act without Plaintiffs' consent.[21] A ruling on the TRO Motion will not result in a declaration as to who has authority as that is not yet before the Court. As a result, following the determination of the TRO Motion, either Mr. Shapiro will continue to act for the Debtors, and Plaintiffs will litigate the Complaint, or Mr. Shapiro will not be able to act, there will be a stalemate, and Plaintiffs will still have to litigate the Complaint. Neither result resolves with certainty how the proposed plans of reorganization will proceed to confirmation, let alone who will address for the Debtors issues of financing, responding to third-party matters, or other actions taken or to be taken in the proceeding. These cases cannot afford the delay and distraction of a determination on the merits of the Complaint.

c. **Confidence**. The prosecution of a plan of reorganization, or plans of reorganization, requires an open, and fair process. Full disclosure is the touchstone of the chapter 11 reorganization process. See In re V. Savino Oil, 99 B.R. at 526 (noting that "honest and straightforward disclosure . . . is intrinsic to the entire reorganization process"). Presently,

---

[20] Indeed, even iStar has suggested that a Chapter 11 Trustee may be the most appropriate measure in these cases. See Limited Objection of iStar Tara LLC to Debtors Motion for Order (1) Appointing Chief Restructuring Officer, and (2) Requiring Receive to Deliver Immediately to the Debtors All Property of the Estate Pursuant to Section 543(b)(1) of the Bankruptcy Code [D.I. 156] p. 7.

[21] The relief sought in the TRO Motion is specific and limited. Plaintiffs seek to enjoin Shapiro from (i) "taking any further action on behalf of Slazer Enterprises, LLC or the Debtors in this Court or otherwise without the express written consent of one of the Plaintiffs" and (ii) "filing or causing to be filed any pleading in the Debtors' chapter 11 cases on behalf of or in the name of one or more of the Debtors, without the express written consent of one of the Plaintiffs." See Proposed Temporary Restraining Order annexed as Exhibit A to the TRO Motion.

the finger pointing between Plaintiffs and Mr. Shapiro does not serve the interests of creditors, and in fact has delayed the opportunity for creditors to obtain a recovery in these cases. Control of these cases is not an asset to be sold for the benefit of the equity holders.[22] Exclusivity is not open for auction. Rather, exclusivity is a responsibility to be exercised as a fiduciary for creditors. It is precisely the need for an independent fiduciary that compels Moving Creditors to bring this motion seeking judicial intervention so that the right course of action can be implemented – the filing and prosecution of competing plans of reorganization.

**d. Costs vs. Benefits**. Concern regarding cost alone is not sufficient to overcome the statutory directive for appointment of a trustee where best interest is shown. See Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.), 1997 U.S. Dist. LEXIS 3304 (D. Del. Mar. 4, 1997). And in this case, it is clear that the benefits of appointment of a Chapter 11 Trustee outweigh the costs. The competing plan proponents will have to carry the costs of prosecuting their own plans, and the Chapter 11 Trustee will be limited to managing the estates –

---

[22] Mr. Caner's trial testimony that control is an asset to be sold is disconcerting, and consistent with his deposition testimony that Green Bridge is to receive a $2 million fee under the proposed HFZ plan.

> Q. No, no, does the plan that you're going to seek acceptance of with HFZ, does it provide for any payments to Green Bridge?
>
> A. Yes.
>
> Q. What's provided for payment to Green Bridge?
>
> A. It's about $2 million over a period of time of 24 months
>
> * _ * _ * _ * _ *
>
> Q. What is that payment on account of? What's it for?
>
> A. That's for consulting fees.
>
> Q. And when do those fees start? When is the first payment of those fees?
>
> A. Once the plan is accepted.
>
> Q. Is there in the proposal any scope of the services that Green Bridge, et cetera, will be providing?
>
> A. I think so. I will have to check the document again, but I am sure it is.
>
> Q. But you don't know what the scope is?
>
> A. Well, I know what the scope is in commercial terms, but I don't know the exact wording.
>
> Q. What are the commercial terms of that scope?
>
> A. Well, the commercial terms is that we will support the, especially in the areas of finance and apartment sales. That's our understanding, what is expected from us.

Caner Depo. at 283:15–285:20.

a task that any debtor in possession would have to shoulder. Given the contentiousness with which these chapter 11 cases have unfolded, the end to such litigation arguably would outweigh an incremental cost from the appointment of a Chapter 11 Trustee. However, even if there were to be any added costs attendant to the appointment of a trustee, it is clear that such cost pales in comparison to the benefits. First, appointing a Chapter 11 Trustee effectively moots the dispute between Plaintiffs and Mr. Shapiro over authority and allows the Debtors and these chapter 11 cases to move beyond a litigation posture. Second, a Chapter 11 Trustee will serve as one independent decision maker for all economic constituencies within the Debtors' estates as compared to the two presently warring factions. Third, a Chapter 11 Trustee can address day-to-day administrative issues and respond to ancillary motions objectively and without regard to the strategic positioning of one plan proponent against another plan proponent. See, e.g., In re Emergency Networks, Inc., 188 B.R. 227, 233 (N.D. Tex. 1995) ("the chapter 11 trustee should seek to maximize the return for the estate's creditors"); In re Ngan Gung Restaurant, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000) ("the chapter 11 trustee must protect and preserve property of the estate for the purpose of maximizing a distribution to creditors, and owes a fiduciary duty to the creditors of the estate"); In re First Interregional Equity Corp., 218 B.R. 731, 737 (Bankr. D.N.J. 1997) (Chapter 11 trustee has a duty "to preserve the assets of the estate and to maximize the distribution to the creditors").

### B. In the Alternative, the Court should Terminate the Debtors' Exclusivity to Allow the Madison Park Member Plan And the Green Bridge Plan to Be Filed and Prosecuted Simultaneously.

49. The Moving Creditors believe that the best interests of the estates will be served by the appointment of a Chapter 11 Trustee as set forth above. If a Chapter 11 Trustee is appointed, the estates will be able to move beyond the authority dispute that has paralyzed the cases for the last month. Accordingly, Moving Creditors seek appointment of a Chapter 11

Trustee as the primary form of relief in this Motion. However, the very same grounds that constitute cause for appointment of a Chapter 11 Trustee also provide ample grounds for terminating the Debtors' exclusivity to allow the competing plans to move forward. And if the Court does not appoint a Chapter 11 Trustee, then termination of the Debtors' exclusivity would better serve the estates than a prolonged dispute over authority with the goal of "control" over exclusivity. Therefore, Moving Creditors alternatively move to terminate the Debtors' exclusive rights under Bankruptcy Code section 1121 to allow for the concurrent prosecution of the Madison Park Member Plan and the Green Bridge Plan.

### 1. Cause For Termination Of Exclusivity Is A Broad Flexible Standard

50. This Court may shorten the Debtors' plan exclusivity periods "for cause." 11 U.S.C. § 1121(d). Although "cause" is not defined in the Bankruptcy Code, the legislative history and reported case law interpreting section 1121(d) make clear that "cause" is a flexible standard designed to balance the competing interests of debtors and their constituencies. Congress designed section 1121 to strike a balance between the debtor's ability to control the process of proposing a plan of reorganization with a creditor's or equity holder's right to "limit the delay that makes creditors [and shareholders] the hostages of Chapter 11 debtors." United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 372 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988).

### 2. The Pendency Of The "Authority Dispute" Constitutes Cause To Terminate Exclusivity

51. Bankruptcy courts have found "cause" to exist for a reduction of the exclusivity period where "acrimonious feuding" between the debtor's principals presented major obstacles to a successful reorganization. Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.), 68 B.R. 712, 725 (N.D. Tex. 1986); In re Crescent Beach Inn, Inc., 22 B.R.

155 (Bankr. D. Me. 1982). This is precisely the case here. Since the filing of the Complaint and the TRO Motion, reorganization efforts have become ancillary to the litigation between Plaintiffs and Mr. Shapiro over control of the Debtors. The TRO Motion is but the initial stage in the adjudication of the Complaint. The TRO Motion does not seek—nor can it—a declaration of rights as to control of the Debtors or the expulsion of Mr. Shapiro from the Debtors' affairs. Thus, the trial on the TRO Motion will result in one of two outcomes. If the TRO Motion is granted, Mr. Shapiro will be enjoined from acting on behalf of the Debtors without Plaintiffs' consent. The granting of the TRO Motion, however, may only perpetuate the Debtors' present inertia because Mr. Shapiro remains a member of the Debtors' manager Slazer Enterprises. And neither Plaintiffs nor Mr. Shapiro can devote their attention to a reorganization effort as the Complaint and its prayer for a declaration of rights must be prosecuted to judgment. On the other hand, if the TRO Motion is denied, Plaintiffs will likely continue to prosecute the Complaint seeking a declaration of their alleged right to control the Debtors in these chapter 11 cases. Thus, whatever the outcome of the TRO Motion, the likelihood of plans of reorganization moving forward will be jeopardized.

### 3. Termination Of Exclusivity And Allowing The Competing Plans To Be Prosecuted To Confirmation Is In The Best Interests Of Creditors

52. As noted above, creditors are prejudiced by the delay caused by the authority dispute. "When the Court is determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward . . . that is a practical call that can override a mere toting up of the factors." In re Dow Corning Corp., 208 B.R. 661, 670 (Bankr.E.D.Mich. 1997); see also, In re Henry Mayo Newhall Memorial Hosp., 282 B.R. 444 (9th Cir. B.A.P. 2002) (whether the exclusivity adjustment will move the case forward is a "transcendent consideration"). In the absence of a Chapter 11

Trustee, terminating exclusivity is the only measure that will move these cases forward and beyond the disputes over authority between Mr. Shapiro and Plaintiffs. Time is of the essence in these cases as iStar continues to press forward for relief from stay and an eventual foreclosure asserting a lack of adequate protection.

53. The objective of chapter 11 is to maximize the value of a debtor's assets. See Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 190 (3d Cir. 2001) (noting the "strong public policy in favor of maximizing debtor's estates and facilitating successful reorganization"). A competing plan process is the only avenue to maximizing the value of the Property. This Court and others in the Third Circuit have recognized the benefits of competition in the plan process. See, e.g., In re Seitel, Inc., Case No. 03-12227 (PJW) (Bankr. D. Del. 2003); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D. N.J. 2000). Competing plans give creditors a choice when there are widely divergent viewpoints among the debtor and key constituents regarding methods for realizing and distributing value under a plan.

54. In the instant case, the Madison Park Member Plan has been filed and Plaintiffs have stated that they can shortly file the Green Bridge Plan if given the ability to do so. The Debtors' estates and their creditors are best served by terminating exclusivity to allow both plans to be prosecuted simultaneously. While Mr. Caner testified that he believes his plan is "better" than the Madison Park Member Plan in various respects, the only measure of examining this contention is through a competitive plan process. And Mr. Caner readily admitted in his trial testimony that competing plans would be the "best thing" for the Debtors' cases:

> Q. You said a moment ago what you wanted was a competitive process where there was more than one plan.
>
> A. Yes.
>
> Q. Okay.
>
> A. That would have been the best thing.

Q. That would be the best thing?

A. Yes.

January 11th Trial Transcript, 289:16-22. When, as here, both Mr. Shapiro and Plaintiffs have a vested interest in their respective plans, competing plans will provide integrity to the plan process as the market provides the forum test the contentions of insiders. Cf. Bank of America Nat'l Trust and Savings Assoc. v. 203 North LaSalle Street Partnership, 526 U.S. 434, 441-443, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) (ruling that a plan providing for equity holders to contribute new capital was not confirmable in the absence of competitive bidding for the equity interests to determine the adequacy of the new value contribution).

**4. Allowing Competing Plans By The Plaintiffs and Madison Park Member Levels The Playing Field, Assuring That Neither Plan Has A Tactical Advantage And Ensuring That Creditor Interests Are Served.**

55. Courts have long recognized that exclusivity should not be used as "a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." Senate Report No. 99-764 & House Conference Report No. 99-958 (reprinted in 1986 U.S. Code Cong. & Adm. News, at 5227); see also In re All Seasons Indus., Inc., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (denying extension of exclusivity when "such an extension would have the result of continuing to hold creditors hostage to the Chapter 11 process and pressuring them into accepting a plan they believe to be unsatisfactory"). Here, terminating exclusivity to allow both the Green Bridge Plan and Madison Park Member Plan to move forward will ensure that neither sponsor will be in a position to use "exclusivity" for tactical advantage.

56. Legislative history identifies that the purpose of section 1121 was as follows:

> Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of

> creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days. In most cases, the 120 days will give the debtor adequate time to negotiate a settlement without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120 day period depending on the circumstances of the case . . . [T]he bill allows flexibility for individual cases[.]

H.R.Rep. No. 595, 95th Cong., 1st Sess. 231-32 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6190-92. Congress unequivocally intended to achieve two objectives through exclusivity. "[Congress] wanted to grant the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan. And at the same time, Congress sought to ensure that a debtor would not use Chapter 11 as a mechanism through which to operate indefinitely without attempting to reorganize." In re Clamp-All Corp., 233 B.R. 198 (Bankr. D. Mass 1999).

57. Ironically here, it is the dispute over control over the Debtors that undermines the congressional purpose behind section 1121. Moreover, the Debtors are not operating at all and subsist on protective advances from iStar which, coupled with the authority dispute, have prevented the Debtors from obtaining debtor-in-possession financing. By allowing the Green Bridge Plan and the Madison Park Member Plan to compete in full public view in the confirmation arena, as opposed to the corridors of "authority," creditors will have the benefit of full disclosure and comparative decision making. Such a result furthers the congressional directive to maximize value for the estate and best serves the interests of creditors - the real parties in interest in these cases.

## CONCLUSION

WHEREFORE, Moving Creditors respectfully submit that the Court enter an Order (i) appointing a trustee pursuant to Section 1104(a)(1) and Section 1104(a)(2) or, in the alternative, (ii) pursuant to 11 U.S.C. § 1121(d) terminating the Debtors' exclusive rights under 11 U.S.C. § 1121 to allow the filing of competing plans of reorganization by Plaintiffs and Madison Park Member.

Dated: January 25, 2011

**BUCHANAN INGERSOLL & ROONEY PC**

Mary Caloway

Mary F. Caloway (No. 3059)
Mona A. Parikh (No. 4901)
1105 N. Market Street, 19th Floor
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295
Email: mary.caloway@bipc.com
mona.parikh@bipc.com

*Attorneys for Moving Creditors*

**Exhibit A**

January 11th Trial Transcript Excerpt

foreclosure?
A Well, it wouldn't have happened.
Q Why wouldn't it have happened?
A Well, if the Chapter 11, that stopped foreclosure proceedings.
Q But you didn't direct anybody to file a Chapter 11.
A You know, we -- I am not of the opinion that the Chapter 11 thing was a mistake. I think it was a good thing to do.
Q But --
A I'm just saying Mr. Shapiro would have had the obligation to come to us as a majority member and ask us, just like he did when he was defending Chapter 7, so we were expecting him to be prudent, to be honest, and to respect his majority members and come and talk to us and we would have supported him.
Q Well, I appreciate that you were angry I think was the term you used in your deposition --
A No, I --
Q -- about Mr. Shapiro.
A Not only angry. It's -- it's just respectless. You don't do that. I mean, you have to honor your agreements and respect your members, the majority members.
Q All right. But again I think you answered it but I'm not sure because it was a little bit off to the side. You didn't direct anyone to file a Chapter 7 case for the debtors?

**Exhibit B**

January 11th Trial Transcript Excerpt

"Q -- since then have you reviewed the documents specific to any of the issues that I've just described to you other than the condominium" -- it says the offer and plans, the condominium offer and plan, and the answer is no. And this was -- that deposition was taken in December of 2010. So I assume that your testimony still stands. Has HFC concluded its due diligence for its plan?
A I think they're pretty much done, maybe since they're --
Q You know, well --
A Sorry.
Q No, I was just going to -- I'm just trying to move it. Do you know what's -- do you know if all of the conditions for them committing to that plan have been satisfied?
A It looks like they're committed and they are satisfied with what they have seen and what they have -- due diligence.
Q So HFC has no conditions whatsoever to its committing to fund the plan and be the plan proponent of the plan that you were working on with them?
A That would be great but certainly --
Q Okay.
A -- cannot be the case. Of course they will have --
Q Their conditions?
A They will have conditions, of course, just like Mr. Eichner has conditions in his plan.
Q Did they need a new condominium plan amendment for them to