UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

FKF MADISON PARK GROUP
OWNER, LLC, *et al.*

               Debtors.

Chapter 11 Case No. 10-11867 (KG)

(Jointly Administered)

Ref: D.I. 224

## OBJECTION OF GREEN BRIDGE CAPITAL S.A. AND SPECIAL SITUATION S.A. TO THE KRAUS/EICHNER MOTION FOR ORDER (I) DIRECTING THE APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(1)-(2); OR (II) IN THE ALTERNATIVE, TERMINATING THE DEBTORS' EXCLUSIVITY RIGHTS PURSUANT TO 11 U.S.C. § 1121(d)

Green Bridge Capital S.A. ("Green Bridge"), the 35% interest holder in Slazer Enterprises LLC ("Slazer")[1] and Special Situation S.A. ("Special Situation"), the holder of an irrevocable proxy for the 32.5% interest of Marc Jacobs in Slazer (the "**Majority Holders**"), by their undersigned counsel, hereby submit their objections to the Motion of Certain Petitioning Creditors[2] for Order (I) Directing the Appointment of a Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1)-(2); or (II) In the Alternative, Terminating the Debtors' Exclusive Rights Pursuant to 11 U.S.C. §1121(d) to Allow the Filing of Competing Plans of Reorganization by Green Bridge Capital S.A. and Special Situation S.A. and New One Madison Park Member I, LLC [D.I. 224] (the "Kraus/Eichner Trustee Motion"),

---

[1] Slazer Enterprises LLC is the sole Manager of debtors FKF Madison Group Owner LLC, JMJS 23rd Street Realty Owner LLC, and Madison Park Group Owner LLC, and it is the sole and managing Member of Debtor Slazer Enterprises Owner LLC.

[2] As defined in Kraus/Eichner Trustee Motion, the "Moving Creditors" are Stephen Kraus, Mitchell Krauss, Barbara Kraus, Hi-Tech home Automation, Inc. and Mad 52, LLC (the sole member or which is Bruce Eichner, as stated in the Joinder it filed to the involuntary petition, D.I. 44, Ex. A).

By separate filings, Green Bridge and Special Situation have or will submit objections to the Motion filed by Ira Shapiro ("Shapiro") in the name of the Debtors for the Appointment of a Chapter 11 Trustee or to Terminate Exclusivity [D.I. 212] (the "Shapiro/Debtor Trustee Motion") and (ii) the United States Trustee's Motion for Entry of an Order Directing Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, or in the Alternative, Entry of an Order Converting or Dismissing this Chapter 11 Case [D.I. 232] (the "UST Trustee, Convert or Dismiss Motion").

It is clear that, if the only choice before the Court were between continued stewardship through Ira Shapiro and a Chapter 11 Trustee, then without question Shapiro would need to be ousted. But that is not the only choice before the Court, and the attempts by Shapiro's partners in this scheme to paint the Majority Holders with the same brush as Shapiro is patently unjustified. In support of and by way of these objections, the Majority Holders respectfully state as follows:

## PRELIMINARY STATEMENT

### A. The Conduct of Eichner and the Krauses in this Action Reflects Their Own Self-Interestedness

1. The Moving Creditors are not, and should not be regarded as, disinterested creditors, outsiders being altruistically mindful of the interests of general creditors at large. To begin with, each of them has wrongfully obtained deeds to units of the One Madison Park condominium, without having paid the minimum sales price or a price otherwise agreed to by iStar Tara, LLC ("iStar"), the senior lender to the Debtors on the project.

2. In the case of the Krauses, Barbara and Mitchell Kraus secured a purchase agreement for unit 23B, unapproved by iStar, at a purchase price of $2.9 million, notwithstanding that the minimum sales price was $3.6 million; and of the purchase price, only

the sum of $1.3 million was purportedly paid. Yet, according to an Ira Shapiro Affidavit [D.I. 24], they clandestinely received a deed for that unit in January 2010.

3. Stephen Kraus allegedly made multiple loans to Park Madison Associates in 2009 totaling $6.657 million (see Debtors' Motion to Dismiss the Involuntary Petition [D.I. 23], Ex. H. In return, Shapiro privately entered into an undisclosed agreement with Stephen Kraus with respect to units 28A and 28B (having minimum sales prices at $2.8 million and $3.3 million respectively), and he entered a purchase agreement with Stephen Kraus with respect to Unit 37A, for a stated price of $5,000,000, of which $3,850,000 was allegedly paid (it is unclear whether any of Kraus's loans were attributed to that), notwithstanding a minimum purchase price of $8,350,000.

4. In the Affidavit he filed in this case on or about June 29, 2010, Shapiro stated:

> 12. In late January 2010, Stephen Kraus and Mitchell Kraus and I met at my offices at 14 West 23rd Street, New York, New York. Mr. Stephen Kraus and Mr. Mitchell Kraus, brought me deeds for Unit 23B conveying the aforementioned unit to Mitchell Kraus and Barbara Kraus as tenants by the entirety; a separate deed wherein the [Debtors] conveyed Unit 37A to Stephen Kraus and a separate deeds wherein the [Debtors] conveyed Units 28A and 28B to Stephen Kraus as well as other recording documents. That Krauses asked me to sign the deeds and the other documents.
>
> 13. That I signed the deeds on behalf of the [Debtors] and gave the Krauses the deeds and the other documents in satisfaction of the [Debtors'] obligation under the contracts and other agreements.

Shapiro Aff., p. 4. Thus, Shapiro gave away the deeds to the Krauses, with no extra consideration.

5. In December 2009, Shapiro gave Bruce Eichner the deed to Unit 52A, after having entered into an undisclosed purchase agreement with him that would allow him to purchase the unit, having a $10 million minimum sale price, at the stated price of $5 million, of which only $500,000 would need to be paid in cash as a deposit, and the balance of $4.5 million

"paid" in the form of a loan[3] (backed by other people's apartments as security). Eichner proceeded to record the deed, and this became one of the principal fraudulent acts of Shapiro cited by iStar in its ex parte motion for appointment of a Receiver.

6. Neither Eichner nor the Krauses have relinquished their claims to the units for which they received deeds from Shapiro. Indeed, their proposed plan provides special treatment for their claims.

7. After Shapiro initially opposed the involuntary Chapter 7 proceeding commenced by the Krauses, Shapiro entered into secret negotiations with Eichner and Stephen Kraus, leading to (a) a "loan" of $125,000 from Eichner to Shapiro, paid by Eichner wiring the funds directly to the account of Pachulski Stang Ziehl and Jones (as Shapiro acknowledged at the 341 Meeting in this case), and (b) their joint plan proposal and DIP financing proposal, filed in conjunction with the consensual conversion of the case to a voluntary Chapter 11 case.[4]

8. The Eichner/Kraus/Shapiro plan and plan support proposal would, *inter alia*, do the following:

> 9. It would provide Eichner and Kraus an **equity stake** (through interests in New One Madison Park LLC, the entity that would be purchasing the Debtors' property) in the project, post-bankruptcy.
>
> 10. Instead of challenging the claims of Eichner and the Krauses arising from their ill-begotten deeds to condo units, their plan would actually *elevate* **their deed-based claims**, categorized as "Deed Holder Claims", placing them at a higher priority than the class of general unsecured claims, thus insuring that those claims would be paid in full before any payment to general unsecured claims.

---

[3] According to the Promissory Note dated April 16, 2009 reflecting the loan, the loan was made to debtor Slazer Enterprises Owner LLC, Park Madison Associates LLC as agent for the other three debtors, and Ira and Heather Shapiro. No information has been obtained on where the proceeds of the loan actually went.

[4] Shapiro was not authorized to consent to the conversion of the case to a voluntary Chapter 11 case not only because a majority vote of the members of Slazer was required, but also because the Operating Agreements of all four Debtors required the written approval of the two Independent Managers, Beth Peoples and Julia McCullough. Shapiro confirmed at trial that he did not obtain their approval.

11. The plan support agreement would provide Shapiro regular income through a **dedicated monthly consulting fee**.

12. The plan would afford Shapiro a reasonable prospect of wiping away substantial claims *and judgments* against him, through the **release language** in the proposed plan that would cover all present and former directors, officers, and members, with respect to claims connected to the Debtors.

13. Moreover, the plan would potentially extend the **releases** in favor of Shapiro to **even wipe out claims of fraud and gross misconduct**, <u>unless</u> they have already been proven and made subject of a final judgment. Mere claims of gross misconduct and fraud would be released as to any creditor that did not expressly opt out of the release language.

14. With the obvious goal of affecting who may be able to vote on any plan that may get considered by creditors, Shapiro filed a list of the Top 20 Creditors in which only the claims of Level One US Property LLC and FKF3 LLC (an entity led by the Debtors' former counsel Burt Dorfman) were marked as "Disputed," while the claims of, among others, Mad52 LLC (Bruce Eichner) and Stephen Kraus were *undisputed*. The Kraus and Eichner claims were labeled undisputed notwithstanding that, in July and August, 2010, Shapiro authorized filings on behalf of the Debtors by Mark Minuti and Saul Ewing that stated that Stephen Kraus no longer had a claim for the reason that he was furnished deeds for condo units, and those deeds served to satisfy his claim. That same reasoning would have applied to Bruce Eichner, since he not only was furnished a deed to a unit; he had it recorded as well. Thus, his listing of creditors is evidently aimed towards enhancing the claim-voting posture of dubious creditors, while disputing the claims of the two creditors with whom he is at odds.

15. At the same time, before even attempting to file any schedules on behalf of the Debtors, and well before the filing of any proofs of claim, Shapiro (undoubtedly with the support of Eichner) caused the filing of a complaint, in the name of the Debtors and Slazer, against Green Bridge, Special Situation, and Level One US Property, to subordinate the Level One claim

and to avoid it as a claim against the Debtors – thus attempting to set a prospective Trustee on a path of litigating against the Majority Interest Holders, rather than coordinating with them, and further aimed at diminishing Level One's ability to vote upon any prospective plan.

16. As this Court has now ruled, Shapiro has been acting without authority in this bankruptcy case with respect to every action he has taken since consenting to the conversion to a voluntary Chapter 11 case. See Mem. Op., pp. 7-9 (Jan. 31, 2011).

### B. Shapiro's Attempts to Tar Green Bridge and Special Situation in the TRO Hearing Miss the Mark

17. Before a Receiver was appointed in the foreclosure action brought in New York by iStar, the senior lender to the project, Shapiro had committed widespread fraud in the course of steering the development of a luxury condominium project in Manhattan, his first such project. As laid out in affidavits filed in the New York action by Matthew Parrott and by John Kubicko, Shapiro not only caused the Debtors to breach their loan agreements with iStar; he also defrauded numerous private investors and condominium purchasers. He managed to collect no less than $40 million from private investors, which sums Shapiro never accounted for to iStar. *See* Affirmation of Matthew D. Parrott in Support of iStar Tara LLC's Application for Appointment of Receiver, p. 14 (Plaintiffs' Ex. 55 in Adv. Pro. 10-56158).

18. Shapiro gave collateral assignments of bogus purchase agreements for condo units in order to obtain loans Shapiro sold or attempted to sell many units at prices below the minimum sales prices set under agreement with iStar, without iStar's approval for the sales. He funneled monies he received into Park Madison Associates LLC, an entity of which Shapiro was and is the sole member, and without disclosing to iStar any of Park Madison Associates' bank account records. He secretly gave away deeds for condo units. He evidently was responsible for an untold number of forgeries in connection with key documents in the course of the project. His

conduct in the project resulted in no less than 41 lawsuits. And all the while, he personally drew no less than $3.3 million in "developer fees," most of which were never on any iStar-approved budget, together with hundreds of thousands of dollars in travel and entertainment personal charges that he ran through the Debtors' accounts as a business expense.

19. Recognizing all along that no court was likely to put Shapiro back in charge, once challenged, the strategy of Kraus, Eichner and Shapiro has been to at least prevent Green Bridge and Special Situation from gaining the control they are rightfully entitled to, as the parties controlling the majority interests in Slazer. By this strategy, preventing the Majority Holders from gaining their rightful control, especially paired with efforts to maximize their creditor-votes and minimize the creditor-votes of Level One US Property and FKF3, would yield a better than even chance of success for their self-interested plan.

20. The manner they have plied to prevent Green Bridge and Special Situation from gaining control has to been to attempt to tar Green Bridge and Special Situation as best they can, to create the appearance or impression of some sort of parity. But that effort is utterly unsupportable.

21. The Kraus/Eichner Trustee Motion suggests that there are "cross-allegations of dishonesty, incompetence, gross mismanagement and breach of fiduciary duty by Mr. Shapiro and Plaintiffs" (i.e., Green Bridge and Special Situation). *Id.* at 5. But insofar as any such allegations have been directed against the Majority Holders, none of it has been borne out by evidence at the TRO hearing, and has only been the stuff of argument from attorney Bruce Grohsgal. Thus, after five hearing days on the TRO Motion, the Krauses and Eichner cites *only* the Debtors' Trial Brief in support of any such charges. *See* Kraus/Eichner Trustee Motion at 15 ("Debtors have made numerous allegations ...."); *id.* at 19. They cite Debtors' Trial Brief to

falsely assert that "Green Bridge concealed ... from iStar" certain promissory notes, notwithstanding that: (i) the promissory notes in question were with Level One US Property, *not* Green Bridge, and (ii) the undisputed testimony of Cevdet Caner was that the notes were fully disclosed to iStar.

22. The Kraus/Eichner Trustee Motion's contention (p. 20) that the terms in the 2006 mezzanine loan agreement between Level One US Property and Slazer and the Debtors, which included terms for acquiring units in the condominium project, would somehow constitute "self-dealing" is absurd. Level One (not Green Bridge) made a loan, and entered into a written agreement, that preceded the iStar loan documents. The option for 35% stake was not even exercised until close to three years after the agreement was executed.

23. The Moving Creditors' assertion that the Majority Holders were somehow incompetent or negligent in seeking dismissal of the involuntary Chapter 7 case they commenced misses, among other things, the key points that (i) the Debtors' Operating Agreements did not permit the Debtors to agree to a bankruptcy proceeding without the express written consent of both Independent Managers, Beth Peoples and Julia McCullough – a requirement that Shapiro ultimately had no compunctions about ignoring – and (ii) the case was filed as a Chapter 7 case, not a Chapter 11 case, and a Chapter 7 case was not evidently preferable to the receivership.

24. Thus, while everyone (including iStar, Marc Jacobs, and the Majority Holders) regards Shapiro as untrustworthy, the effort by the Krauses and Eichner to characterize the Majority Holders as if they are in any respect in the same category as Shapiro is utterly unsubstantiated.

# OBJECTIONS

## I. Appointment of a Chapter 11 Trustee is Unwarranted

25. Under the well-established law of this Circuit, the party seeking appointment of a chapter 11 trustee must prove the need for a trustee by <u>clear and convincing evidence</u>. *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 469, 471 (3rd Cir. 1998) (noting the "strong presumption" against the appointment of a trustee); *see also Official Comm. of Unsecured Asbestos Claimants v. G-1 Holdings, Inc. (In re G-1 Holdings, Inc.)*, 385 F.3d 313, 318 3d Cir. 2004) (Alito, J.) (noting "the heavy burden of persuasion, i.e., by clear and convincing evidence, that the party seeking the appointment of an outside trustee must face"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989)("[t]he party moving for the appointment of a trustee . . . must prove the need for a trustee . . . by clear and convincing evidence").[5] The Kraus/Eichner Trustee Motion falls woefully short of that high evidentiary standard.

### A. Cause Does Not Exist to Appoint a Trustee

26. The Moving Creditors assert that a trustee must be appointed here under section 1104(a)(1), which requires appointment of a chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." 11 U.S.C. § 1104(a)(1).

27. There can be no doubt that these cases have been rife with "fraud, dishonesty, incompetence, or gross mismanagement." That bad conduct, however, has been undertaken by Shapiro, not the Majority Holders.

---

[5] Footnote 10 to the Kraus/Eichner Trustee Motion references a 1991 Supreme Court case that established "preponderance of the evidence" as the **general** level of proof required in bankruptcy cases. *Grogan v. Garner*, 498 U.S. 279, 286-91 (1991). Despite their citation of a handful of cases outside this Circuit that have applied that lower evidentiary standard to trustee motions, the law in this Circuit remains clear – a party seeking appointment of a trustee faces the "clear and convincing evidence" standard.

28. For example, Shapiro, not the Majority Holders, intentionally, knowingly and repeatedly breached the iStar loan agreement by entering into numerous "non-bona fide" contracts to sell condominiums at unconscionable prices. Shapiro, not the Majority Holders, then pledged those "non-bona fide" contracts to persons who "loaned" money to the Debtors at the request of Shapiro. Each of those loans and non-bona fide contracts breached the iStar loan documents. Many, if not all, of those loan agreements and non-bona fide contracts have resulted in lawsuits against the Debtors. Many of those same lawsuits have also since been reduced to judgment against the Debtors. Shapiro not the Majority Holders, granted a deed to Mad 52 LLC, which was then recorded – again breaching the iStar loan agreement. In short, any suggestion that Majority Holders have acted improperly simply is not supported by the known facts.

29. Now that the Court has ruled on the issue of authority in the TRO hearing, the Majority Holders have both the opportunity and the responsibility to steer the Debtors back in the proper direction.

30. Accordingly, the Court should deny the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code.

B. Appointment of a Trustee is not In the Interests of the Estates

31. The Moving Creditors argue that a trustee should be appointed on the grounds that such an appointment would be "in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). The Kraus/Eichner Trustee Motion focuses on four factors: trustworthiness of the Debtors, past and present performance and the prospects for rehabilitation, confidence of creditors in present management and benefits derived from the appointment of a trustee. Reviewing those allegations in turn, the Moving Creditors

have not shown clear and convincing evidence that appointment of a trustee would benefit the estates, and their request for a trustee should be denied.

32. <u>Trustworthiness</u>. The Moving Creditors argue that resolution of the ultimate issue of authority would not resolve the merits of the cross-allegations of misconduct. This line of reasoning not only invokes a false equivalency between the actions of Shapiro and the Majority Holders, but also ignores the fact that the Moving Creditors themselves come to the table with unclean hands as the beneficiaries of certain of Shapiro's wrongdoing. Specifically, the Krauses and Eichner received sweetheart deals on condominium units in violation of minimum sale price requirements which directly resulted in millions of dollars in losses by the enterprise. Indeed, the plan supported by the Moving Creditors attempts to wash away not only Shapiro's guilt, but also that of the Moving Creditors. For those creditors to now argue that the Majority Holders somehow cannot be trusted to manage the estates in the best interests of creditors, is the height of hypocrisy.

33. Because it has now been determined that Shapiro does not have – and never had – the authority to take actions without the consent of the Majority Holders, Green Bridge Capital and Special Situation will finally be able to appoint management and professionals that will appropriately represent the interests of all stakeholders, not solely those of Shapiro's hand-picked plan proponents.

34. <u>Performance</u>. The Moving Creditors then assert that these cases have been hindered by the ongoing control litigation, and that a ruling in favor of the Majority Holders in the TRO litigation would do nothing to "resolve[] with certainty how the proposed plans of reorganization will proceed to confirmation," among other things. That assertion is incorrect. In establishing that Shapiro lacked and lacks authority to act on his own in the name of the Debtors,

and that the Majority Holders do rightfully control Slazer, the managing member or manager of all four Debtors, the Court's Opinion most certainly provides certainty. Furthermore, in accordance with the Court's opinion, the Majority Holders will confer with Shapiro with respect to the goal of proposing a plan of reorganization on behalf of the Debtors consistent with the exclusivity granted under the Bankruptcy Code.[6] Contrary to implications of the Moving Creditors' argument, there is no requirement under the Bankruptcy Code that there must be competing plans in order to ensure that the best interests of the estates are met; indeed, if there were, the concept of exclusivity that is provided for under the Bankruptcy Code would be meaningless.

35. <u>Confidence</u>. With respect to confidence in management, the Moving Creditors again turn to the control litigation, asserting that the ongoing dispute has delayed the opportunity for creditors to obtain a recovery. Further, the Moving Creditors go so far as to accuse Green Bridge Capital of using exclusivity as an asset to be sold for their own personal benefit. Such an accusation is baseless, as any payments to Green Bridge Capital would relate to specific consulting services that will be described in detail in any plan ultimately filed by the Majority Holders. As demonstrated by his testimony at the TRO hearing, Cevdet Caner is intimately aware of the requirements of his fiduciary duties, and intends to use exclusivity not to line his own pockets, but rather to build consensus around a plan that benefits all creditors, not merely Eichner and the Krauses. Innuendo raised by a handful of creditors is insufficient to demonstrate

---

[6] As the Majority Holders understand it, the language that the Court referred to in the Opinion requiring "prior unanimous written consent" with respect to any "Material Action" as set forth in the Operating Agreements of the four Debtors is Section 9(d)(iii). The unanimity required there is between the Independent Managers and the Manager (in the case of FKF Madison, JMJS, and Madison Park), or between the Independent Managers and the Member (in the case of Slazer Owner). In each case, the Manager or managing Member is Slazer Enterprises LLC.

by clear and convincing evidence that the general creditor body has lost confidence in the Debtors' ability to fulfill their fiduciary duties.

36. <u>Costs vs. Benefits</u>. The Kraus/Eichner Trustee Motion grossly oversimplifies the process of appointment of a trustee in an attempt to show that the benefits would outweigh the costs. Any third party trustee would necessarily have a steep learning curve once it took over the business and would, in all likelihood, have to retain separate legal and financial advisors to assist in running the Debtors' day-to-day activities. At the same time, even in a scenario with competing plans, a trustee would still have to be integrally involved in the plan process, all at significant – not, as the Moving Creditors argue, "incremental" – cost to the estates. Moreover, a chapter 11 trustee would earn a significant commission based on distributions to creditors; under any plan in this case, such commissions could be hundreds of thousands of dollars, in addition to professional fees. Broad, unsubstantiated assertions concerning costs cannot satisfy the Moving Creditors' heavy evidentiary burden.

37. Taken as a whole, the accusations in the Kraus/Eichner Trustee Motion fail to provide clear and convincing evidence that appointment of a trustee would benefit the estates. Accordingly, the Court should deny the appointment of a trustee under section 1104(a)(2) of the Bankruptcy Code.

II. <u>Cause Does Not Exist to Terminate Exclusivity</u>

38. Section 1121(b) grants a debtor the exclusive right to file a plan of reorganization for 120 days after entry of the order for relief in its chapter 11 case (the "**Exclusive Period**"). 11 U.S.C. § 1121(b). Here, the order for relief was entered by the Court on November 19, 2010. Because the 120th day after entry of the order for relief is Saturday, March 19, 2011, the Exclusive Period would expire on Monday, March 21, 2011 unless extended by order of the

Court.[7] *See* Fed. R. Bankr. P. 9006(a)(2)(C) (where a period would end on a Saturday, Sunday or legal holiday, that period is continued to the next day that is not a Saturday, Sunday or legal holiday). Assuming the Court does not appoint a chapter 11 trustee in these cases, the Exclusive Period can be terminated only upon a showing of cause. 11 U.S.C. § 1121(d)(1).

39. A party seeking to terminate exclusivity bears a "heavy burden" of proof to establish cause under section 1121(d) of the Bankruptcy Code. *See In re Standard Mill Ltd. P'ship*, 1996 WL 521190, at *1 (Bankr. D. Minn. Sept. 12, 1996) (citing *In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995)); *In re Interco Inc.*, 137 B.R. at 1000 ("A party requesting an immediate termination of the exclusive period as originally authorized by statute or as it may have been extended by the Court, bears a heavy burden.") (citing *In re Texaco, Inc. (Texaco II)*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988)); *see also In re Premier Int'l*, Case No. 09-12019, Hr'g Tr. 85 (Bankr. D. Del. Dec. 7, 2009) (holding that a party seeking to terminate exclusivity must meet a higher burden that a party seeking to extend exclusivity). As with the requests for the appointment of a trustee, the Kraus/Eichner Trustee Motion fails that standard.

40. The thrust of the Moving Creditors' arguments for termination of exclusivity is that the control disputes have taken over these cases, thus impeding any restructuring efforts. Terminating exclusivity to permit prosecution of both the New One Madison Plan and a plan proposed by the Majority Holders would, those motions argue, "provide integrity to the plan process as the market provides the forum [to] test the contentions of insiders" and "ensure that neither party will be in a position to use 'exclusivity' for tactical advantage." While the idea that competing plans would provide some sort of neutral market test sounds good in a vacuum, the

---

[7] Because Shapiro improperly and without authority caused the Trustee Motion – which he, of course, subsequently joined – to be filed purportedly on behalf of the Debtors, the Court should reject any notion that the Debtors have consented to termination of exclusivity.

fact remains that the Bankruptcy Code expressly rejects that notion: the very concept of exclusivity recognizes that, at least for a limited period of time, the debtor, and only the debtor, should have the ability to formulate and propose a plan. In other words, a limited "tactical advantage" is fundamental to the bankruptcy process.[8]

41.  Here, the Majority Holders have, since Shapiro caused these cases to be converted to chapter 11 without proper authority, fought to regain that very basic right for the Debtors. The Majority Holders have never sought to drag these cases out indefinitely with no attempt to reorganize. Rather, they seek only the opportunity to propose, on behalf of the Debtors and consistent with the Debtor's fiduciary responsibilities to all creditors, a plan that truly maximizes the value of the assets for all economic constituents and to have that plan solicited by the Debtors on an exclusive basis consistent with the tenets of the Bankruptcy Code.

42.  Accordingly, the Court should deny termination of exclusivity at this juncture.

WHEREFORE, for the reasons set forth above, the Majority Holders respectfully request that the Court enter an order (i) denying the Kraus/Eichner Trustee Motion in its entirety and (ii) granting such other and further relief as is just and proper.

---

[8]  The legislative history and case law cited by the Moving Creditors speaks to denial of the extension of exclusivity, not its termination.

Dated: February 1, 2011
       Wilmington, Delaware

                                 **MORRIS JAMES LLP**

                                 /s/ Brett D. Fallon
                                 Brett D. Fallon (DE Bar No. 2480)
                                 Carl N. Kunz, III (DE Bar No. 3201)
                                 Douglas N. Candeub (DE Bar No. 4211)
                                 500 Delaware Avenue, Suite 1500
                                 P.O. Box 2306
                                 Wilmington, DE  19899
                                 Telephone: (302) 888-6800
                                 Facsimile: (302) 571-1750
                                 E-mail: bfallon@morrisjames.com
                                            ckunz@morrisjames.com
                                            dcandeub@morrisjames.com

                                 *Attorneys for Green Bridge Capital S.A. and*
                                 *Special Situation S.A.*