# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| FKF MADISON PARK GROUP OWNER, ) | Case No. 10-11867 (KG) |
| LLC, *et al al.*[1] ) | |
| ) | |
| ) | Jointly Administered |
| Debtors. ) | |
| ) | Hearing Date: March 2, 2011 at 9:30 a.m. (ET) |
| ) | (REQUESTED) |
| ) | |
| ) | Objections Due: March 2, 2011 at 9:30 a.m. (ET) |
| ) | (REQUESTED) |

## EMERGENCY MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) MODIFYING THE AUTOMATIC STAY, AND (III) SCHEDULING FINAL HEARING

The above-captioned debtors (collectively, the "Debtors") hereby move (the "Motion")the Court, pursuant to sections 105(a), 361, 362, and 364(c) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Del. Bankr. L. R. 4001-2, for the entry of an interim order (the "Interim Order"), substantially in the form annexed hereto as **Exhibit C**, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"):

(i) authorizing the Debtors to enter into financing arrangements (the "DIP Loans") with (a) HFZ Capital Group, LLC (the "Administrative DIP Lender") pursuant to the terms and conditions of that certain term sheet, dated as of March 1, 2011 (the "Administrative DIP Term Sheet" annexed hereto as **Exhibit A**), and (b) iStar Tara LLC ("iStar" or the "Operations DIP Lender" and together the Administrative DIP Lender, the "DIP Lenders") pursuant to the terms and conditions of that certain term sheet dated March 1, 2011 (the "Operations DIP Term Sheet" annexed hereto as **Exhibit B**) pursuant to which the DIP Lenders will lend the Debtors in an aggregate principal amount of up to $2,423,229

---

[1] The Debtors, followed by the last four digits of their tax identification numbers, are as follows: FKF Madison Group Owner, LLC (6399); JMJS 23rd Street Realty Owner, LLC (6651); Madison Park Group Owner, LLC (3701); and Slazer Enterprises Owner, LLC (4339). The Debtors' mailing address is 230 Congers Road, New City, NY 10920.

(including $1,132,139 on an interim basis pending a final hearing on the Motion), the availability of which shall be limited pursuant to the Approved Budget (as defined below) annexed the Interim Order as Exhibit A and the variances from such Approved Budget as permitted in the Interim Order;

(ii) authorizing the Debtors to enter into all documents necessary to implement the terms of the DIP Loans which may, in the discretion of the DIP Lenders, be the Administrative DIP Term Sheet and/or the Operations DIP Term Sheet (the "DIP Loan Documents");[2]

(iii) determining that amounts owed by the Debtors to the DIP Lenders under the DIP Loans, including all accrued interest, shall constitute claims having super-priority administrative expense priority under section 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claims") which Super-Priority Claims shall be pari passu with one another and repaid on a pro rata basis and shall be secured by first priority liens pursuant to section 364(c)(2) of the Bankruptcy Code on cash collateral consisting of any amounts advanced by the DIP Lenders to the Debtors but not expended, including any iStar Administrative Advances (the "Cash Collateral");

(iv) determining that pursuant to Bankruptcy Rules 2002 and 4001(c)(1), and the Local Rules of this Court that notice of the Interim Hearing (as defined below) was sufficient having been given to (i) the United States Trustee (the "U.S. Trustee"), (ii) counsel to the DIP Lenders, (iii) counsel to the Official Committee of Unsecured Creditors (the "Committee"), and (iv) all parties having requested notice in these proceedings (collectively, the "Notice Parties"); and such notice being sufficient and adequate, and no other or further notice being required;

(v) modifying the automatic stay to the extent necessary;

(vi) scheduling a hearing on the Final Order at such later date as is convenient to the Court (the "Final Hearing"); and

(vii) granting related relief as necessary and appropriate.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these cases in this

---

[2] Undefined capitalized terms used herein shall have the meanings given to them in the DIP Loan Documents or the DIP Orders, as applicable.

Court is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, and 364(c) of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 4001, and 9014 and Local Rule 4001-2.

## BACKGROUND

2. On June 8, 2010 (the "Involuntary Petition Date"), involuntary Chapter 7 petitions were filed in this Court against each of the Debtors by Stephen Kraus, Mitchell Kraus, Barbara Kraus, and Kraus Hi-Tech Automation, Inc., thereby commencing the Debtors' involuntary Chapter 7 cases (the "Chapter 7 Cases"). On November 19, 2010 (the "Conversion Date"), this Court entered Orders for relief in the Chapter 7 Cases and entered Orders converting the Chapter 7 Cases to cases under Chapter 11 of the Bankruptcy Code [Case No. 10-11867, D.I. 119; Case No. 10-11868, D.I. 111; Case No. 10-11869, D.I. 112; and Case No. 10-11870, D.I. 117].

3. The Debtors are operating their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

4. On January 20, 2011, the Office of the United States Trustee appointed the Committee [D.I. 211].

### *Pre-Involuntary Petition Secured Indebtedness*

5. The Debtors' secured indebtedness prior to the Involuntary Petition Date consists largely of a secured facility provided by iStar and certain statutory liens asserted against the Debtors' real property.

6. Numerous parties have filed or asserted statutory liens claims against the Debtors' real property, including substantial allegedly perfected mechanic's liens.

*iStar Pre-Involuntary Petition Secured Debt*

7. The Debtors and iStar are parties to certain loan agreements related to the development of a luxury condominium tower (the "Building") and certain real property largely owned by the Debtors located at 23 East 22nd Street, New York, New York 10010 (the "Property").[3] On or about November 16, 2007, a predecessor in interest to iStar agreed to advance loans to the Debtors in the maximum principal amount of $238.5 million under a facility consisting of three loans: (i) a Senior Loan in the principal amount of $70,943,079 for satisfaction of existing indebtedness on the Property; (ii) a Project Loan in the principal amount of up to $32,025,505 for payment of costs related to the Property; and (iii) a Building Loan in the principal amount of $132,531,416 for costs incurred in connection with the construction of the Building. The agreements underlying such loans (including all related documents, amendments, modifications and promissory notes, the "Prepetition Loan Agreements") were modified by agreement on June 24, 2009, whereby the Project Loan was increased by $12.1 million and the Building Loan was decreased by approximately $5 million.

8. iStar asserts that the Prepetition Loan Agreements are secured by perfected first lien priority mortgages and other security interests on the Debtors' real property, leases and rents from such real property, and substantially all of the Debtors' personal property and fixtures. iStar further asserts that is owed not less than $234,150,572.74 pursuant to the Prepetition Loan Agreements (the "iStar Prepetition Claim").

9. Based on the Debtors' alleged breaches of the Prepetition Loan Agreements, on March 4, 2010, iStar commenced an action (the "Foreclosure Action") in the

---

[3] The Debtors own not less than 80% of the condominium units in the Building.

Supreme Court of the State of New York (the "State Court") to foreclose its mortgages on certain land, improvements, and unsold condominium units which have been or will be developed at the Property. In connection with the Foreclosure Action, iStar sought and obtained from the State Court appointment of a receiver to manage and control the Property during the pendency of the Foreclosure Action. On May 7, 2010, the State Court entered an order (the "Receiver Order") appointing Jonathan H. Newman as receiver (the "Receiver") of the Property, with the powers outlined in the Receiver Order. Following the Involuntary Petition Date, the Foreclosure Action was largely stayed.

10. During the Foreclosure Action and consistent with the terms of the Receiver Order, iStar exercised its right under the Prepetition Loan Agreements to make certain protective advances to the Receiver to, inter alia, (i) ensure that the Property was staffed, safeguarded, and continually managed; (ii) continue the development of the Property, including compensating certain consultants for their work related to the Property; (iii) compensate the Receiver and his legal counsel.

*Post-Involuntary Petition iStar Indebtedness*

11. Pursuant to orders of the Court dated June 30, 2010, July 30, 2010, September 22, 2010 and October 6, 2010, iStar made protective advances on behalf of the Debtors for operating expenses and for payment of the professional fees and expenses of the Receiver incurred during the gap period in the aggregate amount of $2,487,441.04 (the "iStar Gap Claims"). From the Involuntary Petition Date until recently, the Receiver has administered payment of the Debtors' operating expenses and has overseen or assisted in the management of the Debtors' property. Pursuant to orders of the Court dated January 14, 2011, January 21, 2011, January 28, 2011 and February 18, 2011, iStar made further advances to the Debtors for

5

operating expenses constituting administrative expenses which aggregate $229,661.86 as of March 1, 2011 (the "iStar Administrative Advances").

*The Debtors' Immediate Need For Liquidity*

12. The Debtors have an immediate need to obtain funds from the DIP Loans in order to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, preserve and maintain the value of the Debtors' assets, and maximize a return for all creditors requires the availability of working capital from the DIP Loans. The Debtors, their estates, and their creditors will be immediately and irreparably harmed without such financing.

13. Following negotiations among the DIP Lenders and the Debtors, the DIP Lenders have agreed to provide financing for these Chapter 11 cases, provided that the Debtors pursue expeditious approval of a Chapter 11 plan of reorganization acceptable to the DIP Lenders. As of now, the Debtors have determined that the prompt filing and approval of a Chapter 11 plan proposed by the Administrative DIP Lender will best maximize value for the Debtors' stakeholders and allow for the continuation of development of the Property.

14. In order to provide the Debtors with an opportunity to pursue approval of a Chapter 11 plan, however, the Debtors require access to the DIP Loans. Without access to the DIP Loans, the Debtors will be unable to pay the postpetition costs and expenses of these Chapter 11 cases.

I. **Material Terms Of The DIP Loan Documents**

15. The principal terms of the DIP Loan Documents are as follows:[4]

---

[4] The description of the material terms of the DIP Loan Documents set forth herein are for summary purposes only and the terms of the DIP Loan Documents and the DIP Orders shall control in all circumstances.

| | |
|---|---|
| **Administrative DIP Lender:** | HFZ Capital Group LLC or its designee |
| **Operations DIP Lender:** | iStar Tara LLC |
| **Borrowers:** | FKF Madison Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC, and Slazer Enterprises Owner, LLC. |
| **Interest Rate:** | The DIP Loans shall not bear interest except, that, from and after the Maturity Date, upon the occurrence of an event of default under the DIP Loan Documents or upon the termination of all or any portion of the DIP Loans following a Termination Event (as defined below), the DIP Loans shall accrue interest at a variable rate per annum equal to the Prime Rate as reported in The Wall Street Journal. |
| **Loan Advances** | Pursuant to the terms and conditions of the DIP Loan Documents and the DIP Orders, the DIP Lenders shall make advances (the "Loan Advances") to the Borrowers in an aggregate amount up to approximately $2,423,229, with such Loan Advances to be used in accordance with the Approved Budget (as defined below) and the DIP Loan Documents. The DIP Lenders will advance up to $1,132,139 upon the entry of the Interim Order, to the extent approved by the Bankruptcy Court in an interim order in form and substance acceptable to the DIP Lenders. The Final DIP Order provides a mechanism for the DIP Lenders to review and approve an updated budget without the need for further approval by this Court. |
| **Maturity Date:** | The Borrowers shall be obligated to repay the advances under the DIP Loans in full, including accrued interest, in cash on the date (the "Maturity Date") that is the first to occur of: <br><br>(i) June 30, 2011, or such later date as agreed to by the DIP Lenders in their sole and absolute discretion; <br><br>(ii) the consummation of a plan of reorganization in form and substance acceptable to the DIP Lenders; and <br><br>(iii) the occurrence of a Termination Event. |
| **Lien on Unused Loan Advances:** | The DIP Lenders shall be granted a valid, properly perfected, first priority senior lien on all unused Loan Advances, without the need for any deposit account control agreement or other evidence of perfection, and upon the occurrence of the Maturity Date, shall be entitled to immediate repayment of all such unused advances. |
| **Use of Proceeds:** | Proceeds from DIP Loans shall be used exclusively for funding the operating, service and maintenance expenses of the One Madison Park Condominium as set forth in the budget attached to the Interim Order as Exhibit A (the "Approved Budget"). The |

7

|  | Borrowers will be permitted variances of up to 10% for each line item on the Approved Budget forming a part of the Approved Operating Expenses, but shall not be permitted any variances with respect to Approved Administrative Expenses. The Debtors shall be permitted to carry forward from a prior month any unused portion of the Loan Advances attributable to a particular line item (including amounts previously carried forward) to pay to the same line item during the next succeeding month. No portion of the DIP Loan may be used in connection with discovery proceedings, initiation or prosecution of any claims, causes of action, objection or other litigation against the DIP Lenders or with respect to the DIP Obligations |
|---|---|
| **Super-Priority Claims:** | To ensure repayment of the Debtors' obligations under the DIP Loan Documents to the DIP Lenders, the DIP Lenders shall receive and be entitled to, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed super-priority administrative expense claims against the Borrowers' estates over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provisions of the Bankruptcy Code, and which allowed super-priority administrative expense claim shall not be subject to objection or reclassification by the Borrowers or any other party. The super-priority administrative expense claims of the DIP Lenders shall be pari passu with one another and repaid on a pro rata basis. |
| **Section 506(c) Waiver:** | No super-priority or administrative expense claim incurred by the Borrowers' estates pursuant to the DIP Loan Documents and the DIP Orders shall be charged or assessed against or recovered from the Borrowers' property that secures the Operations DIP Lender's pre-petition loans to the Borrowers, or any proceeds therefrom, pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise. |
| **Termination Events:** | The occurrence of any of the following shall constitute a Termination Event under the DIP Orders:<br><br>(i) Appointment of a chapter 11 trustee or examiner with expanded powers for any of the Borrowers;<br><br>(ii) Dismissal or conversion of any of the Chapter 11 Cases;<br><br>(iii) The entry of an order reversing, staying, vacating, or otherwise modifying in any material respect the terms of the DIP Orders or the failure of a Final Order to be entered within 30 days after entry of the Interim Order;<br><br>(iv) Any material violation of the covenants in the DIP Loan Documents; |

|  | (v) Any request for authorization to obtain post-petition loans or other financial accommodations pursuant to Bankruptcy Code section 364, or otherwise, other than from the DIP Lenders; |
|  | (vi) Granting of relief from the automatic stay to the Operations DIP Lender |
|  | (vii) Filing of a plan of reorganization not acceptable in form and substance to the DIP Lenders; or |
|  | (vii) Termination or Expiration of the exclusivity period. |

## II. Provisions That Potentially Implicate Local Rule 4001-2

16. Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires that certain provisions contained in the DIP Loan Documents be highlighted and that the Debtors provide justification for the inclusion of such highlighted provision(s).

17. Local Rule 4001-2(a)(i) provides:

Provisions to be Highlighted. All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

18. The Debtors believe that the following provisions of the DIP Credit Agreement are required to be identified in accordance with Local Rule 4001-2 and that such provisions are justified and necessary in the context and circumstances of these cases.

19. Pursuant to Local Rule 4001-2(a)(i)(B), ¶8(b) of the Interim Order provides that all of the iStar Prepetition Claim under the iStar Loans, iStar Gap Claims and iStar Administrative Advances shall be deemed allowed claims, allowed gap claims and allowed administrative expenses, respectively, jointly and severally against the Debtors' estates (which claims shall not be subject to avoidance under chapter 5 of the Bankruptcy Code), and all of the mortgages, liens and security interests provided for in the iStar Collateral Documents shall be conclusively presumed to be valid, enforceable and perfected, shall not be subject to avoidance under chapter 5 of the Bankruptcy Code and shall have the priority provided under applicable state law (and/or in the case of the iStar Gap Claims and iStar Administrative Advances under the Bankruptcy Code), unless, and solely to the extent that, the validity, enforceability or perfection of such claims, liens, security interests or mortgages is challenged in an action against iStar (including any action under chapter 5 of the Bankruptcy Code) commenced by the Debtors by April 30, 2011, unless such date is extended by agreement of iStar. This provision provides a window of fifty-nine (59) days after the entry of the Interim Order for parties in interest to

investigate iStar's liens and claims. Although this is shorter than the seventy-five (75) day period set forth in Local Rule 4001-2(a)(i)(B), parties have had over three months since the Conversion Date to conduct such investigations and the remaining investigation period is more than sufficient.

20. Pursuant to Local Rule 4001-2(a)(i)(C), ¶18 of the Interim Order provides that the DIP Lenders Super-Priority Claims, the iStar Gap Claims, and the liens granted to the DIP Lenders on the Cash Collateral shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. As the effectiveness of this waiver will be delayed until the entry of the Final Order, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice."

## BASIS FOR RELIEF

21. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code,[5] a court may authorize a debtor-in-possession to obtain

---

[5] Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing. 11 U.S.C. § 364(c).

22. Bankruptcy Rule 4001(c)(2) provides:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

23. Bankruptcy Rule 4001(d) provides, in relevant part, that (i) a motion for approval to modify or terminate the automatic stay shall be served on any committee appointed pursuant to section 1102 of the Bankruptcy Code, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, and (ii) objections may be filed within 15 days of the mailing of the notice of the motion and the time for filing objections thereto. See Fed. R. Bankr. P. 4001(d).

*Approval Under Section 364(c) of the Bankruptcy Code*

24. The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors-in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See* In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek

other sources of credit available under section 364(a) & (b)"); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

*The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis under as provided in 11 U.S.C. § 364(a) or (b)*

25. As evidence at the Interim and Final Hearings will show, the Debtors could not have obtained working capital of the type and magnitude required in these cases on an unsecured, non-priority basis.

26. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. at 1088; see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

27. Other than the proposed DIP financing, there are no financing alternatives available to the Debtors on better terms. For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors'

13

business operations, the immediacy of the Debtors' financing needs, and the liens of the Operations DIP Lender under the Pre-Petition Loan Agreements, the Debtors are convinced that they are unable to obtain better financing to address the their urgent liquidity needs.

28. Moreover, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Operations DIP Lender. Thus, even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Operations DIP Lender, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, jeopardizing these cases.

*Application of the Business Judgment Standard*

29. The Debtors negotiated the terms of the DIP Loans at arm's length and have determined, in the exercise of their business judgment, that they are the best proposal under the circumstances. In addition, the financing will directly and substantially benefit the Debtors' estates by preserving and maintaining the Debtors' property and allowing the continued administration of the Debtors' Chapter 11 cases.

30. Immediate access to the DIP Loans is critical because of the Debtors' lack of liquidity and substantial cash needs. Through its prior Administrative Advances, iStar has provided critical funding that has enabled the Debtors to ensure that certain site safety and other obligations under various permits and state laws were met. iStar's last Administrative Advance included funding for such obligations through the end of February. Following such period and without the funding requested herein, the Debtors have no liquidity to meet future obligations.

31. The financing under the DIP Loans will allow the Debtors, inter alia, to (a) fund the continued operation of, and minimize disruption to, their business and operations, (b) avoid immediate and irreparable harm to their businesses, their creditors, and their assets, (c) permit the Debtors to reorganize their business pursuant to a Chapter 11 plan, and (d) provide a clear path for the Debtors to exit these Chapter 11 proceedings as expeditiously as possible. The financing provided for in the DIP Loan Documents is critical to avoid liquidation and enable the Debtors to continue as a going concern.

32. The Debtors believe that the terms and conditions of the DIP Loan Documents are fair and reasonable under the circumstances. Accordingly, the Debtors request that the DIP Lenders be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the obligations incurred pursuant to the DIP Loan Documents. Based upon the foregoing, the Debtors respectfully request that the Court approve the DIP Loans in accordance with the terms set forth in the DIP Orders and the DIP Loan Documents.

### *Modification of the Automatic Stay*

33. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Loans and the Interim Order contemplate the modification of the automatic stay to the extent necessary to permit the Debtors to incur all liabilities and obligations to the DIP Lenders under the DIP Loan Documents and the DIP Orders.

34. Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Loan Documents.

*Interim Approval of the DIP Loans*

35. As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

36. As explained above, the Debtors have an immediate need to obtain financing to avoid serious harm to their estates. The Debtors respectfully request that the Court schedule and conduct a preliminary hearing on this Motion and authorize the Debtors from the entry of the Interim Order until the Final Hearing to obtain financing under the terms contained in the DIP Loan Documents.

*Establishing Notice Procedures and Scheduling Final Hearing*

37. The Debtors respectfully request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to (a) parties having been given notice of this Motion; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel to the Committee, (d) the Office of the United States Trustee for the District of Delaware; (e) the Internal Revenue Service; (f) counsel to the Operations DIP Lender; and (g) counsel to the Administrative DIP Lender. The Debtors request that the Court approve such notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code.

# NOTICE

38.     Notice of this Motion has been given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; (c) counsel to Administrative DIP Lender; (d) counsel to Operations DIP Lender; and (e) all other parties that have requested notice in these cases or are otherwise entitled to notice under Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto as **Exhibit C**, (i) granting the relief sought herein, and (ii) granting such other and further relief as the Court may deem proper.

Dated:  March 1, 2011
        Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Derek C. Abbott (Bar No. 3376)
Erin R. Fay (Bar No. 5268)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

4088506.3

*Counsel for the Debtors and Debtors-in-Possession*