# EXHIBIT A:

## ADMINISTRATIVE DIP TERM SHEET

## Summary of Indicative Terms and Conditions for
## Proposed Administrative Debtor in Possession Financing

This Term Sheet sets forth the material terms of a debtor in possession financing facility (the "**Administrative DIP Facility**") to be provided by HFZ Capital Group, LLC (the "**Administrative DIP Lender**") to FKF Madison Park Group Owner, LLC and its debtor affiliates (collectively, the "**Debtors**") in their chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") currently pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") jointly administered under case no. 10-11867 (KG).

| Borrowers: | Each of the Debtors |
|---|---|
| Administrative DIP Lender: | HFZ Capital Group, LLC, or its designee |
| Loan Advances: | Pursuant to the terms and conditions of this term sheet and the DIP Orders (as defined below), the Administrative DIP Lender shall make advances (the "**Loan Advances**") (as described below) to the Borrowers in an aggregate amount up to $1,116,550.00 with such Loan Advances subject to the timing and details of, and to be used in accordance with, the Approved Budget (as defined below) and the Use of Proceeds section hereof, to fund the petitioner related/administrative (but not operational) costs of the Chapter 11 Cases. |
| | An amount up to $436,600, to the extent approved by the Bankruptcy Court in an interim order in form and substance acceptable to the Administrative DIP Lender (the "**Interim DIP Order**") and subject to the timing and details of the Approved Budget, shall be available during the period from the date of entry of the Interim DIP Order by the Bankruptcy Court through the date of entry of the final order, in form and substance acceptable to the Administrative DIP Lender by the Bankruptcy Court approving the debtor in possession financing proposed herein (the "**Final DIP Order**," and together with the Interim DIP Order, the "**DIP Orders**"), and the remainder of Loan Advances shall be available after entry of the Final DIP Order. Upon entry of the Interim DIP Order, the Borrowers shall open a new deposit account or designate an existing account (the "**Administrative Expense Account**"), at a bank acceptable to Administrative DIP Lender, in which the proceeds of the Loan Advances, but no other estate funds or property, shall be held and from which disbursements in accordance with the Approved Budget, but no other disbursements, shall be made. |
| Maturity Date: | The Borrowers shall be obligated to repay the advances under the Administrative DIP Facility in full, including accrued interest (the "**Administrative DIP Obligations**"), in cash on the date (the "**Maturity Date**") that is the first to occur of (i) June 30, 2011, or such later date as the Administrative DIP Lender may agree to in |

| | |
|---|---|
| | its sole and absolute discretion; (ii) the consummation of a plan of reorganization in form and substance acceptable to the Administrative DIP Lender; and (iii) the occurrence of a Termination Event.<br><br>Following the occurrence of the Maturity Date, the Administrative DIP Lender shall be entitled to immediately terminate any further advances provided for under the Approved Budget. |
| Termination Events: | The occurrence of any of the following shall constitute a Termination Event under the DIP Orders:<br><br>(i) Appointment of a chapter 11 trustee or examiner with expanded powers for any of the Borrowers;<br><br>(ii) Dismissal or conversion of any of the Chapter 11 Cases;<br><br>(iii) The entry of an order reversing, staying, vacating, or otherwise modifying in any material respect the terms of the DIP Orders or the failure of a Final Order to be entered within 30 days after entry of the Interim Order;<br><br>(iv) Any request for authorization to obtain post-petition loans or other financial accommodations pursuant to Bankruptcy Code section 364, or otherwise, other than from the Administrative DIP Lender or iStar Tara LLC;<br><br>(v) Any material violation of the covenants annexed to this term sheet as Schedule A;<br><br>(vi) Granting of relief from the automatic stay to permit any creditor to take action with respect to the Borrowers' real property or improvements thereon;<br><br>(vii) Filing of a plan of reorganization not acceptable in form and substance to the Administrative DIP Lender; and<br><br>(viii) Termination or expiration of exclusivity |
| Use of Proceeds: | Proceeds of Loan Advances shall be used exclusively for funding the administrative expenses of the Chapter 11 Cases (the **"Approved Administrative Expenses"**) as set forth in a section entitled "Petitioner Related Expenses" in the budget annexed to the Interim DIP Order as Exhibit A (the **"Approved Budget"**). The Borrowers shall not be permitted variances from the Approved Administrative Expenses, but shall be permitted to carry forward from a prior month any unused portion of the Loan Advances attributable to a particular line item (including amounts previously carried forward) to pay the same line item during the next succeeding month. No portion of the DIP Loan may be used in connection with discovery proceedings, initiation or prosecution |

| | |
|---|---|
| | of any claims, causes of action, objection or other litigation against the Administrative DIP Lender or with respect to the Administrative DIP Obligations. |
| Loan Advances/Approved Budget: | Loan Advances shall occur no more frequently than once a month and shall be in a minimum amount of $100,000 unless less than $100,000 remains to be funded hereunder, provided, however, that either of the DIP Lenders in their sole discretion may provide Loan Advances in an amount less than $100,000 upon request by the Debtors. No later than the fifth (5th) business day of every month commencing April 7, 2011, the Borrowers shall deliver: (i) a variance report detailing: (x) the cash expenditures for the prior month and a comparison to the Approved Budget for that month; (y) the cumulative cash expenditures for all of the prior months since the entry of the Interim DIP Order as compared to the Approved Budget for such months; and (z) a narrative explanation of the variances between the actual monthly expenditures and the budgeted monthly expenditures; and (ii) an updated monthly cash flow forecast for the then remaining period of the Approved Budget (the "**Updated Budget**"), consistent with the Approved Budget (collectively, the "**Monthly Budget Reports**"). The Monthly Budget Reports shall be subject to review and approval by the Administrative DIP Lender. |
| Super-priority Claim: | To ensure repayment of the DIP Obligations to the Administrative DIP Lender, the Administrative DIP Lender shall receive and be entitled to, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative expense claim against the Borrowers' estates over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provisions of the Bankruptcy Code, and which allowed super-priority administrative expense claim shall not be subject to objection or reclassification by the Borrowers or any other party. |
| Interest Rate: | Upon the occurrence of a Termination Event, which is not waived by the Administrative DIP Lender, the Loan Advances shall accrue interest at a variable rate per annum equal to the Prime Rate as reported in The Wall Street Journal. No interest shall otherwise accrue on the Loan Advances. |
| Lien on Unused Loan Advances: | The Administrative DIP Lender shall be granted a valid, properly perfected, first priority senior lien on all unused Loan Advances, without the need for any deposit account control agreement or other evidence of perfection, and upon the occurrence of the |

| | |
|---|---|
| | Maturity Date, shall be entitled to immediate repayment of all such unused Loan Advances. |
| Carve Out: | The super-priority claims and liens granted to the Administrative DIP Lender under the DIP Orders shall be subject to the Carve Out (as defined in the DIP Orders) for (i) the unpaid fees of the Clerk of the Court and the U.S. Trustee; (ii) the fees and expenses incurred by any Chapter 7 trustee and any professionals retained by such trustee, in an aggregate amount not to exceed $20,000; (iii) to the extent permitted by the Approved Budget and allowed by final order, all unpaid fees and expenses of Chapter 11 professionals retained by the Borrowers or the Official Committee of Unsecured Creditors, which are incurred at any time on or before the first business day following a Termination Event, whether allowed by the court prior to or after the Termination Event; and (iv) after the first business day following a Termination Event, to the extent allowed by a final order, the payment of reasonable fees of such Chapter 11 professionals in an aggregate amount not to exceed $50,000. |
| Governing Law: | New York, except as governed by the Bankruptcy Code. |

**ACCEPTED AND AGREED TO:**

FKF Madison Group Owner, LLC,
JMJS 23rd Street Realty Owner, LLC,
Madison Park Group Owner, LLC
and Slazer Enterprises Owner, LLC, debtors
and debtors in possession,

By: _____
John Fioretti, their President

{00100794.DOC; 3}

Schedule A

Representations and Covenants[1]

3.9   Non-liability of Lender. Borrower acknowledges and agrees that:

(A)   The relationship between Borrower and Lender is and shall remain solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility to review, inspect, supervise, approve or inform Borrower of any matter in connection with any of the development, design or construction of the Mortgaged Property;

(B)   Lender is not a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower and Lender does not intend to ever assume any such status; and (ii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower; and

(C)   Lender shall not be directly or indirectly liable or responsible for any loss or injury of any kind to any person or property resulting from any construction on, or occupancy or use of, the Mortgaged Property (except to the extent proximately caused by Lender's or Lender's agent's gross negligence or willful misconduct), whether arising from: (i) any defect in any building, grading, landscaping or other onsite or offsite improvement; (ii) any act or omission of Borrower or any of Borrower' agents, employees, independent contractors, licensees or invitees; or (iii) any Mortgaged Property or any fire or other casualty or hazard thereon.

4.1   Organization, Powers, and Qualification. On or before April 15, 2011, each Borrower shall take all necessary steps to ensure that such Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of its state of formation and, at all times thereafter, will preserve and keep in full force and effect its existence, and all rights and franchise material to its respective business and will continue to be qualified in all jurisdictions in which it is required to qualify. Each Borrower has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, and to enter into debtor-in-possession financing arrangements as set forth in the pre-fixed term sheet and as approved by the bankruptcy court (the "DIP Financing"). Slazer Enterprises LLC is a limited liability company, duly organized and validly existing under the laws of the State of Delaware and is the sole manager or economic member in each Borrower.

4.16   Insurance. Schedule 4.16 sets forth a complete and accurate description of all policies of insurance that will be in effect as of the Closing Date for Borrower and such policies of insurance satisfy all of the requirements of Section 5.4. No notice of cancellation has been received with respect to such policies and Borrower is in compliance, in all material respects, with all conditions contained in such policies.

---

[1]   The following representations and covenants are, with certain modifications, adopted from the Building Loan and Security Agreement, dated as of November 16, 2007, between the Borrower and SFT I, Inc. For ease of reference, the original section numbers as they appear in the Building Loan and Security Agreement have been maintained in this Schedule. As used herein, "Lender" shall mean iStar Tara, LLC or HFZ Capital, LLC. All other capitalized terms shall have the meanings given to them in the Building Loan and Security Agreement.

5.1     Financial Statements and Other Reports. From and after the date of entry of the interim order approving the DIP Financing, Borrower will maintain a system of accounting in accordance with sound business practices to permit preparation of financial statements and proper and accurate books, records and Accounts reflecting all of the financial affairs of Borrower with respect to all items of income and expense in connection with the operation of the Mortgaged Property.

5.4     Insurance. Borrower shall at all times provide, maintain and keep in force or cause to be provided, maintained and kept in force the following policies of insurance with respect to the Mortgaged Property and Borrower, as applicable:

    (A)     During Construction.

        (i)     Borrower's Requirements:

    (a)     Builder's Risk. From the closing of the Building Loan until replaced by permanent property insurance, "All Risk" form of Builder's Risk Insurance, including collapse, in an amount no less than 100% of the replacement value of the Project (including upgrades and any leasehold Improvements). Such policy shall be written on a Completed Value Form (non-reporting) or its equivalent and shall not contain a limitation on permission to occupy. The policy shall include coverage for flood and earthquake (including subsidence and sink hole) with sub-limits no less than 25% of the replacement cost, but each not less than $25,000,000.00 per occurrence and in the annual aggregate. If the building is located in a high hazard earthquake zone, Borrower shall maintain earthquake limits equal the Probable Maximum Loss (PML) as established by a licensed engineer with a deductible not greater than 5% of replacement costs. If the building is located in a Special Flood Hazard Zone, as defined by the National Flood Insurance Program (NFIP) flood insurance should be purchased in maximum available limits from the NFIP with excess limits as required by Lender. Such insurance policy shall also include coverage for:

        (1)     Loss suffered with respect to Borrower's materials, equipment, machinery, and supplies whether on-site, in transit, or stored off site, with a limit of no less than 100% replacement cost and subject to a minimum limit of $1,000,000 provided that Borrower shall obtain or cause to be obtained additional insurance whenever the value of materials in transit or in storage exceed those limits;

        (2)     Such policy shall include coverage for existing structures, sidewalks, retaining walls, scaffolding, temporary structures, or underground works;

        (3)     At least 25% of the Soft Costs contained in the Development Budget, and including coverage for all types (including but not limited to interest expense; fees; and plans, specifications, blueprints and models, in connection with any restoration following an insured loss);

        (4)     Loss or delay in start up or completion of the Project for a period of at least 6 months on an actual loss sustained basis. Lender reserves the right to require an endorsement providing for an extended period of indemnity.

(b) Comprehensive Broad Form Boiler and Machinery Insurance, covering all mechanical and electrical apparatus and pressure vessels. Such insurance shall provide coverage against loss or damage from an accident to and/or caused by boilers and machinery, including but not limited to: heating apparatus, pressure vessels, pressure pipes, electrical or air conditioning equipment on a blanket comprehensive coverage form, in such amount as Lender shall reasonably approve. All exclusions for testing (hot and cold) shall be removed.

(c) Commercial General Liability and Umbrella and/or Excess Liability coverage, including but not limited to, coverage for personal and advertising injury, bodily injury, property damage, fire damage, legal liability, with combined limits of not less than $50,000,000.00 per occurrence and in the annual aggregate per location. The policies described in this paragraph shall cover, without limitation: elevators, escalators, independent contractors, contractual liability and products-completed operations liability coverage. The completed operations coverage should be maintained for the applicable State Statute of Limitations. Borrower shall add Lender, its directors, officers, employees and agents as additional insured.

(d) Workers Compensation. If applicable, statutory workers compensation and employers' liability insurance in the amount of $1,000,000 per accident, $1,000,000 per employee and $1,000,000 per policy limit covering Borrower and its employees at the Property.

(e) Other. Such other insurances as may be reasonably requested by Lender.

(i) Contractor's Requirements – Borrower shall require Contractors of record to provide the following requirements:

(a) Commercial General Liability coverage, including, without limitation, products and completed operations and contractual liability, with minimum limits of $1,000,000 per occurrence and $2,000,000 general aggregate per project and $2,000,000 products completed operations aggregate per project. The policy shall name Borrower and Lender as additional insured for premises operations and completed operations. The completed operations coverage should be maintained for the applicable State Statute of Limitations. The liability coverage should not exclude the following:

(1) Damage to work performed by sub-contractors on your behalf;

(2) Explosion, collapse, and underground property damage;

(3) Contractual liability limitation endorsement;

(4) Products completed operations hazard; and

(5) Residential construction.

(b) Statutory Workers Compensation, and employers' liability insurance in the amount of $1,000,000 per accident, $1,000,000 per employee and $1,000,000 per policy limit.

(c) Commercial Auto Liability, covering all owned, borrowed, hired and non-owned vehicles with minimum limits of $1,000,000 per occurrence.

(d) Contractor's Pollution Liability, if the contract requires removal or disposal of hazardous waste, underground tanks, or asbestos.

(e) Umbrella Liability, with minimum limits of $100,000,000.00 per occurrence with a per project aggregate of $100,000,000.00. Umbrella liability should not be more restrictive than the general liability.

(f) Sub-contractors. Contractor shall also ensure that all subcontractors maintain similar coverage with limits appropriate to the hazard associated with their respective work on the site.

(g) Performance and Payment Bonds, for 100% of the contract price as required by Lender. Lender shall be named as co-obligee or multiple obligee as applicable.

(h) OCIP or CCIP. Borrower or Contractor may provide the commercial general liability, umbrella liability, and workers compensation and employers' liability required to be carried pursuant to the liability requirements stated above, through the purchase of a Wrap-up, such as an Owner Controlled Insurance Program or a Contractor Controlled Insurance Program. This program shall provide coverage for all parties engaged in construction operations at the Project with limits approved by Lender.

(ii) Professional Liability – Borrower shall require the Architect, engineers (including Structural and MEP contractors) and all other design professionals retained by the Borrower to purchase and maintain continuous professional liability coverage in the amount of $5,000,000 per claim and $5,000,000 annual aggregate. This policy may be on a "claims made" basis and should be retroactive back to the first date that professional services were provided to the Project. A project professional policy may also be used to insure all members of the design team under one policy with limits not less than $5,000,000 per claim and $5,000,000 in the aggregate. Evidence of this insurance shall be provided to Borrower in form of insurance certificate for a period of 3 years after Substantial Completion of the Project. Professional contractor's shall also provide evidence of general liability coverage with limits of $1,000,000 per occurrence and statutory workers compensation coverage.

(B) <u>Intentionally Omitted</u>.

(C) <u>General Requirements of Insurance Policies</u>.

(i) All insurance policies shall be issued by an insurer or insurers with an A.M. Best rating of "A: IX" or better and a Standard and Poor's rating of "A," or equivalent rating from another agency acceptable to Lender and be authorized in the state where the Project is located.

(ii) The builder's risk insurance policies and the "all-risk" property policies shall name Borrower as the insured and shall also name Lender as additional insured, loss payee, and mortgagee under a non-contributing standard mortgagee clause.

(iii) The commercial general liability and umbrella liability policies of the Borrower and all liability policies of any Contractor and its sub-contractors shall name Lender, its subsidiaries, successors, assigns, directors, officers, and employees as Additional Insured-Mortgagee.

(iv) Lender shall be named as a dual-obligee on the Performance Bond required to be obtained by General Contractor.

(v) The amount of any deductible under any insurance policy must be reasonably acceptable to Lender.

(vi) Borrower shall pay the premiums for the insurance policies as the same become due and payable. Borrower shall deliver a certificate or other evidence of insurance acceptable to Lender evidencing the insurance required hereunder on the closing date, together with receipts for the payment of premiums. If requested by Lender, Borrower shall deliver to Lender copies of the insurance policies required to be maintained within sixty (60) days after the Closing Date. Not later than fifteen (15) days prior to the expiration date of each of the insurance policies Borrower shall deliver to Lender a certificate of insurance evidencing renewal of coverage as required herein. Within ten (10) days after such renewal, Borrower shall deliver to Lender evidence of payment of premium satisfactory to Lender. If requested by Lender and not later than ninety (90) days after the renewal of each of the insurance policies, Borrower shall deliver to Lender an original or certified copy (as required pursuant to Section 5.4 Building Loan and Security Agreement) of a renewal policy or policies.

(vii) Each insurance policy shall contain a provision whereby the insurer agrees that so long as the Building Loan is outstanding, such policy shall not be canceled or fail to be renewed, lapsed or materially changed without in each case, at least thirty (30) days prior written notice to Lender, except ten (10) days for non-payment of premium.

(viii) The interests of Lender shall not be invalidated by any action or inaction of Borrower, and such policies shall insure Lender regardless of any breach or violation by Borrower, of any warranties, declarations or conditions in such policies.

(ix) Any insurance maintained by Borrower pursuant to this Schedule may be evidenced by blanket insurance policies covering the premises and other properties or assets of Borrower or its affiliates; provided that any such policy shall in all other respects comply with the requirements of Section 5.4 of the Building Loan and Security Agreement. Lender, in its reasonable discretion, shall determine whether such blanket policies contain sufficient limits of insurance.

(x) Any insurance carried by Lender shall be for its sole benefit and shall not inure to the benefit of Borrower and Insurance required from Borrower shall be primary to any available, if any, to Lender.

(xi)     All required policies, other than professional liability, shall provide that insurers have waived rights of subrogation against Lender. The required insurance shall be primary without right of contribution from any insurance, which may be carried by Lender.

(xii)    The required limits listed above are minimum limits established by Lender and nothing contained herein shall be construed to mean the required limits are adequate or appropriate to protect Borrower from greater loss.

5.5     Maintenance of Mortgaged Property. Borrower will maintain or cause the Mortgaged Property to be maintained in compliance with all Legal Requirements and in good repair, working order and condition and will make or cause to be made all appropriate repairs, renewals and replacements thereof. Borrower will promptly restore and repair all loss or damage occasioned by (i) any casualty which has occurred to at least the condition existing prior to any such casualty or (ii) any condemnation to an economically and structurally integrated unit. Borrower will prevent any act or thing which might materially impair the value or usefulness of the Mortgaged Property. Borrower will not commit or permit any waste of the Mortgaged Property or any part thereof.

5.6     Inspection; Lender Meeting. Borrower shall, upon request from Lender, permit (and cause to be permitted) Lender's designated representatives to (a) visit, examine, audit, photograph and inspect the Mortgaged Property, (b) examine, audit, inspect, copy, duplicate and abstract Borrower's financial, accounting and other books and records, and (c) discuss Borrower's and the Mortgaged Property's affairs, finances and business with Borrower's officers, senior management, representatives, independent public accountants and agents (including the Manager).

5.7     Environmental Compliance. Borrower shall: (a) comply (or cause compliance) at all times with all applicable Environmental Laws in all material respects, and (b) promptly take, or cause to be taken, any and all necessary remedial actions upon obtaining knowledge of the presence, storage, use, disposal, transportation, release or discharge of any Hazardous Materials on, under or about the Mortgaged Property which has a Material Adverse Effect or is in violation of any Environmental Laws. Borrower shall cause all remedial action with respect to Hazardous Material on, under or about the Mortgaged Property, to comply with all applicable Environmental Laws and the applicable policies, orders and directives of all federal, state and local Governmental Authorities. If Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Law by, or any liability arising thereunder of, Borrower or related to the Mortgaged Property, Borrower shall, upon request from Lender, provide Lender with such reports, certificates, engineering studies and other written material or data as Lender may reasonably require to confirm compliance by Borrower and the Mortgaged Property with all applicable Environmental Laws. Borrower shall permit Lender, its authorized representatives, consultants or other Persons retained by Lender to enter upon, examine, test and inspect the Mortgaged Property with regard to compliance with Environmental Laws, the presence of Hazardous Materials and the environmental condition of the Mortgaged Property and properties adjacent to the Land. The cost incurred by Lender as a result of any such entry, examination, testing and inspecting and reporting shall be an administrative expense of the Borrower's estates.

5.8     Environmental Disclosure.  Borrower shall immediately upon becoming aware thereof advise Lender in writing and in reasonable detail of: (1) any release, disposal or discharge of any Hazardous Material at the Mortgaged Property required to be reported to any federal, state or local governmental or regulatory agency under all applicable Environmental Laws; (2) any and all written communications sent or received by Borrower or its agents with respect to any Environmental Claims or any release, disposal or discharge of Hazardous Material required to be reported to any federal, state or local governmental or regulatory agency; (3) any remedial action taken by Borrower or any other Person in response to any Hazardous Material on, under or about any real property owned, leased or operated by Borrower or the Mortgaged Property or its agents, the existence of which could result in an Environmental Claim; (4) the discovery by Borrower or its agents of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property could cause such real property or any part thereof to be classified as "border-zone property" or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws; and (5) any request for information from any Governmental Authority that indicates such Governmental Authority is investigating whether Borrower or another present or former occupant of the Mortgaged Property may be potentially responsible for a release, disposal or discharge of Hazardous Materials from any of the Mortgaged Property.  Borrower shall promptly notify Lender of any proposed action to be taken by Borrower to commence any operations that could reasonably be expected to subject Borrower to additional laws, rules or regulations, including laws, rules and regulations requiring additional or amended environmental permits or licenses.  Borrower shall, at its own expense, provide copies of such documents or information as Lender may reasonably request in relation to any matters disclosed pursuant to this Section 5.8 of the Building Loan and Security Agreement.

5.12    Use of the Project; Certain Restrictions.

(A)     Except as otherwise expressly permitted in the Building Loan and Security Agreement, Borrower shall not, as Declarant or Residential Unit owner, without the prior written consent of Lender,

(i)     request, consent to or otherwise initiate, or consent in writing to any zoning classification or reclassification of the Project or the adoption, issuance, imposition or amendment of any other law, ordinance, rule, regulation, order, judgment, injunction or decree relating to the use, occupancy, operation, development, disposition or design of the Project which would limit the use of the Residential Units therein or materially reduce its or their fair market value,

(ii)    initiate, request or consent in writing to the annexation of any part of the Project by or into any municipality or other governmental or quasi-governmental unit,

(iii)   execute, file or record any subdivision plat affecting the Project (other than as contemplated in the Declaration or the Project Plans and Specifications) or request or consent in writing to any subdivision of the Project (other than as contemplated and provided for in the Declaration or the Project Plans and Specifications),

(iv) enter into, consent in writing to or otherwise cause, permit or suffer any Residential Unit owned by Borrower to become subject to any covenant, agreement or other arrangement restricting or limiting the use, occupancy, operation, development or disposition thereof (other than the Permitted Exceptions, any covenant of this Agreement, the other Loan Documents or the Governing Instruments),

(v) materially and substantially modify, alter, remove or improve the Common Areas (other than for Tenant Improvements to retail space or as otherwise set forth in the Project Plans and Specifications),

(vi) maintain or permit to be maintained the Residential Units owned by it for lease or as a rental project (except as expressly permitted in the Governing Instruments),

(vii) add or withdraw real property from the Project, or create additional Residential Units, beyond those existing or planned for in accordance with, and pursuant to, the Governing Instruments and Project Plans and Specifications,

(viii) permit the Residential Units to be used other than for nonpermanent residential purposes, or

(ix) propose or vote for or consent to any modification of, or amendment to, the Governing Instruments (after any of the same have been recorded, filed and adopted, respectively) which could have (in the reasonable opinion of Lender) a Material Adverse Effect on the Collateral or the operation or prospects of the Project.

(B) Use by Public. Except as contemplated by the Governing Instruments, Borrower shall not cause, permit or suffer the Mortgaged Property (other than the Common Areas) to be used by the public without restriction (except as required by applicable law or as otherwise provided in the Declaration) or in any manner that might tend to impair Borrower's right, title and interest in and to the Project or in any manner that might make possible any claim of adverse usage or adverse possession by the public or any claim of implied dedication of all or any part of the Project.

(C) Intentionally Omitted.

(D) Other Condominium Covenants.

(i) Intentionally Omitted.

(ii) Local Legal Compliance. Borrower shall comply, and shall cause the Project and the Residential Units to comply, with all applicable restrictive covenants, zoning, design and land use ordinances and building codes, all applicable health and Environmental Laws and regulations and all other applicable laws, rules and regulations and all Licenses and Permits (including the Declaration); and Borrower shall use its commercially reasonable efforts to obtain all certificates of occupancy if required, or their equivalent in the applicable jurisdiction, in respect of the use and operation of the Project and the Residential Units as promptly as possible after the Completion of Construction, except for (a) any upgrades or customizations with respect to any Residential Unit for which Upgrade Deposits have been

posted pursuant to a Sales Agreement, or (b) the improvement, build-out, upgrading or other customization of Residential Units designated by Borrower as "penthouse" units, and Borrower shall keep such certificates in full force and effect.

(iii) <u>Registration Compliance</u>. Borrower shall maintain, or cause to be maintained, all necessary consents, franchises, approvals, and exemption certificates in connection with, and Borrower will make, or cause to be made, all registrations or Declarations with any applicable government or any agency or department thereof required in connection with, the occupancy, use and operation of the Project.

(iv) <u>Records</u>. Borrower shall maintain accurate and complete files relating to the Earnest Money, the Sales Agreements, and the other Collateral to the reasonable satisfaction of Lender, and such files will contain copies of each Sales Agreement, all relevant credit memoranda, and all collection information and correspondence in respect thereof, as the case may be.

(E) <u>Intentionally Omitted</u>.

(F) <u>Contracts</u>. Except as required by applicable law or by the Declaration, Borrower shall not materially modify or amend, or (subject to the rights and obligations of the Association and its members under the Declaration or the Association's Articles of Incorporation or By-Laws) permit to be materially modified or amended, any Material Contract without the prior written consent of Lender, which consent shall not be unreasonably withheld, or enter into, or (subject to the rights and obligations of the Association and its members under the Declaration or the Association's Articles of Incorporation or By-Laws) permit to be entered into, any new Material Contract without the prior written consent of Lender, which consent shall not be unreasonably withheld. Borrower shall perform all of its obligations in a timely fashion under each Material Contract.

(G) <u>Notices</u>. Borrower shall promptly deliver to Lender copies of each written notice or request, financial statement, budget, report, or other information received by Borrower under or with respect to the Declaration and/or the Association's Articles of Incorporation or By-Laws, whether in its capacity as Declarant, owner of a Residential Unit, holder of a mortgage, deed of trust or other "security interest," which could be reasonably expected to have a Material Adverse Effect.

5.14 <u>Protection of Collateral; Assessments; Reimbursement</u>. All Insurance Premiums and all expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral, any and all Impositions on any of the Collateral or in respect of the sale or other disposal thereof shall be borne and paid by Borrower or Borrower shall cause the Association or any manager retained by it to pay the same, as provided for in the Declaration and/or the Association's Articles of Incorporation or By-Laws. Borrower shall promptly pay, as the same become due and payable, its share of all Insurance Premiums, expenses, Impositions and/or assessments as required by the Declaration and/or the Association's By-Laws. Except as otherwise permitted in this Agreement, if Borrower shall fail to pay, or cause to be paid, any such Insurance Premiums, expenses, Impositions and/or assessments, Lender may (in its sole discretion), at Borrower's expense, pay the same. If, by reason of any suit or proceeding of any

kind, nature or description against Borrower, or by Borrower, or by reason of any other material facts or circumstances, which in Lender's reasonable discretion makes it advisable for Lender to seek counsel for the protection and preservation of the Collateral, or to defend its own interest, such expenses and reasonable counsel fees actually incurred shall be allowed to Lender and borne and paid by Borrower as an administrative expense of the Borrower's estates.

7.2    Liens and Related Matters. Borrower will not directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to the Mortgaged Property or other Collateral whether now owned or hereafter acquired, or any income or profits therefrom, except Permitted Encumbrances and as permitted in any interim and final orders approving debtor in possession financing pursuant to section 364 of the Bankruptcy Code from Lender to Borrower.

7.9    Use of Lender's Name. Borrower shall not use the names of Lender or any of Lender's Subsidiaries or Affiliates in connection with the development, marketing, leasing, use and operation of the Mortgaged Property.