IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
In re:                                                     :    Chapter 11
                                                           :
FKF MADISON PARK GROUP OWNER,                              :    Case No. 10-11867 (KG)
et al.,[1]                                                 :
                                                           :    **Re: Docket Nos. 311 and 329**
                                       Debtors.            :
---------------------------------------------------------- x

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE EMERGENCY MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) MODIFYING THE AUTOMATIC STAY, AND (III) SCHEDULING A FINAL HEARING

The Official Committee of Unsecured Creditors (the "Committee") of the above named debtors and debtors-in-possession (collectively, the "Debtors"), hereby files this objection (the "Objection") to the Emergency Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Modifying the Automatic Stay, and (III) Scheduling a Final Hearing [Docket No. 311] (the "Motion"). In support of its Objection, the Committee states as follows:

### PRELIMINARY STATEMENT

1. On the evening of Friday, March 11, 2011, the Committee received a copy of a letter agreement between Mr. Caner's companies, Green Bridge Capital, S.A. and Special Situations, S.A. (the "Majority Owners"), on the one hand, and HFZ Capital Group, LLC ("HFZ") on the other. The letter agreement is referred to as the "HFZ Plan Support Agreement"

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6551); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) (4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

and is attached here as Exhibit A.[2] Although the agreement is dated December 1, 2010, and has been alluded to in testimony, it was only recently provided to the Committee (despite many prior requests) and presumably the Court will be seeing it for the first time upon the filing of this Objection.

2. After reading the HFZ Plan Support Agreement, the Committee understands the parties' reluctance to disclose its terms. The document confirms what many have suspected all along: HFZ essentially has hijacked control of these cases. The Debtors have made it clear that they are simply waiting for HFZ to present its much anticipated plan so that the Debtors can pursue its confirmation. If the Motion is granted, an HFZ plan may be the only option that will ever see the light of day.

3. Although the HFZ Plan Support Agreement is discussed in greater detail below, it is worth noting that:

- The Majority Owners became involved in these cases only after executing the HFZ Plan Support Agreement which requires HFZ to pay the Majority Owners' expenses incurred in the bankruptcy cases, including seeking confirmation of an HFZ-sponsored plan;

- If an HFZ-sponsored plan is confirmed, the Majority Owners are entitled to a consulting fee of $2 million over 24 months, a share of net proceeds pursuant to a waterfall, and a right (but no obligation) to invest in the reorganized debtor;

- In return, the Majority Owners were required to (a) obtain control of the Debtors, as they ultimately did, and (b) support an HFZ-sponsored plan to the exclusion of all others (subject to a narrow "fiduciary out," which would be rendered completely meaningless if a final order is entered).

- Despite the fact that the Debtors are insolvent to the tune of hundreds of millions of dollars, the HFZ Plan Support Agreement provides for equity holders (the Majority Owners) to receive millions. Indeed, equity will receive more than is even contemplated for all unsecured creditors.

---

[2] The Committee initially received the HFZ Plan Support Agreement from the Debtors with confidentiality restrictions. However, the same document was subsequently provided without restriction by the Majority Owners and HFZ.

4. In essence, the Majority Owners bound themselves to HFZ, sought and obtained control of the Debtors, and have directed the Debtors' actions in furtherance of their private agreement – an agreement which provides a substantial benefit to the Majority Owners at the expense of the Debtors' estates.

5. The HFZ Plan Support Agreement helps explain why Mr. Caner and the Majority Owners, who are owners of worthless equity with no previous management responsibility, suddenly and vigorously became involved in these cases in mid-December 2010 Prior to December 2010, Mr. Caner and his companies have taken the same actions most out-of-the-money equity holders take: little or none. After signing the agreement with HFZ, however, Mr. Caner immediately commenced gaining control of the Debtors and to utilize chapter 11 to defend the HFZ Plan Support Agreement.

6. The Motion is another attempt by Mr. Caner (who directs the Debtors through the Majority Owners), to use the Debtors to fulfill his end of a bargain he struck while acting in his own self interest. Styled as a financing motion, the Motion requests relief that, if granted, would prevent the Debtors from supporting a non-HFZ Plan and that would deter other parties from participating in the plan process.

7. In exchange for having its hands tied, the Debtors will receive post-petition financing in an amount that, while not insignificant, is quite small in comparison to the value of the Debtors' estates. By providing such funding, the DIP Lenders are offering the sleeves off of their vests. HFZ, one of the DIP Lenders, already is obligated via the HFZ Plan Support Agreement to fund the HFZ plan process. The other, iStar Terra, LLC ("iStar"), has advancing funds to protect its collateral throughout these cases. Even if iStar was now able to establish a need for further protections, it certainly would not be able to justify the need for terms that

restrict the ability to maximize the value of the Debtors' assets, such as are contained in the DIP Loan Documents.

8. The relief requested in the Motion is particularly inappropriate in light of the interest expressed by other investors in participating in the plan process. The Committee has had discussions with three investor groups. Although the Debtors displayed no interest in having discussions with anyone other the HFZ until the Committee and other parties pressed the issue, the Committee has learned that the Debtors have met with several more interested parties in the last week. There is no credible basis for chilling a competitive plan process in order to honor a pre-petition plan support agreement to which the Debtors are not even parties.

9. Similarly, the Debtors have shown no interest in seeking financing from sources other than the DIP Lenders. At the March 3rd hearing, Mr. Fioretti testified that he had not sought financing from other sources. Apparently swayed by the 0% interest rate and the absence of liens, explained that "[t]here's no reason to spend a lot of time – you know, it doesn't get any better than this." See Transcript of March 3, 2011 Hearing, 66:7 through 66:25, attached as Exhibit B. Mr. Fioretti is missing the point. If approved, the DIP Lenders would be receiving something far more valuable than a few months of interest payments or some additional security; they would be receiving substantial control over the cases. Until the Debtors establish that tried, but were unable, to obtain financing without the egregious terms of the DIP Loans, they are unable to satisfy the requirements of Section 364(c). There is still time for the Debtors to seek alternate financing. There are no exigent circumstances that require immediate approval of the Motion on a final basis.[3] With the recent attention the Debtors have received from willing

---

[3] . Indeed, the debtors have barely spent any of the money which was approved on an interim basis. Thus, rather than approve the problematic DIP Financing at this time, the court should allow the Debtors time to work with other parties and obtain alternatives. Doing so will have the added benefit of allowing HFZ time to propose its plan.

investors, it is likely an alternate DIP exists – and would not require the Debtors to cede control of the cases in return.

10. In the case of In re Innkeepers USA Trust, 442 B.R. 227 (Bankr. S.D.N.Y. 2010), the debtors requested authority to assume a pre-petition plan support agreement that primarily benefited insiders and prepetition lenders. Although the issue was before the court in a different procedural context,[4] the court's sentiments are equally applicable in this case:

> Due, at least in part, to the lack of transparency in the process, the proposed PSA has spurred extensive discovery requests and a motion for an examiner. One objector has – in my view, correctly – argued that the PSA breeds contempt rather than fostering negotiations. This is not what chapter 11 is supposed to be about. To the contrary, a number of the objectors point out that a debtor's exclusive period was intended by Congress to provide for an opportunity for the debtor to negotiate with its constituents and reach a consensual plan, a successful plan. Others cite to cases in this District for the proposition that exclusivity should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory. The PSA has had such an effect on the Debtors' estates by tying all parties to a plan which lacks support from nearly the entire capital structure and preventing the Debtors from negotiating in good faith with their numerous constituents who will eventually be required to vote on a plan.

Id. at 234.

11. The Debtors have not been utilizing exclusivity to negotiate the best possible plan for their estates. In fact, they have done the exact opposite. The Majority Owners first negotiated the HFZ Plan Term Sheet for their own benefit and then obtained control of the Debtors so they could use exclusivity to push through their deal – for the benefit of equity, instead of creditors. The Debtors appear content to wait for HFZ to negotiate with iStar and deliver a plan term sheet – as they have been waiting since before the February 8th hearing. It is

---

[4] In that case, the court addressed the debtors' request for authority to assume the prepetition plan support agreement. In this case, of course, the Debtors are not even parties to the HFZ Plan Support Agreement.

unclear when this will happen, if at all, and what an HFZ Plan will provide. The Court should not allow the Debtors to continue to tie their own hands, which would force the estates to wait without the ability to consider other options.

12. The Debtors apparently have had recent discussions with other interested parties, (which occurred only after admitting that the Debtors took no steps to contact other parties to obtain financing). It remains to be seen whether the Debtors' efforts are sincere or whether they are merely going through the motions. In either case, granting the Motion in its present form will make future negotiations all but meaningless. The DIP Lenders would have the ability to terminate funding at the first sign of a competitive plan, including any attempt to bring in a take out lender. The Debtors would not be able to pursue a competing plan without risking their funding.

13. Granting the Motion on a final basis would allow the Majority Owners to leverage the Debtors' exclusivity for their own gain. As Judge Chapman stated in Innkeepers, this is not what chapter 11 is supposed to be about.

## Background

14. On June 8, 2010 (the "Petition Date"), Petitioning Creditors Stephen Kraus, Mitchell Kraus, Barbara Kraus, and Kraus Hi-Tech Home Automation, Inc. filed involuntary petitions for relief against the Debtors under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The cases were converted pursuant to the Court's Order entered on November 19, 2010.

15. On January 31, 2011, the Court entered its Order and issued its opinion in Adversary Proceeding No. 10-56158 (the "Adversary Proceeding"). The Court clarified the rights of the owners of Slazer Enterprises, LLC ("Slazer Enterprises"). Because Slazer

Enterprises is the manager and/or owner of each of the Debtors,[5] the party with authority to act on its behalf would also control the Debtors. Prior to the Court's ruling, the Debtors acted at the direction of Ira Shapiro, owner of 32.5% and manager of Slazer Enterprises. After the Court's ruling, the Debtors have been under the control of Cedvet Caner, through the Majority Owners, which collectively own the remaining 67.5% of Slazer Enterprises.

16. The actions of the Debtors in these cases have been vastly different depending on who was in charge at the time. The Shapiro Debtors initially sought to dismiss the involuntary petitions. However, after agreeing to the terms of a plan of reorganization (the "New One Madison Plan") with New One Madison Park Member I, LP ("New One Madison") as plan sponsor, the Shapiro Debtors consented to the conversion of the cases to cases under Chapter 11.[6] The Shapiro Debtors filed the New One Madison Plan on December 15, 2010 [Docket No. 160]. (Notably, the Majority Owners filed the Adversary Proceeding on that same day). Later, on January 20, 2011, while the Adversary was pending, the Shapiro Debtors filed a motion for the appointment of a trustee or, alternatively, for termination of exclusivity [Docket No. 212], which would have allowed any party in interest to file a plan.

17. Once under the control of Mr. Caner, the Debtors quickly changed course. Within about a week of the Court's January 31st ruling, the Caner Debtors withdrew the New One Madison Plan and also withdrew the motion for appointment of a trustee or termination of exclusivity previously filed by the Shapiro Debtors [Docket No. 259].

18. Although the Debtors' trustee/exclusivity motion was no longer an issue, a similar motion filed by the petitioning creditors was heard on February 8, 2011. At that hearing, the

---

[5] Each of the Debtors is managed by Slazer Enterprises, LLC ("Slazer").[5] Slazer, in turn, is (a) owned by Green Bridge Capital, S.A. ("Green Bridge"), Special Situations, S.A. ("Special Situations") and Ira Shapiro, and (b) at least at the inception of these cases, managed by Ira Shapiro.

[6]

Caner Debtors relied heavily on the existence of a plan term sheet with HFZ to resist appointment of a trustee or termination of exclusivity. Although Mr. Caner testified that it would be filed in the near future,[7] five weeks have passed with no HFZ Plan on file.

19. Mr. Caner also assured the Court and creditors that the Debtors agreement with HFZ would not deter the Debtors from considering other plans in a "transparent" process. When asked how the Debtors would respond to other proposals, Mr. Caner answered:

> Very clearly, whenever Mr. Eichner or any other party approaches us with a plan that's better than the HFZ plan we will absolutely consider it…and we will enter…negotiations immediately and we will have that transparent procedure to follow through with these negotiations and pick the best plan.

February 8th Transcript, 62:19 through 63:2, attached hereto as Exhibit C.

20. When deciding not to appoint a trustee or terminate exclusivity, the Court found Mr. Caner's assurances of an open plan process significant:

> Obviously, my [January 31, 2011] opinion has had some influence on the parties' actions and it has moved the case forward in great significance. And I think if nothing else it shows what negotiation can do. And those negotiations will still be available in the plan process. And I take Mr. Caner at his word that he will be reaching out to creditors. And obviously, there is a creditors committee now which will insist on that negotiation taking place which I think goes a long way in having me conclude that I also – not only shouldn't I appoint a Chapter 11 trustee, but that I should not terminate exclusivity in this case.

February 8th Transcript, 109:19 through 110:4, attached hereto as Exhibit D. The Committee suspects that the Debtors' last minute discussions with other investors, while they continue to bind themselves to HFZ through their pursuit of the Motion, is not what the Court had in mind.

21. On March 1, 2011, the Debtors filed the DIP Motion, which the Court granted on an interim basis pursuant to its Order entered on March 3, 2011 [Docket No. 329] (the "Interim

---

[7] Mr. Caner stated that he "hop[ed] that [filing the HFZ Plan] will be possible within five working days." Transcript of Hearing held February 8, 2011, 76:17, attached as Exhibit F.

Order"). The Committee filed an initial objection to the DIP Motion [Docket No. 325] (the "First Committee Objection"), in which it outlined its concerns with the DIP Loans. Among other concerns, the Committee objected to the provisions that allowed the DIP Lenders, one of which is HFZ, to terminate funding upon (a) the filing of a plan of which the DIP Lenders do not approve, (b) the termination or expiration of exclusivity, or (c) any request to obtain alternative financing. The Committee also was concerned with the prior testimony of Messrs. Caner and Shapiro that they had reached agreements with HFZ that provide for substantial sums to be paid to them by HFZ (directly to Mr. Caner and indirectly to Mr. Shapiro) under an HFZ Plan.[8]

22. Although it recognized the Committee's concerns, the Court granted the DIP Motion on an interim basis with the hopes that the parties would resolve the issues in advance of the final hearing set for March 17, 2011:

> I would hope that...while the interim financing is in place pending a final hearing that the parties will, first of all, talk with one another about a positive outcome for the estate, but as well, talk about specifically whether there are in fact other lenders who might provide more reasonable terms...[H]ow they could be more reasonable, frankly, I don't know, but terms I suppose from the creditors' committee standpoint would [include] terms that don't in any way chill other parties from coming in and supporting the plan process.
>
> But on an interim basis the Court just doesn't see that that's a major risk in any of these terms.

Transcript of Hearing on March 3, 2011, 123:21 through 124:11, attached hereto as Exhibit E.

23. Since the hearing on March 3, the Committee has been attempting to obtain a copy of the term sheet for the HFZ Plan – which was requested prior to that time and again during the hearing -- as well as any documents relating to the compensation to be received

---

[8] Mr. Caner testified that he or an affiliate would be receiving a $2 million consulting fee over 24 months, a "back end profit participation" that he expected to be around $1 million. February 8, 2011 Transcript, 44:6 through 45:25. Mr. Shapiro testified that he would receive a $15,000 per month consulting fee under an HFZ Plan. February 8, 2011 Transcript, 36:5.

Messrs. Caner and Shapiro thereunder. On the evening of Friday, March 11, 2011, the Debtors provided certain documents to Committee counsel with confidentiality restrictions. On March 14, 2011 – less than three days before the hearing -- counsel for the Majority Owners and counsel for HFZ provided copies of the HFZ Plan Support Agreement without confidentiality restrictions.

24. The HFZ Plan Support Agreement reveals even more perks for the Majority Owners than indicated by Mr. Caner in his testimony – and now the Committee understands why HFZ and Mr. Caner hid its terms from the Committee for so long. In exchange for the Majority Owner's agreement to commence the Adversary Proceeding, withdraw the New One Madison Plan, and file and pursue confirmation of an HFZ Plan (in a form acceptable to HFZ in its sole discretion), the HFZ Plan Support Agreement provides:

    (a)    The Majority Owners will have "an opportunity, through a right of first refusal, to participate in any recapitalization of the project" by HFZ;

    (b)    Upon confirmation of an HFZ Plan, the Majority Owners will be entitled to a $2,000,000 consulting fee payable over 24 months;

    (c)    The Majority Owners would be entitled to a share of net proceeds from the property according to a waterfall. The waterfall provides that the net proceeds (after deducting certain costs) would be applied:

        (i)    First, payment to HFZ of an amount equal to two (2) times the return of capital it provides;

        (ii)    second, reimbursement to HFZ for one half ($1 million) of its payment of the $2 million consulting fee;

        (iii)    third, payment to Green Bridge (one of the Majority Owners) of $4,000,000;

        (iv)    fourth, 12% to Green Bridge of the next $15,000,000; and

        (v)    Fifth, 11% to Green Bridge of any additional amounts.

25. HFZ also agreed to pay (a) "all amounts necessary with respect to the [HFZ Plan] provided that the [HFZ Plan] is confirmed by a final order by the Bankruptcy Court; and (b) "all

third party legal fees and third party expenses incurred by Green Bridge after December 1, 2010 for work performed" in the bankruptcy cases irrespective of whether the HFZ Plan is ultimately confirmed (subject to prior notice of incurring more than $10,000 fees in any 30-day period). Counsel for the Committee has requested documents, through counsel, from HFZ and the Majority Owners relating to any expenses that have been paid to or for the benefit of the Majority Owners in connection with their actions in this case. Initial responses indicate that (a) HFZ has paid counsel for the Majority Owners approximately $170,000; and (b) HFZ has paid Mr. Shapiro (through one of his companies) the amount of $30,000 with an additional $15,000 expected in the near future.[9]

## OBJECTIONS[10]

### A. The Termination Provisions of the DIP Loan Documents Are Designed to Prevent the Estates from Obtaining More Favorable Plan Terms

26. The DIP term sheets currently allow the DIP Lenders to terminate funding if any of the following events, each of which would result in more competition for HFZ, occur:

> (a) A plan of reorganization not acceptable in form or substance to DIP Lenders is *filed*;
>
> (b) Termination or expiration of exclusivity; and
>
> (c) Any *request* for authorization to obtain post-petition loans, other than from DIP Lenders.

27. These provisions go far beyond protecting the DIP Lenders in their capacities as post-petition lenders. The first termination event (filing of a plan the DIP Lenders find unacceptable) prevents the Debtors from pursuing any plan other than the HFZ Plan. To the

---

[9] Mr. Fioretti and counsel for the Debtors have disclosed that, consistent with their employment applications, HFZ has paid retainers directly to them.

[10] At the time this Objection was filed, the Debtors had not yet distributed a proposed final order. Many of the objections contained herein are based on the form of interim order and the Committee reserves the right to supplement this Objection to the extent necessary to address additional issues.

extent the narrow "fiduciary out" in the HFZ Plan Support Agreement had any significance, this provision strips it away. The small amount of freedom retained by the Debtors is rendered almost meaningless by the economic penalty that would be exacted by HFZ if the Debtors supported another plan. If the Debtors actually found that their fiduciary duties required the support of another plan sponsor, the Debtors would have to risk the administrative solvency of the estates, because their financing would be terminated – even if the Plan provides for payment in full of the DIP Lenders' claims – in order to comply with those duties. If the Debtors are unwilling to risk their financing by insisting that the termination provisions be removed, it is highly unlikely they will do so in the future if the termination provisions are approved on a final basis. Similarly, the fact that the DIP Lenders insist on pursuing the final approval of these termination rights indicates that they intend to use them if necessary.

28. The DIP Lenders should not have unfettered veto power over the *filing* of any plan of reorganization. So long as a plan provides for the full repayment of the DIP financing, a DIP lender (when evaluating a plan in that capacity) should be indifferent as to the terms of the plan, whether filed or confirmed. The Committee would not object if that provision was modified so that termination would occur upon the *confirmation*, rather than the filing, of an unacceptable plan.

29. The second termination event (termination or expiration of exclusivity) is equally offensive. The DIP Lenders could terminate funding if any non-debtor party obtains the right to file a competing plan, whether or not one is ever filed. The Debtors (on behalf of Mr. Caner and HFZ) are attempting to obtain a ruling on exclusivity without properly placing the issue before the Court.

30. This provision is particularly offensive in light of Mr. Caner's testimony in which made clear that he would ensure the Debtors considered any alternatives in a transparent process. By locking up the Debtors with this provision, HFZ ensures that there will not be any transparent process.

31. The third termination event (seeking financing) ties the Debtors' hands even further. This provision, as written, would prevent the Debtors from seeking financing even if the purpose was to take out the DIP Loans. The Debtors must have the flexibility to seek financing from alternative plan sponsors (or other parties) in order to maintain some modicum of freedom. The Committee would not object, however, to a provision that requires the DIP Loans to be paid in full from any alternative financing.

**B.     Any Finding of Good Faith Should Be Limited; Unseen DIP Loan Documents**

32. In light of the information the Committee has only recently learned, and the reluctance with which it has been provided, the Committee does not believe that the Debtors and the DIP Lenders, particularly HFZ, have established the requisite facts for a finding of good faith. To the extent the Court determines that a finding of good faith is appropriate, it should be limited to the final Order for the purposes of Section 364(e), and should not be binding with respect to any other determinations in these cases.

33. Furthermore, the Debtors' have requested approval of, and findings with respect to, DIP Loan Documents, which is defined to include both documents filed to date as well as documents created in the future which are not even required to be filed with the Court. If the Court approves the financing, such approval should only apply to loan documents filed to date. Any documents executed in the future must be filed with the Court and should be subject to a challenge period to ensure they are not inconsistent with any Order of the Court.

C.  **The DIP Lenders Should Not Receive the Protections of Section 364 While These Cases are being Administered for their Benefit**

34. As set forth above, HFZ made a conscious effort to enlist the assistance of Mr. Caner and the Majority Owners in pursuing a plan of reorganization to the exclusion of others. Furthermore, HFZ has agreed to pay the costs incurred by the Majority Owners in the bankruptcy cases, including in seeking confirmation of an HFZ Plan. To the extent the Debtors are burdened with the obligations of the HFZ Plan Support Agreement, they should also enjoy the benefits. HFZ should not be allowed to characterize its voluntary funding as a loan, especially not a loan that enjoys the protections of Section 364, while at the same time blocking the Debtors from pursuing alternatives.

35. iStar is similarly providing financing for its own benefit. For many months, it has advanced funds in order to protect and maintain its collateral. iStar should not be allowed to better its position merely by continuing to act in its own self interest. Furthermore, to the extent the Court is inclined to offer additional protections to iStar, they should only apply to funds advanced on or after March 3, 2011, the date the interim order was entered.

D.  **Avoidance Actions Should Remain Unencumbered**

36. Any Order granting the Motion should expressly provide that the DIP Lenders' superpriority claims shall not be payable from Avoidance Actions or the proceeds of Avoidance Actions. In addition, certain claims under Chapter 5 may be asserted against iStar and iStar should not have a superpriority claim with respect to any such recovery.

E.  **The Maturity Date Must Be Extended**

37. The DIP Loan Documents provide for a maturity date of June 30, 2011. This abbreviated date will place undue pressure on alternative plan proponents, who have not had the same amount of time or access to information as HFZ has enjoyed. Such an abbreviated time

period would further tilt the playing field in HFZ's favor. This period should be extended through at least September 1, 2011 in order to minimize the disparity between HFZ and other interested parties.

F.  **The Carve-Out is Insufficient**

38. The interim order provides for a Carve-Out for professional fees in the amount of $50,000. This amount is woefully insufficient to ensure the estates' professionals can protect the rights of their constituents in this case. The Carve-Out amount should be increased to $250,000. In addition, in order to ensure that funds are available to compensate professionals who will act in reliance on the Carve-Out, fees and expenses incurred prior to a Termination Event should be paid after a Termination Event (as long as they comply with the other terms of the Order), whether funds are in the possession of the Debtors or the DIP Lenders.

39. The absence of a meaningful Carve-Out runs contrary to the goals of the Bankruptcy Code, which presuppose that estate fiduciaries will be able to discharge the duties imposed on them by law. See, In re Ames Department Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("[I]t has been the uniform practice of this court…to insist on a carve out from superpriority status and post-petition liens in a reasonable amount designed to provide for payment of the fees of debtor's and committees' counsel and possible trustee's counsel in order to preserve the adversary system. Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

G.  **The Committee, and Other Creditors with Standing, Should Have Challenge Rights**

40. The Committee should not be precluded from investigating or challenging the DIP Lenders' liens and claims. Rather, as in most cases, the Committee should be entitled to investigate and should be authorized to prosecute an action or objection to the extent such claims

have merit. To provide otherwise (as in the interim order) simply ensures there will be disputes and further litigation over these issues.

41. In order to give meaning to the Committee's challenge rights, the amount available to the Debtors for investigation of claims ($50,000) should be increased (to at least $100,000) and made available to the Committee. If the DIP Lenders are concerned with duplication of efforts, the Committee submits that it, rather than Debtors, is the appropriate party to conduct an investigation. The challenge deadline of April 30, 2011, also should be extended, through at least July 1, 2011, to provide a reasonable opportunity for such investigation to occur. This is particularly appropriate here, where the Debtors have not filed a plan and it is unlikely that even a disclosure statement could be approved by the deadline demanded by iStar – thus, making it clear that iStar will not suffer any prejudice by allowing a reasonable to object.

42. Further, to the extent individual creditors are entitled to commence actions against the DIP Lenders, any presumption of validity afforded to iStar's prepetition claims should be without prejudice to creditors bringing those actions. Indeed, there may be claims that the Debtors may not even be able to assert directly in light of certain case law. At the very least, individual creditors with standing should have the benefit of the same challenge period.

## H. Incorporation of Additional Objections Contained in the First Committee Objection

43. Rather than restate every additional objection contained in the First Committee Objection, the Committee adopts those objections by reference. The additional objections contained therein include without limitation the following: (a) the provisions regarding survival of the interim order upon any subsequent reversal or modification (paragraph 15 of the Interim Order) should be limited to the extent funds actually have been advanced on reliance on the Court's Orders; (b) the provisions of the Interim Order (paragraph 18) freeing the DIP Lenders

from challenge under Sections 506(c), 510, 549 or 550, should apply only to amounts funded under and in reliance upon the Court's Orders and should not include other advances, such as iStar's prior advances; (c) the DIP Lenders should not be entitled to indemnification from the Debtors on account of funding they are providing to further their own goals in these cases; if indemnification is allowed, it should narrowly apply to funds actually advanced as provided by Orders of the Court; and (d) the budget attached to the Interim Order does not provide for funding of Committee expenses during the first two periods, despite the receipt by Debtors' counsel of a retainer of $150,000 during those periods.

Dated: March 15, 2011
Wilmington, Delaware

**POLSINELLI SHUGHART PC**

*/s/ Shanti M. Katona*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

-and-

Schuyler G. Carroll, Esq.
**PERKINS COIE LLP**
30 Rockefeller Plaza, 25th Floor
New York, New York 10112
Telephone: (212) 262-6905
Facsimile: (212) 977-1636
scarroll@perkinscoie.com

-and-

Brian A. Jennings, Esq.
**PERKINS COIE LLP**
1201 Third Avenue, 48th Floor
Seattle, Washington 98101
Telephone: (206) 359-3679
Facsimile: (206) 358-4679
bjennings@perkinscoie.com

PROPOSED COUNSEL FOR THE
OFFICIAL COMMITTEE OF
UNSECURED CREDITORS