IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| FKF MADISON GROUP OWNER LLC *et al.*,[1] | Case No. 10-11867 (KG) |
| Debtors. | (Jointly Administered) |

## PRELIMINARY OBJECTION OF AMALGAMATED BANK TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1121(d) FURTHER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTORS MAY FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF AND RESERVATION OF RIGHTS

Amalgamated Bank, as Trustee of Longview Ultra Construction Loan Fund ("Amalgamated") hereby submits this objection (the "Objection") to the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for the entry of an order (i) further extending the period in which the Debtors have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") through and including September 30, 2011; and (ii) extending the period during which the Debtors have the exclusive right to solicit acceptances thereof (together with the Exclusive Filing Period, the "Exclusive Periods") through and including November 30, 2011 pursuant to section 1121(d) of chapter 11 of title 11 of the United States Code. In support of its Objection, Amalgamated respectfully states as follows:

---

[1] The Debtors, followed by the last four digits of their tax identification numbers, are as follows: FKF Madison Group Owner LLC (6399); JMJS 23rd Street Realty Owner LLC (6651); Madison Park Group Owner LLC (3701); and Slazer Enterprises Owner LLC (4339). The Debtors' mailing address is P.O. Box 49249, Charlotte, NC, 28277.

## BACKGROUND REGARDING AMALGAMATED

1. As this Court is aware, the Debtors' principal secured creditor is SFI Belmont LLC ("iStar"). Specifically, as of the commencement of these chapter 11 cases, the Debtors were indebted to iStar in an amount not less than $234,150,572.74 (the "iStar Prepetition Claim") pursuant to (i) that certain Senior Loan and Security Agreement between the Debtors and iStar, dated November 16, 2007 (the "Senior Loan"), (ii) that certain Building Loan and Security Agreement between the Debtors and iStar, dated November 16, 2007, as amended (the "Building Loan"), and (iii) that certain Project Loan and Security Agreement, dated November 16, 2007, as amended (the "Project Loan", and, collectively with the Senior Loan and Building Loan, the "Property Loans"). The Property Loans are secured by liens and mortgages on substantially all of the Debtors' property, including, without limitation, the real property known as One Madison Park, New York, New York (the "Property"), pursuant to the following collateral documents, among others: (a) that certain Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing [Senior Loan] from the Debtors in favor of iStar, dated as of November 16, 2007, and (b) that certain Second Consolidated, Amended and Restated Mortgage with Security Agreement, Assignment of Leases and Rents and Fixture Filing [Project Loan] from the Debtors in favor of iStar, dated as of June 24, 2009, together with all other agreements and documents evidencing liens, security interests and mortgages securing the Property Loans, the iStar Gap Claims[2] and the iStar Administrative Advances[3] (the "Collateral Documents").

---

[2] Pursuant to orders of the Court dated June 30, 2010, July 30, 2010, September 22, 2010 and October 6, 2010, iStar made protective advances on behalf of the Debtors for operating expenses and for payment of the professional fees and expenses of the Debtors' New York state court-appointed receiver incurred during the gap period in the aggregate amount of approximately $2,487,441 (the "iStar Gap Claims").

[3] Pursuant to orders of the Court dated January 14, 2011, January 14, 2011, January 21, 2011, January 28, 2011 and February 18, 2011, iStar made advances to the Debtors for operating expenses which aggregated approximately $229,661 as of March 1, 2011 (the "iStar Administrative Advances").

2. When the Property Loans were originated, there were two lenders: iStar[4] and Amalgamated. Of the over $240 million ultimately disbursed in respect of the Property Loans, Amalgamated funded approximately $90 million. The relative priorities of iStar and Amalgamated are governed by a Participation and Servicing Agreement dated November 2007 (as modified, the "Participation Agreement"). Pursuant to the terms of the Participation Agreement, the Property Loans were effectively split into a senior piece held by iStar (the "Senior Participation") and a junior piece held by Amalgamated (the "Junior Participation").

3. The intercreditor agreements between iStar and Amalgamated set forth in the Participation Agreement provide mechanisms for Amalgamated, as the junior lender, to protect its interests in the Property Loans, including the right to purchase the Senior Participation (the "Purchase Right") upon an event of default under the Property Loans. The Purchase Right allows Amalgamated, as the junior lender, to assume ownership of the Property Loans in their entirety, together with all of the rights and remedies available to the secured lender under the Collateral Documents, by acquiring the Senior Participation.

4. Over the past several months, Amalgamated has been closely monitoring the Debtors' cases and witnessed iStar and the Debtors negotiating the terms of a chapter 11 plan that substantially undervalues the Property and would provide a full recovery for the holder of the Senior Participation while providing virtually no recovery for Amalgamated, as the holder of the Junior Participation. Amalgamated has repeatedly objected to iStar's pursuit of such a plan, and recently concluded that, given the limitations placed on it by the Participation Agreement, the only way to ensure that the value of the Debtors' estates would be maximized and that Amalgamated would receive an appropriate recovery on account of the Junior Participation was to exercise the Purchase Right. Accordingly, on June 7, 2011, Amalgamated provided iStar with the requisite notice under the Participation Agreement to exercise the Purchase Right, all in accordance with the terms and conditions of the Participation Agreement.

---

[4] At the time of the Property Loans, iStar's predecessor in interest SFT I Inc. actually made the Property Loans.

**PRELIMINARY STATEMENT**

5. To date, the Debtors' chapter 11 cases have been marred by member disputes, numerous allegations of fraud and other nefarious activity. The Debtors contend that they have made significant progress towards filing a proposed chapter 11 plan in the near term that will provide for a sale of the Property to an identified bidder and facilitate the Debtors' emergence from these chapter 11 cases. The Debtors' proposed plan, however, is fundamentally flawed in that it significantly undervalues the Property and the Debtors' estates. Indeed, the "successful bidder" touted by the Debtors was only "successful" at a closed-door, private "auction" that resulted in only one "bidder." In fact, the proposed plan is a lowball deal for the Debtors' assets, would provide no meaningful recovery on account of Amalgamated's $90 million secured Junior Participation and, in that regard, Amalgamated understands that there have been discussions regarding a waiver of Amalgamated's deficiency claim. Plainly, Amalgamated will not accept such a result and will vigorously oppose any efforts by the Debtors to pursue that plan.

6. Amalgamated recognizes that its exercise of the Purchase Right now prevents the Debtors from continuing its strategy of trying to obtain the support of the Senior Participation at the expense of the Junior Participation. Now, for the Debtors to achieve a consensual plan, they must address the concerns of a lender holding "unified" title to the Property Loans that is determined to maximize the recovery on account of the full Property Loans. The Debtors therefore face a very simple choice at this point in these cases – they can either elect to engage Amalgamated in negotiations over the terms of a plan that will maximize the value of their estates, or they can pursue their current path of seeking to pursue a plan that undervalues the Debtors and seeks to transfer ownership of the Debtors' assets to the "bidder" selected in a backroom deal.

7. Amalgamated recognizes that there are approximately 30 days until the hearing on the Debtors' Motion. Amalgamated is hopeful that over the next 30 days the Debtors will elect to engage in discussions with Amalgamated in good faith, and that a consensual plan

4

process will emerge over the next month, before the hearing on the Motion. In such event, hopefully, Amalgamated and the Debtors will reach a consensual resolution of the Motion. However, given the timing of the objection deadline and the Debtors' actions to date, Amalgamated submits this Objection to preserve its rights.

## OBJECTION

8. In the Motion, the Debtors state that they intend to file a plan in the near term funded by the so-called "successful bidder" that was picked by the Debtors at an "auction" held on April 13, 2011 (the "Private Sale"). Amalgamated was not present at the Private Sale, and the Debtors did not seek or obtain approval of any auction or bidding procedures from this Court nor publicize this Private Sale. Notably, the opening bidder, the Debtors' administrative debtor-in-possession lender, HFZ Capital Group, LLC ("HFZ"), was the only party that submitted a bid at the Private Sale, and Amalgamated asserts that such bid woefully undervalues the Property and the Debtors' estates. This so-called "auction" was not the product of a robust, court-approved marketing process and excluded many potential bidders that could have come forward had adequate notice and marketing efforts been made.

9. Once again, while Amalgamated is hopeful that the Debtors will not pursue the Private Sale, to date Amalgamated's concerns have not been adequately addressed either by iStar or the Debtors and the Debtors have not yet negotiated with Amalgamated regarding the Private Sale or a chapter 11 plan. That should and must change. If between now and the hearing on the Motion, the Debtors negotiate with Amalgamated in good faith, there may yet be a consensual resolution of the Motion. If the Debtors do not, the Exclusive Periods should not be extended, as the Debtors will be unable to make any showing of cause to extend such periods.

10. The Debtors carry the burden to demonstrate that there is cause to extend the exclusive period to file a chapter 11 plan. In re Newark Airport/Hotel Ltd P'ship, 154 B.R.444, 450-451 (Bankr. D.N.J. 1993); In re Pine Run Trust, Inc., 67 B.R. 432, 434 (Bankr. E.D. Pa. 1986). Given Amalgamated's recent exercise of the Purchase Right, and that a full

5

month remains before the hearing on the Motion, Amalgamated will not waste the Court's time and resources discussing the failure of the Debtors to show the existence of cause to extend the Exclusive Periods. Rather, Amalgamated intends to supplement this preliminary objection prior to the hearing, if necessary, to account for the facts and circumstances that develop.

11. Notwithstanding the extensive litigation both preceding and during the Debtors' bankruptcy cases, these cases are really straightforward single asset real estate cases that are only complicated as a result of the Debtors' prepetition misconduct. Thus, if the Debtors refuse to immediately engage with Amalgamated and agree on a consensual path prior to the hearing on the Motion, an extension of the Exclusive Periods would serve only to provide the Debtors with additional time to waste judicial and creditor resources.

12. If the Debtors do not engage Amalgamated in the coming month, and if exclusivity is terminated, Amalgamated intends to file a chapter 11 plan that will maximize value for the Debtors' estates and their stakeholders. To that end, in an effort to achieve consensus among the Debtors' creditors, Amalgamated intends to engage in discussions directly with the Official Committee of Unsecured Creditors regarding recoveries to unsecured creditors under an Amalgamated-sponsored chapter 11 plan.

**RESERVATION OF RIGHTS**

13. Amalgamated reserves its right to supplement this Objection prior to the hearing on the Motion to account for facts and circumstances that occur, or come to light prior to such hearing.

**CONCLUSION**

14. Amalgamated believes that a consensual, confirmable plan is a very achievable goal, and will be a good faith participant in negotiations toward that end. Nevertheless, the present trajectory of the case is troubling in light of the Debtors' past and current behavior and Amalgamated harbors deep concerns about the Debtors' commitment to a fair and open process that will yield a confirmable chapter 11 plan that maximizes value to the Debtors' estates and creditors. Amalgamated is hopeful that the Debtors will quickly engage in

6
YCST01:11173455.1                                                                                                    900002.0001

discussions with Amalgamated and be in a position to file a consensual chapter 11 plan. If that does not occur prior to the hearing on the Motion, Amalgamated objects to the extension of the Debtors' Exclusive Periods for the reasons stated herein.

WHEREFORE, for all of the above-stated reasons, Amalgamated respectfully requests that the Court deny the Debtors' motion to for entry of an order pursuant to 11 U.S.C. § 1121(d) further extending the Debtors' Exclusive Periods.

Dated: June 14, 2011
Wilmington Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ M. Blake Cleary*

M. Blake Cleary (No. 3614)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Phone: (302) 571-6600
Facsimile: (302) 576-1253

-and-

ARNOLD & PORTER LLP
Michael J. Canning
399 Park Avenue
New York, NY 10022-4690
Phone: (212) 715-1000
Facsimile: (212) 715-1399