** THIS IS NOT A PLAN, A
DISCLOSURE STATEMENT OR A
SOLICITATION OF VOTES ON A
PLAN **

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re: | : | **Chapter 11** |
| **FKF MADISON PARK GROUP** | : | |
| **OWNER,** *et al.*,[1] | : | **Case No. 10-11867 (KG)** |
| **Debtors.** | : | |
| | : | **Jointly Administered** |
| | : | |
| | : | **Re: D.I. 477** |

**ONE MADISON FM, LLC's OBJECTION TO DEBTORS' MOTION
FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1121(d)
FURTHER EXTENDING THEIR EXCLUSIVE PERIODS**

One Madison FM, LLC ("OMF"),[2] as pre-petition secured creditor under the Loan

Documents[3], by and through its undersigned counsel, hereby files this objection (the

---

[1] The Debtors in these cases, along with the last four digits of their EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6551); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) (4339). The Debtors' address is 230 Congers Road, New City, NY 10920.

[2] OMF's sole member, One Madison R/A Holdings, LLC, is an entity, with an affiliate of The Related Companies ("Related") acting as its managing member, and Amalgamated Bank as Trustee of Longview Ultra Construction Loan Fund ("Amalgamated") as the other member.

[3] The Loan Documents include, without limitation, the (i) *Senior Loan and Security Agreement*, (ii) *Building Loan and Security Agreement*, and (iii) *Project Loan and Security Agreement*, all dated November 16, 2007, and all collateral documents executed in connection thereto. When they were originated, the loans under the Loan Documents were held by (a) iStar Tara LLC (as predecessor-in-interest to SFI Belmont, LLC, "iStar") in the approximate amount of $150 million (the "Senior Participation"), and (b) Amalgamated, in the approximate amount of $90 million (the "Junior Participation"). The relative priorities and rights as between the Senior Participation and the Junior Participation were governed by a *Participation and Servicing Agreement* dated November 2007 (as modified, the "Participation Agreement"). The Participation Agreement contained provisions including Amalgamated's right to protect its interests by purchasing the Senior Participation in the event of a default under the Loan Documents (the "Purchase Right"). Amalgamated exercised this right on June 7, 2011, and the sale closed on June 17, 2011. Thereafter Amalgamated held both the Senior Participation and the Junior Participation under the Loan Documents. On June 17, 2011, OMF acquired the pre-petition secured claims under the Loan Documents (the "OMF Secured Claims") as reflected in the Notices of Transfer of Claims Pursuant to FRBP 3001(e) filed on June

"Objection")[4] to the above-captioned Debtors' (the "Debtors") motion seeking to further extend their exclusive periods (the "Exclusive Periods") to file and solicit acceptances for a plan of reorganization (the "Second Exclusivity Motion")[5].  In support thereof, OMF respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     On June 30, 2011, OMF executed and delivered to the Debtors a binding commitment letter (the "OMF Commitment") in an effort to engage the Debtors in negotiations over plan of reorganization terms capable of leading to the filing of a consensual, confirmable plan.  The OMF Commitment provides for a fully-financed open-market process that contains a starting bid materially higher and better than the HFZ Plan (defined below).  Some of the salient terms of the OMF Commitment and the HFZ Plan are compared side-by-side in the table below[6]:

---

23, 2011 (the "Claim Transfers") D.I. 508 and 509.  Also on June 17, 2011, OMF acquired the other claims against the Debtors previously held by iStar, including (i) the claims for amounts funded under the Debtors' DIP financing for the debtors' operations, and (ii) administrative claims and gap claims (collectively, the "Other Acquired Claims").  Given that the Senior Participation and the Junior Participation were united, OMF terminated the Participation Agreement.

[4] On June 14, 2011, Amalgamated filed a preliminary objection (the "Preliminary Objection") to the Second Exclusivity Motion, reserving the right to file a supplement thereto.  Thereafter, on June 17, 2011, OMF acquired the claims of Amalgamated, and is now the sole pre-petition secured lender in these cases.  In the hopes that the Debtors would agree to go forward with the OMF Commitment as the basis for a consensual plan and an open-market process, OMF did not file this Objection until after the expiration of the deadline contained in the OMF Commitment (*i.e.*, July 7, 2011 at 5:00  p.m. (ET)).  Unfortunately, the Debtors did not accept the OMF Commitment.  Accordingly, OMF hereby files this Objection as the senior secured lender, supplementing the points and arguments made in the Preliminary Objection.

[5] *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) Further Extending the Exclusive Periods during which only the Debtors may File a Chapter 11 Plan and Solicit Acceptances Thereof.  D.I. 477*

[6] The terms contained in the table are intended for summary purposes only, and are not complete.

| | HFZ Plan | OMF Commitment |
|---|---|---|
| Treatment of OMF Claim | **Secured part of claim set at 162 million cram-down note** with 7-year term; interest at lesser of 6.25% per annum and Court-determined interest rate<br><br>Classified as *unimpaired* under HFZ Plan | **Secured part of claim set at $220 million** (*i.e.,* initial bid for Property[7] of *at least* $220 million, subject to reduction of up to $35 million in event that Deed Holder Claims are not deemed to be general unsecured claims prior to plan confirmation) |
| | Est. **$72 million** OMF deficiency claim | Est. **$14 million** OMF deficiency claim (or less, if higher bid rec'd) |
| Treatment of General Unsecured Claims | **$6.75 million cash**, in the event (i) the Committee does not object to confirmation, and (ii) general unsecured claims class votes in favor of HFZ Plan (without taking into account any vote cast by OMF on account of its deficiency claim) | **$6.90 million cash**, in the event (i) general unsecured claims class votes in favor of an OMF proposed plan,[8] and (ii) the Committee does not commence a Challenge (as defined in the OMF Commitment) or file and/or seek to prosecute a Lender Liability Lawsuit (as defined in the OMF Commitment) |
| | **Involuntary waiver** of OMF's right to recover on account of OMF deficiency claim | **Voluntary waiver** by OMF of right to recover on account of OMF deficiency claim |
| Market Test of Property Value | None | Subject to higher and better offers, with no stalking horse fee to OMF and no expense reimbursement requirement; *requires* an open, competitive marketing process |
| Conditions to Plan Effective Date | OMF Secured Claims determined by Bankruptcy Court to be *not more than* $162 million<br><br>Resolution of Deed Holder Issue[9] | N/a |
| Outside Date for Plan Effective Date | December 31, **2012** | October 31, **2011** |

---

[7] The "Property" is the real estate development known as One Madison Park Condominium located at 23 East 22nd Street, County of New York, State of New York, excluding twelve uncontested sold units.

[8] Neither this Objection, nor the OMF Commitment, constitute a plan, a disclosure statement or a solicitation of votes to accept or reject a plan of reorganization. The proposed plan treatments outlined herein and therein are premised upon and require that the Court first (i) grant OMF the right to file a plan embodying the terms contained in the OMF Proposal and (ii) enter an order, after notice and hearing, approving a disclosure statement describing such plan prior to any effort to solicit votes on such plan.

[9] The Deed Holder Claims are claims for ownership of condominium units or for damages or other relief in connection with the transfer or purported transfer of title to a portion of the Property or any unit contained therein (the "Deed Holder Claims"). *See* HFZ Plan at p. 4, §1.25. As set forth in Exhibit C to the OMF Commitment, Property units 23B, 28A, 28B, 37A, 49B and 52A are disputed units as to ownership as it is alleged that deeds have been purportedly transferred (the "Deed Holder Issue").

As indicated by the above comparison, the terms of the OMF Commitment are objectively better than those contained in the HFZ Plan, and do not require legal gymnastics or the torturing of bankruptcy law principles to achieve plan confirmation. The OMF Commitment represents a true "sea change" in these cases. Unfortunately, the Debtors remain intent on pressing ahead with the HFZ Plan, a plan that is legally defective and lacks clear support from any constituent group in these cases.

2.  In the months following the control battle and trustee motions that have shaped these bankruptcy cases, the Debtors and their principals have assured the Court that they are focused on maximizing value for these estates and negotiating a plan that could be supported by the Debtors' senior lender. Taking their words at face value, the Debtors' have lost sight of these objectives. The HFZ Plan, filed by the Debtors (with HFZ as co-sponsor) on May 31, 2011, seeks to strip tens of millions of dollars of value from OMF, the Debtors' senior lender, and to transfer it to HFZ via a cramdown note.[10] On June 23, 2011, armed with the knowledge that their senior lender opposed the HFZ Plan, the Debtors' response was nonetheless to press ahead and schedule a disclosure statement hearing on the HFZ Plan for July 28, 2011. Finally, and most shockingly, the Debtors have failed to embrace the OMF Commitment, which would result in materially better recoveries for both secured and unsecured creditors.

3.  The Debtors are fiduciaries charged with maximizing value for the estate and its prepetition creditors, not HFZ. The Debtors are not proceeding under this mandate with the HFZ Plan. Accordingly, the Court should level the playing field by declining to extend the Exclusive Periods so that the Debtors' true economic parties-in-interest can maximize value through an open, competitive market process. The reasons for this are plentiful. *First*, OMF has

---

[10] HFZ is on record only as a debtor-in-possession ("DIP") lender, and will be paid on account of its DIP loan at confirmation of any plan. Upon information and belief, HFZ does not hold any pre-petition claims.

offered the Debtors a deal that is light-years ahead of the HFZ Plan and would garner a recovery on the Property with an opening bid at least *$58 million* more than the HFZ Plan.  *Second*, the HFZ Plan is premised upon an artificially low, contrived value of $162 million for the Property. This value was garnered at a non-market, private auction that only generated a single bid – by the Debtors' intended plan sponsor, HFZ Capital Group LLC ("HFZ").  In contrast, the OMF Commitment mandates a robust, transparent, open market process to ensure a true market test for the Property.  Indeed the OMF Commitment contemplates that OMF will make available a 90-day DIP facility to finance the marketing process.  *Third*, the OMF Commitment eliminates the many significant conditions, contingencies and "outs" that underlie the HFZ Plan.  *Fourth,* the HFZ Plan proposes to provide OMF with a cramdown note, yet treats the OMF Secured Claims as "unimpaired" in a clear attempt to disenfranchise OMF.  This is a facial violation of bankruptcy law.  *Fifth*, the OMF Commitment's initial bid of $220 million for the Property already exceeds the $162 million ceiling value contained in the HFZ Plan, thus rendering the HFZ Plan  a nullity.

4.	In light of the Debtors' failure to exercise their fiduciary duty to maximize value for these estates by rejecting a higher and better offer for the estate assets and a fully-financed open market process, OMF requests that this Court deny the Second Exclusivity Motion and permit OMF (and others) to file competing plans of reorganization.  Doing so will allow for a true market test and set these cases on a course to plan confirmation through a financed, competitive, open market process.

RLF1 4415036v. 1

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408.  The predicates for relief requested herein are sections 105 and 1121 of the Bankruptcy Code.

## FACTUAL BACKGROUND

### A.      The Chapter 11 Cases

6.      On June 8, 2010, involuntary chapter 7 petitions were filed by petitioning creditors (the "Petitioning Creditors") with this Court thereby commencing the Debtors' involuntary chapter 7 cases (the "Chapter 7 Cases").

7.      On November 19, 2010, the Court entered orders converting the Chapter 7 Cases to cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[11]

8.      The Debtors have been operating their business as debtors in possession in the Chapter 11 Cases pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

9.      On January 20, 2011, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").[12]

### B.      The PSA and the Control Dispute

10.      On or about December 1, 2010, Green Bridge Capital S.A. and Special Situation S.A., the controlling members of the Debtors (the "Controlling Members"), and HFZ entered into a plan support agreement (the "HFZ PSA"), whereby the Controlling Members agreed to, among other things, file and prosecute a plan of reorganization with HFZ as the "plan

---

[11] D.I. 119; Case No. 10-11868 D.I. 111; Case No. 11869, D.I. 112; and Case No. 10-11870, D.I. 117.

[12] D.I. 211.

funder," which, if effectuated, would result in HFZ owning the Property.[13] Under the HFZ PSA, HFZ agreed to provide the Controlling Members with, among other things, (a) the right to participate, via a right of first refusal, in any recapitalization of the Property, (b) $2 million over a 24-month period, and (c) a share of net proceeds of a disposition of the Property pursuant to a waterfall.[14]

11.    As required under the HFZ PSA, on December 15, 2010, the Controlling Members commenced an adversary proceeding [No. 10-56158 (KG)] in this Court by filing a complaint seeking declaratory and injunctive relief that Ira Shapiro ("Shapiro"), the then Debtors' president, did not have the corporate authority to act on the Debtors' behalf (the "Control Dispute").

12.    On January 20, 2011, as a result of the Controlling Members' entry into the HFZ PSA and the Control Dispute, the Debtors filed *Debtors' Motion for the Appointment of a Chapter 11 Trustee or to Terminate Exclusivity* (the "Trustee Motion").[15] On January 25, 2011, the Petitioning Creditors filed a separate motion seeking similar relief (the "Petitioning Creditors' Trustee Motion," and together with the Trustee Motion, the "Trustee Motions").[16]

13.    On January 31, 2011, this Court issued an order (i) determining that the Controlling Members had the right to control the Debtors' management except for "Material Actions" (*e.g.*, selection of a plan of reorganization), which would require unanimity, and (ii) restraining Shapiro from taking further action for the Debtors without complying with the Debtors' governance instruments.[17]

---

[13] D.I. 352, Ex. A.

[14] *See id.*

[15] D.I. 212.

[16] D.I. 224.

[17] Adv. D.I. 67.

14.     In the days before the hearing to consider the Petitioning Creditors' Trustee Motion (the "Trustee Hearing"), the Controlling Members agreed to pay Shapiro for "consulting services to the Debtors," and on February 25, 2011 and March 17, 2011, the Controlling Members paid Shapiro $30,000 and $15,000, respectively.[18]

15.     On February 7, 2011, the Committee filed a statement (the "Committee Statement")[19] in response to the Trustee Motions, warning "… if the Trustee Motions are not granted, the Debtors will not undertake an open process to maximize recovery, but rather will pursue a plan with a sponsor of their choosing," and "unless the assets are fully marketed and all parties are given the opportunity to put forth a proposal, the proposal from the Debtors' plan sponsor will not represent its best offer – which will prejudice creditors."[20]

16.     On February 7, 2011, the Debtors withdrew the Trustee Motion.[21]  (The Petitioning Creditors' Trustee Motion was not withdrawn.)

17.     On February 8, 2011, at the Trustee Hearing, Debtors' counsel represented to the Court:

> What the [Bankruptcy] Code contemplated, Your Honor, is the debtors having an opportunity to stabilize their businesses, to negotiate with creditors and determine an appropriate plan.  The debtors have a fiduciary duty to do that.  They are cognizant of those fiduciary duties and, in fact, they're willing to exercise them. . . .[22]

18.     Also at the Trustee Hearing, Shapiro and Cedvet Caner ("Caner"), the CEO of the Controlling Members, testified that they would exercise their fiduciary duties and

---

[18] HFZ Disclosure Statement at p. 14.

[19] D.I. 258.

[20] Committee Statement at ¶4.

[21] D.I. 259.

[22] Transcript of Trustee Hearing ("Trustee Hr'g Tr.") at 22:4-17, 21-25; 23:1-4 (emphasis supplied).  True and correct copies of the relevant portions of the Trustee Hr'g Tr. are annexed hereto as Exhibit "A."

would, after employing a transparent evaluation process, prosecute the best plan available for the Debtors.  Caner testified:

> . . . whenever Mr. Eichner or any other party approaches us with a plan that's better than the HFZ Plan we will absolutely consider it. . . .  And we will enter into … negotiations immediately and we will have that transparent procedure to follow through with these negotiations and pick the best plan. . . .  The procedure is to compare objectively the numbers.  At the end of the day it's not rocket science.  It's one building in New York City and the numbers are quite clear.  So it's a very easy comparison.[23]

19.     The Court denied the Petitioning Creditors' Trustee Motion at the Trustee Hearing.[24]  In so ruling, the Court noted it was assured by Caner's testimony that the Debtors would exercise their fiduciary duties responsibly in promoting and negotiating a plan.

## C.     First Extension of Exclusivity

20.     On March 18, 2011, the Debtors filed a motion seeking to extend the Exclusive Periods to May 31, 2011 and July 30, 2011, respectively (the "First Exclusivity Motion").[25]  In the First Exclusivity Motion, the Debtors stated that they needed an extension of the Exclusive Periods to select the best possible plan and build consensus among numerous constituencies regarding such plan and collect and review the claims filed against them as a necessary predicate to confirming a plan.[26]

---

[23] Trustee Hr'g Tr. at 62:19-63:7.  In addition, Shapiro testified that in evaluating competing plans, the Debtors "looked at criteria's [sic] which would be better for iStar, the secured lender, which would be better for the unsecured creditors, mechanic lienholders," and "which plan the Debtors thought would be able to get confirmed and the best up-size for One Madison Park. … Mr. Caner and myself, we understand fully our fiduciary responsibilities.  And, at this point, the debtors understand this is the plan today, this is the best plan today, but we clearly understand what our fiduciary obligations are when it comes to other people approaching us and that's the way – they should come and approach us, that they have a better plan, they should sit down with [us] and we will do what's right, as per our fiduciary duties."  Trustee Hr'g Tr. at 32:7-14; 35:5-12.

[24] D.I. 269.

[25] D.I. 374.

[26] Id. at ¶26.

21.     On April 8, 2011, the Court granted the First Exclusivity Motion.[27]

**D.     The Private Auction and the Exercise of the Purchase Right**

22.     According to the Debtors, during the first two weeks in April 2011, the Debtors determined that they needed a "more formal process."[28]  The Debtors did not file a motion with the Bankruptcy Court seeking the retention of a broker or investment banker, or approval of any marketing or bid procedures, all of which are common in bankruptcy cases. While the Debtors state that they "contacted each party that had indicated any level of interest in sponsoring a plan"[29] they did not contact Related, one of the largest high-end real estate condominium developers in New York City, to determine if it would have any interest in sponsoring a plan.

23.     According to the Debtors, on or about April 14, 2011, the Debtors held an "auction" at the offices of iStar's counsel, with iStar, the Committee, HFZ and another bidder present (the "Private Auction").[30]  HFZ made the only bid at the Private Auction and was selected as the winning bidder.[31]

24.     By letter dated April 18, 2011 (the "April 18 Letter"), iStar's counsel advised Amalgamated's counsel that HFZ had been selected as the winning bidder at the Private Auction and attached a term sheet embodying HFZ's bid (the "HFZ Term Sheet").[32]  The April 18 Letter specified that iStar would receive $162 million – the approximate amount of iStar's

---

[27] D.I. 407.

[28] D.I. 499

[29] HFZ Disclosure Statement at p. 17.

[30] *Id.*

[31] *Id.*

[32] A true and correct copy of the April 18 Letter is annexed hereto as Exhibit "B."

Senior Participation – in cash on account of all $234 million of the OMF Secured Claims.[33] Given the payment waterfall contained in the Participation Agreement, this result would wipe out all or substantially all of the claims of Amalgamated, holder of the Junior Participation.

25.     To prevent the Junior Participation from being denied any recovery under an HFZ-sponsored plan, Amalgamated advised iStar, by letter dated May 25, 2011 (the "May 25 Letter"), that it intended to exercise its Purchase Right under the Participation Agreement. Amalgamated further advised iStar to cease and desist in supporting the plan embodied in the HFZ Term Sheet or any other plan for the reorganization of the Debtors without Amalgamated's express written consent.[34]

26.     By letter dated May 27, 2011 (the "May 27, 2011 Letter"), among other things, iStar advised Amalgamated that, pending Amalgamated's exercise of its Purchase Right, iStar intended to continue to pursue the HFZ proposal.[35]

27.     By letter dated June 7, 2011 (the "June 7 Letter"), Amalgamated advised iStar that it had exercised the Purchase Right to unite the Senior Participation and the Junior Participation.[36]

28.     By letter dated June 8, 2011 (the "June 8 Letter"), iStar responded to the June 7 Letter and advised that until the closing of Amalgamated's purchase of the Senior Participation, iStar had the "sole right to control the servicing of the Loan in accordance with the Participation and Servicing Agreement."[37]

---

[33] *See id.*, HFZ Term Sheet at p. 3.

[34] A true and correct copy of the May 25 Letter is annexed hereto as Exhibit "C."

[35] A true and correct copy of the May 27 Letter is annexed hereto as Exhibit "D."

[36] A true and correct copy of the June 7 Letter is annexed to hereto as Exhibit "E."

[37] A true and correct copy of the June 8 Letter is annexed hereto as Exhibit "F."

## E. The Debtors Proceed with the HFZ Plan Without Creditor Support

29. On May 31, 2011, the Debtors filed the Second Exclusivity Motion, wherein they requested an extension of the Exclusive Periods to finalize negotiations with HFZ as the sponsor and prosecute such plan (the "HFZ Plan").

30. On June 14, 2011, Amalgamated filed the Preliminary Objection and, among other things, advised the Court that it had exercised the Purchase Right to unite the Senior Participation and Junior Participation in Amalgamated. Amalgamated argued that the Exclusive Periods should not be extended to enable the Debtors to prosecute the HFZ Plan, which sought to wipe out the Junior Participation and transfer the Property to HFZ via a "backroom deal."[38] In its objection, Amalgamated suggested that there be immediate and focused negotiations to attempt to address the new circumstances of the case, and in particular, the fact that the senior secured creditor (now holding the unified pre-petition debt of approximately $240 million) opposed the conduct of the Debtors and HFZ in proposing a plan that would eliminate nearly $90 million of its secured claim in favor of HFZ.

31. Despite Amalgamated's requests for negotiations, and apparently *in direct response* to Amalgamated's notice that would hold the unified debt position and that iStar was out of the picture, on June 15, 2011, the Debtors filed the HFZ Plan and accompanying disclosure statement (the "HFZ Disclosure Statement").[39] Whereas the HFZ Term Sheet had proposed to pay iStar $162 million in cash on the effective date, the HFZ Plan actually filed by the Debtors (following Amalgamated's June 14, 2011 objection) "values" the Property ("Property Component") at $162 million and proposes to give the senior secured lender a $162 million *cram-down* note on account of the secured component of its senior claim.

---

[38] *See generally* D.I. 495.

[39] D.I. 498 and D.I. 499, respectively.

**D. OMF's Involvement and the OMF Commitment**

32. On June 17, 2011, OMF became the holder of the OMF Secured Claims, as well as the Other Acquired Claims.

33. Negotiations with the Debtors on a commitment letter began on or about June 28, 2011 to embrace an OMF-sponsored plan premised upon an open marketing, competitive bidding process for the Property. By e-mail dated June 30, 2011, OMF sent the Debtors the OMF Commitment, containing an acceptance date by the Debtors of July 7, 2011 at 5:00 p.m. (ET) (the "July 7 Commitment Deadline").[40]

**E. The Debtors' Current DIP Extension**

34. On June 30, 2011, the Debtors filed the *Debtors' Emergency Motion for Entry of Second Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c) and Fed. R. Bankr. P. 2002, 4001 and 9014 Authorizing Debtors to Obtain Post-Petition Financing* (the "Second DIP Motion") seeking an extension of their post-petition financing for 30 days.[41] In the Second DIP Motion, the Debtors explained that now that OMF had acquired the OMF Secured Claims and was willing to sponsor a plan that OMF asserted was better than the HFZ Plan, the Debtors only sought a modest extension of their DIP financing to, among other things, continue to engage in plan discussions.[42]

35. On July 1, 2011, OMF filed a statement in response to the Second DIP Motion (the "OMF Statement") stating, among other things, that OMF remained hopeful that the Debtors would exercise their fiduciary duties and subject the Property value and plan

---

[40] The OMF Commitment already reflects enhancements to previous versions of the commitment letter sent to the Debtors on June 28, 2011 and June 29, 2011, as requested by the Debtors.

[41] D.I. 529.

[42] *Id.* at ¶¶14-15.

sponsorship to a transparent market test after the Second DIP Motion was approved.[43]  On July 1,

2011, the Court approved the Second DIP Motion.[44]

36.     The Debtors failed to execute the OMF Commitment prior to the July 7

Commitment Deadline, and it expired by its own terms.

## ARGUMENT AND AUTHORITY

37.     Section 1121 of the Bankruptcy Code provides a debtor the exclusive right

to file a chapter 11 plan of reorganization.  11 U.S.C. § 1121(b).  Section 1121(d) of the

Bankruptcy Code provides a bankruptcy court with the authority to extend or shorten a debtor's

exclusive period, for cause, upon a motion by a party in interest.  11 U.S.C. § 1121(d).  The

benefits of exclusivity should not remain available to a debtor for longer than necessary because

Congress had in mind "the interest of the creditors in avoiding undue delay in the satisfaction of

the debtors' obligations."  *Geriatrics Nursing Home, Inc. v. First Fid. Bank, N.A. (In re*

*Geriatrics Nursing Home, Inc.)*, 187 B.R. 128, 131-132 (D.N.J. 1995).

38.     An extension of the exclusivity period must *not* be "granted routinely." *In*

*re Pine Trust, Inc.*, 67 B.R. 432, 434 (Bankr. E.D. Pa. 1986).  Congress was aware of the risks

associated with lengthy extensions.  *See* H.R. REP. NO. 103-835 at 36 (1994), as reprinted in

1994 U.S.C.C.A.N. 3340, 3344 ("[U]ndue extension can result in excessively prolonged and

costly delay, to the detriment of the creditors."); *see also In re Sw.t Oil Co. of Jourdanton, Inc.*,

84 B.R. 448, 450 (Bankr. W.D. Tex. 1987) (stating that "[c]ourts considering the question of

whether to extend the exclusivity period have not favored extensions of the 120 day-period, a

position supported by the legislative history.").

---

[43] *See generally* OMF Statement.

[44] D.I. 536.

39. The Bankruptcy Code does not define "cause" for extending or shortening the exclusive periods, but relevant factors identified by courts include:

(a)    size and complexity of the case;
(b)    the necessity of sufficient time to negotiate and prepare adequate information;
(c)    the existence of good faith progress;
(d)    whether the debtor is paying its debts as they become due;
(e)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;
(f)    whether the debtor has made progress negotiating with creditors;
(g)    the length of time a case has been pending;
(h)    whether the debtor is seeking an extension to pressure creditors; and
(i)    whether or not unresolved contingencies exist.

*In re Cent.l Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006) *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) (listing 9 similar factors).

40. Not all cause factors are relevant to every request for the extension or termination of exclusivity and the court has the "discretion … to decide which factors are relevant and give appropriate weight to each." *Bunch v. Hoffinger Indus., Inc. (In re Hoffinger Indus., Inc.)*, 292 B.R. 639, 644 (8th Cir. B.A.P. 2003). "Importantly, the primary consideration in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward, and that this 'is a practical call that can override a mere toting up of the factors.'" *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (quoting *In re Dow Corning Corp.*, 208 B.R. 661 (Bankr. E.D. Mich. 1997)). "The test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case. Certainly practical considerations, or other considerations in the interest of justice, could override, in certain cases, the result after analysis of the nine factors." *In re Adelphia*, 352 B.R. at 590.

RLF1 4415036v. 1

41.    Here, substantially all of the factors existent in these cases compel an end to the Exclusive Periods. This is not a "complex" case but rather a single-asset real estate case, involving few creditors and Debtors that are generating no revenues. Absent DIP funding and more debt on the estate, no ongoing post-petition bills of any kind could be paid by Debtor operations.[45] Substantially all of the Debtors' assets are subject to OMF's first priority liens and security interest. The Debtors have had more than enough time to engage creditors to try to formulate a viable plan – yet have used this time only to press ahead with the unconfirmable HFZ Plan. This does not constitute good sense or good faith. Moreover, given the Debtors' insistence on going forward with the HFZ Plan, which lacks the support of any major creditor constituency, in the face of an economically superior, market-driven financed offer being proposed by OMF, progress in negotiating with creditors has stalled. In light of each of these factors, the Court should allow OMF to file its competing plan and let the estates' creditors and the Court decide which generates the best result for these estates – and not just for HFZ.

**A.  OMF Has Made The Debtors A Binding Offer For A Plan Of Reorganization That Is Far Superior To The HFZ Plan**

42.    As discussed herein, the OMF Commitment is superior to the HFZ Plan in a myriad of ways. As such, the Court should decline to extend the Exclusive Periods so that OMF can file a competing plan consistent with the terms of the OMF Commitment and includes a competitive, open market process. The Court and creditors can then engage in a plan-by-plan comparison, and approve the better option. *See In re Pliant Corp., et. al.*, Case No. 09-10443 (MFW) (Bankr. D. Del. June 29, 2009) (relevant transcript excerpts attached hereto as Exhibit "G") (holding that terminating exclusivity was appropriate to allow creditors to test upside of

---

[45] As Mr. Caner testified on February 8, 2011: "At the end of the day it's not rocket science. It's one building in New York City . . ." Trustee Hr'g Tr. at 62:19-63:7.

competing plans); *In re Seitel, Inc.*, Case No. 03-1227 (PJW) (Bankr. D. Del. Nov. 3, 2003) (relevant transcript excerpts attached hereto as Exhibit "H") (approving motion to terminate exclusivity in order to provide equity holders with information regarding alternative plan with a potentially higher recovery for all creditors).[46]

(i)  The OMF Commitment Provides for a Greater Recovery to OMF<br>on Account of the OMF Secured Claims

43. The HFZ Plan provides that the secured component of the OMF Secured Claims (Class 1 of the HFZ Plan) shall receive a note with (i) a present value equal to $162 million at (ii) an interest rate of the lesser of 6.25% or such other rate as the Court may determine to be market customary and (iii) a maturity of 7 years from the effective date, and treats OMF's secured claim as unimpaired. *See* HFZ Disclosure Statement at pp. 6 and 26. All of this will be the subject of extensive litigation. In contrast, the OMF Commitment provides for an *initial bid* of $220 million for the Property.[47] *See* OMF Commitment at p. 3. The OMF Commitment, at its *worst*, and prior to any further bidding, provides at least *$58 million* more value to OMF on account of the OMF Secured Claims than the HFZ Plan.[48]

44. In addition to the fact that the OMF Commitment is economically better for these estates, the Property Component of the OMF Commitment (*i.e.*, $220 million as the

---

[46] *See also In re Interco Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992) ("In appropriate circumstances, simultaneous consideration of competing plans may be an efficient procedure"). *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363 (5th Cir. 1987) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors."); *In re Haw. Telecom Commc'ns Inc., et al.*, Case No. 08-02005 (LK) (Bankr. D. Hi. July 1, 2009) (relevant transcript excerpts attached hereto as Exhibit "I") (denying debtor's motion to extend exclusive periods to allow other parties in interest, including a potential acquirer of the debtor, to file a competing plan where public interest was best served by terminating exclusivity).

[47] The Property Component in the OMF Initial Acquisition Bid is subject to a potential reduction with respect to the Deed Holder Issue as detailed in the OMF Commitment but not in an amount greater than $35 million. In contrast, the resolution of the Deed Holder issue is a condition precedent to the HFZ Plan being confirmed and going effective. In other words, under the HFZ Plan, if the Deed Holder Issue is not resolved favorably, creditors receive nothing because HFZ's Plan would fail.

[48] *See id.*

initial bid) triggers a condition precedent for HFZ not to go forward under the HFZ Plan. According to the HFZ Plan and HFZ Disclosure Statement, as a condition to confirmation, the Court must determine the secured component of the OMF Secured Claims to be worth no more than $162 million.[49]  *See Bank of Am. Nat'l Trust and Sav. Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 457 (1999) ("the best way to determine value is exposure to a market"); *In re Boston Generating, LLC*, 440 B.R. 302, 325 (Bankr. S.D.N.Y. 2010) ("absent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value").  The $220 million initial bid for the Property Component in the OMF Commitment (which reflects the OMF's Commitment's treatment of OMF's secured claim) already exceeds the $162 million ceiling contained in the HFZ Plan as a condition to confirmation, and therefore makes the HFZ Plan unconfirmable.  It would be an expensive and fruitless effort to proceed with the HFZ Plan.  If the Debtors are unwilling to embrace the OMF Commitment (or a higher and better one), the Court should at a minimum decline to extend the Exclusive Periods and allow the Court and the estates' creditors the opportunity to decide which offer is best.

(ii)    The OMF Commitment Provides a Greater Recovery to Unsecured Creditors

45.    In addition to providing more value to secured creditors, the OMF Commitment also provides materially enhanced value to unsecured creditors.  The OMF Commitment provides a $6.90 million distribution to general unsecured creditors,[50] as compared to the HFZ Plan which only provides for a $6.75 million distribution.[51]  In addition, the OMF Commitment provides that, subject to certain conditions, including the acceptance of the OMF

---

[49] Section M(1) of the HFZ Disclosure Statement states, as a condition to confirmation that "[t]he [OMF] Secured Claim shall be determined by the Bankruptcy Court to be not more than $162 million."

[50] *See* Exhibit A to OMF Commitment at p. 3.

[51] *See, e.g.*, HFZ Disclosure Statement at p. 28.

Plan by general unsecured creditors, OMF shall waive its right to receive any deficiency claim based on the OMF Secured Claims. *See* Exhibit A to OMF Commitment at p. 3. This is a material improvement to the general unsecured creditors' proposed plan treatment, since OMF's $220 million initial bid would reduce its deficiency claim from approximately $70 million down to approximately $14 million, resulting in less dilution of unsecured creditors' recoveries. Furthermore, OMF is willing to waive its right to a recovery on its deficiency claim in the event that the general unsecured creditor class votes in favor of the OMF plan (assuming the Court grants OMF the right to file a plan). In addition, while the HFZ Plan also purports to have the secured creditor waive its deficiency claim, OMF will certainly not agree to such plan treatment in the context of the HFZ Plan, resulting in the general unsecured creditors receiving a recovery diluted by OMF's $70 million deficiency claim. This feature of the OMF Commitment provides a tangible benefit to the estates' general unsecured creditors.[52]

      (iii)      The OMF Commitment Mandates that the Debtors Engage in a Marketing Process Subjecting the OMF Commitment to Higher and Better Offers

      46.      The OMF Commitment provides that "OMF acknowledges, in fact it has *insisted*, that the OMF Plan will be subject to higher and better offers for creditor treatment by virtue of the Debtors marketing the Property and inviting Acquisition Price bidding." *See* OMF Commitment at p. 3. (Emphasis added.) Importantly, OMF has agreed to finance this open market process – an auction or competitive plan process without a break-up fee or expense reimbursement, via a 90-day DIP – win or lose.

      47.      In contrast, the HFZ Plan creates a closed process that does not contemplate future competitive bidding. The Debtors' two-week "process" in connection with the HFZ Plan was more akin to a private sale than a public auction. Upon information and

---

[52] The treatment for all other classes of creditors is similar in the HFZ Plan and the OMF Proposal.

belief, at no time did the Debtors provide public notice (to the creditor body or otherwise) of the fact that the Property was on the market or that there was a current proposal valuing the Property at $162 million. At no time did the Debtors request court approval of bidding procedures or a stalking horse on any terms to market the Property in an open market transaction. At no time did the Debtors engage a real estate broker to publicly market the Property. At no time has there been a teaser or information sheet produced about the Property and made available to real estate investors.

48. The requirement that a debtor in possession properly market its assets derives from fiduciary duties to obtain the highest price or best overall benefit for the estate. *See Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) ("It is not surprising that, in the sale context, a board's failure to obtain a valuation of their company's assets and failure to adequately market those assets constitute breaches of the duty of care."). The best method for bringing maximum value to an estate is by exposure to the market through a public auction. *LaSalle*, 526 U.S. at 457 ("the best way to determine value is exposure to a market"); *WBQ P'Ship v. Commonwealth of Va. Dep. of Med. Assistance Servs.*, 189 B.R. 97, 104 (Bankr. E.D. Va. 1995) ("a public auction can serve the interests of creditors more than a private deal reached between a Chapter 11 debtor and a prospective buyer"); *In re Boston Generating,* 440 B.R. at 326 ("as long as you go to a broad enough swathe of potential buyers, the market will tell you what the asset is worth") (citations and quotations omitted).

49. Faced with notice that Amalgamated had unified the Senior Participation and the Junior Participation and opposed the HFZ Plan, the Debtors chose to press ahead with the HFZ Plan rather than exercise their fiduciary duties and negotiate with their largest creditor

to implement an open market process for the Property. The Debtors have had more than enough time to follow through on their repeated promises to run an open process in furtherance of their duty to maximize value for these estates. They have not done so, despite the opportunity afforded them via the OMF Commitment. Because the Debtors have abdicated this crucial element of their fiduciary duties, exclusivity must end and an open process, subject to higher and better offers, as sought by OMF, must be allowed.

(iv)    The OMF Commitment Provides for Fewer Closing Contingencies than the HFZ Plan and Has the Ability to Go Effective In a Shorter Amount of Time

50.    The HFZ Plan provides, as a condition to effectiveness, that the Debtors shall have obtained final orders resolving the Deed Holder Issue.[53] Practically speaking, it may take many months to resolve the Deed Holder Issue.[54] In contrast to the HFZ Plan, OMF has determined that it is willing to accept title to the Property subject to the Deed Holder Claims, if necessary. This eliminates a substantial condition to effectiveness in favor of the OMF Commitment. In contrast, the existence of the Deed Holder Claims contingency in the HFZ Plan provides a gaping hole for HFZ to walk through in order to back-out of the HFZ Plan. Additionally, the OMF Commitment allows confirmation of a plan more quickly (and an outside date for plan effectiveness of October 31, 2011 versus December 31, 2012 – a difference of *fourteen months*), thereby saving the estates the significant costs and expenses of remaining in bankruptcy. Once again, on these points alone, the OMF Commitment is superior to the HFZ Plan and therefore the Court should deny the Debtors' requested extension of the Exclusive Periods.

---

[53] *See* HFZ Plan at § 1.25.

[54] In light of this built-in delay for potential effectiveness of the HFZ Plan, there is no reason why the Debtors need a disclosure statement hearing for the HFZ Plan on July 28, 2011.

(v)     It is in the Best Interests of the Estates' Creditors to Permit OMF to File a
        Competing Plan

51.     It is in the best interests of the Debtors' estates to allow OMF to propose a plan that immediately provides for a greater recovery to OMF and the estates' general unsecured creditors. Competition to create value for creditors is a good thing for the Chapter 11 process – and it is both legal and common sense for a fiduciary to encourage it. Competing plans may motivate the Debtors to engage in expedited, meaningful negotiations. *See In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) ("In some instances, authority to file a competing plan may additionally motivate the debtor to more earnestly negotiate an acceptable consensual plan."). Moreover, the filing of a competing plan will not prejudice the Debtors, since they will remain able to solicit acceptances for the plan they have already filed or a new plan. *See In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) (decision to terminate exclusivity "does not sound a death knell for debtor's reorganization," rather it simply affords creditors the right to file plans as well; these rights coexist with the debtor's ongoing right to file a plan).

**B.     The HFZ Plan Impermissibly Treats The OMF Secured Claims**

52.     The Court should decline to extend the Exclusive Periods because proceeding with the HFZ Plan is futile. For example, the HFZ Plan attempts to force an artificially-valued $162 million cramdown note upon OMF, yet treats the secured portion of the OMF Secured Claims as "unimpaired" under Bankruptcy Code section 1124, rendering OMF unable to vote on the HFZ Plan.[55]  Additionally, the HFZ Plan provides for an involuntary waiver by OMF of its right to receive a distribution on account of its deficiency claim. This too

---

[55] Presumably, the Debtors are attempting to avoid having to meet the cramdown test in order to confirm the HFZ Plan, since they cannot satisfy Bankruptcy Code section 1129(b)'s "fair and equitable" test as to OMF's plan treatment.

is impermissible, since Bankruptcy Code section 1123(a)(4) requires that a plan provide the same treatment for each claim of a particular class, unless the holder of such claim agrees to less favorable treatment. The lengths to which the Debtors have gone to disenfranchise and disadvantage OMF, in favor of HFZ, provides further evidence as to the Debtors' abdication of their fiduciary duties. The Debtors have no fiduciary duty to maximize HFZ's recovery on its pre-petition claims (indeed, HFZ has no such claims). However, the Debtors do owe this duty to OMF and the other creditors of these estates and they have failed to meet this mandate. The Court should now level the playing field for the real parties in this case – the creditors – and allow competing plans to be filed and prosecuted.

## CONCLUSION

The Debtors claim to favor consensus and a plan that maximizes value for creditors. But with the predicate for a consensus plan in their grasp, the Debtors' actions do not match their words. The OMF Commitment (i) provides for a higher recovery for the estates' secured and unsecured creditors, (ii) contains fewer conditions to confirmation and effectiveness, (iii) provides for, and insists upon, a fully-financed open-market bidding process and (iv) allows these cases to proceed towards confirmation in an expeditious manner. The Debtors have not embraced the OMF Proposal and intend to proceed with the HFZ Plan instead. If the Court permits the Exclusive Periods to expire, OMF intends to promptly file a competing plan, consistent with the terms of the OMF Proposal, and disclosure statement in order to implement a transparent, open-market market process for the Property with a goal of confirming a plan and exiting bankruptcy by October 31, 2011. OMF requests that the HFZ Disclosure Statement hearing, currently on calendar for July 28, 2011, be adjourned to allow for a consolidated hearing on the HFZ Disclosure Statement and a to-be-filed OMF disclosure statement. Accordingly, the

Court should enter an order denying the Second Exclusivity Motion and permit OMF to file a plan consistent with the terms of the OMF Commitment.

WHEREFORE, for the reasons set forth above, OMF respectfully requests that the Court enter an order (a) denying the Second Exclusivity Motion; (b) adjourning the July 28, 2011 HFZ Disclosure Statement hearing to a date to be determined; and (c) granting such other and further relief as is just and proper.

Dated: July 7, 2011
  Wilmington, Delaware

        */s/ Zachary I. Shapiro*
        Russell C. Silberglied (No. 3462)
        Zachary I. Shapiro (No. 5103)
        **RICHARDS, LAYTON & FINGER, PA**
        One Rodney Square
        920 North King Street
        Wilmington, Delaware 19801
        Telephone: (302) 651-7700
        Facsimile: (302) 651-7701

          -and-

        **HAYNES AND BOONE, LLP**
        30 Rockefeller Plaza, 26th Floor
        New York, New York 10112
        Telephone: (212) 659-7300
        Facsimile: (212) 918-8989
        Lenard M. Parkins (admitted *pro hac vice*)
        Lawrence Mittman (admitted *pro hac vice*)
        Trevor R. Hoffmann (admitted *pro hac vice*)

        ***Counsel to One Madison FM, LLC***

RLF1 4415036v. 1