# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FKF MADISON GROUP OWNER, LLC, *et al.*,[1] | ) Case No. 10-11867 (KG) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Hearing Date: July 14, 2011 at 2:30 p.m. (ET) |
| | ) |
| | ) Re: D.I. 477 and 548 |

## DEBTORS' REPLY TO ONE MADISON FM, LLC'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1121(d) FURTHER EXTENDING THEIR EXCLUSIVE PERIODS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit their reply (the "Reply") to *One Madison FM, LLC's Objection To Debtors' Motion For Entry Of An Order Pursuant to 11 U.S.C. § 1121(d) Further Extending Their Exclusive Periods* (the "Objection") (D.I. 548).[2] In support of their Reply and the *Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. § 1121(d) Further Extending The Exclusive Periods During Which Only The Debtors May File A Chapter 11 Plan And Solicit Acceptances Thereof* (the "Motion") (D.I. 477), the Debtors respectfully state as follows:[3]

## REPLY

1. The relief requested in the Motion goes to the heart of a debtor's ability to shape the course of its chapter 11 proceedings: the debtor's rights to manage its cases and

---

[1] The Debtors in these cases, along with the last four digits of the EIN, are: FKF Madison Group Owner LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner LLC (Case No. 10-11868) (6651); Madison Park Group Owner LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner LLC (Case No. 10-11870) 4339). The Debtors' address is P.O. Box 49249, Charlotte, North Carolina, 28277.

[2] To the extent necessary, the Reply also constitutes the Debtors' response to the *Preliminary Objection Of Amalgamated Bank To The Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. § 1121(d) Further Extending The Exclusive Periods During Which Only The Debtors May File A Chapter 11 Plan And Solicit Acceptances Thereof And Reservation of Rights* (the "Amalgamated Objection") (D.I. 495).

[3] Undefined capitalized terms shall have the meanings ascribed to them in the Motion.

propose a plan of reorganization. Despite the allegations contained in the Objection, the only issue before the Court is whether the Debtors have shown sufficient cause for the extension of their Exclusive Periods.

2. Since the entry of the Control Order in late January, the Debtors have undertaken a multitude of tasks and actions to move these cases forward and maximize value for the Debtors' creditors. The Motion details the Debtors' extensive efforts since the filing of the First Exclusivity Motion, and the Debtors will not belabor the Court with unnecessary repetition. Since the filing of the Motion, however, the Debtors have undertaken additional efforts to move these cases along, including (i) filing a plan of reorganization sponsored by an affiliate of HFZ Capital Group LLC (the "HFZ Plan") and a related disclosure statement; (ii) negotiating further enhancements to the HFZ Plan; and (iii) obtaining an extension of the Debtors' post-petition financing. These and other facts provide more than sufficient basis for the Court to determine that the Debtors have made good faith progress toward a successful conclusion of these cases and that a further extension of the Debtors' Exclusive Periods is warranted.

3. The Objection attempts to paint these cases as uncomplicated single-asset real estate cases where the Debtors have failed to maximize value; however, this depiction could not be farther from the truth. The Court's own experience with these cases and the significant disputes that have occurred herein, beginning with the origination of the cases as involuntary chapter 7 proceedings, continuing through the control fight and the adversary proceedings that have been filed to-date, refutes the proposition of simplicity. To understand the fallacy of the assertion that the Debtors have failed to maximize value, it is important to clarify the events surrounding the April 14, 2011 auction (the "Auction") and recent events related to the appearance of One Madison FM LLC ("OMF") in these cases.

### A. The Auction Dramatically Increased Values

4. Prior to the Auction, the Debtors, through their officer and counsel, in addition to the Controlling Members and Shapiro met or conferred with numerous entities that expressed interest in sponsoring a chapter 11 plan for the Debtors. The Debtors provided due diligence materials to, and coordinated site visits for, such parties. In addition, the Debtors facilitated meetings between potential plan sponsors and some of the Debtors' significant creditors. The Debtors met with each and every entity that came forward as a potential plan sponsor.[4]

5. Ultimately, the Debtors determined that a more formal process was necessary to determine the highest or otherwise best plan proponent offer. To that end, in the first two weeks of April 2011, the Debtors contacted each party that had indicated any level of interest in sponsoring a plan to decipher if such parties were interested in submitting a proposal, as part of an auction process, within the range of values expressed by other potential plan proponents. Despite the impressive pool of potentially interested sponsors, which included significant players in the New York real estate and finance markets, only two potential plan sponsors indicated an interest in participating in such a process, and on April 14, 2011, the Debtors held the Auction.

6. OMF does much to malign the Auction; however, it is critical to point out that OMF's predecessor in interest, iStar, was present at the Auction. In fact, the Auction was

---

[4] Although it is clear from the visitor logs maintained at the Property, attached hereto as **Exhibit A**, that individuals affiliated with The Related Companies and Amalgamated Bank have been touring the Property since no later than early April 2011 and early March 2011, respectively, at no time did Amalgamated Bank or The Related Companies approach the Debtors regarding acquiring the Debtors' real property or proposing a plan of reorganization. *See* **Exhibit A**. In addition, upon information and belief, The Related Companies toured the Debtors' real property in May or June of 2010 in connection with marketing efforts of Jonathan Newman, the New York State Court appointed receiver.

held at the offices of iStar's counsel and iStar principals and counsel were present for, and participated in, the entire Auction. At no point prior to, during, or after the Auction did iStar seek to put forth a plan of reorganization for the Debtors or seek an alternative or additional bidding process. The Debtors consulted with iStar (and the Committee) throughout the Auction process and at the conclusion of the Auction, the Debtors and iStar agreed that HFZ's winning bid was the highest and best offer for the Debtors' assets.

7.  It is undisputed that iStar represented as much in its communications with its junior participant, Amalgamated Bank ("Amalgamated"). *See* Objection, Exh. D, May 27, 2011 Letter from iStar Senior Vice President John Kubicko to Amalgamated Bank Senior Vice President James Freel ("iStar believes the high bid by HFZ Capital LLC that emerged from the auction process conducted by the Debtors has resulted in the best proposal available and will maximize recoveries on the loan . . . iStar intends to pursue the HFZ proposal."); Exh. F, June 8, 2011 Letter from iStar Senior Vice President John Kubicko to Amalgamated Bank Senior Vice President James Freel ("iStar believes that the HFZ plan represents the best recovery available in respect of the Loan").

8.  It is clear that the winning bid at the Auction represents a dramatic increase in value for all of the Debtors' creditors over prior valuations in the Debtors' cases. OMF's predecessor iStar previously represented to this Court that it believed the value of the Debtors' real property was between $131 million and $138 million. See *Motion of iStar Tara LLC For Relief From The Automatic Stay To Foreclose On Mortgaged Property*, ¶ 6 (D.I. 105). Following iStar's representation of value, the Debtors, under the direction of Shapiro, filed a plan of reorganization (the "New One Madison Plan") (D.I. 160) to be funded by an entity known as New One Madison Park Member I, LP. The New One Madison Plan provided that the

iStar secured debt would be treated as a secured claim in the amount of $124,500,000. In contrast, the HFZ Plan currently on file provides for a secured claim in the amount of $162 million on account of iStar's secured debt and establishes a pool of $6.75 million for distributions to unsecured creditors. As should be clear, the Debtors' efforts surrounding the Auction have significantly increased value in these cases to the extent of over $40 million worth of additional value over the New One Madison Plan.

**B.     The Plan Process and OMF's Entry Into These Cases**

9.      Following the Auction, the Debtors, iStar, and HFZ spent numerous hours over eight weeks negotiating and refining the terms of a plan of reorganization consistent with the terms of HFZ's winning bid. By early June, the plan documents, including a plan support agreement to be executed by iStar, were in substantially final form. Shortly thereafter, however, iStar notified the Debtors that Amalgamated had given notice of its intent to purchase iStar's interest in the Debtors' pre-petition secured loans and that iStar would not sign the fully negotiated plan documents.

10.     Subsequently, in an effort to understand Amalgamated's intentions, the Debtors' professionals began to reach out to Amalgamated on both business and professional fronts. Indeed, the Debtors emailed or called Amalgamated's professionals not less than eleven times in the following weeks, as demonstrated in the emails and previously filed time records attached hereto as **Exhibit B**. Around this same time and notwithstanding these efforts by the Debtors and their professionals to engage Amalgamated, Amalgamated filed its preliminary objection to the Motion, therein disingenuously representing that the Debtors had failed to engage with Amalgamated. *See* Amalgamated Objection, ¶¶ 6, 9, 11, 12, and 14.

11.     Notwithstanding the Debtors' multiple efforts to open discussions with Amalgamated, the Debtors were never able to engage Amalgamated in a meaningful discussion. In fact, the Debtors were kept completely in the dark as to its purported new lender's intentions until June 26, 2011 when OMF's counsel finally began to engage the Debtors in a substantive conversation, after initially indicating their pending retention by OMF on June 23, 2011. Several days later and approximately two days before the Debtors post-petition financing expired, OMF provided the Debtors with a draft of the commitment letter described in the Objection.

12.     OMF provided the Debtors with its commitment letter in the same week that the Debtors' post-petition financing was expiring and at a time when the Debtors had only been acquainted with OMF for several days. The Debtors were understandably focused on securing continued financing last week and after the long holiday weekend have turned their attentions to considering the OMF term sheet. The Debtors continue to recognize their fiduciary duties to maximize value in these cases, but will not be intimidated into withdrawing a plan that is the result of a fair process and lengthy good-faith negotiations by an exploding offer from a come-lately lender.

13.     Section 1121(d) allows the Court to extend the Debtors' Exclusive Periods for "cause." 11 U.S.C. § 1121(d). The determination of cause under section 1121(d) is a highly fact-specific inquiry committed to the bankruptcy court's discretion. *See, e.g., First Am. Bank of N.Y. v. S.W. Gloves and Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986). The existence of good faith progress and the need for additional time to continue such progress is a particularly significant factor in establishing cause for extending the exclusive periods under section 1121(d) of the Bankruptcy Code. *See In re Express One Int'l, Inc.*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996); *In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986). Given the progress

to date in the Debtors' cases and the necessity for additional time to consider the impact of OMF's entry into these cases, the Exclusivity Motion should be approved to allow the Debtors to exercise their rights and responsibilities in these cases and make informed decisions.[5]

14. To the extent that the Court is not inclined to approve the Motion in its entirety, the Debtors request that the Court instead extend the Exclusive Periods for a shorter duration to allow the Debtors necessary time to determine the best course forward.

WHEREFORE, the Debtors respectfully request that the Court (i) overrule the Objection in its entirety, (ii) approve the Motion in its entirety, and (iii) grant such other and further relief as is just and proper.

Dated: July 11, 2011
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Derek C. Abbott (Bar No. 3376)
Erin R. Fay (Bar No. 5268)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Email: dabbott@mnat.com
         efay@mnat.com
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

4367603.2

*Counsel to Debtors and Debtors in Possession*

---

[5] The Objection essentially asserts OMF's objections to the HFZ Plan and related disclosure statement and asks that the Court adjourn the hearing on the disclosure statement related to the HFZ Plan. The Debtors do not believe that this relief is proper in the context of an objection to a motion to extend Exclusive Periods and ask that, to the extent the Court considers such relief, it be denied. The Debtors reserve their rights to object to any request to adjourn the disclosure statement hearing, to the extent such request is properly asserted.