# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FKF MADISON GROUP OWNER, LLC, *et al.,*[1] | Case No. 10-11867 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing Date** _____, **2011 at** |
| | **Objection Deadline:** _____, **2011 at 4:00 p.m. (ET)** |

**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE FIRST AMENDED JOINT CONSOLIDATED PLAN OF REORGANIZATION FOR FKF MADISON GROUP OWNER, LLC AND ITS AFFILIATED DEBTORS**

| | |
|---|---|
| **MORRIS, NICHOLS, ARSHT & TUNNELL LLP** | **HAYNES AND BOONE, LLP** |
| Derek C. Abbott, Esq. (No. 3583) | Lenard M. Parkins, Esq. |
| Erin R. Fay, Esq. (No. 5268) | Lawrence Mittman, Esq. |
| 1201 N. Market Street | Trevor Hoffmann, Esq. |
| 18th Floor | Jonathan Hook, Esq. |
| Wilmington, Delaware 19801 | 30 Rockefeller Plaza, 26th Floor |
| Telephone: (302) 658-9200 | New York, New York 10112 |
| Facsimile: (302) 658-9400 | Telephone: (212) 659-7300 |
| | Facsimile: (212) 884-8211 |
| *Counsel to FKF Madison Group Owner, LLC, JMJS 23rd Street Realty Owner, LLC, Madison Park Group Owner, LLC and Slazer Enterprises Owner, LLC* | -and- |
| | **RICHARDS, LAYTON & FINGER, P.A.** |
| | Russell C. Silberglied, Esq. (No.3462) |
| | Zachary I. Shapiro, Esq. (No. 5103) |
| | 920 One Rodney Square |
| | P.O. Box 551 |
| | Wilmington, Delaware 19801 |
| | Telephone: (302) 651-7700 |
| | Facsimile: (302) 498-7701 |
| | *Counsel to One Madison FM, LLC, as Plan Proponent* |

---

[1] The Debtors in these cases, along with the last four digits of the EIN, are: FKF Madison Group Owner, LLC (Case No. 10-11867) (3699); JMJS 23rd Street Realty Owner, LLC (Case No. 10-11868) (6651); Madison Park Group Owner, LLC (Case No. 10-11869) (3701); and Slazer Enterprises Owner, LLC (Case No. 10-11870) 4339). The Debtors' address is P.O. Box 49249, Charlotte, North Carolina, 28277.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN.  ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.  THE PROPONENTS MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

## IMPORTANT DATES

- Date by which Ballots must be received: [DATE].

- Date by which objections to Confirmation of the Plan must be Filed and served: [DATE].

- Hearing on Confirmation of the Plan: [DATE] at _____ [ ].m. (ET).

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................ 1

    A.  OVERVIEW OF THE PLAN ............................................................. 3

    B.  SUBSTANTIVE CONSOLIDATION................................................. 6

    C.  SUMMARY OF CLASSIFICATION AND TREATMENT OF
       ALLOWED CLAIMS AGAINST AND INTERESTS IN EACH
       OF THE DEBTORS UNDER THE PLAN .......................................... 7

II. GENERAL INFORMATION.................................................................. 10

    A.  THE DEBTORS' BUSINESS ........................................................... 10

    B.  MANAGEMENT OF THE DEBTORS.............................................. 10

    C.  DESCRIPTION OF DEVELOPMENT TO DATE............................ 11

    D.  PRE-RELIEF DATE DEBT AND CAPITAL STRUCTURE OF
       THE COMPANY................................................................................ 12

          1.  Secured Debt..................................................................... 12

               (a)  The OMF Prepetition Claims................................ 12

               (b)  Secured Mechanic Liens....................................... 12

               (c)  Other Secured Debt............................................... 12

          2.  Priority Claim Debt........................................................... 13

               (a)  Gap Claims........................................................... 13

               (b)  Other Priority Claims........................................... 13

          3.  Unsecured Debt................................................................. 13

          4.  Equity ............................................................................... 13

    E.  PENDING LITIGATION AGAINST THE DEBTORS ..................... 13

          1.  The Foreclosure Action..................................................... 14

          2.  Property Adversary Proceedings and the Lipman Lift Stay
              Motion.............................................................................. 14

|   | (a) | Flamingo | 14 |
|   | (b) | Wills | 14 |
|   | (c) | Kraus | 15 |
|   | (d) | Masheck and Lin | 15 |
|   | (e) | Lipman | 15 |
| 3. |  | Other Litigation | 15 |
| F. |  | THE DEBTORS' BANKRUPTCY CASES | 16 |
| 1. |  | Events Leading Up to the Chapter 11 Cases | 16 |
|   | (a) | The Involuntary Petitions | 16 |
|   | (b) | Conversion Order | 16 |
| 2. |  | iStar Funding Motions and Stay Relief Motion | 16 |
|   | (a) | iStar's Protective Advance Motions | 16 |
|   | (b) | iStar's Motion for Relief from Stay | 17 |
|   | (c) | Supplement to iStar Lift Stay Motion | 18 |
| 3. |  | Events and Transactions Related to Green Bridge and Special Situation | 18 |
|   | (a) | Green Bridge Capital S.A. and Special Situation S.A. v. Ira Shapiro, Adversary Proceeding No. 10-56158 | 18 |
|   | (b) | Agreements Between the Controlling Members and HFZ | 18 |
| 4. |  | Events During the Pendency of the Control Proceeding | 19 |
|   | (a) | Unauthorized Filings | 19 |
|   | (b) | The Committee | 20 |
| 5. |  | Events Following the Entry of the Control Order | 20 |
|   | (a) | Professional Retentions | 20 |
|   | (b) | Ordinary Course Retentions | 20 |
|   | (c) | Schedules of Assets and Liabilities & Statements of Financial |  |

Affairs .............................................................................................. 20

  (d)  The Bar Date Motion ............................................................... 21

  (e)  Debtor in Possession Financing ............................................... 21

  (f)  Extensions of the Debtors' Exclusive Periods ........................... 22

  (g)  The Initial Chapter 11 Plan ..................................................... 23

  (h)  The Unification of the OMF Prepetition Indebtedness and OMF Enters Chapter 11 Cases ........................................................ 24

  (i)  The New OMF Commitment and the Plan Process ................... 25

III. THE PLAN OF REORGANIZATION ............................................................ 29

 A. GENERAL ............................................................................................ 30

 B. PURPOSE OF DISCLOSURE STATEMENT .................................... 30

 C. SOLICITATION PACKAGE ............................................................... 31

 D. VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE ........................................................................................... 31

  1. Voting Deadline .................................................................... 31

  2. Holders of Claims Entitled to Vote ....................................... 32

  3. Vote Required for Acceptance by a Class of Claims ............. 33

  4. Voting Procedures ................................................................ 33

   (a)  Ballots ....................................................................... 33

   (b)  Withdrawal or Change of Votes on the Plan ............... 34

 E. CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION .................................................. 34

 F. CLASSIFICATION OF CLAIMS AND INTERESTS ........................ 34

 G. TREATMENT OF UNCLASSIFIED CLAIMS .................................. 35

  1. Administrative Claims ........................................................... 35

  2. Gap Claims ........................................................................... 36

3.     Priority Tax Claims ................................................................. 36

H.    TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
INTERESTS ........................................................................................ 37

     1.     OMF Prepetition Claims (Class 1) ........................................ 37

     2.     Secured Mechanic Lien Claims (Class 2) .............................. 38

     3.     Other Secured Claims (Class 3) .............................................. 39

     4.     Other Priority Claims (Class 4) .............................................. 39

     5.     General Unsecured Claims (Class 5) ...................................... 40

     6.     Old Equity Interests (Class 6) ................................................ 41

I.     ACCEPTANCE OR REJECTION OF THE PLAN ............................. 41

     1.     Acceptance by an Impaired Class .......................................... 41

     2.     Presumed Acceptances by Unimpaired Classes ..................... 41

     3.     Presumed Rejection by Certain Impaired Classes .................. 42

     4.     Impaired Classes of Claims Entitled to Vote on the Plan ....... 42

J.     MEANS FOR IMPLEMENTATION OF THE PLAN ......................... 42

     1.     Vesting of Assets in Reorganized Debtors ............................. 42

     2.     Provisions for Plan Payments ................................................. 44

     3.     Post-Effective Date Ownership, Development and Sale of
the Units ................................................................................ 44

     4.     Plan Administrator ................................................................. 44

     5.     The Reorganized Debtors ....................................................... 47

     6.     Standing of Reorganized Debtors .......................................... 48

     7.     Cancellation of Notes, Instruments, Debentures, Old Equity
Interests; Assignment of Morgages. ....................................... 48

     8.     Cancellation of Liens and New Title Policy ........................... 49

     9.     Cram-Down ............................................................................ 50

| | 10. | Dissolution of the Committee ................................................ 50 |
|---|---|---|
| | 11. | Exercise of Foreclosure Rights ............................................. 50 |
| K. | | PROVISIONS GOVERNING DISTRIBUTIONS ................................ 50 |
| | 1. | Distributions By Disbursing Agent ....................................... 51 |
| | 2. | Interest on Claims ................................................................ 51 |
| | 3. | Substantive Consolidation ................................................... 51 |
| | 4. | Delivery of Distributions and Undeliverable or Unclaimed Distributions ......................................................................... 51 |
| | 5. | Record Date for Distributions .............................................. 52 |
| | 6. | Allocation of Plan Distributions Between Principal and Interest ................................................................................. 52 |
| | 7. | Means of Cash Payment ....................................................... 52 |
| | 8. | Withholding and Reporting Requirements ............................ 53 |
| | 9. | Setoffs and Recoupment ...................................................... 53 |
| | 10. | Compromises and Settlements ............................................. 53 |
| | 11. | De Minimis Distributions .................................................... 54 |
| | 12. | Claims Administration Responsibility ................................. 55 |
| | 13. | Determination of Allowed Claims and Causes of Action ....... 55 |
| | 14. | Late Filed Claims ................................................................ 56 |
| | 15. | Reserves ............................................................................... 56 |
| L. | | TREATMENT OF EXECUTORY CONTRACTS, AND UNEXPIRED LEASES .............................................................. 57 |
| | 1. | Assumption Generally .......................................................... 57 |
| | 2. | Approval of Assumption ...................................................... 58 |
| | 3. | Objections to Assumption .................................................... 58 |
| | 4. | Payments Related to Assumption ......................................... 59 |

|   | 5. | Rejection Generally | 59 |
|   | 6. | Approval of Rejection | 60 |
|   | 7. | Objections to Rejection | 60 |
| M. | | CONFIRMATION AND CONSUMMATION OF THE PLAN | 60 |
|   | 1. | Conditions to Confirmation | 60 |
|   | 2. | Conditions to Effective Date | 61 |
|   | 3. | Waiver of Conditions | 62 |
|   | 4. | Effect of Non-Occurrence of Effective Date | 62 |
| N. | | EFFECT OF PLAN CONFIRMATION | 62 |
|   | 1. | Binding Effect | 62 |
|   | 2. | Exculpation, Releases and Discharge | 63 |
|   | 3. | Preservation of Litigation Claims | 64 |
|   | 4. | Injunction | 65 |
|   | 5. | Term of Bankruptcy Injunction or Stays | 66 |
|   | 6. | Termination of Subordination Rights and Settlement of Related Claims | 66 |
| O. | | MISCELLANEOUS PLAN PROVISIONS | 66 |
|   | 1. | Post-Effective Date Retention of Professionals | 66 |
|   | 2. | Bar Date for Certain Administrative Claims | 66 |
|   | 3. | Effectuating Documents and Further Transactions | 67 |
|   | 4. | Action by Debtors Authorized | 67 |
|   | 5. | Exemption from Transfer Taxes | 68 |
|   | 6. | Payment of Statutory Fees | 68 |
|   | 7. | Amendment or Modification of the Plan | 68 |
|   | 8. | Revocation, Withdrawal or Non-Consummation | 69 |

9.      Notice ...................................................................................................... 69

10.    Governing Law ......................................................................................... 71

11.    Tax Reporting and Compliance ............................................................... 71

12.    Limitations on Effect of Confirmation .................................................... 71

13.    Securities Exemption ................................................................................ 71

14.    Controlling Documents ............................................................................ 71

15.    No Admissions .......................................................................................... 72

IV.     CONFIRMATION OF THE PLAN .................................................................... 72

     A.      CONFIRMATION HEARING .................................................................. 72

     B.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF
THE PLAN ................................................................................................ 73

         1.      Acceptance ................................................................................................ 73

         2.      Fair and Equitable Test ............................................................................ 73

         3.      Feasibility ................................................................................................. 75

         4.      Best Interests Test and Liquidation Analysis .......................................... 75

V.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ......................................................................................................... 76

     A.      CONTINUATION OF THE CHAPTER 11 CASES ............................... 76

     B.      LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 .................... 76

     C.      DISMISSAL ............................................................................................. 76

VI.     RISK FACTORS ................................................................................................ 77

     A.      GENERAL BANKRUPTCY LAW CONSIDERATIONS ..................... 77

         1.      Failure to Obtain Confirmation of the Plan May Result in
Liquidation or an Alternative Plan on Less Favorable Terms ................. 77

         2.      Failure of Occurrence of the Effective Date May Result in
Liquidation or an Alternative Plan on Less Favorable Terms ................. 78

     B.      OTHER RISK FACTORS ........................................................................ 78

     1.  Potential Natural or Other Disasters ................................................. 78

     2.  Possible Terrorist Activity or Other Acts of Violence ............................ 78

     3.  Pending and Future Litigation ................................................. 79

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................ 79

  A. REGULAR FEDERAL INCOME TAX ................................................. 80

  B. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS
    OF CLAIMS AND INTERESTS ................................................. 80

  C. INFORMATION REPORTING AND BACKUP WITHHOLDING ................ 80

  D. IMPORTANCE OF OBTAINING PROFESSIONAL TAX
    ASSISTANCE ................................................. 81

VIII. CONCLUSION AND RECOMMENDATION ................................................. 81

# INDEX OF EXHIBITS

**Exhibit A -** *First Amended Joint Consolidated Plan of Reorganization for FKF Madison Group Owner, LLC and Its Affiliated Debtors*

**Exhibit B –** Liquidation Analysis

## I.  INTRODUCTION

The Debtors and OMF[1] are proposing the *First Amended Joint Consolidated Plan of Reorganization for FKF Madison Group Owner, LLC and Its Affiliated Debtors* (as may be amended and supplemented attached hereto as "**Exhibit A**" to facilitate the Debtors' emergence from bankruptcy.  The purpose of this Disclosure Statement[2] is to describe the Plan and its provisions and provide certain information, as required of the Proponents under applicable Bankruptcy Code and Bankruptcy Rule provisions, including, without limitation, Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016, to creditors who will have the right to vote on the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan.  Creditors entitled to vote to accept or reject the Plan have received a Ballot together with this Disclosure Statement to enable them to vote on the Plan.  By Order dated _____, the Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" under Section 1125 of the Bankruptcy Code [Docket No. __].

This Disclosure Statement includes, among other things:  (1) information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 7 Cases, entry of the Relief Order and the commencement of the Chapter 11 Cases; (2) information regarding significant events that occurred during the Chapter 7 Cases and the Chapter 11 Cases; (3) an overview of the Plan, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan; (4) a discussion of the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote on the Plan in order for their votes to be counted; and (5) information regarding the implementation and feasibility of the Plan.

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement transmitted to each Holder of a Claim entitled to vote on the Plan.

The Proponents may supplement or amend this Disclosure Statement, or any Exhibits attached hereto, at any time prior to the hearing to approve this Disclosure Statement.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

---

[1]  OMF is a limited liability company controlled by Related and in which HFZ and Amalgamated either own or shall own interests.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS, APPENDICES, AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS, OTHER NON-BANKRUPTCY LAWS, OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE VI, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS, NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS,

WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER ANY DEBTOR OR THE REORGANIZED DEBTORS.

## A. OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. For a more detailed description of the terms and provisions of the Plan, see Article III herein, "The Plan of Reorganization." The Proponents, moreover, reserve the right to modify the Plan consistent with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The Plan embodies an agreement between the Debtors, OMF and the Committee and provides for retention of all or substantially all of the assets of the Debtors' Estates by, and vesting of title and ownership in, the Reorganized Debtors. At its core, the Plan currently provides that, on the Effective Date, or as soon as practicable thereafter:

- All assets of the Debtors (including, without limitation, the Property, but excluding, for the avoidance of doubt, the GUC Cash Amount and the Plan Administrator Actions) and their Estates that are not specifically disposed of pursuant to the Plan, including, without limitation, all Causes of Action (including all Avoidance Actions), whether pending or asserted in the future, shall be retained by, and title and ownership shall vest in the Reorganized Debtors on the Effective Date, subject to (a) the OMF Prepetition Indebtedness, OMF Prepetition Claims and the OMF Prepetition Liens to the extent OMSub is the Plan Funder, (b) those liens that are acceptable to OMF based on its review of the Title Commitment, and (c) any interests relating to the Disputed Units asserted by parties in the Bankruptcy Cases prior to the applicable Bar Date pending final adjudication of such Disputed Unit Claims by a court of competent jurisdiction, but otherwise free and clear of all Liens, Claims and Old Equity Interests, including, without limitation, the Liens and Claims of Holders of any Mechanic Lien Claim, Flamingo Claim, Judgment Lien Claim, McDonald's Claim, and Other Secured

Claim, any Claim of successor liability, any Claim of any owner of a Unit other than a Disputed Unit, any Claim based on the actions or inactions of the Debtors or their agents, representatives, employees or contractors with respect to the development, construction or sale of the Property or any Unit, or any patent or latent construction defects.

- Pursuant to Bankruptcy Code Section 1111(b), OMF will elect to have the entirety of the OMF Prepetition Claims treated as fully secured.

- If OMSub is the Plan Funder, then (i) on or prior to the Effective Date, OMSub will satisfy the Plan Funding Commitment (*i.e.*, all cash necessary to fund the Plan) and in exchange, will receive 100% of the New Equity, and (ii) OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (a) continue to be evidenced and secured by all of the OMF Prepetition Liens, (b) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property (other than as provided in the Plan Supplement in connection with the amendment of, restatement of and/or modifications to the Loan Documents), and (c) not be merged with the ownership of the New Equity. As a result, on the Effective Date, OMSub will own the New Equity and OMF will continue to own and hold the OMF Prepetition Indebtedness and the OMF Prepetition Claims secured by the OMF Prepetition Liens. If OMSub is not the Plan Funder, then (y) OMF's Plan treatment will be the payment in full, in cash, of the OMF Prepetition Claims on the Effective Date or such other treatment as OMF may agree in its sole and absolute discretion, and (z) the New Equity will be issued to the Plan Funder.

- It is contemplated that if OMSub is the Plan Funder and as a result receives 100% of the New Equity on the Effective Date, pursuant to the Plan, the Reorganized Debtors will merge into OMSub and OMSub shall be the surviving entity of such merger.

- All Old Equity Interests in each Debtor, including any outstanding warrants, options, or other rights to acquire outstanding Old Equity Interests, shall be terminated and cancelled and the Holders thereof shall neither retain nor receive any property under the Plan.

- The OMF DIP Funding Claim and the HFZ DIP Funding Claim shall be paid in full by the Reorganized Debtors on the Effective Date.

- The Reorganized Debtors shall pay the Cure Amount under each executory contract and unexpired lease to be assumed on the Effective Date.

- Holders of Allowed Administrative Claims (Unclassified), Allowed Gap Claims (Unclassified), and Other Priority Claims (Class 4) shall be satisfied by the

Reorganized Debtors in full in cash or by such other treatment as the Reorganized Debtors and the Holder shall have agreed.

- Holders of Allowed Priority Tax Claims (Unclassified) that are due and payable on or prior to the Effective Date shall be satisfied by the Reorganized Debtors in (i) cash equal to the amount of such Allowed Priority Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Relief Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim.

- Holders of Allowed Secured Mechanic Lien Claims (Class 2) shall be satisfied by the Reorganized Debtors by (i) Distributions as agreed between the holder of such claims, on the one hand, and the Debtors and the Plan Funder prior to the Effective Date or the Reorganized Debtors after the Effective Date, on the other hand, or, to the extent the parties cannot so agree, (ii) a cash payment equal to one hundred percent (100%) of the Allowed principal amount of each such Holder's Allowed Secured Mechanic Lien Claim, without interest;

- Holders of Allowed Other Secured Claims (Class 3) shall, at the Reorganized Debtor's election, have their Claims satisfied by either (i) reinstatement pursuant to Section 1124 of the Bankruptcy Code, (ii) receipt of the collateral securing such claim and any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, (iii) such other treatment as the Reorganized Debtors and the applicable Holder of an Allowed Other Secured Claim may agree, or (iv) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code.

- As set forth in the 9019 Order, Holders of General Unsecured Claims (Class 5) shall receive their pro rata share of the GUC Cash Amount which shall be $6.75 million unless (A) the Bankruptcy Court determines that the Committee violates, breaches or takes any action inconsistent with the terms described in Section 2.3(e)(ii)(A) of the Plan and as set forth in the 9019 Order, in which case the GUC Cash Amount shall be reduced to $3.4 million; (B) the Bankruptcy Court determines that the Committee violates, breaches or takes any action inconsistent with any of sub-paragraphs (ii)(B)-(E) of section 2.3 of the Plan and as set forth in the 9019 Order, in which case the GUC Cash Amount shall be reduced to $0; or (C) Class 5 fails to accept the Plan by the requisite statutory majorities, in which case the GUC Cash Amount shall be reduced to $3.4 million. For the avoidance of doubt, in the event that the Court determines that the Committee violated, breached or took any action resulting in the GUC Cash Amount being reduced to both $3.4 million and $0, the GUC Cash Amount shall be $0.

As set forth in the 9019 Order, the Committee (A) shall support the efforts of the Debtors and OMF to implement the terms of the 9019 Settlement and confirm the Plan; (B) shall not support any restructuring or reorganization plan other than the Plan and the plan process contemplated by the 9019 Settlement (which may be amended from time to time by the Debtors

and OMF so long as the GUC Cash Amount, its authorized uses, and OMF's waiver of any right to share in the GUC Cash Amount are not changed to the detriment of Holders of Allowed General Unsecured Claims), and the Debtors' and OMF's prosecution of the Plan; (C) shall provide a letter in support of the Plan, recommending that Holders of General Unsecured Claims vote in favor of the Plan, which letter is to be included in the Plan solicitation materials (provided that such letter may include the Committee's assessment and analysis of the Plan and its consideration of various factors in deciding to support the Plan); (D) shall oppose any efforts by any third party in opposition to the Plan and the Plan process contemplated by the 9019 Settlement; and (E) shall take no actions, directly or indirectly, to interfere with, hinder, or delay the confirmation and implementation of the Plan, or any litigation related thereto (including any litigation related to ownership or rights to the Property, including the Units), except to the extent the Plan or incident litigation purports to reduce the GUC Cash Amount or alter any provisions of the Plan in a manner inconsistent with the terms hereof, and shall not cause others to do so in any litigation (whether in the Bankruptcy Court or any other court) related in any way to (1) the validity, priority or enforceability of the mortgages and liens of OMF against the Property; (2) the Property, including with respect to objections to claims related in any way to claims or rights asserted by any party to ownership of the Property, including Units; (3) the Disputed Commercial Unit; (4) any litigation, claims and rights therein retained by the Debtors or Reorganized Debtors under the Plan, or (5) any litigation needed to implement the Plan so long as the consideration to Holders of Allowed General Unsecured Claims does not change.

## B.    <u>SUBSTANTIVE CONSOLIDATION</u>

As further described below, Slazer Enterprises LLC, (a non-Debtor) ("<u>Slazer</u>") manages each of the Debtors pursuant to the terms of the Debtors' operating and other agreements. With the exception of the Loan Documents and certain transactions that are or may be subject to litigation, it is believed that Slazer, or other non-Debtor affiliates including, but not limited to, Park Madison Associates, LLC, interacted with many creditors and entered into contracts or agreements with such parties on the Debtors' behalf. To the extent that the Debtors did enter into contracts with creditors, it is believed that all of the Debtors were generally included in such contracts. In addition, all of the Debtors are borrowers under the Loan Documents. As a result, the Debtors believe that their creditors generally understood that they were interacting with all of the Debtors as a single entity, or Slazer or Park Madison Associates, LLC on all of the Debtors' behalf. Moreover, there is no evidence that the Debtors ever kept separate books and records or accounted for their assets and liabilities separately. To the extent that financial reporting was done, all reporting was completed on a consolidated basis for all of the Debtors by Slazer. As a result, sorting out the liabilities of one Debtor from another cannot be accomplished to any meaningful degree.

Accordingly and to the extent necessary, the Plan serves as a motion by the Debtors seeking entry of an order granting substantive consolidation, upon the Effective Date, of the Estates and all the Debts of all of the Debtors for all purposes, including for Distributions to be made under the Plan. Pursuant to such order (which may be the Confirmation Order): (i) all assets and liabilities of the Debtors shall be deemed merged; (ii) all guarantees by one Debtor of the obligations of another Debtor shall be deemed eliminated so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several

liability of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every Claim Filed or to be Filed in the Chapter 11 Case of any of the Debtors shall be deemed Filed against the consolidated Debtors and shall be deemed one claim against and a single obligation of the consolidated Debtors; and (iv) Claims by one Debtor against another Debtor shall be Disallowed.

## C. SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AGAINST AND INTERESTS IN EACH OF THE DEBTORS UNDER THE PLAN

The following chart summarizes the projected Distributions to Holders of Allowed Claims against, and Old Equity Interests in, the Debtors under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of the Allowed amount of Claims or Old Equity Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims as well as other factors related to the Debtors' business operations and general economic conditions. In addition, the ability to receive Distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. Furthermore, Disputed Claims are subject to disallowance or allowance in a reduced amount.[3] Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Old Equity Interests in the Debtors.

| Class | Estimated Allowed Amount[4] | Treatment under the Plan[5] |
|-------|------------------------------|------------------------------|
|       |                              |                              |

---

[3] For a detailed description of the treatment of Disputed Claims, see Section III.K.13 of this Disclosure Statement.

[4] These estimates are derived from the Schedules and a review of claims actually filed by creditors, and constitutes the Debtors' projections of the average range of Allowed Claims against the Debtors' estates unsatisfied as of the Effective Date. There can be no assurance that actual amounts will not differ significantly from the estimates set forth herein. The projections set forth herein shall not be deemed an admission or waiver by the Debtors or OMF as to the amount, validity, priority, or extent any claims.

[5] The estimated percentage of recovery is based on amounts that are expected to be available for distribution to creditors on the Effective Date and estimates of the aggregate amount of Allowed Claims in each Class. There can be no assurance that actual amounts will not differ significantly from the estimates set forth herein. The projections set forth herein shall not be deemed an admission or waiver by the Debtors or OMF as to the amount, validity, priority, or extent any claims.

| Class | Estimated Allowed Amount[4] | Treatment under the Plan[5] |
|---|---|---|
| Unclassified Claims | $10-12 million | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Payment in full in cash on the Effective Date or as otherwise provided in the Bankruptcy Code, except to the extent that a holder of such claims agrees to different treatment. |
| Class 1 OMF Prepetition Claims | Not less than $234,150,572.72. | Est. Percentage Recovery: TBD<br><br>Form of Recovery: If OMSub is the Plan Funder, then OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (a) continue to be evidenced and secured by all of the OMF Prepetition Liens, (b) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property (other than as provided in the Plan Supplement in connection with the amendment of, restatement of and/or modifications to the Loan Documents), and (c) not be merged with the ownership of the New Equity.<br><br>If OMSub is not the Plan Funder, then (y) OMF's Plan treatment will be the payment in full, in cash, of the OMF Prepetition Claims on the Effective Date or such other treatment as OMF may agree in its sole and absolute discretion, and (z) the New Equity will be issued to the Plan Funder.<br><br>This class is Impaired. |

| Class | Estimated Allowed Amount[4] | Treatment under the Plan[5] |
|---|---|---|
| Class 2<br>Secured Mechanic Lien Claims | $11,000,000-<br>$12,500,000 | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Distributions as agreed between the holder of such claims, on the one hand, and the Debtors and the Plan Funder prior to the Effective Date or the Reorganized Debtors after the Effective Date, on the other hand, or, to the extent the parties cannot so agree, (ii) a cash payment equal to one hundred percent (100%) of the Allowed principal amount of each such Holder's Allowed Secured Mechanic Lien Claim, without interest.<br><br>This class is Impaired. |
| Class 3<br>Other Secured Claims | $0-$50,000[6] | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Reinstatement, replacement collateral and any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, such other treatment as the Reorganized Debtors and the applicable Holder of an Allowed Other Secured Claim may agree or such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code.<br><br>This class is Unimpaired. |
| Class 4<br>Other Priority Claims | $13,000- $50,000 | Est. Percentage Recovery: 100%<br><br>Form of Recovery: Cash or such other treatment as the Reorganized Debtors and the Holder of such Allowed Other Priority Claim shall have agreed.<br><br>This class is Unimpaired. |

---

[6]    The estimated amount of Other Secured Claims is derived from the Schedules and a review of claims actually filed by creditors, and constitutes the Debtors' projections of the average range of claims that may be Allowed Other Secured Claims with priority over all or a portion of the OMF Prepetition Claims. The projections set forth herein shall not be deemed an admission or waiver by the Debtors or OMF as to the amount, validity, priority, or extent any claims.

| Class | Estimated Allowed Amount[4] | Treatment under the Plan[5] |
|---|---|---|
| Class 5<br>General Unsecured Claims | $160-180 million | Est. Percentage Recovery: 1.9%-4.27%[7]<br><br>Form of Recovery: Pro rata share of the GUC Cash Amount as described in Section 2.3 of the Plan.<br><br>This class is Impaired. |
| Class 6<br>Old Equity Interests | $0 | Est. Percentage Recovery: 0%<br><br>Form of Recovery: This Class receives nothing under the Plan.<br><br>This class is Impaired. |

## II.     GENERAL INFORMATION

### A.     THE DEBTORS' BUSINESS

Each of the Debtors is a Delaware limited liability company formed for the single purpose of the acquisition, ownership and development of the Property. The Debtors own the Property as tenants in common with FKF Madison owning a 6% undivided interest, JMJS owning a 4% undivided interest, Madison Park owning a 12% undivided interest, and Slazer Owner owning a 78% undivided interest. The Property consists of the land, the improvements, the unsold Units, including the Debtors' interest in the Disputed Units, that have been or will be developed, designed, and constructed at 23 East 22nd Street, New York, New York 10010 (and sometimes also referred to as 20 East 23rd Street) consisting of the North Tower containing sixty nine (69) residential units as well as an adjacent lot, together with the land underlying and abutting the North Tower and the adjacent lot, the improvements, the unsold Units, all easements, air rights, development rights, sewer rights, water rights, servitudes, rights of way, streets, ways, alleys and other appurtenances thereto in any way relating to the foregoing. In addition to the Property, the Debtors have additional assets, including litigation claims and certain deposits related to utility services, air right purchase agreements, and the construction manager contract for the Property. The Debtors may also be owed certain refunds related to real property and other taxes.

### B.     MANAGEMENT OF THE DEBTORS

Slazer Enterprises is the sole member of Debtor Slazer Enterprises Owner, LLC and serves as the manager for all of the Debtors. Slazer, in turn, is controlled by Green Bridge Capital S.A. ("Green Bridge") (35%), Special Situation S.A. (by proxy for Marc Jacobs) ("Special Situation") (32.5%), and Ira Shapiro ("Shapiro") (32.5%).

On or about February 7, 2011, Shapiro conveyed by Bill of Sale his rights and interests in his membership interest in Slazer to Caner Privatstiftung, an entity controlled by a principal of the Controlling Members, in partial satisfaction of a duly perfected security interest. On May 11, 2011, the Honorable William A. Kelly, Supreme Court Justice, Supreme Court of the State of New York, County of Rockland, issued an order in a civil action styled *Forest Mall, LLC v. Slazer Enterprises Owner LLC, et al.*, Index No. 12479/09 (the "Forest Mall Action"), holding that the transfer of Shapiro's interest in Slazer is void because such transfer violated a restraining order issued in connection with a money judgment obtained subsequent to the filing of the said security interest. Caner Privatstiftung, the secured creditor, prior transferee and record holder of the membership interest, was not made a party to nor served with process in the Forest Mall Action, by reason of which Caner Privatstiftung is not bound by said order. On June 10, 2011, Justice Kelly entered a charging order under New York law against Shapiro's economic interest in Slazer. The plaintiff in the Forest Mall Action sought such relief without joining Caner Privatstiftung as a party. As a result, the status of Shapiro's full membership interest in Slazer is uncertain; however, the Debtors believe that Shapiro retains his voting rights in Slazer and his ability support the Plan.

On or about February 3, 2011, Slazer through the Controlling Members and Shapiro, entered into an agreement with John Fioretti to engage Mr. John Fioretti as the President, Secretary, and Treasurer of each of the Debtors ("Fioretti"). Fioretti was thereafter appointed as the President, Secretary, and Treasurer of the Debtors by Slazer.

## C.    DESCRIPTION OF DEVELOPMENT TO DATE

Of the sixty-nine (69) residential units in the North Tower, forty-nine (49) have received temporary certificates of occupancy (each such certificate a "TCO"), and sales of twelve (12) of those forty-nine (49) units have closed. The Reorganized Debtors must complete the build-out of the twenty (20) units that have not received TCOs (the "Unfinished Units") in order to receive the required TCO's. The Unfinished Units are each in various stages of completion: (1) completely raw space being used for storage; (2) partially framed with limited mechanical, electrical, plumbing ("MEP") rough-in; (3) drywall and with substantially complete MEP rough-in, and concrete floors; (4) drywall and with substantially complete MEP rough-in, cabinet boxes partially installed, sub-flooring placed, door frames set, bathrooms substantially complete; and (5) substantially complete with cabinet boxes installed (no drawers or doors), appliances installed, bathrooms finished (except for glass and glazing), wood flooring installed and shade boxes set. The North Tower also contains two fire stairwells and is serviced by two oversized handicapped accessible passenger elevators. The elevators stop in the ground level, on floors four (4) and five (5), and on each residential floor.

The fourth (4th) and fifth (5th) floors in the North Tower contain an aggregate of nine thousand (9,000) square feet currently allocated for common area amenity space (the "Amenity Space") for use by all of the residential unit owners in the Property. These floors are serviced by

two passenger elevators and an additional service elevator that also reaches the cellar level. The Amenity Space is yet to be completed; however, the stainless steel lap pool structure has been assembled and set in place.

## D. PRE-RELIEF DATE DEBT AND CAPITAL STRUCTURE OF THE COMPANY

### 1. Secured Debt

(a) **The OMF Prepetition Claims**. Each of the Debtors is obligated to OMF pursuant to the terms of the Loan Documents evidencing the OMF Prepetition Indebtedness. The OMF Prepetition Indebtedness, which is not less than $234,150,572.72 pursuant to the Loan Documents, is secured by, among other things, perfected first priority liens, mortgages and security interests on and to the Property (i.e., the OMF Prepetition Liens). When originated, the OMF Prepetition Indebtedness was held by (a) iStar (as predecessor-in-interest to SFI) in the approximate amount of $150 million (the "Senior Participation"), and (b) Amalgamated, in the approximate amount of $90 million (the "Junior Participation"). The relative priorities and rights as between the Senior Participation and the Junior Participation were governed by a Participation and Servicing Agreement dated as of November 2007 (as modified, the "Participation Agreement"). The Participation Agreement contained provisions including Amalgamated's right to purchase the Senior Participation under certain terms and conditions, including in the event of a default under the Loan Documents (the "Purchase Right").

As set forth in the 9019 Motion, the 9019 Settlement, and the 9019 Order, the Debtors have diligently and fully investigated the validity, enforceability and extent of the OMF Prepetition Indebtedness, the OMF Prepetition Claims and the OMF Prepetition Liens and have determined that the OMF Prepetition Indebtedness, the OMF Prepetition Claims and the OMF Prepetition Liens are valid and enforceable against the Debtors and the Property in all respects, subject only to Secured Mechanic Lien Claims, which Claims will be satisfied under the Plan. Although a number of Persons or Entities have asserted Liens against various Units, the Debtors believe that all such Liens are junior in all respects to the OMF Prepetition Liens and by the Confirmation Order, the Debtors will seek a finding from the Bankruptcy Court that the OMF Prepetition Liens are senior in all respects to all other Liens against the Debtors' assets including, without limitation, the Property.

(b) **Secured Mechanic Liens**. Numerous parties have filed or asserted mechanic lien claims against the Property. According to the Debtors' records, the Secured Mechanic Lien Claims in the aggregate of approximately $21 million have been asserted by approximately 30 different lienors. After reconciling such Claims, the Debtors believe that the actual potentially valid amount of such claims is between approximately $11 million and $12.5 million in the aggregate. To the extent that such Secured Mechanic Lien Claims were properly and timely filed, the Debtors believe that such liens would be senior in priority to a portion of the OMF Prepetition Liens under applicable non-bankruptcy law.

(c) **Other Secured Debt**. Based upon a review of the few Other Secured Claims filed to date, the Debtors estimate that there will be little to no Distributions necessary for Allowed Other Secured Claims.

2. **Priority Claim Debt**

(a) **Gap Claims**. The Debtors believe that the amount of Gap Claims that arose between the Petition Date and the date of entry of the Relief Order will not exceed $2,542,757.04, which amount consists of the OMF Gap Claims and certain other filed Gap Claims. The Debtors believe that Administrative Claims arising after the Relief Order through the Effective Date will be in excess of $10 million. The Debtors do not believe that there are any due but unpaid property, or other, taxes.

(b) **Other Priority Claims**. Based upon a review of the few Other Priority Claims filed to date, the Debtors estimate that there will be little to no Distributions necessary for Allowed Other Priority Claims.

3. **Unsecured Debt**

The Debtors owe numerous creditors amounts relating to various promissory notes, contracts, deposits and judgments. General Unsecured Claims filed in the Debtors' cases exceed $300 million; however, the Debtors believe many of such Claims are duplicative in nature or otherwise do not represent valid Claims and should not be Allowed. In addition, a number of Claims filed against the Debtors seek specific performance related relief as an alternative to, or in lieu of, general unsecured obligations. After reconciling General Unsecured Claims, the Debtors estimate that approximately $160-$180 million of potentially valid General Unsecured Claims exist.

4. **Equity**

The Debtors are organized as limited liability companies under the state of Delaware. The Debtors' membership interests are held in accordance with the following chart:

| Debtor: | Manager: | Members: |
|---|---|---|
| FKF Madison Group Owner LLC | Slazer Enterprises LLC | John Magee<br>Burt Dorfman<br>Mitchell Klein |
| JMJS 23rd Street Realty Owner LLC | Slazer Enterprises LLC | Scott Haber<br>Michael Haber<br>Jerome Haber<br>Jeffrey Haber |
| Madison Park Group Owner LLC | Slazer Enterprises LLC | Kevin Romano<br>Howard Josephs<br>Walter Klauser<br>Mitchell Klein |
| Slazer Enterprises Owner LLC | Slazer Enterprises LLC | |

E. **PENDING LITIGATION AGAINST THE DEBTORS**

1. **The Foreclosure Action**

On February 18, 2010, iStar commenced an action (the "Foreclosure Action") by filing its Verified Amended Complaint (the "Foreclosure Complaint") in the Supreme Court of the State of New York (the "State Court") to foreclose its mortgages on the Property. In connection with the Foreclosure Action, iStar sought and obtained from the State Court appointment of a receiver to manage and control the Property during the pendency of the Foreclosure Action. On April 15, 2010, the State Court entered an interim order (the "Interim Receiver Order") appointing Jonathan H. Newman (the "Receiver") as interim receiver of the Property. On May 5, 2010, the State Court issued a supplemental order (the "Receiver Order") affirming the Receiver's appointment and expanding the Receiver's powers with respect the Property. The Receiver remained in control of the Property until February of 2011 when he turned over any and all property of the Debtors' Estates to the Debtors via Fioretti.

In its Foreclosure Complaint, iStar named the Debtors and all parties known to iStar that had asserted a claim against the Property as defendants, including mechanic lien and contract claimants, taxing authorities and John Does.

Following the Petition Date, the State Court held a number of status conferences in the Foreclosure Action; however, the Foreclosure Action was largely stayed during the pendency of the Chapter 7 Cases. Following the Conversion Date, the Debtors filed a Suggestion of Bankruptcy in the Foreclosure Action, thus notifying all parties thereto of the commencement of the Chapter 11 Cases.

2. **Property Adversary Proceedings and the Lipman Lift Stay Motion**

(a) **Flamingo**. On March 28, 2011, Flamingo filed a complaint seeking declaratory judgment and other relief against the Debtors and others, thereby initiating the Flamingo Action. By its complaint, Flamingo asserts that entities related to the Debtors undertook certain actions with respect to a building owned by Flamingo, including causing an easement with respect to Flamingo's property to be filed and placing an encroaching structure connected to the Debtors' Property on the roof of the building belonging to Flamingo. The Debtors and Flamingo are currently negotiating to resolve the issues implicated by the Flamingo Action.

(b) **Wills**. On March 31, 2011, The Wills Group Family Limited Partnership ("Wills") filed a complaint against the Debtors, iStar, and others, thereby initiating the Wills Action. By its complaint, Wills seeks, among other things, a declaratory judgment that Wills is the rightful owner of certain Units in the North Tower or that the Debtors hold such Units in constructive trust for Wills. The Wills' complaint alleges that pursuant to a series of promissory notes, collateral assignments and purchase agreements, Wills is the lawful purchaser or equitable owner of two units in the North Tower and that the Debtors and iStar were unjustly enriched by funds provided by Wills. The Wills' complaint seeks additional relief, including the imposition of a permanent injunction prohibiting the Debtors and iStar from agreeing to sell, transfer or encumber the Units to which Wills asserts an ownership interest. The Debtors dispute

the allegations of Wills and believe Wills is only, at most, a General Unsecured Creditor of the Debtors.

(c) **Kraus**. On July 8, 2011, Stephen Kraus, Mitchell Kraus and Barbara Kraus (collectively, "Krauses") filed a complaint against the Debtors, thereby initiating the Kraus Action. By its complaint, the Krauses seek, among other things, a declaratory judgment that Stephen Kraus is the owner of Units 28A/28B and 37A in the North Tower and that Mitchell and Barbara Kraus are the owners of Unit 23A in the North Tower and that the Debtors' Estates have no ownership interest in such Units. The Krauses allege (i) they entered into purchase agreements in connection with Units and paid the full purchase price stated therein, (ii) the City Register recorded memoranda of contract under City Register File Numbers 2010000041788, 2010000041787 and 2010000041786, respectively, whereby the public was put on notice that they purchased Units, and (iii) the Debtors have admitted in pleadings filed with the Bankruptcy Court that the deeds for the Units in question were executed and delivered to Kraus by Shapiro. The Debtors dispute the allegations of the Krauses and believe the Krauses are only, at most, General Unsecured Creditors of the Debtors.

(d) **Masheck and Lin**. On August 26, 2011, Rance Masheck and Tim Lin ("M&L") filed a complaint against the Debtors, Wills, Forest Mall LLC and OMF thereby initiating the M&L Action. By their complaint, M&L seek, among other things, a declaratory judgment that (a) they are the owners of Unit 49B in the North Tower ("49B") and that the Debtors' Estates and the other named defendants have no ownership interest in 49B, and (b) the Debtors should be compelled to record the deed and pay the transfer taxes in connection with the sale of 49B to M&L. M&L allege (i) they entered into purchase agreements in connection with 49B and paid the full purchase price stated therein, and (ii) while they were not able to record the deed with respect to 49B because they did not receive executed transfer tax documents in connection with their purchase of 49B, the public was put on notice that they purchased 49B. The Debtors dispute the allegations of M&L and believe M&L are only, at most, General Unsecured Creditors of the Debtors.

(e) **Lipman**. On August 16, 2011, David Lipman ("Lipman") filed a motion to lift the automatic stay to allow two different New York state court lawsuits, including the Foreclosure Action, to proceed so that Lipman could obtain specific performance against the Debtors regarding ownership of Units 15A and 15B in the North Tower [Docket No. 621] (the "Lipman Lift Stay Motion"). Among other pleadings filed in opposition to the Lipman Lift Stay Motion, on September 22, 2011, the Debtors and OMF filed pleadings arguing, among other things, that (i) the Lipman Lift Stay Motion improperly sought to divest the Bankruptcy Court of jurisdiction to determine Lipman's specific performance claims in the context of the Debtors' objection to the proofs of claim filed by Lipman against the Debtors in the Chapter 11 Cases, (ii) Lipman did not have standing to bring the Lipman Lift Stay Motion, and (iii) "cause" did not exist to lift the automatic stay. [See Docket Nos. 675, 678, 680 and 681]. The hearing to consider the Lipman Lift Stay Motion is currently scheduled for December 20, 2011. The Debtors dispute the allegations of Lipman and believe Lipman is only, at most, a General Unsecured Creditor of the Debtors.

**3.    Other Litigation**

The Debtors are party to a number of pre-Petition Date lawsuits, primarily in the State Court, relating to the Property, including claims for return of deposits on Units, claims on promissory notes and claims relating to ownership of certain Units in the Property.

The Debtors anticipate that some or all of such pending litigation and/or Claims will be resolved prior to the Effective Date of the Plan or as part of the claims administration process.

The Debtors plan to file Claims Objections or otherwise institute proceedings against all parties that claim an interest in the Disputed Units (the "Unit Claim Objections"). In addition, the Debtors and OMF plan to file a joint complaint commencing the Declaratory Judgment Action seeking a ruling that that the OMF Prepetition Claims and the OMF Prepetition Liens are superior to all other asserted interests other than Secured Mechanic Lien Claims (which claims will be satisfied under the Plan) as a necessary step to implement the Plan.

The Debtors believe that any adverse judgment against or liability of the Debtors arising out of the pre-Petition lawsuits and the Unit Claim Objections would constitute a Claim that will be treated in accordance with the provisions of the Plan and the Bankruptcy Code.

### F.    THE DEBTORS' BANKRUPTCY CASES

#### 1.    Events Leading Up to the Chapter 11 Cases

##### (a)    The Involuntary Petitions

On the Petition Date, the Krauses and Kraus Hi-Tech Home Automation, Inc. (collectively, the "Petitioning Creditors") filed the Involuntary Petitions against the Debtors, thus commencing the Chapter 7 Cases. On or about June 29, 2010, the Debtors filed a motion to dismiss the Involuntary Petitions (the "Motion to Dismiss"). Prior to a hearing on the Motion to Dismiss, additional creditors of the Debtors filed joinders to the Involuntary Petitions (collectively, the "Joinders") [Docket No. 44, 45, 46, 47, 67] including (i) Dr. Harvey Schiller, (ii) Mr. Joe Coffey, (iii) Mad 52, LLC, (iv) Pace Plumbing Corp., and (v) Gotham Greenwich Construction Co., LLC. Following briefing on the issue, the Bankruptcy Court entered an Order ruling that the Joinders related back to the Petition Date [Docket No. 79].

##### (b)    Conversion Order

On November 18, 2010, the Debtors withdrew the Motion to Dismiss [Docket No. 113]. Shortly thereafter, on November 18, 2010, the Petitioning Creditors filed a motion to have the Bankruptcy Court immediately enter orders for relief and convert the Chapter 7 Cases to cases under Chapter 11 of the Bankruptcy Code [Docket No. 114]. On November 19, 2010 (*i.e.*, the Relief Date) the Bankruptcy Court entered the Conversion Order, thus commencing the Chapter 11 Cases.

#### 2.    iStar Funding Motions and Stay Relief Motion

##### (a)    iStar's Protective Advance Motions

On June 24, 2010, iStar filed a motion [Docket No. 13] (the "First Gap Funding Motion") seeking authority to continue making protective advances during June and July 2010 in an amount up to $488,610 pursuant to an approved budget, in order to fund (i) operating and maintenance expenses for the Property, including payroll for staff, payment of the Building's managing agent, utilities, insurance, permits and warranty-related costs and (ii) emergency repairs and construction to ensure the safety of the Building and the health and welfare of the residents and the public. The First Gap Funding Motion was approved by Order of the Bankruptcy Court on June 30, 2010 [Docket No. 26].

On July 16, 2010, iStar filed a second motion [Docket No. 34] (the "Second Gap Funding Motion") seeking authority to make protective advances to fund certain expenses of the Property through September 30, 2010 in an amount up to $584,615 pursuant to the budget attached to the Second Funding Motion. Additionally, the Second Gap Funding Motion sought authority to pay the premium to renew the Debtors' construction liability insurance policy through January 20, 2011 estimated in the amount of $65,000. The Second Gap Funding Motion was approved by Order of the Bankruptcy Court on July 30, 2010 [Docket No. 38].

On September 8, 2010, iStar filed a third motion [Docket No. 80] (the "Third Gap Funding Motion") seeking authority to make protective advances to pay certain professional fees of the Receiver in connection with his management of the Property upon a determination by the State Court of the amount of fees the Receiver and his professionals are entitled to be paid under New York law with such advances to be secured by liens on the real and personal property comprising the collateral under the Loan Agreements having the same validity extent and priority as iStar's liens under the Loan Agreements. The Third Gap Funding Motion was approved by Order of the Bankruptcy Court on September 22, 2010 [Docket No. 88].

On September 23, 2010, iStar filed a fourth motion [Docket No. 87] (the "Fourth Gap Funding Motion," and together with the First Gap Funding Motion, the Second Gap Funding Motion, and the Third Gap Funding Motion, the "Gap Funding Motions") for authority to make protective advances to fund the expenses of the Property through December 31, 2010 in an amount of up to $664,369 pursuant to the budget attached to the Third Gap Funding Motion. The Fourth Gap Funding Motion also requested authority to pay the real estate taxes due to the City of New York with respect to the Property for the third and fourth quarters of 2010 in the estimated amounts of $430,845.76 for third quarter (and unpaid second quarter) taxes and $248,643.75 for fourth quarter taxes. The Fourth Gap Funding Motion was approved by Order of the Bankruptcy Court on October 6, 2010 [Docket No. 98].

The Debtors calculate that the total amount of the protective advances disbursed to the Debtors during the Chapter 7 Cases pursuant to the Gap Funding Motions totaled $2,487,441.04 (*i.e.*, OMF Gap Claims).

(b) <b>iStar's Motion for Relief from Stay</b>

On November 3, 2010, iStar filed its *Motion for Relief From the Automatic Stay to Foreclose on Mortgaged Property* (the "iStar Lift Stay Motion") [Docket No. 105]. By the iStar Lift Stay Motion, iStar sought entry of an order modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to permit iStar to proceed with the Foreclosure Action

pending in the State Court. Several parties, including the Debtors and the Petitioning Creditors filed objections to the iStar Lift Stay Motion [See Docket Nos. 115, 116]. An initial status conference on the iStar Lift Stay Motion was held on December 16, 2010. iStar subsequently agreed to adjourn the status conference on the iStar Lift Stay Motion several times.

(c) **Supplement to iStar Lift Stay Motion**

On January 6, 2011, iStar filed its *Supplement to Motion of iStar Tara LLC for Relief from the Automatic Stay to Foreclose on Mortgaged Property and Request to Make Additional Protective Advances To Be Granted Administrative Expense Priority* (the "iStar Lift Stay Supplement") [Docket No. 191]. By the iStar Lift Stay Supplement, iStar requested temporary adequate protection of its interests in the Property by way of authority to make protective advances related to the Property, which advances would be granted administrative expense priority under Bankruptcy Code Section 503(b)(1)(A).

The Debtors and New One Madison Park objected to the iStar Lift Stay Supplement; however, such parties later agreed to limited advances by iStar under the terms requested in the iStar Supplement. As a result, pursuant to Orders of the Bankruptcy Court dated January 14, 2011, January 21, 2011, January 28, 2011 and February 18, 2011, iStar made administrative expense advances to the Debtors for operating expenses which aggregate $229,661.86, which amounts constitute the Allowed OMF Administrative Advances Claim.

3. **Events and Transactions Related to Green Bridge and Special Situation**

(a) **Green Bridge Capital S.A. and Special Situation S.A. v. Ira Shapiro, Adversary Proceeding No. 10-56158**

On December 15, 2010, the Controlling Members filed a verified complaint (the "Control Complaint") against Shapiro in the Bankruptcy Court thereby initiating Adversary Proceeding No. 10-56158 (the "Control Proceeding"). By the Control Complaint, the Controlling Members sought declaratory and injunctive relief providing that Shapiro did not have corporate authority to control Slazer's management of the Debtors.

On January 31, 2011, after a lengthy evidentiary hearing, the Bankruptcy Court issued an order (the "Control Order") [Adv. Docket No. 67] determining that (i) the Controlling Members had the right to control Slazer's management of the Debtors, except with respect to "Material Actions," including the selection of a plan of reorganization, and (ii) restraining Shapiro from taking further action in violation of Slazer's and the Debtors' governing instruments.

(b) **Agreements Between the Controlling Members and HFZ**

On or about December 1, 2010, the Controlling Members and HFZ entered into a letter agreement related to the proposal of a plan of reorganization for the Debtors and the funding of the Debtors' chapter 11 cases [See Docket No. 352, Exh. A]. The letter agreement provided that, consistent with their fiduciary duties, the Controlling Members retained their ability to entertain

and negotiate plans of reorganization with parties other than HFZ in the event that such other plans appeared reasonably likely to provide higher or better value to the Debtors' creditors [See id.]. On March 17, 2011, in connection with the hearings related to the Debtors' postpetition financing, the Controlling Members advised the Bankruptcy Court that they believed the letter agreement had expired of its own terms and that in any event, the Controlling Members specifically disavowed any right to consulting fees, "back end" consideration from HFZ, or rights of first refusal that might have otherwise arisen under the agreement, subject to reserving rights to seek consulting fees, make substantial contribution claims, or invest in the Debtors, subject to Bankruptcy Court approval after notice and a hearing and in accordance with the Bankruptcy Code [See Docket No. 357].

### (c)     Agreements Between the Controlling Members and Shapiro

Following the entry of the Control Order, on or about February 3, 2011, the Controlling Members and Shapiro agreed that, under certain circumstances, Green Bridge would provide remuneration for Shapiro's consulting services to the Debtors through payments to a company designated by Shapiro. Accordingly, on February 25, 2011 and March 17, 2011, the Controlling Members remitted $30,000 and $15,000, respectively, to IJS Management LLC ("IJS"), as the company designated by Shapiro. Following these payments, Shapiro and the Controlling Members terminated their agreement regarding Shapiro's consulting fees and no other or further payments were made by the Controlling Members to Shapiro or any company that Shapiro is employed by or controls.

### 4.     Events During the Pendency of the Control Proceeding

### (a)     Unauthorized Filings

Prior to the Bankruptcy Court's entry of the Control Order, all actions in the Debtors' cases were undertaken at the direction of Shapiro acting on behalf of Slazer. Such actions included filing a motion to approve postpetition financing [Docket No. 145], filing a motion to appoint a Chief Restructuring Officer [Docket No. 147], and filing a chapter 11 plan of reorganization and related disclosure statement [Docket Nos. 158, 159]. These filings were not approved by the Controlling Members and following entry of the Control Order, the Controlling Members directed the Debtors (through Slazer) to withdraw such filings [See Docket No. 259].

During the pendency of the Control Proceeding, the Debtors, at Shapiro's direction (through Slazer), also filed a motion for the appointment of a chapter 11 trustee or to terminate the Debtors' exclusive periods to propose and solicit a plan of reorganization (the "Debtors' Trustee Motion") [Docket No. 212]. Other parties, including the U.S. Trustee and the Petitioning Creditors, also filed motions seeking similar relief [Docket Nos. 224, 232], and additional responses and joinders were filed. Following the entry of the Control Order, Slazer (now under the control of the Controlling Members) retained new bankruptcy counsel for the Debtors and withdrew the Debtors' Trustee Motion. Accordingly, at the hearing on the Trustee Motions, the Debtors argued that exclusivity should not be terminated and a chapter 11 trustee should not be appointed. The Bankruptcy Court denied the relief requested in the Petitioning Creditors' trustee motion and allowed the Chapter 11 Cases continue with the Debtors in control of their cases.

The U.S. Trustee adjourned its trustee motion and such motion was subsequently voluntarily dismissed [Docket No. 385].

### (b) The Committee

Also during the pendency of the Control Proceeding, on January 20, 2011, the U.S. Trustee appointed the Committee, consisting of Uri Sasson, Larry Adler, and Wills [Docket No. 211].

### 5. Events Following the Entry of the Control Order

### (a) Professional Retentions

Following the entry of the Control Order, Slazer (under the control of the Controlling Members) directed the Debtors to retain new bankruptcy counsel, Morris, Nichols, Arsht & Tunnell LLP, and an officer, Fioretti, for the Debtors, and the Bankruptcy Court entered Orders approving the retentions [Docket Nos. 293, 370].

On March 21, 2011, the Bankruptcy Court entered an Order authorizing the Committee to retain Arent Fox LLP as Committee counsel for the period of February 2, 2011 through March 2, 2011 [379]. Arent Fox LLP was later replaced by Perkins Coie LLP as Committee counsel, which retention was approved by Order of the Bankruptcy Court, dated April 1, 2011 [Docket No. 394]. Also on April 1, 2011, the Bankruptcy Court entered an Order authorizing the Committee to retain Polsinelli Shughart PC as Delaware counsel to the Committee [Docket No. 393].

On April 19, 2011, the Bankruptcy Court entered an Order approving the retention of EisnerAmper LLP as tax accountants to the Debtors [Docket No. 432].

On October 20, 2011, the Bankruptcy Court entered an Order approving the retention and employment of Windels Marx Lane & Mittendorf, LLP, as special counsel for the Debtors [Docket No. 742].

### (b) Ordinary Course Retentions

On March 18, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to employ certain professionals in the ordinary course of their business [Docket No. 372]. Such professionals include Seiden & Schein, P.C., as real estate counsel to the Debtors and Ditchik & Ditchik, LLP, as real estate tax counsel to the Debtors. . Further, on June 14, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to retain IJS as a consultant to the Debtors through August 31, 2011 [Docket No. 494]. IJS is a New York limited liability company that employs Shapiro. The IJS consulting agreement has expired and has not been renewed.

### (c) Schedules of Assets and Liabilities & Statements of Financial Affairs

On February 25, 2011, each of the Debtors filed their respective schedules of assets and liabilities and statements of financial affairs [Docket Nos. 297, 298, 299, 300, 301, 302, 303, 304].

On May 27, 2011, each of the Debtors filed amendments to their respective schedules of assets and liabilities [Docket Nos. 466, 467, 468, 469].

(d)     **The Bar Date Motion**[8]

On February 28, 2010, the Debtors filed their *Motion for an Order to Establish Deadline to File Proofs of Claim, (ii) Approving Proof of Claim Form, Bar Date Notices and Mailing and Publication Procedures, and (iii) Providing Certain Supplemental Relief and (2) Motion Shortening Notice Period* [Docket No. 305] (the "Bar Date Motion") seeking to establish deadlines by which entities are required to submit certain claims. More specifically, the Bar Date Motion sought, *inter alia*, to establish the date that was thirty (30) days after service of the Bar Date Notice Packages as the Bar Date for filing pre-Conversion Claims and requests for payment of Administrative Expenses that accrued prior to March 2, 2011. The Bar Date Motion was approved by the Bankruptcy Court on March 3, 2011 [Docket No. 328]. The Debtors served the Bar Date Notice Packages on March 11, 2011 [See Docket No. 356]. Accordingly, the Bar Date for filing pre-Conversion Claims and requests for payment of Administrative Expenses that accrued prior to March 2, 2011 is April 11, 2011.[9]

Subsequently, on May 27, 2011, the Debtors filed and served a supplemental bar date notice (the "Supplemental Bar Date Notice") on certain creditors that were either listed on the Debtors' amended Schedules or believed to be holders of condominium units at the Debtors' Property [See Docket No. 471]. As a result, a supplemental bar date of June 17, 2011 was set for entities listed on Exhibits A and B to the Supplemental Bar Date Notice to file pre-Conversion Claims and requests for payment of Administrative Expenses that accrued prior to March 2, 2011.

(e)     **Debtor in Possession Financing**

On March 1, 2011, the Debtors filed the *Emergency Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Modifying the Automatic Stay, and (III) Scheduling a Final Hearing* [Docket No. 311] (the "First DIP Financing Motion"). By the DIP Financing Motion, the Debtors sought entry of an order permitting them to obtain postpetition financing on a super-priority administrative basis from iStar (*i.e.*, the Operations DIP Financing) and HFZ (the Administrative DIP Financing).

On March 3, 2011, the Bankruptcy Court granted the relief requested in the First DIP Financing Motion on an interim basis [Docket No. 329], and on March 18, 2011, the Bankruptcy Court granted the relief requested in the First DIP Financing Motion on a final basis through and

---

[8]     Undefined capitalized terms used in this paragraph shall have the meanings ascribed to them in the Bar Date Motion.

[9]     The bar date applicable to governmental units (as defined in Section 101(27) of the Bankruptcy Code) is May 18, 2011 at 4:00 p.m. (ET).

including June 30, 2011 (the "DIP Maturity Date") [Docket No. 369] (the "Final DIP Order"). Pursuant to the Final DIP Order, the Debtors were permitted to use up to $50,000 of the Administrative DIP Financing to investigate the OMF Prepetition Claims and the OMF Prepetition Liens [See id. at ¶ 8(b)]. The Final DIP Order also provided that all of the OMF Prepetition Indebtedness, the OMF Prepetition Claims, other Claims of OMF against the Debtors and the OMF Prepetition Liens shall be deemed Allowed unless, and solely to the extent that, the validity, enforceability or perfection of such claims or liens were challenged in an action commenced by the Debtors or the Committee (to the extent the Committee properly obtained standing) by April 30, 2011 [See id.].[10] As agreed to by the Debtors, OMF, HFZ, and the Committee in the 9019 Settlement and determined by the 9019 Order, the OMF Prepetition Lien are valid and enforceable against the Debtors and the Property the OMF Prepetition Liens encumber in all respects and the OMP Prepetition Claims are allowed against the Debtors.

On June 30, 2011, the Debtors filed the *Debtors' Emergency Motion for Entry of Second Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c) and Fed, R. Bankr. P. 2002, 4001 and 9014 Authorizing Debtors to Obtain Postpetition Financing* [Docket No. 529] (the "Second DIP Financing Motion"). The Second DIP Financing Motion sought to extend and broaden the Debtors' authority to obtain post-petition financing under the Final DIP Order and extend the DIP Maturity Date through and including July 31, 2011. In the Second DIP Motion, the Debtors advised the Bankruptcy Court that they were engaging in discussions with OMF, including with respect to OMF's willingness to sponsor a plan of reorganization for the Debtors that was materially superior to the Initial Plan. On July 1, 2011, the Bankruptcy Court granted the relief requested in the Second DIP Financing Motion (the "Second DIP Order") [Docket No. 536].

In accordance with the Second DIP Order, (i) on August 4, 2011, the Debtors filed a notice of, among other things, the extension of the DIP Maturity Date through and including August 31, 2011 [Docket No. 614], (ii) on August 31, 2011, the Debtors filed a notice of, among other things, the extension of the DIP Maturity Date through and including September 30, 2011 [Docket No. 645], and (iii) on September 30, 2011, the Debtors filed a notice of, among other things, the extension of the DIP Maturity Date through and including December 31, 2011 [Docket No. 690].

(f)    **Extensions of the Debtors' Exclusive Periods**

Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors initial exclusive periods to file a chapter 11 plan and solicit acceptances thereof (the "Exclusive Periods") were set to expire on March 21, 2011 and May 18, 2011, respectively. On March 18, 2011, the Debtors filed a motion to extend the Exclusive Periods [Docket No. 374], and on April 8, 2011, the Bankruptcy Court entered an Order extending the Exclusive Periods through and including May 31, 2011, and July 30, 2011, respectively [Docket No. 407].

On May 31, 2011, the Debtors filed a second motion to extend their Exclusive Periods (the "Second Exclusivity Motion") [Docket No. 477], and on September 23, 2011, the

---

[10]    Although the Challenge Deadline was previously extended through and including November 15, 2011 [Docket No. 694], the 9019 Settlement and the 9019 Order effectively end the period during which a Challenge could have been brought.

Bankruptcy Court entered an order granting the Second Exclusivity Motion, extending the Exclusive Periods to September 30, 2011 and November 2011, respectively [Docket No. 677].

On September 30, 2011, the Debtors filed a third motion to extend their Exclusive Periods to file a chapter 11 plan and solicit acceptances thereof (the "Third Exclusivity Motion") [Docket No. 687], and on October 20, 2011, the Bankruptcy Court entered an order granting the Third Exclusivity Motion, extending the Exclusive Periods to January 13, 2012 and March 13, 2012, respectively [Docket No. 760].

### (g)     The Initial Chapter 11 Plan

Following the entry of the Control Order, the Debtors, through their officer and counsel, in addition to the Controlling Members and Shapiro met with numerous entities that expressed interest in sponsoring a chapter 11 plan for the Debtors. The Debtors provided due diligence materials to such parties and coordinated site visits for such parties. In addition, the Debtors facilitated meetings between potential plan sponsors and some of the Debtors' significant creditors. The Debtors met with each and every entity that came forward as a potential plan sponsor.

Ultimately, the Debtors determined that a more formal process was necessary to determine the highest or otherwise best plan proponent offer. To that end, in the first two weeks of April of 2011, the Debtors contacted each party that had indicated any level of interest in sponsoring a plan to decipher if such parties were interested in submitting a proposal, as part of an auction process, within the range of values expressed by other potential plan proponents. Only two potential plan sponsors indicated an interest in participating in such a process.

On April 14, 2011, the Debtors held an auction at the law offices of Katten Muchin Rosenman LLP in New York, New York. The Committee and iStar, in addition to two potential plan proponents were present at the auction. The Debtors opened the auction with a bid from HFZ that the Debtors believed to represent the highest and best offer. Although two potential plan proponents were present at the auction, no other bids were received, and as a result, the HFZ proposal was selected as the winning bid. Following the auction, HFZ, through a related entity, caused $10 million to be deposited into an escrow account. Such amount remains in escrow as of the filing of this Disclosure Statement

On June 15, 2011, the Debtors filed the Initial Plan and the Initial Disclosure Statement.

On July 11, 2011, the Debtors filed the *Motion for the Entry of an Order (i) Approving Disclosure Statement, (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Chapter 11 Plan of Reorganization, (iii) Establishing Voting Record Date, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving the Form of Ballots and Solicitation Materials, (vi) Approving Related Notice Procedures, (vii) Authorizing the Debtors to Act as their Own Balloting Agent, (viii) Approving Cure Procedures, and (ix) Granting Related Relief* [Docket No. 566].

**The Unification of the OMF Prepetition Indebtedness and OMF Enters Chapter 11 Cases**

On June 14, 2011, Amalgamated filed a preliminary objection to the Second Exclusivity Objection and argued that the Exclusive Periods should not be extended to enable the Debtors to prosecute the Initial Plan, which sought to wipe out the Junior Participation (the "Amalgamated Objection") [Docket No. 495]. In the Amalgamated Objection, Amalgamated advised that it had exercised the Purchase Right to unite the Senior Participation and the Junior Participation and suggested that the Debtors engage in immediate and focused negotiations to attempt to address the new circumstances of the Chapter 11 Cases, and in particular, the fact that the senior secured creditor (now holding the unified OMF Prepetition Indebtedness of no less than approximately $235 million) opposed the Initial Plan.

On June 17, 2011, OMF became the Holder of the OMF Prepetition Claims, including as reflected in the *Notices of Transfer of Claims Pursuant to FRBP 3001(e)* filed on June 23, 2011 [Docket Nos. 508 and 509].

Negotiations with the Debtors on a commitment letter began on or about June 28, 2011 to embrace an OMF-sponsored plan premised upon an open marketing, competitive bidding process for the Property, and on June 30, 2011, OMF sent the Debtors a commitment letter and accompanying term sheet for a plan of reorganization for the Debtors (the "Initial OMF Commitment").

On July 7, 2011, OMF filed an objection to the Second Exclusivity Motion arguing it should be permitted to file a competing plan of reorganization and that the Chapter 11 Cases should be set on a course to plan confirmation through a financed, competitive, open market process that would maximize value for the Estates (the "OMF Exclusivity Objection") [Docket No. 548]. In the OMF Exclusivity Objection, OMF argued that the Initial Plan was patently unconfirmable and that the value of the Debtors' assets were not being maximized for all of the Estates' creditors.

At the hearing to consider the Second Exclusivity Motion (the "July 14 Hearing"), the Debtors advised the Bankruptcy Court that they welcomed the chance to increase value for the Estates, including in connection with Initial OMF Commitment, but they needed more time to allow the process to mature. Also at the July 14 Hearing, the Committee advised the Bankruptcy Court that it believed that, under the circumstances, the extension of the Exclusive Periods would be the appropriate way to ensure a level playing field for continued negotiations towards maximizing recovery for all of the Estates' constituents.

Ultimately, before the Bankruptcy Court ruled on the Second Exclusivity Motion, the parties-in-interest at the July 14 Hearing agreed to a 45-day standstill period to allow for continued plan negotiations which was extended, from time to time, by the agreement of the parties. Thereafter, the Bankruptcy Court conducted intermittent status conferences on August 15 and 26, 2011, and September 8 and 15, 2011 so that the parties could advise the Bankruptcy Court as to the progress of the plan negotiations (the "Status Conferences"). At the Status Conferences, the Debtors, OMF and HFZ advised the Bankruptcy Court that there were

discussions between them to address issues with respect to the Debtors' reorganization and at the Status Conference on September 15, 2011, the Debtors, OMF and HFZ advised the Bankruptcy Court that a comprehensive resolution among the parties was imminent as embodied in a revised commitment letter and a plan term sheet (*i.e.*, the New OMF Commitment). The Plan is the product of such negotiations.

(i)      **The New OMF Commitment and the Plan Process**

On September 19, 2011, as a product of the extensive negotiations between the Debtors, OMF and HFZ, and as foreshadowed at the Status Conferences, the Debtors and OMF executed the New OMF Commitment. In exercising their business judgment, the Debtors believe that the New OMF Commitment embodies superior terms for a plan of reorganization than the Initial Plan and maximizes recoveries to the Debtors' creditors. In addition, and in the Debtors' business judgment perhaps of equal importance, the New OMF Commitment embodies (1) a marketing and bidding process in an effort to attract competing proposals to the Plan – with OMF/OMSub acting as a "stalking horse" -- to ensure that the Debtors fully and finally maximize the Estates' value, and (2) a resolution of the litigation between the Debtors, OMF and HFZ that had threatened the viability of the Debtors' successful and timely exit from bankruptcy. The market-test component of the New OMF Commitment was especially attractive to the Debtors, and reinforced their business judgment decision to execute and obligate themselves under the New OMF Commitment in light of the fact that OMF (a) agreed to provide DIP financing for the Broker to conduct the market-test, and (b) did not require "stalking horse" protections typically afforded to "stalking horse" entities in a plan context.

On September 29 and September 30, 2011, the Debtors filed the following motions/applications seeking relief upon which the Plan is premised, which the Bankruptcy Court granted, as follows:

1)    The Bid Procedures

As set forth in the New OMF Commitment, the Debtors acknowledged and OMF insisted that it would be in the Debtors' best interest and would ensure that the value of the Estates' assets were maximized if the Debtors subjected the Plan to higher and better offers for creditor treatment in the form of a Competing Plan Proposal.

Therefore, on September 29, 2011, the Debtors jointly filed with OMF the Bid Procedures Motion seeking a Bankruptcy Court order approving the proposed process to solicit Competing Plan Proposals to compete against the terms of the New OMF Commitment embodied in the Plan, including the establishment of a mechanism for filing a Competing Plan Proposal [Docket No. 686]. On October 24, 2011, the Bankruptcy Court entered an order [Docket No. 757] approving the following Bid Procedures to govern and control the bidding process, as set forth in the Bid Procedures Motion:

a.    As soon as reasonably practicable after the entry of the Bid Procedures Order, the Debtors will send (i) a copy of the Bid Procedures Order by

email, to all potential bidders identified by the Broker as likely to have an interest in submitting a Competing Plan Proposal, so that such bidders will have more than adequate time to perform any necessary due diligence and participate in the bidding process, and (ii) notice, substantially in the form attached hereto, of the entry of the Bid Procedures Order by first class mail, to (a) all persons or entities that have filed proofs of claim and/or requests for payment of administrative claims in the Chapter 11 Cases, (b) all persons or entities listed in the Debtors' Schedules, (c) any other known holders of claims against or interests in the Debtors, (d) parties to adversary proceedings associated with the Chapter 11 Cases, and (e) known parties which have asserted purported interests in the units set forth in Exhibits B and C to the New OMF Commitment;

b. A potential bidder interested in submitting a Competing Plan Proposal may be granted access (to the extent access has not already been granted) to confidential financial and operational materials, provided that such bidder (i) executes a confidentiality agreement in a form acceptable to the Debtors and (ii) provides sufficient information to the Debtors demonstrating its wherewithal to consummate a Competing Plan Proposal;

c. To the extent a bidder submits a Competing Plan Proposal, such Competing Plan Proposal shall be actually received by the Debtors, OMF, the Committee and the Broker no later than **December 8, 2011 at 5:00 p.m. (ET)** (the "Bid Deadline") at the following addresses:

> (i) The Debtors: One Madison Park Condominium, P.O. Box 49249, Charlotte, NC, 28277 (Attn: John Fioretti);

> (ii) Counsel to the Debtors: Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899-1347 (Attn: Derek C. Abbott, Esq.);

> (iii) Counsel to OMF: Haynes and Boone, LLP, 30 Rockefeller Plaza, 26th Floor, New York, New York, 10112 (Attn: Lenard Parkins, Esq. and Lawrence Mittman, Esq.);

> (iv) Counsel to the Committee: Perkins Coie LLP, 30 Rockefeller Plaza, 25th Floor, New York, New York, 10112 (Attn: Schuyler G. Carroll, Esq.); and

> (v) The Broker: Jones Lang LaSalle, 601 Lexington Avenue, 33rd Floor, New York, NY 10022 (Attn: Joshua D. Gleiber).

d. Any Competing Plan Proposal shall (i) be a binding and irrevocable offer evidenced by a commitment letter and accompanying plan term sheet in the form of a mark-up of New OMF Commitment and the accompanying term sheet that (a) is not subject to any due diligence or other "outs" (other than as described in the New OMF Commitment or the accompanying term sheet), and (b) betters the OMF Initial Bid by at least the Overbid Amount, and (ii) provides for payments on account of the OMF

Prepetition Claims, in cash only and in full on the Effective Date, or such other treatment as to which OMF, in its sole and absolute discretion, may agree;

e. In addition, a Competing Plan Proposal shall (i) include evidence satisfactory to the Debtors of the Bidder's financial ability to fund a plan of reorganization embodying the terms of such Competing Plan Proposal and (ii) be accompanied by the Good-Faith Deposit in an amount equal to $10 million, which will be held in escrow during the pendency of the bidding process;

f. Any overbids set forth in a Competing Plan Proposal shall be first paid on account of the OMF Prepetition Claims until the OMF Prepetition Claims have been paid in full and in cash (which will include accrued interest and default interest, fees and costs and other amounts that OMF may be entitled to under the Loan Documents) or such other treatment as to which OMF, in its sole and absolute discretion, may agree;

g. By **5:00 p.m. (ET)** at least two (2) business days prior to the Plan Auction (as defined below), the Debtors shall notify (i) Bidders that submitted Competing Plan Proposals that, in the Debtors' business judgment, (A) satisfy the requirements of the Bid Procedures and (B) are superior to the New OMF Commitment that such Bidders have been designated as "Qualified Bidders" authorized to bid in the Plan Auction and (ii) all other Bidders that they have not been designated as Qualified Bidders and are not eligible to bid at the Plan Auction;

h. OMF shall be a Qualified Bidder and be permitted to submit further and additional bids to compete with any Competing Plan Proposal, which subsequent bids may include credit bid and cash bid components;

i. To the extent there is at least one Qualified Bidder other than OMF, the Debtors shall conduct an auction to determine the identity of the Qualified Bidder with the highest and best plan proposal on December 13, 2011 at the office of Debtors' counsel (Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, DE 19899-1347) (the "Plan Auction");

j. If applicable, the Plan Auction will begin with the Debtors' presentation of the then existing highest and best Competing Plan Proposal, as determined by the Debtors in their business judgment (the "Baseline Bid"). All other Qualified Bidders, including OMF, shall then be entitled to submit further overbids in the increments of at least $250,000 (the "Overbid Amount") against the Baseline Bid, and to the extent there is more than one round of bidding, the bids at each succeeding round of bidding must be greater than the highest bid of the previous round by at least the Overbid Amount;

k. In connection with bidding at the Plan Auction, OMF may credit bid up to the full amount of the OMF Prepetition Claims (which will include

accrued interest and default interest, fees and costs and other amounts that OMF may be entitled to under the Loan Documents);

l.  At the Plan Auction, the Debtors shall determine and declare, in their business judgment, which Competing Plan Proposal constitutes the highest and best offer (the "Winning Bid" and the Bidder with the Winning Bid, the "Winning Bidder"). Thereafter, the Debtors shall seek to confirm the Plan with the Winning Bidder as the Plan Funder;

m.  If no Qualified Bidder has submitted a Competing Plan Proposal by the Bid Deadline, the Debtors will not conduct the Plan Auction and will proceed with the Plan with OMSub as the Plan Funder;

n.  If a Bidder is not determined to be the Winning Bidder, such Bidder's Good Faith Deposit shall be refunded within five business (5) days of the conclusion of the Plan Auction;

o.  The Winning Bidder's Good Faith Deposit shall be credited against the cash consideration set forth in the Winning Proposal;

p.  If Debtors are unable to confirm a plan of reorganization embodying the Winning Bid no later than March 15, 2012 and cause such plan to go effective no later than April 15, 2012 (each a "Non-Consummation Event"), the Debtors shall immediately move to confirm the OMF Plan embodying the Initial OMF Bid. In the event of a Non-Consummation Event, if such event occurs (a) through no fault of the Debtors, the Good Faith Deposit shall be forfeited, (b) through the fault of the Debtors, the Winning Bidder shall receive the Good Faith Deposit within three (3) business days of the Non-Consummation Event and the Winning Bidder shall have no liability to any party as a result of the Non-Consummation Event; and

q.  The Debtors reserve their rights to: (i) impose, at or prior to the Plan Auction, additional terms and conditions on any Competing Plan Proposals; (ii) extend any deadlines set forth in the Bid Procedures other than the deadlines pertaining to a Non-Consummation Event; and/or (iii) adjourn the Plan Auction without further notice.

2)  The Broker

As set forth in the New OMF Commitment, in an effort to attract Competing Plan Proposals, OMF agreed to make or otherwise arrange for DIP financing to fund the fees and expenses of a real estate broker which was to be retained by the Debtors with the approval of the Bankruptcy Court.

On September 30, 2011, the Debtors filed an application for an order authorizing the retention of Jones Lang LaSalle Americas, Inc. as the Broker [Docket No. 689]. As set forth in the Broker Application, the Broker's duties shall be to (i) work with the Debtors and OMF to develop and implement a mutually agreeable marketing process to solicit Competing Plan Proposals in a manner reasonably acceptable to OMF and the Debtors and otherwise in

accordance with the Bid Procedures Order and (ii) distribute the New OMF Commitment, upon which any Competing Plan Proposal shall be based, to any such potential bidder, such that competing bidders, if any, will have the information and time necessary to submit a Competing Plan Proposal. On October 6, 2011, the Bankruptcy Court entered an order approving the Broker Application [Docket No. 698].

### 3) The 9019 Settlement and Committee Settlement

On September 29, 2011, the Debtors filed the 9019 Motion seeking the entry of a Bankruptcy Court order under Bankruptcy Rule 9019 [Docket No. 685], seeking the approval of the 9019 Settlement pursuant to which (i) the rights of the Debtors and their Estates to commence or file a challenge in law or in equity to the OMF Prepetition Claims in any respect and/or prosecute any claims or causes of action in law or in equity against OMF were to be fully compromised, released and settled in exchange for up to $6.75 million to be funded for the treatment of general unsecured claims, subject to, and as set forth in the New OMF Commitment; (ii) the allowance and validity of the OMF Prepetition Claims and the OMF Prepetition Liens that evidence and secure such claims in full and in all respects, and (iii) a global settlement, good faith compromise, and release of all claims, interests and controversies by and among the Debtors (on behalf of themselves and their Estates), OMF, HFZ, and their respective members, officers, directors and affiliated entities, including, without limitation, claims arising under or relating to the contractual, legal, equitable and other rights of such parties in respect of the Debtors and/or their Estates, except for the obligations and payments set forth in the New OMF Commitment, the Plan and the Debtors' post-petition financing. As set forth in the 9019 Motion and the 9019 Settlement, OMF expressly did not waive or release and nothing contained in the Plan or therein is or shall be deemed a waiver or release of any rights, claims or remedies of OMF against (i) certain Estate Released Parties (as defined in the 9019 Settlement) for acts or omissions prior to the Relief Date, (ii) any previous holder of any portion of the OMF Prepetition Claims, or (iii) any other person or entity or any of their affiliated entities on any matter or issues whatsoever.

After the filing of the 9019 Motion, the Debtors, OMF, HFZ and the Committee engaged in discussions concerning the Committee's informal objections to the 9019 Settlement. The results of the discussions were a stipulation settling, among other things, all of the Committee's objections to the 9019 Settlement (the "Committee Stipulation"). The Committee Stipulation was attached as Exhibit Z to the 9019 Order, modified the 9019 Settlement and provided, generally, that the Committee will support the Plan and that certain Causes of Action (defined in the Plan as the "Plan Administrator Actions") would be preserved for the benefit of General Unsecured Creditors under the Plan.

On October 24, 2011, the Bankruptcy Court entered the 9019 Order [Docket No. 756] approving the 9019 Settlement, as modified by the Committee Stipulation. In the 9019 Order, the Bankruptcy Court specifically overruled objections of certain Holders of Disputed Unit Claims and determined that the OMF Prepetition Liens are valid and enforceable against the Debtors and the Property the OMF Prepetition Liens encumber in all respects.

## III.   THE PLAN OF REORGANIZATION

## A.     GENERAL

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders. In addition to permitting rehabilitation of the debtor, another goal of chapter 11 is to promote equality of treatment of creditors and equity security holders, respectively, who hold substantially similar claims or interests with respect to the Distribution of the value of a debtor's assets. In furtherance of these two goals, upon the filing of a petition for relief under Section 362 of the Bankruptcy Code generally provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of prepetition equity holders.

The Plan serves as a motion by the Debtors seeking entry of an order granting consolidation, upon the Effective Date, of the Estates and all the Debts of all of the Debtors for all purposes, including for Distributions to be made under the Plan. Pursuant to such order (which may be the Confirmation Order): (i) all assets and liabilities of the Debtors shall be deemed merged; (ii) all guarantees by one Debtor of the obligations of another Debtor shall be deemed eliminated so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every Claim Filed or to be Filed in the Chapter 11 Case of any of the Debtors shall be deemed Filed against the consolidated Debtors and shall be deemed one claim against and a single obligation of the consolidated Debtors; and (iv) Claims by one Debtor against another Debtor shall be Disallowed.

## B.     PURPOSE OF DISCLOSURE STATEMENT

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against, or equity interests in, a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to Holders of Claims against and Old Equity Interests in each Debtor in order to satisfy the requirements of Section 1125 of the Bankruptcy Code.

## C.    SOLICITATION PACKAGE

Accompanying this Disclosure Statement is a package of materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Disclosure Statement Approval Order, which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets the procedures for distributing Solicitation Packages to the Holders of Claims against and Old Equity Interests in the Debtors, approves the form of Ballot, establishes the procedures for tabulating Ballots used in voting on the Plan, fixes the deadline for objecting to confirmation of the Plan, and approves the Bid Procedures and a Plan Auction, if applicable, in connection thereto;

- the Notice of Hearing to Consider Confirmation of the Plan; and

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which are to be used by creditors who are entitled to vote on the Plan.

## D.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot please call or email the undersigned Debtors' counsel at: (302) 658-9200 or efay@mnat.com.

### 1.    Voting Deadline

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE **ACTUALLY RECEIVED BY** THE DEBTORS NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. (ET) ON [DATE]. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE DEBTORS BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

**If by First Class Mail:**

Morris, Nichols, Arsht & Tunnell LLP
Attn. FKF Madison Balloting
P.O. Box 1347
Wilmington, Delaware 19899-1347

**If by Overnight Mail or Hand Delivery:**

Morris, Nichols, Arsht & Tunnell LLP
Attn. FKF Madison Balloting
1201 N. Market Street
18th Floor
Wilmington, Delaware 19801

Ballots will only be counted if mailed or hand delivered to one of the above addresses. Ballots cannot be transmitted orally, by facsimile or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot promptly. Any executed Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both an acceptance and rejection of the Plan shall not be counted.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

## 2. Holders of Claims Entitled to Vote

In general, a holder of a claim may vote to accept or reject a plan of reorganization if (i) the claim or equity interest of the holder is "Allowed," (*i.e.*, generally not disputed, contingent, or unliquidated), and (ii) such claim or equity interest of the holder is "Impaired" by the plan. However, if a holder of an allowed and impaired claim will not receive any distribution under a plan, than such holder is deemed to have rejected the plan and is not entitled to vote. In the same vein, a holder of an allowed and unimpaired claim will be presumed to have accepted the plan and will not be entitled to vote.

Under the Bankruptcy Code, a class of claims or equity interests is presumed impaired unless a plan (i) does not alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder thereof; or (2) regardless of any legal right to an accelerated payment of such claim or equity interest the plan (a) cures all existing defaults, except the defaults of a kind specified in Section 365(b)(2), (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim for any damages incurred as a result any such holder's reasonable reliance on such legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

The following sets forth which classes are and are not entitled to vote on the Plan:

- The Debtors are seeking votes from the Holders of Claims in Classes 1, 2, and 5.

- The Debtors are not seeking votes from the Holders of Claims in Classes 3 and 4 because those Claims are Unimpaired under the Plan, and the

Holders of Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

- The Debtors are not seeking votes from the Holders of Old Equity Interests in Class 6 because those Old Equity Interests are Impaired under the Plan and the Holders are receiving no Distribution on account of such Claims and Old Equity Interests. These Holders of Old Equity Interests will be deemed to have voted to reject the Plan.

ANY VOTE NOT SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE WILL NOT BE COUNTED PURSUANT TO SECTION 1126(e) OF THE BANKRUPTCY CODE.

### 3. Vote Required for Acceptance by a Class of Claims

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Approval Order.

### 4. Voting Procedures

#### (a) Ballots

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

ANY BALLOT THAT IS RECEIVED BUT WHICH IS NOT SIGNED OR THAT OTHERWISE CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE CONSIDERED AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERRING ACCEPTANCE OR REJECTION OF THE PLAN.

In order for a vote to be counted, the respective Holder must complete and sign an original Ballot and return it in the envelope provided (only original signatures will be accepted). In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Plan. Accordingly, in voting to accept or reject the Plan, a Holder must use only the coded Ballot or Ballots sent with this Disclosure Statement.

Ballots must be delivered to the Debtors, at the address set forth above, and actually received by the Voting Deadline. THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the undersigned Debtors' counsel in the manner set forth in this Disclosure Statement.**

(b)    **Withdrawal or Change of Votes on the Plan**

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Proponents, which consent shall be given in the Proponents' sole discretion.

Any Holder of a Claim who has submitted a properly completed Ballot prior to the Voting Deadline may change its vote by submitting a subsequent properly completed Ballot prior to the Voting Deadline. If more than one timely, properly completed Ballot is received with respect to the same Claim or Equity Interest, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Proponents determine was the last to be received.

E.    **CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Bankruptcy Court has scheduled the Confirmation Hearing on [DATE] (ET) before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing. Any objection to confirmation of the Plan must be made in accordance with the requirements of Section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014 and the procedures set forth in Article IV, Section A of this Disclosure Statement.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS "EXHIBIT A." THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

F.    **CLASSIFICATION OF CLAIMS AND INTERESTS**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, Section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates several "Classes" of Claims and one Class of Old Equity Interests. These Classes take into account the differing nature and priority of Claims against and Old Equity Interests in the Debtors. Administrative Claims, Gap Claims, and Priority Tax Claims are not classified for purposes of voting or receiving Distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Old Equity Interests. Only Holders of certain Allowed Claims are entitled to vote on and receive Distributions under the Plan. Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Equity Interest.

The categories of Claims and Old Equity Interests listed below, which exclude Administrative Claims, Gap Claims, and Priority Tax Claims in accordance with Section 1123(a)(1) of the Bankruptcy Code, are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan, as follows:

| Classes | Designation | Impairment | Entitled to Vote |
|---------|-------------|------------|------------------|
| 1 | OMF Prepetition Claims | Impaired | Yes |
| 2 | Secured Mechanic Lien Claims | Impaired | Yes |
| 3 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 4 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Old Equity Interests | Impaired | No (Deemed to Reject) |

## G.     TREATMENT OF UNCLASSIFIED CLAIMS

### 1.     Administrative Claims

Administrative Claims are claims or requests for costs and expenses of administration of the Chapter 11 Cases arising on or after the Relief Date and prior to the Effective Date under Sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors from and after the Relief Date, including, without limitation, the OMF Administrative Advances Claims, the OMF DIP Funding Claim and the HFZ DIP Funding Claim, and Claims of governmental units for taxes (including tax audits) related to tax years commencing after the Relief Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Relief Date or later incurred or assumed prior to the Relief Date, or subject to a lien dating prior to the Relief Date; (b) all Professional

Fee Claims; (c) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; (d) any payment to be made under the Plan, or otherwise, to cure a default under an executory contract or unexpired lease that has been or will be assumed by the Debtors under the Plan, or otherwise, (except to the extent that "adequate assurance" of such cure is provided); and (e) any fees and charges assessed against the Estates under Section 1930, Chapter 123, of Title 28 of the United States Code. The Bankruptcy Code does not require that Administrative Claims be classified under the Plan. It does, however, require that Allowed Administrative Claims be paid in full in cash in order for the Plan to be confirmed, unless the Holder of such Claim consents to different treatment.

Pursuant to Section 2.2(a) of the Plan, subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code and section 10.2 of the Plan, each Holder of an Allowed Administrative Claim against a Debtor shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, either cash equal to the full unpaid amount of such Allowed Administrative Claim, or such other treatment as the Reorganized Debtors and the Holder of such Allowed Administrative Claim shall have agreed.

Notwithstanding anything to the contrary, Allowed Administrative Claims representing the Debtors' postpetition liabilities incurred in the ordinary course of business will continue to be paid by the Debtors during the Chapter 11 Cases in accordance with the terms and conditions of the particular transactions and any agreement or Court order relating thereto.

Each Allowed Administrative Claim, to the extent such Claim has not been previously satisfied, will be paid by the Reorganized Debtors and there shall be only a single recovery on account of such Allowed Claim.

## 2. Gap Claims

Gap Claims are unsecured Claims against any Debtor arising from the Petition Date to the Relief Date pursuant to Section 502(f) and entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, the OMF Gap Claim.

Pursuant to the Plan, except to the extent that the Reorganized Debtors and the Holder of an Allowed Gap Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern) or as otherwise provided in the Plan, each Holder of an Allowed Gap Claim against a Debtor shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Gap Claim, either cash equal to the full unpaid amount of such Allowed Gap Claim, or such other treatment as the Reorganized Debtors and the Holder of such Allowed Gap Claim shall have agreed.

## 3. Priority Tax Claims

Priority Tax Claims are any Claims of a governmental unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The taxes entitled to priority are: (a) taxes on income or gross receipts that meet the requirements of Section 507(a)(8)(A); (b) property taxes meeting the requirements of Section 507(a)(8)(B); (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C); (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(4), to the extent such taxes also meet the requirements of Section 507(a)(8)(D); (e) excise taxes of the kind specified in Section 507(a)(8)(E); (f) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F); and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G).

The Bankruptcy Code does not require that Priority Tax Claims be classified under the Plan. It does, however, require that such claims receive the treatment described below in order for the Plan to be confirmed unless the Holders of such Claims consent to different treatment.

Pursuant to the Plan, except to the extent that the applicable Debtor and the Holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Tax Claim that is due and payable on or before the Effective Date shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the Debtors' sole discretion, either (i) cash equal to the amount of such Allowed Priority Tax Claim or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Relief Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the applicable non-bankruptcy law governing such Claims.

## H.    TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.    OMF Prepetition Claims (Class 1)

OMF Prepetition Claims are the Allowed Claim of OMF in respect of the OMF Prepetition Indebtedness, including as set forth in the 9019 Order, in the amount of $234,150,572.74, which claim amount may be increased to include accrued interest and default interest, fees and costs and other sums that OMF may be entitled to under the Loan Documents, in the event a Competitive Plan Proposal is timely and properly submitted and the Plan that is Confirmed embodies the such Competitive Plan Proposal. For the avoidance of doubt, the OMF Prepetition Claims do not include the OMF Gap Claim, the OMF Administrative Advances Claim and the OMF DIP Funding Claim.

As set forth in the Plan, OMF has elected to have the entirety of the OMF Prepetition Claims treated as secured claims pursuant to Bankruptcy Code Section 1111(b) and the Plan treatment of the OMF Prepetition Claims will depend upon the identity of the Plan Funder under the Plan.

If OMSub is the Plan Funder, then (i) on or prior to the Effective Date, OMSub will satisfy the Plan Funding Commitment (*i.e.*, all cash necessary to fund the Plan) and in exchange, will receive 100% of the New Equity, and (ii) OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (a) continue to be evidenced and secured by all of the OMF Prepetition Liens, (b) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property (other than as provided in the Plan Supplement in connection with the amendment of, restatement of and/or modifications to the Loan Documents), and (c) not be merged with the ownership of the New Equity. As a result, on the Effective Date, OMSub will own the New Equity and OMF will continue to own and hold the OMF Prepetition Indebtedness and the OMF Prepetition Claims secured by the OMF Prepetition Liens. If OMSub is not the Plan Funder, then (y) OMF's Plan treatment will be the payment in full, in cash, of the OMF Prepetition Claims on the Effective Date or such other treatment as OMF may agree in its sole and absolute discretion, and (z) the New Equity will be issued to the Plan Funder.

For the avoidance of doubt, the OMF Prepetition Claims do not include the OMF Gap Claims, OMF Administrative Advance Claims or the OMF DIP Funding Claim.

Class 1 is Impaired under the Plan, and OMF shall be entitled to vote on the Plan on account of the OMF Prepetition Claims.

## 2. <u>Secured Mechanic Lien Claims (Class 2)</u>

Secured Mechanic Lien Claims are Claims held by a Holder derived from an asserted mechanic lien on the Property under applicable non-bankruptcy law that (i) was properly and timely asserted, (ii) was validly perfected, and (iii) constitutes a Lien having priority over a portion of the OMF Prepetition Claims under applicable non-bankruptcy law. The term "Secured Mechanic Lien Claim" expressly excludes Judgment Lien Claims.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Mechanic Lien Claim against a Debtor shall, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Secured Mechanic Lien Claim, shall receive (i) Distributions as agreed between the holder of such claims, on the one hand, and the Debtors and the Plan Funder prior to the Effective Date or the Reorganized Debtors after the Effective Date, on the other hand, or, to the extent the parties cannot so agree, (ii) a cash payment equal to one hundred percent (100%) of the Allowed principal amount of each such Holder's Allowed Secured Mechanic Lien Claim, without interest. On the Effective Date, the Lien asserted by the Holder of an Allowed Secured Mechanic Lien Claim shall be null and void, the Holder of the Allowed Secured Mechanic Lien Claim shall execute all documents requested by the Reorganized Debtors to effectuate the cancellation of its Lien, including the release and/or termination of any recording of the Lien, and the Holder of the Allowed Secured Mechanic Lien Claim shall be enjoined from taking any action against the Reorganized Debtors or the Property to enforce, perfect, or record its Mechanic Lien.

Class 2 is Impaired under the Plan, and each Holder of an Allowed Secured Mechanic Lien Claim shall be entitled to vote on the Plan.

### 3.      **Other Secured Claims (Class 3)**

Other Secured Claims are any Claims secured, or purporting to be secured, by the assets of a Debtor other than a Secured Mechanic Lien Claim, a Mechanic Lien Claim, the McDonald's Claim, a Judgment Lien Claim, the OMF Prepetition Claims or a Disputed Unit Claim, but solely to the extent the Lien securing or purporting to secure such Claim has priority under non-bankruptcy law over all or a portion of the OMF Prepetition Liens.

On the Effective Date or as soon as reasonably practicable thereafter, at the election of the Reorganized Debtors, Holders of Allowed Other Secured Claims shall, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Other Secured Claims, have their Claims satisfied by either (i) reinstatement pursuant to Section 1124 of the Bankruptcy Code, (ii) receipt of the collateral securing such claim and any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, (iii) such other treatment as the Reorganized Debtors and the applicable Holder of an Allowed Other Secured Claim may agree, or (iv) such other recovery necessary to satisfy Section 1129 of the Bankruptcy Code. The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum (including, without limitation, the Bankruptcy Court pursuant to or in furtherance of the Plan) including when and if such Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or the Reorganized Debtors or the value of any such collateral (including, without limitation, in the Bankruptcy Court pursuant to or in furtherance of the Plan).

Class 3 is Unimpaired under the Plan, and each Holder of an Other Secured Claim shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

### 4.      **Other Priority Claims (Class 4)**

Other Priority Claims are any Claims other than an Administrative Claim or a Priority Tax Claim entitled to priority in payment pursuant to Section 507(a) of the Bankruptcy Code.

Each Holder of an Allowed Other Priority Claim against the Debtors shall receive, on or as soon as practicable after the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Other Priority Claim, either cash equal to the full unpaid amount of such Allowed Other Priority Claim, or such other treatment as the Reorganized Debtors and the Holder of such Allowed Other Priority Claim shall have agreed.

Class 4 is Unimpaired under the Plan, and each Holder of an Allowed Other Priority Claim shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

## 5.    General Unsecured Claims (Class 5)

General Unsecured Claims are Claims against any Debtor that is not an Administrative Claim, a Priority Tax Claim, a Gap Claim, an Other Priority Claim, an Other Secured Claim, a Secured Mechanic Lien Claim, or the OMF Prepetition Claims and specifically includes, without limitation, any Judgment Lien Claim, Mechanic Lien Claim, Disputed Unit Claim, Flamingo Claim, and McDonald's Claim.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Debtors, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, shall receive its pro rata portion of the GUC Cash Amount which shall be $6.75 million unless (A) the Court determines that the Committee violates, breaches or takes any action inconsistent with the 9019 Order and as described in sub-paragraph (ii)(A) below, in which case the GUC Cash Amount shall be reduced to $3.4 million; (B) the Court determines that the Committee violates, breaches or takes any action inconsistent with the 9019 Order as described in sub-paragraphs (B)-(E) in the next paragraph (which are consistent with Section 2.3(e)(ii)(B)-(E) of the Plan), in which case the GUC Cash Amount shall be reduced to $0; or (C) Class 5 fails to accept the Plan by the requisite statutory majorities, in which case the GUC Cash Amount shall be reduced to $3.4 million. For the avoidance of doubt, in the event that the Court determines that the Committee violated, breached or took any action resulting in the GUC Cash Amount being reduced to both $3.4 million and $0, the GUC Cash Amount shall be $0.

As set forth in the 9019 Order, the Committee (A) shall support the efforts of the Debtors and OMF to implement the terms of the 9019 Settlement and confirm the Plan; (B) shall not support any restructuring or reorganization plan other than the Plan and the plan process contemplated by the 9019 Settlement (which may be amended from time to time by the Debtors and OMF so long as the GUC Cash Amount, its authorized uses, and OMF's waiver of any right to share in the GUC Cash Amount are not changed to the detriment of Holders of Allowed General Unsecured Claims), and the Debtors' and OMF's prosecution of the Plan; (C) shall provide a letter in support of the Plan, recommending that Holders of General Unsecured Claims vote in favor of the Plan, which letter is to be included in the Plan solicitation materials (provided that such letter may include the Committee's assessment and analysis of the Plan and its consideration of various factors in deciding to support the Plan); (D) shall oppose any efforts by any third party in opposition to the Plan and the Plan process contemplated by the 9019 Settlement; and (E) shall take no actions, directly or indirectly, to interfere with, hinder, or delay the confirmation and implementation of the Plan, or any litigation related thereto (including any litigation related to ownership or rights to the Property, including the Units), except to the extent the Plan or incident litigation purports to reduce the GUC Cash Amount or alter any provisions of the Plan in a manner inconsistent with the terms hereof, and shall not cause others to do so in any litigation (whether in the Bankruptcy Court or any other court) related in any way to (1) the validity, priority or enforceability of the mortgages and liens of OMF against the Property; (2) the Property, including with respect to objections to claims related in any way to claims or rights asserted by any party to ownership of the Property, including Units; (3) the Disputed Commercial Unit; (4) any litigation, claims and rights therein retained by the Debtors or

Reorganized Debtors under the Plan, or (5) any litigation needed to implement the Plan so long as the consideration to Holders of Allowed General Unsecured Claims does not change.

Class 5 is Impaired under the Plan, and each Holder of an Allowed General Unsecured Claim in such shall be entitled to vote on the Plan.

### 6. Old Equity Interests (Class 6)

Old Equity Interest is (a) an equity interest or equity security in or of the Debtors or (b) any Claim against any of the Debtors (i) arising from the rescission of a purchase or sale of an equity interest in the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such equity interest, (iii) for violations of the securities laws (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code) in connection with any such equity interests, (iv) any similar Claims otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims.

As of the Effective Date, all Old Equity Interests in each Debtor, including any outstanding warrants, options, or other rights to acquire outstanding Old Equity Interests, shall be terminated and cancelled and the Holders thereof shall neither retain nor receive any property under the Plan.

Old Equity Interests are terminated under the Plan and Holders of such Old Equity Interests shall neither receive nor retain any property under the Plan. As a result, each Holder of an Equity Interest shall be conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

## I. ACCEPTANCE OR REJECTION OF THE PLAN

### 1. Acceptance by an Impaired Class

In accordance with Section 1126(c) of the Bankruptcy Code and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

### 2. Presumed Acceptances by Unimpaired Classes

Pursuant to Section 1126(f) of the Bankruptcy Code, Classes of Claims designated as Unimpaired are conclusively presumed to accept the Plan and the votes of the Holders of such Claims or Old Equity Interests will not be solicited. Classes 3 and 4 are Unimpaired by the Plan and, as such, shall not be entitled to vote to accept or reject the Plan.

### 3. Presumed Rejection by Certain Impaired Classes

Holders of Old Equity Interests in Class 6 will not receive or retain any property under the Plan on account of such Old Equity Interests. Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of such Old Equity Interests are conclusively presumed to have rejected the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

### 4. Impaired Classes of Claims Entitled to Vote on the Plan

Holders of Claims in Classes 1, 2 and 5 are Impaired and shall be entitled to vote to accept or reject the Plan.

## J. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. Vesting of Assets in Reorganized Debtors

Pursuant to Section 1123(a)(5) of the Bankruptcy Code, all assets of the Debtors (including, without limitation, the Property, but excluding, for the avoidance of doubt, the GUC Cash Amount and the Plan Administrator Actions) and their Estates that is not specifically disposed of pursuant to the Plan, including, without limitation, all Causes of Action (including all Avoidance Actions), whether pending or asserted in the future, shall be retained by, and title and ownership shall vest in the Reorganized Debtors on the Effective Date, subject to (a) the OMF Prepetition Indebtedness, OMF Prepetition Claims and the OMF Prepetition Liens to the extent OMSub is the Plan Funder, (b) those liens that are acceptable to OMF based on its review of the Title Commitment, and (c) any interests relating to the Disputed Units asserted by parties in the Bankruptcy Cases prior to the applicable Bar Date pending final adjudication of such Disputed Unit Claims by a court of competent jurisdiction, but otherwise free and clear of all Liens, Claims and Old Equity Interests, including, without limitation, the Liens and Claims of Holders of any Mechanic Lien Claim, Flamingo Claim, Judgment Lien Claim, McDonald's Claim, and Other Secured Claim, any Claim of successor liability, any Claim of any owner of a Unit other than a Disputed Unit, any Claim based on the actions or inactions of the Debtors or their agents, representatives, employees or contractors with respect to the development, construction or sale of the Property or any Unit, or any patent or latent construction defects.

As of the Effective Date, the Reorganized Debtors shall be vested with all powers of the Debtors and the Estates, including, without limitation, the power to take any action necessary to implement the Plan, other than those powers specifically conveyed to the Plan Administrator, including, without limitation, the following: (a) the establishment and maintenance of such operating, reserve and trust account(s) as are necessary and appropriate to wind down the affairs of the Debtors other than with respect to Class 5 Claims that are not Property-Related Litigation Claims; (b) the pursuit of objections to, estimations and settlements of all Claims and Causes of Action other than Class 5 Claims that are not Property-Related Litigation Claims, regardless of whether such Claim is listed in the Schedules; (c) the calculation and distribution of all Distributions to Holders of Allowed Claims to be made under the Plan other than Class 5 Claims that are not Property-Related Litigation Claims; (d) the filing of all required tax returns and operating reports and paying of taxes and all other obligations on behalf of Debtors, if any; (e) the payment of fees pursuant to 28 U.S.C. § 1930 incurred after the Effective Date until the

closing of the Chapter 11 Cases; and (f) if as and when appropriate, to seek a final decree.

Pursuant to Section 1123(a)(5) of the Bankruptcy Code, the GUC Cash Amount and the Plan Administrator Actions shall be retained by, and title and ownership shall vest in the Plan Administrator on the Effective Date, free and clear of all Liens, Claims and Old Equity Interests, including, without limitation, the Liens and Claims of Holders of any Property-Related Litigation Claims. Furthermore, as of the Effective Date, the Plan Administrator shall be vested with all powers of the Debtors and the Estates specifically conveyed to the Plan Administrator in the Plan Administrator Agreement, including, without limitation, the following: (a) the establishment and maintenance of such operating, reserve and trust account(s) as are necessary and appropriate to wind down the affairs of the Debtors with respect to Class 5 Claims that are not Property-Related Litigation Claims or Claims that affect, relate to, impede or impact the Property or any Property-Related Litigation Claim; (b) the pursuit of objections to, estimations and settlements of all Class 5 Claims Class 5 Claims that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim, regardless of whether such Claim is listed in the Schedules; (c) the calculation and distribution of all Distributions to Holders of Allowed Class 5 Claims to be made under the Plan; and (d) the filing of all required tax returns and paying of taxes and all other obligations, if any, related to the assets being administered by the Plan Administrator on behalf of Debtors.

For the avoidance of doubt, on and after the Effective Date, to the extent OMSub is the Plan Funder, OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (a) continue to be evidenced and secured by all of the OMF Prepetition Liens, (b) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property, and (c) not be merged with the ownership of the New Equity. Furthermore, the GUC Cash Amount shall be funded by the Plan Funder to the Plan Administrator on the Effective Date, free and clear of all Liens, Claims and Old Equity Interests, including, without limitation, the Liens and Claims of Holders of any Mechanic Lien Claim, Disputed Unit Claim, Flamingo Claim, Judgment Lien Claim, McDonald's Claim, and Other Secured Claim, any Claim of successor liability, any Claim of any owner of a Unit, any Claim based on the actions or inactions of the Debtors or their agents, representatives, employees or contractors with respect to the development, construction or sale of the Property or any Unit, or any patent or latent construction defects.

On or after the Effective Date, if OMSub is the Plan Funder and as a result OMSub receives 100% of the New Equity on the Effective Date, it is contemplated that pursuant to the Plan, the Reorganized Debtors will merge into OMSub and OMSub shall be the surviving entity of such merger.

On and after the Effective Date, the Plan Funder, the Plan Administrator, and the Reorganized Debtors are authorized to, and shall, take all actions necessary, and to execute all documents required, to effectuate the vesting of (i) the Estates' assets in the Reorganized Debtors and, (ii) with respect to the GUC Cash Amount, the Plan Administrator Actions, in the Plan Administrator. The Reorganized Debtors and the Disbursing Agent shall cooperate and furnish

information reasonably necessary for the Plan Administrator to fulfill its duties under the Plan, the Plan Administrator Agreement and the Confirmation Order.

From and after the Effective Date, the Reorganized Debtors and the Plan Administrator may operate their properties and business, and may use, acquire and dispose of property, free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules. In addition, the Reorganized Debtors and the Plan Administrator may, without the need for any application to, or approval by, the Bankruptcy Court, each pay their respective fees incurred after the Effective Date for professional services and expenses, including, without limitation, in respect of the Debtors, their Estates and any asset transferred to the Reorganized Debtors and the Plan Administrator, respectively, pursuant to the Plan.

## 2. Provisions for Plan Payments

As set forth in, and pursuant and subject to the terms and conditions of, the New Commitment, the Plan Funder has committed the Plan Funding Commitment that will enable the Reorganized Debtors and Plan Administrator to make all payments required under the Plan. As of the Effective Date, the Plan Funder, which will be OMSub or the Entity that submits a Competing Plan Proposal that is embodied in the Confirmed Plan, shall be the holder of 100% of the membership interests in the Reorganized Debtors (*i.e.*, the New Equity).

The Plan Funding Commitment funds will be used by the Reorganized Debtors and the Plan Administrator to fund all necessary Plan payments in accordance with the Plan, including, without limitation, the following:

(i)     payment of the DIP Financing Claims;

(ii)    payments of the Claims that are unclassified under the Plan;

(iii)   payments to Holders of Allowed Claims in Classes 1 (in the event OMSub is not the Plan Funder), 2, 3, and 4;

(iv)    the GUC Cash Amount; and

(v)     payments of Cure Amounts under the executory contracts and unexpired leases to be assumed and assigned under the Plan

## 3. Post-Effective Date Ownership, Development and Sale of the Units

From and after the Effective Date, the Reorganized Debtors may operate and/or complete development, and sell the Units consistent with the Offering Plan, as may be amended, supplemented or otherwise modified from time to time, or a new offering plan, and applicable non-bankruptcy laws and regulations.

## 4. Plan Administrator

(i)      Appointment.  On or after the Effective Date, the Plan Administrator shall be appointed in accordance with the Plan Administrator Agreement to administer the Plan Administrator Claims Distribution Assets, and make distributions of the Plan Administrator Claims Distribution Assets under the Plan.

(ii)      The Plan Administrator.   From and after the Effective Date, the Plan Administrator shall be a Person appointed pursuant to the Plan Administrator Agreement, Plan, and Confirmation Order, until death, resignation, or discharge and the appointment of a successor Plan Administrator in accordance with the terms of the Plan Administrator Agreement. The Plan Administrator shall be the exclusive agent and fiduciary of the Holders of Allowed Claims in Class 5 with respect to the Distribution of the Plan Administrator Claims Distribution Assets and shall be deemed a trustee under Title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).

(iii)      Responsibilities of the Plan Administrator.   The responsibilities of the Plan Administrator under the Plan Administrator Agreement and the Plan shall include those set forth in the Plan Administrator Agreement, including, without limitation, the following:  (a) the establishment and maintenance of such operating, reserve and trust account(s) as are necessary and appropriate to wind down the affairs of the Debtors with respect to Class 5 Claims that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim; (b) the investment of the Plan Administrator Claims Distribution Assets, to the extent appropriate; (c) the pursuit of objections to, estimations of and settlements of Class 5 Claims that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim and the prosecution of Plan Administrator Actions; (d) the calculation and distribution of all Distributions to Holders of Allowed Class 5 Claims be made under the Plan; (e) such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement, the Confirmation Order, other Bankruptcy Court orders, or as otherwise may be consistent with and necessary and proper to carry out the duties of the Plan Administrator under the Plan.

(iv)      Powers of the Plan Administrator.  The powers of the Plan Administrator shall include, without limitation and without further Bankruptcy Court approval, each of the following:

a.      To maintain accounts, to make distributions to holders of Allowed Class 5 Claims provided for or contemplated by the Plan; and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves in the name of the Plan Administrator;

b.      To object to Claims in Class 5 (whether Disputed Claims or otherwise) that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim, to compromise or settle Claims in Class 5 that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim prior to objection and to prosecute, compromise and settle Plan Administrator Actions without

supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and the guidelines and requirements of the U.S. Trustee, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Administrator Agreement;

c.  To dispose of, in any commercially reasonable manner, including abandonment or donation to a charitable organization of its choice, any Plan Administrator Distribution Assets, if the Plan Administrator concludes that they are of immaterial benefit to the Plan Administrator or Holders of Class 5 Claims;

d.  To make decisions regarding the retention or engagement of professionals, employees and consultants, and to pay (in respect of the duties described in Section 1.95 hereof) in respect of the Distributions to be made to Holders of Allowed Class 5 Claims, from the Plan Administrator Claims Distribution Assets, the fees and charges incurred by the Plan Administrator on or after the Effective Date for fees and expenses of professionals (including those retained by the Plan Administrator), disbursements, expenses or related support services without application to, or approval of, the Bankruptcy Court;

e.  To take all other actions not inconsistent with the provisions of the Plan and the Plan Administrator Agreement, which the Plan Administrator deems reasonably necessary or desirable with respect to administration of Claims in Class 5 that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim;

f.  To invest Cash as deemed appropriate by the Plan Administrator, as further set forth in the Plan Administrator Agreement;

g.  To maintain any books and records, including financial books and records, as is necessary and/or appropriate in the Plan Administrator's discretion;

h.  To investigate, object to prosecute and/or settle Plan Administrator Actions and Claims in Class 5 that are not Property-Related Litigation Claims and that do not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim without approval of the Bankruptcy Court and, in respect thereof, exercise, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding and pursue to settlement or judgment such actions;

i.  To purchase or create and carry all insurance policies and pay all insurance premiums and costs the Plan Administrator deems necessary or advisable;

j.  To administer the Plan Administrator Claims Distribution Assets and distribute all Plan Administrator Claims Distribution Assets pursuant to the Plan, the Confirmation Order and the Plan Administrator Agreement;

k.     To hold legal title to any and all Plan Administrator Claims Distribution Assets;

l.     Exercise such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement, the Confirmation Order, other orders of the Bankruptcy Court, or as may be desirable, necessary and/or proper to carry out the provision of the Plan.

m.     The Plan Administrator shall stand in the same position as the Debtors and the Reorganized Debtors with respect to any Class 5 Claim that is not a Property-Related Litigation Claim and that does not affect, relate to, impede or impact the Property or any Property-Related Litigation Claim as to which the Debtors may have to assert an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Plan Administrator shall be entitled to assert all of the Debtors' rights to preserve, assert or waive any such privilege.

(v)     Compensation of Plan Administrator.     The Plan Administrator shall be compensated as set forth in the Plan Administrator Agreement from the Plan Administrator Claims Distribution Assets.

(vi)     Termination of the Plan Administrator's Appointment. The Plan Administrator's appointment shall terminate upon the Distribution of all property in accordance with the terms of the Plan Administrator Agreement and the Plan and the entry of a final decree by the Bankruptcy Court closing all of the Chapter 11 Cases.

## 5.     The Reorganized Debtors

On or after the Effective Date, if OMF is the Plan Funder and as a result OMSub receives 100% of the New Equity on the Effective Date, the Reorganized Debtors will merge into OMSub and OMSub shall be the surviving entity of such merger.

The Related Companies, L.P., an affiliate of OMF and OMSub, is one of the largest and most respected real estate developers in New York City and has both the operational know-how and financial wherewithal to ensure the Reorganized Debtors' successful and efficacious development of the Property.  In addition, as a result of the 9019 Settlement embodied in the 9019 Settlement, the development of the Property and certain other real estate, including, without limitation, the Disputed Units, will be jointly undertaken by HFZ and Related, further ensuring the successful resolution to the Chapter 11 Cases.

HFZ Capital Group is a Manhattan-based real estate investment and development company founded by Ziel Feldman.  HFZ Capital and its managing principal, Ziel Feldman, have been active investors in Manhattan real estate for the past 20 years. In 1991, Mr. Feldman founded Property Markets Group (www.propertymg.com) a national real estate development company with a diverse portfolio of holdings. Over the past 10 years, Mr. Feldman has refocused his real estate investment activities and operations under HFZ Capital Group

(www.hfzcap.com). Collectively, Mr. Feldman's companies financed, acquired, developed, managed and sold real estate assets valued at over $4 billion.

### 6.     **Standing of Reorganized Debtors**

On or after the Effective Date, if OMSub is the Plan Funder and as a result receives 100% of the New Equity on the Effective Date, pursuant to the Plan, it is contemplated that, the Reorganized Debtors will merge into OMSub and OMSub shall be the surviving entity of such merger.

(a)     On and after the Effective Date, the Reorganized Debtors shall automatically be conferred with and have authority and standing, and shall be the sole authorized Entity with authority and standing, to take any and all actions that were previously vested in the Debtors or their Estates, including, without limitation, the prosecution or settlement of any Claim, Claim Objection, or Cause of Action vested in the Reorganized Debtors and/or challenge to Lien (except with respect to Plan Administrator Actions and Claims in Class 5 that are not Property-Related Litigation Claims, as to which Claims the Plan Administrator shall be the sole authorized Entity with standing, to take any and all actions on behalf of the Debtors or their Estates, including, without limitation, the prosecution or settlement of such Claims, Claim Objections or Causes of Action).  Other than in respect of matters involving Plan Administrator Assets and Class 5 Claims that are not Property-Related Litigation Claims, the Reorganized Debtors, shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Reorganized Debtors shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

(b)     With respect to Plan Administrator Assets and Class 5 Claims that are not Property-Related Litigation Claims, the Plan Administrator shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Plan Administrator shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

### 7.     **Cancellation of Notes, Instruments, Debentures, Old Equity Interests; Assignment of Morgages.**

(a)     On the Effective Date, ***except for*** the OMF Prepetition Indebtedness, the OMF Prepetition Claims, the OMF Prepetition Liens and the corresponding Loan Documents (other than as such Loan Documents are amended, restated and/or modified to reflect the changes in the legal and/or contractual terms of the Loan Documents, which will be included as part of the Plan Supplement), in the event OMSub is the Plan Funder, and as otherwise provided in the Plan or in the Confirmation Order, all credit documents, notes, bonds, operating agreements, member agreements, registration rights agreements, and/or all documents plans, or agreements evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Old Equity Interests that are Impaired under the Plan (the "Cancelled Documents"), shall be cancelled, void and of no further force and effect as against the Debtors or their Estates (other than as evidence

of a Claim subject to the treatment set forth in the Plan) and the obligations of the Debtors and the Reorganized Debtors under any such Cancelled Documents shall be discharged. From and after the Effective Date, except as otherwise provided in the Plan, the Cancelled Documents shall solely evidence Claims against the Debtors, the allowance of which would qualify the Holders of such Allowed Claims to receive the treatment for such Allowed Claims provided for in the Plan.

(b)     As provided for in the Plan and as shall be provided for in the Confirmation Order, in the event OMSub is the Plan Funder, OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (i) continue to be evidenced and secured by all of the OMF Prepetition Liens, (ii) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property, and (iii) not be merged with the ownership of the New Equity. Following the Effective Date, in the event OMF determines it necessary, OMF and/or an affiliated entity shall be entitled to exercise any and all remedies available to it in law and in equity, including the right to proceed to commence an OMF Foreclosure Proceeding.

### 8.    Cancellation of Liens and New Title Policy

Except as otherwise provided for in the Plan with respect to (1) the OMF Prepetition Indebtedness, the OMF Prepetition Claims and the OMF Prepetition Liens, (2) those liens that are acceptable to OMF based on its review of the Title Commitment, and (3) any interests relating to the Disputed Units asserted by parties in the Bankruptcy Cases prior to the applicable Bar Date pending final adjudication of such Disputed Unit Claims by a court of competent jurisdiction, on the Effective Date, in consideration for the Distributions to be made under the Plan, (i) all Liens, charges, encumbrances, and rights relating to any Claim, Equity Interest, or other interest with respect to any of the Debtors' assets, including, without limitation, the Property, shall be disallowed, terminated, null and void and of no effect and/or deemed subordinated to the rights of the Reorganized Debtors or OMF, as applicable and (ii) all Holders of Secured Claims (other than Holders of Other Secured Claims that are Reinstated pursuant to the Plan and OMF with respect to the OMF Prepetition Indebtedness, the OMF Prepetition Claims and the OMF Prepetition Liens, if OMSub is the Plan Funder), including without limitation, any Holders of Claims classified in Classes 2 and 3, shall be authorized and directed to release any and all Liens on collateral or property of any Debtor securing such Secured Claims held by such Holders and to take such actions as may be requested by the Reorganized Debtors or the Plan Administrator to evidence the release of such Liens, including the execution, delivery and filing or recording of such release documents as may be requested by the Reorganized Debtors or the Plan Administrator, provided however, in the event OMSub is the Plan Funder, OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (a) continue to be evidenced and secured by all of the OMF Prepetition Liens, (b) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property, and (c) not be merged with the ownership of the New Equity.

In connection with effectuating the terms of the Plan, the Reorganized Debtors are irrevocably appointed by Holders of Claims in Classes 2 and 3 to execute any necessary release of Liens securing such Holders' Class 2 and 3 Claims.

In the Confirmation Order, the appropriate state or local government filing and recording officers shall be authorized and directed to accept for filing or recording any and all documents to be executed, filed and recorded in accordance with the Plan and the exhibits thereto, without payment of any filing or recording fee of any kind, and without the presentation of any affidavits, instruments, or returns otherwise required for recording, other than the Confirmation Order.

## 9.    Cram-Down

If any Impaired Class fails to accept the Plan by the requisite statutory majorities, the Proponents reserve the right (i) to seek confirmation of the Plan by a "cram-down" of such non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code and (ii) to propose any modifications to the Plan and to confirm the Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

## 10.    Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically and their members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code; provided that such parties shall continue to be bound by any obligations arising under confidentiality agreements or joint defense/common interest agreements (whether formal or informal) entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms, and provided further that the Committee's Professionals shall continue to have a right to be heard with respect to their respective applications for Professional Fee Claims.

## 11.    Exercise of Foreclosure Rights

In the event that OMSub is the Plan Funder and notwithstanding anything to the contrary contained in the Plan, in the event that it is necessary or desirable for OMF pursuant to Section 4.6(b) of the Plan or otherwise to exercise its rights and powers under the OMF Prepetition Liens to effectuate a state-court foreclosure (or similar action) with respect to a portion of the Property (including, without limitation, any Unit(s) and the common elements of the Property allocable to such Unit(s)) in order to effectuate the transactions contemplated by the Plan, including without limitation, commencing and prosecuting the Foreclosure Proceeding, such exercise shall be deemed to be an action taken under and in furtherance of the Plan, and any such portion of the Property thereby recovered by such assignee may be transferred (a) to the Debtors for transfer to the Reorganized Debtors, or (b) directly to the Reorganized Debtors, for the purpose of completing the sale and transfer contemplated under Section 4.1 of the Plan.

## K.    PROVISIONS GOVERNING DISTRIBUTIONS

The following is a summary of the Provisions Governing Distributions under the Plan and is qualified in its entirety by the terms of the Plan.

## 1.    Distributions By Disbursing Agent

Unless the Holder of an Allowed Claim and the Proponents (prior to the Effective Date) or the Reorganized Debtors or Plan Administrator, as appropriate, (after the Effective Date), agree to a different Distribution Date, and notwithstanding anything to the contrary contained in the Plan, Distributions required under the Plan to be made on the Effective Date on account of Claims (a) that are Allowed as of the Effective Date shall be made by the Disbursing Agent on the Initial Distribution Date or as soon as practicable thereafter and (b) that are Disputed Claims as of the Effective Date shall be made by the Disbursing Agent on such later date as the Disputed Claim otherwise entitled to Distribution on the Effective Date becomes an Allowed Claim. Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. All Distributions under the Plan shall be funded from (a) any unencumbered cash of the Debtors or their Estates, (b) the amounts funded by the Plan Funder pursuant to Section 4.2.2 of the Plan or (c) any reserve established pursuant to the Plan.

## 2.    Interest on Claims

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, no penalty or post-petition interest shall accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to penalties or interest accruing on or after the Relief Date, including, without limitation, on or after the Effective Date, on any Claim.

## 3.    Substantive Consolidation

As contemplated by the Plan, the Debtors will be merged into the Reorganized Debtors and all of the Debtors' assets and the Claims against, and Old Equity Interests in, the Debtors will be substantively consolidated on the Effective Date. As a result, Claims filed against multiple Debtors seeking recovery of the same debt shall only receive a single distribution to the extent such Claim is an Allowed Claim. Claims of Debtors against other Debtors will be disregarded for both voting and distribution purposes.

## 4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

Under section 5.3(a) of the Plan, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or notices of transfer Filed pursuant to Bankruptcy Rule 3001.

If the Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors, the Plan Administrator or the Disbursing Agent(s) as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder, and such Holder shall be deemed to have forfeited any rights to further distributions, unless the appropriate Disbursing Agent is notified in writing by the Holder of such Holder's then current address within ninety (90) days of such returned or unclaimed Distribution. A Distribution will be deemed unclaimed for purposes of this paragraph if a check or instrument for such Distribution is not cashed by such Holder within ninety (90) days.

Any Holder of an Allowed Claim that does not provide any information required by Section 5.7 of the Plan within one hundred eighty (180) days after the Effective Date shall be deemed to have forfeited its Claim and shall be forever barred and enjoined from seeking any further Distributions on such claim or asserting such Claim against the Debtors or their Estates, the Plan Administrator or the Reorganized Debtors or their respective property.

Any Distributions forfeited pursuant to Sections 5.3(b)(i) and (ii) shall be redistributed to other claimants pro rata (in the case of Class 5 Claims) subject to Section 5.10 of the Plan or become the property of the Reorganized Debtors free of any restrictions thereon (in the case of Unclassified Claims and Claims in Classes 2 through 4) and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors or the Plan Administrator to attempt to locate any Holder of an Allowed Claim.

### 5. Record Date for Distributions

The Reorganized Debtors, the Plan Administrator, and the Disbursing Agent(s) will have no obligation to, but may, in their sole and absolute discretion, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtors, the Plan Administrator, and the Disbursing Agent(s) shall be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official claims register as of the close of business on the Distribution Record Date.

### 6. Allocation of Plan Distributions Between Principal and Interest

Except as otherwise expressly provided in the Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 7. Means of Cash Payment

Payments of cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Disbursing Agent, by (i) checks drawn on or (ii) wire transfer from an account at a bank selected by the Disbursing Agent.

### 8.     Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection herewith and Distributions under the Plan, the Disbursing Agent, the Plan Administrator, and the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements, and the Disbursing Agent(s) shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements; *provided*, *however*, that, notwithstanding anything to the contrary contained in the Plan, (a) any party entitled to receive any Distribution under the Plan shall be required to deliver to the Reorganized Debtors, the Plan Administrator or the Disbursing Agent (as the case may be) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 to avoid the incurrence of certain federal income withholding tax obligations on its respective Distribution and (b) each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any governmental unit, including, without limitation, income, withholding and other tax obligations, on account of such Distribution. No Distribution shall be made to or on behalf of any Holder of an Allowed Claim unless and until such Holder has made arrangements satisfactory to the appropriate Disbursing Agent for the payment and satisfaction of any such tax obligations. The Reorganized Debtors, the Plan Administrator, or Disbursing Agent (as appropriate) shall cause a notice of this requirement to be sent to all Holders of Allowed Claims, which notice may be contained in the Confirmation Order or Notice of Effective Date.

### 9.     Setoffs and Recoupment

The Reorganized Debtors, the Plan Administrator and the Disbursing Agent, as the case may be, may, pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off or recoup against any Claim, the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors, the Plan Administrator or the Reorganized Debtors may have against the Holder of such Claim, including, without limitation, for any Causes of Action; provided, however, that neither the failure to assert such rights of setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or the Plan Administrator of any Claim that the Debtors, the Plan Administrator or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

### 10.    Compromises and Settlements

Subsequent to the July 14 Hearing and as reported to the Bankruptcy Court at the Status Conferences, OMF and certain of its affiliates on the one hand and HFZ and 23 East 22nd Street (NY) LLC on the other hand conducted extensive negotiations amongst themselves and with the Debtors to resolve their disputes, all of which culminated in the Plan. On October 24, 2011, the Bankruptcy Court entered an Order approving the 9019 Motion and the 9019 Settlement.

As a foundational element of the 9019 Settlement, on October ▨, 2011, HFZ entered into an Amended and Restated Limited Liability Company Operating Agreement with Related Recovery Fund One Madison, LLC ("RRFOM"), by which HFZ purchased 40% of the membership interests of RRFOM.

On and after the Effective Date and without any further notice to or action, order or approval of the Bankruptcy Court, the Reorganized Debtors (or their successor by merger, if applicable), with respect to Unclassified Claims, Class 1 through Class 4 Claims, Property-Related Litigation Claims and Causes of Action (other than Plan Administrator Actions), and the Plan Administrator, with respect to Plan Administrator Actions and Class 5 Claims that are not Property-Related Litigation Claims, may compromise or settle such Claims or Causes of Action.

In such vein, on and after the Effective Date, the Reorganized Debtors (in the case of Unclassified Claims, Class 1 through 4 Claims, Causes of Action other than Plan Administrator Actions) and the Plan Administrator (in the case of Plan Administrator Actions and Claims in Class 5 that are not Property-Related Litigation Claims) shall have the sole right to compromise and settle such Claims and Causes of Action and the Reorganized Debtors and the Plan Administrator shall thereafter be authorized to compromise and settle their respective Disputed Claims and Causes of Action and execute all necessary documents, including a stipulation of settlement or release, in each's sole discretion, without notice to any party, and without the need for further approval of the Bankruptcy Court and without following Bankruptcy Rule 9019(a).

Notwithstanding the foregoing, the Plan Administrator shall provide the Reorganized Debtor five (5) Business Days' notice of any proposed settlement or compromise of Plan Administrator Actions or Claims in Class 5 that are not Property-Related Litigation Claims and the opportunity to object to any such settlement or compromise on the grounds that such settlement or compromise affects, relates to, impedes or impacts the Property or any Property-Related Litigation Claim. In the event that any such objection cannot be resolved consensually, the Reorganized Debtor, on reasonable notice to the Plan Administrator, shall move the Bankruptcy Court for a determination as to whether the proposed settlement or compromise affects, relates to, impedes or impacts the Property or any Property-Related Litigation Claim. In the event of such an objection, unless and until the Bankruptcy Court determines that the proposed settlement or compromise does not affect, relate to, impede or impact the Property or any Property-Related Litigation Claims, the Plan Administrator shall not effectuate the disputed settlement or compromise.

## 11.    De Minimis Distributions

No payment of fractional cents shall be made under the Plan and any such Distribution shall be rounded to the nearest whole cent. All Distributions (other than the final Distribution)

less than one hundred dollars ($100) will be held by the Disbursing Agent for the benefit of the Holder of the Allowed Claim entitled to such Distribution. When the aggregate amount held by the appropriate Disbursing Agent for the Holder of an Allowed Claim equals or exceeds $100, the Disbursing Agent shall make a Distribution to such Holder. If at the time the Disbursing Agent is to make the final Distribution to Holders of Allowed Claims and the Disbursing Agent is holding a Distribution for a Holder of an Allowed Claim of less than twenty-five dollars ($25), inclusive of any final Distribution, the Disbursing Agent shall not be required to make such final Distribution and the amount of such final Distribution for such Holder shall instead be submitted as an undeliverable Distribution to a charity in the form of the Combined Campaign for Justice then in effect in the state of Delaware.

## 12.    Claims Administration Responsibility

From and after the Effective Date, the Reorganized Debtors, in the case of Unclassified Claims, Claims in Classes 1 through 4 and Property-Related Litigation Claims, and the Plan Administrator in the case Claims in Class 5 that are not Property-Related Litigation Claims, shall have the respective sole responsibility and authority for disputing, objecting to, compromising and settling, or otherwise resolving and making Distributions (if any) with respect to such Claims.

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and Filed on or before the Claim Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if service of such objection is effected upon such Holder in any of the following manners: (a) (i) in accordance with Federal Rule of Civil Procedure 4, as made applicable in the Chapter 11 Cases by Bankruptcy Rule 7004 but, in respect of mailings, to the Holder's last known address; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable Proof of Claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases and whose appearance has not been revoked or withdrawn, or (b) otherwise in accordance with the Bankruptcy Rules.

## 13.    Determination of Allowed Claims and Causes of Action

On and after the Effective Date, except as otherwise set forth in the Plan or as agreed to in writing by the Reorganized Debtors (in the case of Unclassified Claims, Claims in Classes 2 through 4 and Causes of Action) or the Plan Administrator (in the case of Claims in Class 5 that are not Property-Related Litigation Claims), the Allowed amount of any Claim as to which a Proof of Claim was timely Filed in the Chapter 11 Cases, and which Claim is subject to an objection Filed by the Debtors, the Plan Administrator or the Reorganized Debtors before the Claim Objection Deadline, will be determined and liquidated pursuant to a Final Order of the Bankruptcy Court. Upon such determination, the Claim shall become an Allowed Claim to the extent set forth in the applicable Final Order and will be satisfied in accordance with the Plan. Any Claim that has been or is hereafter listed in the Schedules in an undisputed, fixed, liquidated

amount and is not disputed, contingent or unliquidated and with respect to which no contrary or superseding Proof of Claim or Claim Objection has been timely Filed on or before the Claims Objection Deadline, shall be deemed Allowed in the fixed amount so listed in the Schedules for purposes of the Plan unless otherwise ordered by the Bankruptcy Court.

Except as otherwise set forth in the Plan, no Distributions shall be made with respect to a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim. Promptly after a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors, the Plan Administrator or the Disbursing Agent, as applicable, will distribute on the next succeeding Distribution Date to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim to the extent of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims in the same Class to the extent such Claim (or portion thereof) had been an Allowed Claim on such dates. Notwithstanding the foregoing, the Reorganized Debtors (in the case of Unclassified Claims, Claims in Classes 2 through 4 and Causes of Action) and the Plan Administrator (in the case of Claims in Class 5 that are not Property-Related Litigation Claims) shall make Distributions on the Initial Distribution Date on account of such Claims (or portions thereof) as the Reorganized Debtors or the Plan Administrator, as applicable, reasonably believes to be valid and whereupon such Claims (or portions of such Claims, if applicable) shall, notwithstanding anything to the contrary contained in the Plan, automatically constitute, and be deemed for all purposes hereunder Allowed Claims.

### 14. Late Filed Claims

Any Claims Filed after the Claims Bar Date, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, Reorganized Debtors or Plan Administrator.

### 15. Reserves

As of and after the Effective Date with respect to Distributions to be made under the Plan, to the extent that a Claim is a Disputed Claim but if the Claim was an Allowed Claim the Holder of such Claim would be entitled to a Distribution, the appropriate Disbursing Agent(s) shall establish a reserve for the payment of any such Disputed Claim at such time that a Distribution would otherwise be made under the Plan on account of such Claim if it was an Allowed Claim, funded from amounts made available by the Plan Funder pursuant to Section 4.2.2 of the Plan upon such reserve's establishment as follows: the amount reserved for each Disputed Claim shall be the amount that the Holder of such Disputed Claim would have been entitled to receive under the Plan it if was an Allowed Claim based upon the Claim being the lower of: (i) the amount set forth in a Proof of Claim Filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being non-contingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for Distribution purposes, as determined by the Bankruptcy Court. As soon as practicable after (and to the extent) that a Disputed Claim becomes an Allowed Claim, the appropriate Disbursing Agent(s) shall make a payment on such Allowed Claim from the reserve established for such

Disputed Claim that becomes an Allowed Claim. Any amount reserved on account of a Disputed Claim that becomes a Disallowed Claim shall be released from the reserve and either: (i) held by the appropriate Disbursing Agent(s) for Distribution to all Holders of Allowed Claims in the Class in which such Disputed Claim was Classified in accordance with the Plan; or (ii) if there are no such other Holders of Allowed Claims in the Class in which such Disputed Claim was classified or the remaining amount to be distributed does not have to be distributed by reason of the last sentence of Section 5.10 of the Plan, the remaining amount reserved on account of such Disputed Claim shall be disbursed by the appropriate Disbursing Agent(s) to the Plan Funder. The appropriate Disbursing Agent shall establish appropriate reserves for the payment of Professional Fee Claims and Administrative Claims funded from amounts made available by the Plan Funder pursuant to Section 4.2.2 of the Plan upon such reserves' establishment.

## L.    TREATMENT OF EXECUTORY CONTRACTS, AND UNEXPIRED LEASES

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1.    Assumption Generally

Except as otherwise provided in the Plan, or in any Final Order, on the Effective Date, pursuant to Bankruptcy Code Section 365, each of the executory contracts and unexpired leases designated for assumption and listed on Schedule 6.1 to the Plan, which will be Filed with the Plan Supplement and may be amended through the date that is ten (10) days prior to the Confirmation Hearing, by notice Filed by the Debtors and served on the parties affected by such amendment, shall be assumed by the Debtors.

Each executory contract and unexpired lease identified for assumption on Schedule 6.1 shall be assumed only to the extent, if any, that it constitutes an executory contract or unexpired lease on the Effective Date, and the listing of such contract or lease on Schedule 6.1 shall not constitute an admission by the Debtors or the Estates that such contract or lease is an executory contract or unexpired lease or that the Debtors, or the Estates have any liability thereunder. Any executory contract or unexpired lease that is not listed on Schedule 6.1, or that has not been assumed by the Debtors pursuant to an order of the Bankruptcy Court, or is not the subject of a pending assumption motion by the Debtors, shall be deemed rejected as of the Effective Date.

All executory contracts and unexpired leases assumed by the Debtors will be deemed assigned to the Reorganized Debtors. Any executory contract or unexpired lease that the Debtors assume and assign to the Reorganized Debtors shall be deemed to be a permitted assignment notwithstanding a provision in such contract or lease requiring consent of the nondebtor party to such contract or lease. All executory contracts or unexpired leases assumed by the Debtors shall continue in full force and effect from and after the Effective Date.

The execution and recording of any memorandum of lease relating to any unexpired lease listed on Schedule 6.1 of the Plan is exempt from any law or requirement requiring lessor consent or joinder, whether express or otherwise, to such execution or recordation. The

Reorganized Debtors, or any agent or representative thereof, is hereby authorized to serve upon all filing and recording officers a notice in connection with the execution, filing and recording of any memoranda of lease (whether recorded or unrecorded) in accordance with the Plan, to evidence and implement this paragraph, and the Reorganized Debtors shall be deemed to have "attorney-in-fact" power on behalf of any lessor in respect thereof. The Confirmation Order shall authorize and direct the appropriate state or local government filing and recording officers to accept for filing or recording any and all memoranda of lease to be executed, filed and recorded in accordance with the Plan and the exhibits thereto, without need for lessor consent or joinder to such execution or recordation, and without the presentation of any affidavits, instruments, or returns otherwise required for recording, other than the Confirmation Order. The Bankruptcy Court shall retain the exclusive jurisdiction to enforce the foregoing direction, by contempt proceedings or otherwise.

### 2. Approval of Assumption

The Confirmation Order shall constitute an order of the Bankruptcy Court approving assumption and assignment of the executory contracts and unexpired leases set forth in Schedule 6.1, as amended from time to time prior to the date that is ten (10) days prior to the Confirmation Hearing, pursuant to Bankruptcy Code Section 365, as of the Effective Date.

### 3. Objections to Assumption

In accordance with the Disclosure Statement Approval Order, any party in interest wishing to object to the assumption or assignment of an executory contract or unexpired lease, was required to File and serve on counsel for the Proponents, counsel for the Committee and the U.S. Trustee any objection to such assumption by the same deadline and in the same manner established for filing objections to Confirmation, unless the assumption of such executory contract or unexpired lease is the subject of an amendment to **Schedule 6.1,** in which case the deadline is the date that is the later of: (a) seven (7) days after the date of such amendment; or (b) the day that is ten (10) days before the initial Confirmation Hearing. Failure to File and serve any such objection by the applicable deadline shall constitute consent to the assumption and assignment, an acknowledgment that, except as set forth in **Schedule 6.1,** there are no defaults or cure amount claims due under the executory contract or unexpired lease identified for assumption, and that adequate assurance of future performance in connection with the proposed assumption and assignment has been provided.

If an objection to assumption or assignment of an executory contract or unexpired lease has been or hereafter is timely Filed and: (a) a Final Order is entered determining that the executory contract or unexpired lease cannot be assumed or assigned; or (b) the Debtors give notice to the other party to such executory contract or unexpired lease stating that it no longer seeks assumption and assignment of such contract or lease, then the contract or lease shall automatically thereupon be deemed to have been included on **Schedule 6.5,** and rejected pursuant to Section 6.5.

If the Debtors' rejection of an executory contract or unexpired lease pursuant to Section 6.5 gives rise to an Allowed Claim, such Claim shall be classified in Class 5; provided, however,

that: (a) any Claim arising from such rejection which has not been barred by a prior order of the Bankruptcy Court shall be forever barred and shall not be enforceable unless a proof of Claim is Filed within thirty (30) days after the mailing of notice referred to in Section 6.5; and (b) nothing in the Plan shall otherwise constitute a waiver of the Claims Bar Date, if applicable. Nothing in the Plan shall constitute a waiver of any other applicable bar date.

## 4. **Payments Related to Assumption**

Any defaults under each executory contract and unexpired lease to be assumed and assigned under the Plan, shall be cured, pursuant to Bankruptcy Code Section 365(b)(1), by payment of the amount (the "**Cure Amount**"), if any, as set forth in **Schedule 6.1** (or as otherwise agreed by the Reorganized Debtors and the parties to such executory contract or unexpired lease, or as determined by the Bankruptcy Court as provided in a Final Order, if a timely objection is Filed to the assumption), and shall be paid on or as soon as practicable after the Effective Date by the Reorganized Debtors. In the case of a dispute with respect to such Cure Amount set forth in a timely Filed objection to the assumption or assignment, the Reorganized Debtors shall pay such Cure Amount in Cash on or as soon as practicable after entry of a Final Order resolving the dispute, and approving the assumption and assignment.

## 5. **Rejection Generally**

As of the Effective Date, the following executory contracts and unexpired leases shall be rejected, inclusive of any remaining obligations of the Debtors thereunder or under any executory contract or unexpired lease assigned by the Debtors prior to the commencement of the Chapter 11 Cases, respectively: (a) each executory contract or unexpired lease of the Debtors that (i) has not been previously assumed, assumed and assigned, or rejected by Final Order, (ii) is not the subject of a motion pending on the Effective Date to assume or to assume and assign, or (iii) is not being assumed pursuant to Section 6.1 of the Plan; (b) each contract or lease of the Debtors that has expired by its own terms before the Confirmation Date; (c) any purchase orders executed or issued by the Debtors before the commencement of the Chapter 11 Cases, which have not been previously performed, assumed and assigned, or terminated; (d) any contract providing for support, guaranty, contribution, indemnity, and similar obligations unless specifically assumed; and (e) the executory contracts and unexpired leases listed on **Schedule 6.5** to the Plan, which will be Filed with the Plan Supplement and may be amended through the date that is ten (10) days prior to the Confirmation Hearing, on notice Filed by the Debtors and served on the parties affected by such amendments. The listing of a contract or lease by category above, or on **Schedule 6.5** to the Plan, shall not constitute an admission by any party that such contract or lease is an executory contract or unexpired lease, or that the Debtors or the Estates have any liability thereunder, nor shall such listing, the absence of an objection thereto, or Confirmation constitute a finding or determination that any such contract or lease is an executory contract or unexpired lease.

The execution and recording of any document necessary to evidence the rejection of any unexpired lease or executory contract listed on **Schedule 6.5** to the Plan is hereby exempt from

any law or requirement requiring lessor consent or joinder, whether express or otherwise, to such execution or recordation. The Reorganized Debtors or any agent or representative thereof, shall be authorized in the Confirmation Order to serve upon all filing and recording officers a notice in connection with the execution, filing and recording of any document (whether recorded or unrecorded) in accordance with the Plan, to evidence and implement this paragraph, and the Reorganized Debtors shall be deemed to have "attorney-in-fact" power on behalf of any lessor or contract counterparty in respect thereof. The appropriate state or local government filing and recording officers shall be authorized and directed in the Confirmation Order to accept for filing or recording any and all documents to be executed, filed and recorded in accordance with the Plan and the exhibits thereto, without need for lessor or contract counterparty consent or joinder to such execution or recordation, and without the presentation of any affidavits, instruments, or returns otherwise required for recording, other than the Confirmation Order. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the foregoing direction, by contempt proceedings or otherwise.

### 6. Approval of Rejection

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of the executory contracts and unexpired leases as provided for under the Plan pursuant to Bankruptcy Code Sections 365 and 1123(b)(2).

### 7. Objections to Rejection

Any party in interest wishing to object to the rejection of an executory contract or unexpired lease identified for rejection, as provided under the Plan, shall File and serve on counsel for the Proponents, counsel for the Committee, and the U.S. Trustee any objection by the same deadline and in the same manner established for filing objections to Confirmation, unless the rejection is the subject of an amendment to **Schedule 6.5** of the Plan, in which case the deadline is the date that is the earlier of: (a) twenty (20) days after the date of such amendment; or (b) the day that is five (5) days before the initial Confirmation Hearing. Failure to File and serve any such objection by the applicable deadline shall constitute consent to the rejection.

## M. CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1. Conditions to Confirmation

Pursuant to Section 7.1, the Plan shall not be confirmed unless and until the following conditions shall have been satisfied or waived in accordance with Section 7.3 of the Plan:

(a) Either (a) the amount, priority or extent of the Administrative, Priority or Secured claims other than the OMF Prepetition Claims are reasonably satisfactory to OMF, or (b) the Reorganized Debtors, OMF or a designated affiliate shall retain the right to dispute any such claims by filing claim objections within 180 days after of the Effective Date.

(b) The Debtors shall obtain the Confirmation Order in form and substance reasonably acceptable to the Proponents, including, in the event OMSub is the Plan Funder,

findings that the OMF Prepetition Liens are first in priority as to all of the assets of the Debtors and their Estates, including, without limitation, the Property and the proceeds thereof, except with respect to the Secured Mechanic Lien Claims and the Other Secured Claims (which Claims will be satisfied under the Plan), unless to the extent OMF determines, in its sole and absolute discretion, that such findings are not necessary to be included in the Confirmation Order itself, including in the event such findings are embodied in a Final Order other than the Confirmation Order (*i.e.*, the Declaratory Action Order), which other order shall be a Final Order by the Confirmation Date.

(c)     The final version of all of the schedules, documents, and Plan exhibits, including a plan supplement, shall have been filed in form and substance reasonably acceptable to the Proponents.

## 2.     Conditions to Effective Date

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived in accordance with Section 7.3 of the Plan, it being understood that certain of such conditions shall be satisfied at the time the Plan becomes effective:

(a)     All conditions to confirmation in Section 7.1 of the Plan shall have been either satisfied or waived in accordance with Section 7.3 of the Plan.

(b)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Proponents, which order shall be final and non-appealable, and the title company insuring title to the Property for the benefit of the Reorganized Debtors shall have issued the title policy referenced in section 7.2(c) of the Plan no later than February 15, 2012 (or March 15, 2012 in the event OMSub is not the Plan Funder) or such later date as the Proponents may agree.

(c)     The title company insuring title to the Property shall have issued a title policy in favor of the Reorganized Debtors not less favorable than the Title Commitment.

(d)     The title company insuring title to the Property shall have issued a lender's title insurance policy reflecting that the OMF Prepetition Liens (and all related documents, including, without limitation, the Loan Documents) have not been discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order.

(e)     All documents and agreements necessary to implement the Plan on the Effective Date shall have been duly and validly executed and delivered by all parties thereto, all such documents and agreements must be reasonably acceptable to the Proponents.

(f)     The Debtors shall have obtained Final Orders or judgments of the Bankruptcy Court or another court of competent jurisdiction, or obtained such other settlement or resolution acceptable to the Proponents, in their respective sole and absolute discretion, determining or resolving that any Lien or other interest in the Property or any other assets of the

Debtors or their Estates asserted by the Holder of (i) the McDonald's Claim, and (ii) a Judgment Lien Claim (including the FKF 3 Claim) is (a) null and void or avoided in its entirety, (b) subordinate in all respects, including, without limitation, priority, to the OMF Prepetition Liens and any Allowed Secured Mechanic Lien Claims against the Property and therefore to be treated under the Plan as a Class 5 Claim, or (c) not enforceable against the Debtors, Reorganized Debtors or their assets.

(g)     All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement Article IV of the Plan as of the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.  For the avoidance of doubt, approval or acceptance of the Offering Plan by the New York State Department of Law or any other governmental entity shall not be a condition to the occurrence of the Effective Date.

(h)     The Proponents shall jointly file with the Bankruptcy Court a notice of the Effective Date stating that the conditions in the Plan have been satisfied or waived pursuant to Section 7.3 of the Plan, which filing shall be made no later than thirty (30) days after such conditions have been satisfied or waived.

### 3.     Waiver of Conditions

Each of the conditions set forth in Sections 7.1 and 7.2 of the Plan may be waived in whole or in part by the Proponents, provided however, that the conditions set forth in Sections 7.2 (c) and (d) of this Plan may only be waived by the Plan Funder.

### 4.     Effect of Non-Occurrence of Effective Date

If each of the conditions specified in Section 7.2 of the Plan have not been satisfied or waived in the manner provided in Section 7.3 of the Plan on or before the Outside Date or such later date as the agreed to by the Plan Proponents: (i) the Confirmation Order shall automatically be revoked and vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims and Old Equity Interests in the Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to the Claims and Old Equity Interests shall remain unaffected by the Plan and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

### N.     EFFECT OF PLAN CONFIRMATION

### 1.     Binding Effect

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any and all Holders of Claim against, or Old Equity Interests in, the Debtors and all such Holders' respective successors and assigns, whether or not the Claims or Old Equity Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

## 2. Exculpation, Releases and Discharge

(a)     **Exculpation. From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to, or be subject to any right of action by, any and all Holders of Claims or Old Equity Interests, or any other parties in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 7 Cases or Chapter 11 Cases, formulating, negotiating or implementing the Plan, the Disclosure Statement, or any of the transactions contemplated under the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, the Chapter 7 Cases or administration of the Plan, the property to be distributed under the Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 7 Cases or Chapter 11 Cases; provided, however, that this section shall not apply to (i) obligations under, and the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under the Plan, and (ii) any claims or causes of action arising out of willful misconduct or gross negligence as determined by a Final Order.  Any of the Exculpated Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.   For the avoidance of doubt, Slazer Enterprises LLC and the Controlling Members and each of their respective current and former principals, directors, partners, officers, members, managers, agents, affiliates, employees, representatives, counsel and financial advisors are not Exculpated Parties with respect to actions taken or occurring (or omissions not taken or not occurring) before the Relief Date.**

(b)     **Releases by the Debtors. Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and the Reorganized Debtors on its own behalf and as a representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Exculpated Parties of and from any and all Claims and Causes of Action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Old Equity Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are or may be based in whole or part on any act or omission, transaction, event or other circumstance**

taking place or existing on or prior to the Effective Date (including prior to the Relief Date) in connection with or related to any of the Debtors, the Reorganized Debtors, their respective assets, property and/or Estates, the Chapter 7 Cases or the Chapter 11 Cases or the Plan, the Disclosure Statement, or any transactions contemplated under the Plan that may be asserted by or on behalf of any of the Debtors, the Debtors' Estates, or the Reorganized Debtors against any of the Exculpated Parties; provided, however, that nothing in this section shall be construed to release any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order. For the avoidance of doubt, Slazer Enterprises LLC and the Controlling Members and each of their respective current and former principals, directors, partners, officers, members, managers, agents, affiliates, employees, representatives, counsel and financial advisors are not Exculpated Parties with respect to actions taken or occurring (or omissions not taken or not occurring) before the Relief Date.

(c)     Discharge of Claims and Termination of Equity Interests. Except as otherwise provided in the Plan or in the Confirmation Order; all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Old Equity Interests (other than Unimpaired Claims that are Allowed) of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Old Equity Interests.

As of the Effective Date, except for their treatment under the Plan and as otherwise expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Proponents, the Plan Funder, the Plan Administrator or the Reorganized Debtors and their respective assets, property and/or Estates, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a Holder of an Equity Interest, relating to any of the Proponents, the Plan Funder, the Plan Administrator or Reorganized Debtors or any of their respective assets, property and/or Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interest or other rights of a Holder of an Equity Interest and termination of all rights of any Holder of an Equity Interest in any of the Debtors pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Plan Administrator or the Reorganized Debtors, or any of their respective assets, property and/or Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated Equity Interest in any of the Debtors.

3.     Preservation of Litigation Claims

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, as of the Effective Date, the Reorganized Debtors and the Plan Administrator, as set forth in the Plan, shall retain each and every Cause of Action (all of which will vest in the Reorganized Debtors or the Plan Administrator as is appropriate) owned, held or possessed by the Debtors and their Estates immediately prior to the Effective Date whether or not litigation related thereto is pending on the Effective Date, and whether or not any such Cause of Action has been listed or referred to in the Plan or the Disclosure Statement, or any other document Filed with the Bankruptcy Court, and the Debtors, the Debtors' Estates, the Reorganized Debtors and the Plan Administrator shall not be deemed to waive, release, relinquish, forfeit, or abandon (nor shall they be estopped or otherwise precluded or-impaired from asserting) any Cause of Action that constitutes property of the Debtors or their Estates: (a) whether or not such Cause of Action has been listed or referred to in the Plan, the Disclosure Statement, or any other document Filed with the Bankruptcy Court, (b) whether or not such Cause of Action is currently known to the Proponents, and (c) whether or not a defendant in any litigation relating to such Cause of Action Filed a Proof of Claim in the Chapter 11 Cases, Filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan. The Reorganized Debtors and Plan Administrator, as successors in interest to the Debtors and the Debtors' Estates solely with respect to each Cause of Action, and as duly appointed representatives of the Estates pursuant to Section 1123(b) of the Bankruptcy Code, shall have the authority to, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any Cause of Action which has vested in the Reorganized Debtors or Plan Administrator as set forth in the Plan. The Debtors, the Reorganized Debtors and the Plan Administrator expressly reserve all rights to prosecute any Cause of Action against any Entity, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of *res judicata*, issue preclusion, estoppel (judicial, collateral, equitable or otherwise), or laches, shall apply to any such Cause of Action, or operate to waive, eliminate, modify, or release the Cause of Action, upon, after, or as a consequence of the entry of the Confirmation Order or the occurrence of the Effective Date.

4. **Injunction**

**Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors, are permanently enjoined from taking any of the following actions against the Estate(s), any of the Persons or Entities party to the 9019 Agreement the Plan Administrator, the Reorganized Debtors or their respective property, or the Exculpated Parties (solely to the extent of the exculpation set forth in Section 8.2(a) of the Plan), on account of such Claims or Equity Interests: (A) commencing or continuing, in any manner or in any place, any action, or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting any right of setoff or subrogation of any kind, including, without limitation, as a defense to any Cause of Action and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing**

contained in the Plan shall preclude such Persons from enforcing their rights set forth in the Plan, the Plan Supplement or the Confirmation Order.

### 5.  Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 6.  Termination of Subordination Rights and Settlement of Related Claims

The classification and manner of satisfying all Claims and Equity Interests and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class and the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, Section 510(b) of the Bankruptcy Code or otherwise. Subject to the proviso set forth in the last sentence of this Section 8.6, all subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Distribution to be made under the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Accordingly, Distributions under the Plan to Holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

## O.  MISCELLANEOUS PLAN PROVISIONS

THE FOLLOWING IS A SUMMARY OF CERTAIN MISCELLANEOUS PROVISIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1.  Post-Effective Date Retention of Professionals

On the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors and the Plan Administrator will be authorized to employ and compensate professionals and without the need for Bankruptcy Court approval.

### 2.  Bar Date for Certain Administrative Claims

Except as otherwise provided pursuant to the previously ordered Claims Bar Date, all applications for final allowance of compensation or reimbursement of the expenses incurred by any Professional, and all other requests for the payment of Administrative Claims accruing on and after March 3, 2011 (expressly including (a) all requests for the allowance of any Administrative Claim pursuant to Section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in these Chapter 11 Cases accruing on and after March 3, 2011 and (b) all requests for the payment of unpaid obligations incurred by the Debtors in the ordinary course of their business operations but excluding (c) all Claims of any officer of the Debtors retained or compensated pursuant to section 363 of the Bankruptcy Code, which Claims of such officers shall be paid in the ordinary course of business without the need to file requests for allowance), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in the Plan, by the Plan Administrative Claims Bar Date for Administrative Claims (other than Professional Fee Claims) accruing on and after March 3, 2011, and by the Professional Fee Bar Date for Professional Fee Claims accruing at any time. Holders of the OMF Administrative Advances Claim, the OMF Gap Claim, the OMF DIP Funding Claim, and the HFZ DIP Funding Claim shall not be required to file any request pursuant to this Section 10.2 for payment of such Claims. Unless expressly exempted from filing pursuant to this Section 10.2, any request for the payment of an Administrative Claim accruing on and after March 3, 2011 or a Professional Fee Claim accruing at any time that is not timely filed and served by the Plan Administrative Claims Bar Date or the Professional Fee Bar Date, as applicable, shall be discharged and forever barred and the Holder or such Administrative Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such claim. From and after the Effective Date, the Reorganized Debtors shall have sole standing and responsibility for filing objections to and resolving all requests for the allowance of Administrative Claims. The objection deadline for filing any objections to Administrative Claims or Professional Fee Claims shall be the date that is thirty (30) days from the Plan Administrative Claims Bar Date or the Professional Fee Bar Date, respectively. Nothing in this section is intended to allow, or actually allows, any Person to timely File an Administrative Claims that accrued on or prior to March 3, 2011 except in conformity with the previously ordered Claims Bar Date.

### 3.   Effectuating Documents and Further Transactions

Each of the Debtors, the Plan Administrator and the Reorganized Debtors are authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan, including, without limitation, execution and delivery of any mortgages or liens against the Property in connection with the financing or funding of any Distributions under the Plan.

### 4.   Action by Debtors Authorized

Notwithstanding anything to the contrary in the Debtors' organizational documents or the Offering Plan, or such other documents as may be relevant, prior to the Effective Date, the Debtors, including, without limitation, in compliance with Bankruptcy Code section 1142, shall be authorized to execute and deliver any and all documents, and take any and all actions on behalf of the Debtors as are required of the Debtors hereunder or are otherwise necessary to consummate the transactions required under this Plan. Notwithstanding anything to the contrary in the Debtors' organizational documents or the Offering Plan, or such other documents as may be relevant, after the Effective Date, the Plan Administrator shall be authorized to execute and deliver any and all documents, and take any and all actions hereunder or are otherwise necessary to consummate the transactions required under the Plan without the necessity for any approval of the members or mangers of any of the Debtors.

5.      **Exemption from Transfer Taxes**

Pursuant to Section 1146 of the Bankruptcy Code and the Plan, the Confirmation Order shall provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; (b) the creation, assignment, recordation or perfection of any mortgage, deed of trust, lien, pledge or other security interest or other instruments of transfer, including, without limitation, the OMF Prepetition Liens or any other mortgage on the Property executed and delivered by the Reorganized Debtors, the Plan Administrator or any of their designees related to or in connection with the funding or financing the Plan; (c) the making or assignment of any lease or sublease; (d) the creation, execution and delivery of any agreements or other documents creating or evidencing the formation of the Reorganized Debtors or the issuance or ownership of any interest in the Reorganized Debtors, or (e) the making or delivery of any deed or other instrument of transfer under the Plan in connection with the vesting of the Debtors' assets, including, without limitation, the Property and all Causes of Action, in the Reorganized Debtors (or pursuant to Section 4.11 of the Plan, to the Debtors for transfer to the Reorganized Debtors) or the Plan Administrator pursuant to or in connection with the Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, including any transfer, conveyance or sale of the Property and Unit Sales, will not be subject to any stamp tax, filing or recording or other similar tax.

6.      **Payment of Statutory Fees**

All fees payable pursuant to Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

7.      **Amendment or Modification of the Plan**

In accordance with Section 1127 of the Bankruptcy Code, the Proponents may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. Any Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

## 8.     Revocation, Withdrawal or Non-Consummation

The Proponents reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Proponents revoke or withdraw the Plan as to any or all of the Debtors or if confirmation or consummation of the Plan as to any or all of the Debtors does not occur, then, with respect to all Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Old Equity Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or constitute an admission of any sort by the Debtors or any other Person.

## 9.     Notice

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

FKF Madison Group Owner LLC
JMJS 23rd Street Realty Owner LLC
Madison Park Group Owner LLC
Slazer Enterprises Owner LLC
Attn. John Fioretti
P.O. Box 49249
Charlotte, NC, 28277
Tel: (908) 963-3188
Facsimile: (704) 341-0554
Email: jfio@turnaroundadvisorsllc.com

With a copy (which shall not constitute notice) to:

Morris, Nichols, Arsht & Tunnell LLP
Attn: Derek C. Abbott, Esq.
1201 N. Market Street
18th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-9400
Email: dabbott@mnat.com

If to the Plan Funder, OMF, or the Reorganized Debtors:

c/o The Related Companies, L.P.
Attn: Richard O'Toole
Jennifer McCool
60 Columbus Circle
New York, NY 10023
Tel: (212) 801-1000
Facsimile: (212) 801-1036
Email: rotoole@related.com
jmccool@related.com

With a copy (which shall not constitute notice) to:

Haynes and Boone, LLP
Attn: Lenard M. Parkins, Esq.
Lawrence Mittman, Esq.
Trevor R. Hoffmann, Esq.
Jonathan Hook, Esq.
30 Rockefeller Plaza, 26th Floor
New York, New York 10012
Telephone: (212) 659-7300
Facsimile: (212) 884-8211
Email:lenard.parkins@haynesboone.com
lawrence.mittman@haynesboone.com
trevor.hoffmann@haynesboone.com
jonathan.hook@jhaynesboone.com

and


Richards, Layton & Finger, P.A.
Attn: Russell C. Silberglied, Esq.
Zachary I. Shapiro, Esq.
One Rodney Square, 920
Wilmington, Delaware 19801

Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: silberglied@rlf.com
Shapiro@rlf.com

If to the Plan Funder (in the event OMF is not the Plan Funder):


If to the Plan Administrator:

## 10.     Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an Exhibit or schedule to the Plan or any document prepared or executed pursuant to, in connection with or in furtherance of the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

## 11.     Tax Reporting and Compliance

Pursuant to the Plan, the Debtors shall be authorized to request an expedited determination under Section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Relief Date through, and including, the Effective Date.

## 12.     Limitations on Effect of Confirmation

Nothing contained in the Plan will limit the effect of Confirmation as described in Section 1141 of the Bankruptcy Code.

## 13.     Securities Exemption

Any rights issued under, pursuant to or in effecting the Plan, including, without limitation, the New Equity, and the offering and issuance thereof by any party, including without limitation the Proponents and Estates, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for Distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation Section 1145 of the Bankruptcy Code.

## 14.     Controlling Documents

In the event and to the extent that any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence.  In the event and to the extent that any provision of the Plan is inconsistent with any provision of the Confirmation Order, the provisions of the Confirmation Order shall control and

take precedence.

### 15. <u>No Admissions</u>

Notwithstanding anything contained in the Plan or this Disclosure Statement to the contrary, nothing contained in the Plan or this Disclosure Statement shall be deemed an admission by the Proponents or the Debtors with respect to any matter therein or herein, including, without limitation, liability on any Claim or the propriety of a Claim's classification.

## IV. CONFIRMATION OF THE PLAN

### A. <u>CONFIRMATION HEARING</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to Section 1128 of the Bankruptcy Code **will be held on [DATE] (ET),** before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Sixth Floor, Courtroom No. 3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be Filed with the Court, together with proof of service, and served so that they are received **on or before [DATE] at 4:00 p.m. (ET)** by the following parties:

<table>
<tr><td>
Haynes and Boone, LLP<br>
Attn: Lenard M. Parkins, Esq.<br>
Lawrence Mittman, Esq.<br>
Trevor R. Hoffmann, Esq.<br>
Jonathan Hook, Esq.<br>
30 Rockefeller Plaza, 26th Floor<br>
New York, New York 10012<br>
Telephone: (212) 659-7300<br>
Facsimile: (212) 884-8211<br>
Email: lenard.parkins@haynesboone.com<br>
lawrence.mittman@haynesboone.com<br>
trevor.hoffmann@haynesboone.com<br>
jonathan.hook@haynesboone.com
</td>
<td>
Morris, Nichols, Arsht & Tunnell LLP<br>
Attn: Derek C. Abbott, Esq.<br>
1201 N. Market Street, 18th Floor<br>
Wilmington, Delaware 19801<br>
Telephone: (302) 658-9200<br>
Facsimile: (302) 658-9400<br>
Email: dabbott@mnat.com
</td></tr>
</table>

Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all Impaired Classes of Claims and Old Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of Holders of Claims and Old Equity Interests impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

### 1. Acceptance

Claims in Classes 1, 2, and 5 are Impaired under the Plan. As a condition to Plan Confirmation, the Bankruptcy Code requires that each Impaired Class vote to accept the Plan unless the Plan satisfies the "fair and equitable test" (as described below) as applied to such non-accepting Impaired Class. As such, the aforementioned Impaired Classes must accept the Plan in order for it to be confirmed without application of the "fair and equitable test."

The Claims in Classes 1, 2, and 5 are entitled to vote on the Plan. As stated above, Impaired Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims or Old Equity Interests of each such Class (other than any Claims of creditors designated under Section 1126(e) of the Bankruptcy Code) that have timely and properly voted to accept or reject the Plan.

The Other Secured Claims in Class 3 and the Other Priority Claims in Class 4 are not entitled to vote on the Plan because they are Unimpaired under the Plan. As stated above, Holders of Claims that are Unimpaired under the Plan are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

The Old Equity Interests in Class 6 are not entitled to vote on the Plan because they are Impaired under the Plan and the Holders of such Old Equity Interests will not receive or retain any property under the Plan. Accordingly, Holders of Claims in Class 6 are conclusively presumed to have rejected the Plan and are not entitled to vote on the Plan.

### 2. Fair and Equitable Test

The Debtors may seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any Impaired Class of Claims or Old Equity Interests. To obtain such confirmation, they must be demonstrated that the Plan "does not discriminate unfairly" and

is "fair and equitable" with respect to such dissenting Impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

Secured Creditors: Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

In connection with confirmation of the Plan, the Proponents plan to demonstrate that (i) the Holders of Allowed Secured Mechanic Lien Claims and Other Secured Claims will realize the "indubitable equivalent" of such claim, and (ii) on account of the OMF Prepetition Claims, either (a) OMF will retain and be the owner and holder of the OMF Prepetition Indebtedness and the OMF Prepetition Claims, which shall (1) continue to be evidenced and secured by all of the OMF Prepetition Liens, (2) not be discharged, affected, released or otherwise satisfied or impaired by the Plan or the Confirmation Order and shall remain in full force and effect against all of the Reorganized Debtors' assets, including, without limitation, the Property, and (3) not be merged with the ownership of the New Equity, or (b) if OMSub is not the Plan Funder, then OMF's Plan treatment will be the payment in full, in cash, of the OMF Prepetition Claims on the Effective Date.

Unsecured Creditors: Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan. In connection with confirmation of the Plan, the Proponents plan to demonstrate that the Holders of Allowed General Unsecured Claims are not entitled to Distributions under the Bankruptcy Code and to the extent the Plan Administrator Distribution Assets are being Distributed under the Plan, such Distributions are being made as a settlement payment made in connection with the 9019 Settlement. Equity Interest Holders: Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the non-accepting class will not receive or retain any property under the plan. **THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE CRAMDOWN REQUIREMENTS OF**

**SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

> 3.      **Feasibility**

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Proponents believe that the Plan satisfies this requirement.

The payments to be made on or as soon as practicable after the Effective Date under the Plan include payments on account of Allowed Administrative Claims, Allowed Gap Claims, Allowed Priority Tax Claims, OMF Prepetition Claims (if applicable), Secured Mechanic Lien Claims, Other Secured Claims, Other Priority Claims, and General Unsecured Claims. These payments are to be satisfied from the Plan Funding Commitment and the Proponents therefore believe that these payments are feasible without the need for financing that is not contemplated by the New Commitment or a further restructuring.

> 4.      **Best Interests Test and Liquidation Analysis**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), each Holder of an Impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in Chapter 7. The gross amount of cash available for Distribution to creditors would be the sum of the proceeds from the disposition of the Debtors' assets during, and the cash held by the Debtors at the commencement of, their hypothetical Chapter 7 cases. Such amount would then be reduced by the costs and expenses of the liquidation.

The second step in determining whether the Best Interests Test has been met is to apply the available cash and the proceeds from the hypothetical liquidation of the Debtors' assets in accordance with the Distribution hierarchy established by Section 726 of the Bankruptcy Code and to compare the Distribution that would be made to each class of claims and interests in that hypothetical liquidation with the Distribution proposed under the terms of the Plan. Available cash and proceeds from the hypothetical liquidation would be applied to satisfy Claims in the following order of priority: superpriority claims, secured claims, unsecured priority claims, general unsecured claims, subordinate claims, and equity interests.

A liquidation analysis is set forth at "**Exhibit B**" hereto and which projects that in a hypothetical chapter 7 liquidation, there would be a forced sale of the Property. Such a sale would by definition not be a fair market sale and thus would yield a value less than the value of the Property if it were sold in a market sale. Based upon the going concern value of the Property,

the Property has a value less than the OMF Prepetition Claims. Additionally, in a chapter 7 case, additional administrative expenses involved in the appointment of a trustee as well as the trustee's attorneys, accountants and other professionals would accrue. Accordingly, in a chapter 7 liquidation, creditors other than OMF would not receive any recovery, and would not receive a greater recovery than as provided in the Plan.

## V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A. CONTINUATION OF THE CHAPTER 11 CASES

If the Chapter 11 Cases continue, the Debtors could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases.

### B. LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under Chapter 7 of the Bankruptcy Code. In Chapter 7 case, a trustee would be appointed to promptly liquidate the Debtors' assets.

As set forth on Exhibit B hereto, in a hypothetical Chapter 7 liquidation, there would be a forced sale of the Property. Such a sale would, by definition, not be a fair market sale, and thus would yield a value less than the value of the Property if it were sold in a market sale. Based upon the going concern value of the Property, the Property has a value less than the OMF Prepetition Indebtedness. Under a hypothetical chapter 7 liquidation, OMF would not receive more than the going concern value of the Property, and would most assuredly receive less. Further, in a Chapter 7 case, there would accrue additional administrative expenses involved in the appointment of a trustee as well as the trustee's attorneys, accountants and other professionals.

Accordingly, in a chapter 7 liquidation, OMF would receive less on account of the OMF Prepetition Claims than it would receive under the Plan and other creditors would not receive any recovery, or would not receive a recovery greater than that provided for in the Plan.

### C. DISMISSAL

If the Plan is not confirmed, the Chapter 11 Cases could be dismissed. If dismissed, holders of secured Claims including OMF would likely exercise their rights under state law and other creditors would not receive any recovery, or would not receive a recovery greater than that provided for in the Plan.

# VI. RISK FACTORS

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

## A. GENERAL BANKRUPTCY LAW CONSIDERATIONS

### 1. Failure to Obtain Confirmation of the Plan May Result in Liquidation or an Alternative Plan on Less Favorable Terms

Although the Proponents believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with Section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right:  (a) to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 11.7 thereof.  While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under Section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to any Class that may reject or may be deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can be no assurance that any such challenge to the requirements for nonconsensual confirmation will not delay the Debtors' emergence from Chapter 11 or prevent confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into Chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

2.  **Failure of Occurrence of the Effective Date May Result in Liquidation or an Alternative Plan on Less Favorable Terms**

There can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to certain conditions precedent as described in Article VIII of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated. Specifically, section 8.2(c) provides that as a condition to effectiveness, the Debtors must obtain final orders, judgments, settlements, or resolutions acceptable to OMF, the Debtors, and the Plan Funder, in their respective sole and absolute discretion, determining that certain Liens or interests in the Debtors' Property are null and void or subordinate to the OMF Prepetition Liens and therefore treated as a General Unsecured Claim. It is unclear at this time whether the Debtors will be able to obtain the required resolution of all relevant claims and thus, it is possible that the Debtors will be unable to meet all of the conditions to the Effective Date.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Old Equity Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into Chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

B.  **OTHER RISK FACTORS**

1.  **Potential Natural or Other Disasters**

A natural disaster, major weather event, flooding, industrial accident, fire or force majure is a real possibility and must be noted. Any such event could cause damage or a complete casualty to the Property or, at a minimum, could delay sale of the Property for an indeterminate amount of time.

2.  **Possible Terrorist Activity or Other Acts of Violence**

Future terrorist attacks in the United States or other acts of violence may result in either an indirect or direct material adverse effect on the Property. For instance, a terrorist attack could cause a decline in economic activity, which could harm the demand for the Units. Terrorist activities or violence also could directly affect the value of the Property through damage, destruction or loss.

3. **Pending and Future Litigation**

There is, or may be in the future, certain litigation that could result in a material judgment against the Debtors and/or the Property. Litigation and any judgment in connection therewith could have a material negative impact on the Debtors and/or the Property, as applicable, and their respective values, assets and future operations.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

THE FOLLOWING SUMMARY IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS, AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS IN EFFECT ON THE DATE HEREOF. CHANGES IN, OR NEW INTERPRETATIONS OF, SUCH RULES MAY HAVE RETROACTIVE EFFECT AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE IRS OR AN OPINION OF COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT AND WHETHER THE IRS WILL CHALLENGE ONE OR MORE OF THE TAX CONSEQUENCES OF THE PLAN DESCRIBED BELOW. IN ADDITION, THIS SUMMARY DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN, AND IT DOES NOT PURPORT TO ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN TAXPAYERS, BROKER-DEALERS, BANKS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND INVESTORS IN PASS-THROUGH ENTITIES). MOREOVER, THIS SUMMARY DOES NOT PURPORT TO COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY APPLY TO HOLDERS OF CLAIMS OR OLD EQUITY INTERESTS.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A. REGULAR FEDERAL INCOME TAX

Federal income taxes, like many other taxes, are priority claims. Accordingly, such claims must be satisfied before most other claims may be paid. The Debtors do not believe that any federal income taxes accrued with respect to taxable years ending after June 2008 because the Debtors have not had positive taxable income for this period and as limited liability companies, the Debtors' tax attributes are passed to their members.

## B. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS

Holders of Claims and Old Equity Interests should generally recognize gain (or loss) to the extent the amount realized under the Plan in respect of their Claims exceeds or is exceeded by their respective tax bases in their Claims or Interests, as applicable. The amount realized for this purpose will generally equal the amount of cash, and fair market value of the Distribution received under the Plan in respect of their respective Claims.

The tax treatment of Holders of Claims or Old Equity Interests and the character and amount of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan will depend upon, among other things, (i) the manner in which a Holder acquired a Claim or Equity Interest; (ii) the length of time a Claim or Equity Interest has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the holder has taken a bad debt deduction with respect to a Claim in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the method of tax accounting of a holder; and (vii) whether a Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims or Old Equity Interests should consult their own tax advisor for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

The extent to which the consideration received under the Plan by a Holder of Claims will be attributable to accrued interest on the debts constituting the Claims is unclear. Treasury Regulations generally treat a payment under a debt instrument as a payment of accrued and unpaid interest, determined under the Regulations, and then as a payment of principal. If, however, an allocation is reflected in the plan of reorganization, the Report of the House Ways and Means Committee on the Bankruptcy Tax Act of 1980 in discounting bankruptcy reorganizations under Section 368 of the Tax Code indicates that both the debtor and creditor must utilize such allocation. However, the IRS could take the view that consideration received pursuant to a plan of reorganization must be allocated proportionately between the portion of a claim representing principal and the portion of the claim representing interest.

## C. INFORMATION REPORTING AND BACKUP WITH-HOLDING

Certain payments, including the payments of Claims pursuant to the Plan, are generally subject to information reporting by the payor (the Debtors) to the IRS. Moreover, such reportable payments are subject to backup withholding rules, a holder of a Claim may be subject to backup withholding (presently, at a rate of twenty-eight percent (28%)) with respect to

Distributions or payments made pursuant to the Plan, unless the Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Any amounts withheld from a payment under the backup withholding rules will be allowed as a credit against such holder's federal income tax liability and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.

### D.   IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE T AX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## VIII.   CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest Distributions and opportunity for Distributions to Holders of Claims against any of the Debtors. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, the Debtors urge all Holders of Claims entitled to vote on the Plan to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (ET), on [DATE].

Dated: Wilmington, Delaware     Respectfully submitted,
October 31, 2011

**FKF MADISON GROUP OWNER, LLC**

By: Slazer Enterprises LLC, its Manager
   By: Green Bridge Capital S.A., 35% Member
      By: _____
      Name: _____
      Its: _____

   By: Special Situation, S.A., as holder of
      irrevocable voting proxy from Marc Jacobs
      32.5% Member
      By: _____
      Name: _____
      Its: _____

   By: _____
      Name: Ira Shapiro, 32.5% Member

**SLAZER ENTERPRISES OWNER, LLC**

By: Slazer Enterprises LLC, its Sole Member
   By: Green Bridge Capital S.A., 35% Member
      By: _____
      Name: _____
      Its: _____

   By: Special Situation, S.A., as holder of
      irrevocable voting proxy from Marc Jacobs
      32.5% Member
      By: _____
      Name: _____
      Its: _____

   By: _____
      Name: Ira Shapiro, 32.5% Member

**JMJS 23RD STREET REALTY OWNER LLC**

By: Slazer Enterprises LLC, its Manager
   By: Green Bridge Capital S.A., 35% Member
      By: _____
      Name: _____
      Its: _____

   By: Special Situation, S.A., as holder of
      irrevocable voting proxy from Marc Jacobs
      32.5% Member
      By: _____
      Name: _____
      Its: _____

   By: _____
      Name: Ira Shapiro, 32.5% Member

**MADISON PARK GROUP OWNER, LLC**

By: Slazer Enterprises LLC, its Manager
   By: Green Bridge Capital S.A., 35% Member
      By: _____
      Name: _____
      Its: _____

   By: Special Situation, S.A., as holder of
      irrevocable voting proxy from Marc Jacobs
      32.5% Member
      By: _____
      Name: _____
      Its: _____

   By: _____
      Name: Ira Shapiro, 32.5% Member

[SIGNATURE PAGE – DISCLOSURE STATEMENT]

Dated: Wilmington, Delaware
       October 31, 2011                Respectfully submitted,

**FKF MADISON GROUP OWNER, LLC**

By: Slazer Enterprises LLC, its Manager
    By: Green Bridge Capital S.A., 35% Member
        By: _____
        Name: _____
        Its: _____

    By: Special Situation, S.A., as holder of
        irrevocable voting proxy from Marc Jacobs
        32.5% Member
        By: _____
        Name: _____
        Its: _____
By: _____
    Name: Ira Shapiro, 32.5% Member

**SLAZER ENTERPRISES OWNER, LLC**

By: Slazer Enterprises LLC, its Sole Member
    By: Green Bridge Capital S.A., 35% Member
        By: _____
        Name: _____
        Its: _____

    By: Special Situation, S.A., as holder of
        irrevocable voting proxy from Marc Jacobs
        32.5% Member
        By: _____
        Name: _____
        Its: _____
By: _____
    Name: Ira Shapiro, 32.5% Member

**JMJS 23RD STREET REALTY OWNER LLC**

By: Slazer Enterprises LLC, its Manager
    By: Green Bridge Capital S.A., 35% Member
        By: _____
        Name: _____
        Its: _____

    By: Special Situation, S.A., as holder of
        irrevocable voting proxy from Marc Jacobs
        32.5% Member
        By: _____
        Name: _____
        Its: _____
By: _____
    Name: Ira Shapiro, 32.5% Member

**MADISON PARK GROUP OWNER, LLC**

By: Slazer Enterprises LLC, its Manager
    By: Green Bridge Capital S.A., 35% Member
        By: _____
        Name: _____
        Its: _____

    By: Special Situation, S.A., as holder of
        irrevocable voting proxy from Marc Jacobs
        32.5% Member
        By: _____
        Name: _____
        Its: _____
By: _____
    Name: Ira Shapiro, 32.5% Member

[SIGNATURE PAGE – DISCLOSURE STATEMENT]

# EXHIBIT A

## PLAN

# EXHIBIT B

## LIQUIDATION ANALYSIS

# EXHIBIT B
## LIQUIDATION ANALYSIS

| | | Liquidation Value | | Estimated Claims*** | | Chapter 7 liquidation recovery | | Chapter 11 Plan recovery |
|---|---|---|---|---|---|---|---|---|
| | | Low 75% | High 100% | Low | High | Low | High | |
| **Assets:** | Liquidation of encumbered assets (projected market value of Property) | $130,500,000 | $174,000,000 | | | | | |
| | Costs of liquidation of Property (5%) | -$6,525,000 | -$8,700,000 | | | | | |
| | Costs of preserving and maintaining the Property** | -$2,000,000 | -$2,000,000 | | | | | |
| | Net proceeds from liquidation of encumbered assets | $121,975,000 | $163,300,000 | | | | | |
| | | | | | | | | |
| | Liquidation of unencumbered assets* | $374,799 | $846,732 | | | | | |
| | Litigation Claims† | $0 | $0 | | | | | |
| | Gross proceeds from liquidation of unencumbered assets | $374,799 | $846,732 | | | | | |
| | | | | | | | | |
| **Secured Claims:** | Secured Mechanics' Lien Claims | | | $11,000,000 | $12,500,000 | 100% | 100% | 100% |
| | Other Secured Claims | | | $0 | $50,000 | 100% | 100% | 100% |
| | iStar Existing Indebtedness | | | $234,150,573 | $234,150,573 | 52% | 70% | TBD |
| | Total remaining proceeds from encumbered assets | | | $0 | $0 | | | |
| | | | | | | | | |
| **Admin Claims:** | Estimated chapter 7 trustee commission (3%) | | | $3,920,244 | $5,245,402 | >1% | 6% | N/A |
| | Administrative Claims | | | $7,282,900 | $9,282,900 | >1% | 6% | 100% |
| | Total remaining proceeds from unencumbered assets | | | $0 | $0 | | | |
| | | | | | | | | |
| | Total remaining proceeds for other creditors | | | $0 | $0 | | | |
| | | | | | | | | |
| **Priority &** | Priority Claims | | | $2,730,100 | $2,767,100 | 0% | 0% | 100% |
| **Unsecured Claims:** | General Unsecured Claims | | | $160,000,000 | $180,000,000 | 0% | 0% | 2-4% |

* Represents potentially unencumbered assets of the estates based on a review of the Debtors' books and records.

** Includes both operating costs of the building and administrative-related expenses for a 6 month period.

*** These estimates are derived from the Debtors' Schedules and a review of claims actually filed by creditors, and constitute the Debtors' projections of the average range of potentially allowable Claims against the Debtors' Estates. There can be no assurance that actual amounts will not differ significantly from the estimates set forth herein. The projections set forth herein shall not be deemed an admission or waiver by the Debtors as to the amount, validity , priority, or extent any Claims.

† The Debtors have not yet discovered any Litigation Claims against collectable entities of significant value and thus have valued these claims at $0 for the purposes of this analysis.

*A Chapter 7 liquidation would distribute no recovery to unsecured creditors vs. the $6.75 million proposed in Plan.*
*The Plan clearly proposes to distribute more value to every class than would be distributed under a Chapter 7 liquidation.*